**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KICKFLIP, INC., a Delaware corporation, | |
| *Plaintiff,* | |
| v. | C.A. NO. _____ |
| FACEBOOK, INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

**COMPLAINT FOR ANTITRUST VIOLATIONS
AND TORTIOUS INTERFERENCE**

Plaintiff KICKFLIP, INC., a Delaware corporation, d/b/a Gambit, hereby alleges for its complaint against Defendant FACEBOOK, INC., a Delaware corporation, upon personal information as to Plaintiff's own activities, and upon information and belief as to the activities of others, as follows:

## I.   INTRODUCTION

This case arises from Facebook's violations of the United States antitrust laws and from its tortious interference with Gambit's contracts and prospective business opportunities.

Gambit was a leading virtual-currency and payment-processing provider to software developers that published games on Facebook and other social networks.

Social games are usually free to play. So game developers earn money through the sale of "virtual goods" that players can use to improve the game experience. Players acquire virtual goods by spending "virtual currency" that they can buy with real money or earn by viewing advertising or interacting with an in-game advertiser.

Until Facebook violated antitrust laws, game developers turned to a vibrant and competitive market of virtual currency and payment-processing service providers. Gambit's competitors in that market included Super Rewards, Offerpal, TrialPay, and Sometrics. Each offered a wide range of virtual-currency services to social-game developers. They competed

- 1 -

vigorously on service and price. And they were all successful in meeting consumer needs and generating significant revenue.

Then in 2009, Facebook began offering its own virtual-currency services to compete with Gambit and its rivals. But Facebook charged a 30% fee—significantly more than the market rate—yet provided only a narrow range of services. Unsurprisingly, Facebook's virtual-currency services never gained significant market share when competing on the merits.

Instead, Facebook exploited its dominance in the separate market for social-game networks to force its virtual-currency competitors to the sidelines. First, Facebook blacklisted Gambit under the false pretext of maintaining the integrity of its social network. Facebook's next step was to prohibit social-game developers from accessing Facebook's social-game network unless they agreed to only use Facebook's virtual-currency services. Facebook began forcing developers to switch to its services exclusively in 2009 and 2010, thereby systematically excluding alternative virtual-currency services providers like Gambit.

Consequently, Facebook leveraged its dominance in the social-game marketplace to control and dominate the separate market for virtual-currency services.

As the result of Facebook's actions, Gambit's business was destroyed.

Gambit is suing Facebook because Facebook has monopolized the market for virtual-currency services in violation of Section 2 of the Sherman Antitrust Act. In addition, Facebook committed an illegal-tying arrangement in violation of Section 1 of the Sherman Act by requiring social-game developers to use only its virtual-currency service.

Gambit is also suing Facebook because Facebook tortiously interfered with Gambit's contracts and prospective business opportunities with social-game developers in violation of Delaware common law.

Gambit seeks an injunction prohibiting Facebook from continuing to enforce its policy requiring social-game developers as a condition for access to its social-game network to (1) exclusively to use Facebook's virtual-currency services and (2) not use virtual-currency services from other providers like Gambit.

Gambit also seeks money damages caused by Facebook's unlawful conduct, an award of triple those damages, and its attorneys' fees and costs.

## II.  PARTIES

Plaintiff Kickflip, Inc., d/b/a Gambit, is a Delaware corporation with its principal business address at 902 East 5th Street, Suite 201, Austin, TX 78702.

Defendant Facebook, Inc. is a Delaware corporation with its headquarters and principal business address at 1601 Willow Park Road, Menlo Park, California 94205.

## III. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over Gambit's claims arising under the federal Sherman Act, 15 U.S.C. §§ 1 and 2, under 28 U.S.C. § 1331 because those claims arise under the laws of the United States.

This Court has supplemental subject-matter jurisdiction over Gambit's state-law claims under 28 U.S.C. § 1367 because those claims are so related to Gambit's Sherman Act claims that they form part of the same case or controversy.

This Court has personal jurisdiction over Facebook because Facebook is incorporated in Delaware.

Venue is proper in this judicial district under 28 U.S.C. § 1391 because Facebook resides in this District and because a substantial portion of the events or omissions giving rise to Gambit's claims occurred in this district.

## IV. RELEVANT MARKETS

For purposes of Gambit's antitrust claims, the relevant product markets are: A) social-game networks; and B) virtual-currency services. The United States is the relevant geographic market for both of these relevant-product markets.

**A.**     **The market for social-game networks.**

The market for social-game networks includes social networks that offer social games to users. Social games available on a social network like Facebook are distinct from games made

available through other types of marketplaces such as dedicated websites, mobile devices, and stores that sell games for dedicated hardware (*e.g.* a PlayStation video-game console).

Social games offer the player the opportunity to interact briefly but repeatedly with other members of his or her existing social network—*i.e.* friends, family, and coworkers. This contrasts with other kinds of games, for example, console gaming, which offers only interactions with other players connected directly to the console or across a network and does not leverage existing social networks, and MMOs (massively multi-player online games), which offer interactions with other players, but do not leverage existing social networks.

Social games offer the developer an economic model distinct from those offered by games distributed through other game marketplaces. Console games are generally more elaborate and expensive to develop. Their developers derive revenue from game sales directly to consumers. Social games, by contrast, are generally less elaborate and expensive to develop. Social-game developers derive revenue primarily from advertising, or from the in-game purchase of virtual goods. In contrast to standalone games, social-game players and advertisers spend very little on a per-user basis.

So the social-game model is economically viable only when the games are made available to, and ultimately accessed by, a large user base. Unlike other game markets, the social-game network environment offers developers a substantial number of potential game-players, a marketplace through which to reach them, and a mechanism for the widespread distribution and adoption of the games. The market for social-game networks includes Facebook, MySpace, Google+, and other social networks that offer social games to users. Facebook is dominant in the social-game network market.

**B.     The market for virtual-currency services.**

The market for virtual-currency services includes those who offer virtual-currency services, payment-processing services, advertising, and related customer services to social-game developers. These virtual-currency services permit developers to issue virtual currency to game players in exchange for (1) direct payment by credit or debit card, Amazon payment, PayPal

transfer, mobile billing, and other payment methods; (2) participation in third-party advertising offers;[1] or (3) completing predefined tasks.[2] These services also include managing payment processors (*e.g.*, credit card companies, PayPal, and mobile billing companies) and providing customer support to gamers for payment and virtual-currency issues. Currently, the only way for developers to effectively monetize social games is through the use of virtual-currency services— there are no substitutes. The market for virtual-currency services included Gambit, Offerpal, TrialPay, Super Rewards, Sometrics, Facebook, and other competitors.

## V. FACTUAL BACKGROUND ALLEGATIONS

A.   **In 2007, Facebook introduced and promoted its Platform to social-game developers like Gambit.**

In May 2007, Facebook launched its Platform, an collection of application programming interfaces ("APIs") that provide a way for developers to make their applications, including games, available via Facebook, and to access Facebook users' existing social relationships on Facebook's social network.

Facebook has become the dominant social-game network in part because of the businesses like Gambit that invested in and fostered the early virtual-currency services market.

The number of Platform applications on Facebook grew exponentially from zero to more than 700,000 in five years, tracking the exponential growth of Facebook's user base during the same period. Facebook had roughly 50 million monthly active users before the Platform launched in 2007. Since the launch of the Platform, Facebook has grown to one billion monthly active users.

Developing games for Facebook using the Platform presents developers with a unique opportunity to create games in which players can cooperate and/or compete with their real-world

---

[1] Those offers included: (i) signing up for subscriptions (*e.g.,* creating a Netflix account), (ii) applying for credit-cards, (iii) purchasing ringtones, and (iv) shopping with retailers like Macy's, Dell, and 24 Hour Fitness.

[2] Those tasks include, *e.g.*, "human intelligence tasks" such as "identifying objects in a photo or video, performing data de-duplication, transcribing audio recordings or researching data details." Amazon Web Services, Amazon Mechanical Turk, http://aws.amazon.com/mturk.

friends with minimal effort spent signing up or connecting. This is because the players have already signed up for Facebook and established those connections. Game developers like Gambit devised ingenious methods of monetizing their games and began to generate considerable and increasing revenues.

**B.**     **Gambit's business and the competitive market for virtual-currency services.**

The most profitable methods that social-game developers devised to monetize their games all involve selling virtual currency, through any of a variety of payment methods, to users who spend this currency to buy virtual goods and unlock additional features within the games. The largest social-game developer, Zynga, Inc., booked over $1 billion in revenue last year, most of which was generated through sales of virtual currency.

Zynga and other social-game developers attract massive audiences for their games by offering free gameplay. Once a player is engaged, the developer can offer in-game enhancements in exchange for virtual currency, which the player must earn or purchase.

For example in Zynga's popular social game CityVille, available on Facebook, players are given the tools to build and govern their own virtual cities for free. But some of the buildings and features available to upgrade these in-game virtual cities are not free—they must be purchased with Zynga's in-game CityVille cash virtual currency.

In the first few years after Facebook launched the Platform, game developers and other third-party vendors offered players multiple ways to obtain in-game virtual currency. Players could pay real-world cash for virtual currency with a credit card or PayPal account. Or they could complete a pre-defined task in exchange for virtual currency which would be awarded upon completion of the task. These tasks include watching advertisements, filling out surveys, and signing up for new accounts with online and offline services offered by advertisers.

Processing and tracking these various methods of acquiring virtual currency requires relationships with advertisers and payment processors (*e.g.* PayPal and credit-card processing services). And it requires the technology to analyze and dynamically adjust pricing strategies, the

capability to manage and serve campaigns 24-hours a day in real time, and the ability to detect and combat fraud.

With the proliferation of social games that accompanied the launch of the Platform, developers realized that selling virtual currency was a profitable way of monetizing their games. But instead of developing their own virtual-currency systems and relationships with advertisers and payment-processors, most social-game developers remained focused on game development and hired third-party virtual-currency service providers.

As a result, a vibrant and competitive market for virtual-currency services rapidly emerged. By mid-2009 there were at least twenty virtual-currency service providers available to social-game developers.[3]

In 2007, soon after the launch of the Platform, Gambit's founders began developing social games. In 2008 Gambit stopped developing games and focused solely on providing virtual-currency services to social-game developers. This decision to change the direction of Gambit's business proved timely—Gambit quickly became a leading virtual-currency services provider and became increasingly profitable.

Two factors were instrumental to Gambit's success in becoming a virtual-currency services provider. The first is that Gambit supplied better virtual-currency services than competitors by allowing social-game developers to offer more ways for their users to pay for virtual currency, providing more functional analytical and fraud-prevention tools, and reliably delivering these services and customer service. The second factor leading to Gambit's success was the rapid growth of the social-game market.

**C.     Facebook begins its march toward dominance of the market for virtual-currency services.**

The rising profits and growing businesses of Gambit and its virtual-currency services competitors coincided with Facebook's increasingly urgent need for revenue. Facebook

---

[3] Azam Khan, *20 Essential Social Game Monetization Tools that Every Game Should Use*, SOCIALTIMES, Nov. 10, 2010, http://socialtimes.com/the-20-top-social-game-monetization-tools-that-we-reviewed-so-you-dont-have-to_b25657.

recognized the revenue opportunities presented by virtual-currency services and began a deliberate and comprehensive program to enter and dominate the market for virtual-currency services.

In May 2009, after months of preparation, Facebook launched a virtual-currency service for developers called Facebook Credits, which it began testing with a limited selection of game developers.[4] Following that, Facebook systematically expanded the use of Credits on it Platform.[5]

Facebook, following the model used by Apple,[6] charged much higher commissions on its virtual-currency services than Gambit and its competitors. For example, Gambit typically charged game developers a 10-percent fee on transactions using its services while Facebook demanded 30 percent despite providing a much narrower range of services for that fee. As a result, many social-game developers continued to use virtual-currency services provided by third-party providers like Gambit.

**D.   Facebook forced social-game developers to stop using Gambit's virtual-currency services, which ultimately destroyed Gambit's business.**

Throughout 2009, the social-game industry and the market for virtual-currency services continued to expand quickly. Facebook was in the midst of a year-long campaign to monetize its Platform, of which the roll-out of its Credits virtual-currency services was a major component.[7]

---

[4] Justin Smith, *Confirmed: Facebook to Launch Virtual Currency Test in Platform Applications Soon*, INSIDE FACEBOOK, May 12, 2009, http://www.insidefacebook.com/2009/05/12/confirmed-facebook-to-launch-virtual-currency-test-in-platform-applications-soon/; Justin Smith, *Facebook Payments Alpha Test Now Live in 3 Apps*, INSIDE FACEBOOK, June 1, 2009, http://www.insidefacebook.com/2009/06/01/facebook-payments-alpha-test-now-live-in-3-apps/.

[5] Justin Smith, *A Running Summary of Facebook's Virtual Currency Tests*, INSIDE FACEBOOK, Aug. 26, 2009, http://www.insidefacebook.com/2009/08/26/a-running-summary-of-facebooks-virtual-currency-tests/; Eric Eldon, *Facebook's Latest Virtual Currency Test: A "Credits Enabled" App Directory*, INSIDE FACEBOOK, Aug. 31, 2009, http://www.insidefacebook.com/2009/08/31/facebooks-latest-virtual-currency-test-a-credits-enabled-app-directory/.

[6] Justin Smith, *Will Facebook Take a Cue from Apple on Payment Fees for Developers?*, INSIDE FACEBOOK, June 4, 2009, http://www.insidefacebook.com/2009/06/04/will-facebook-take-a-cue-from-apple-on-payment-fees-for-developers/.

[7] Justin Smith, *2009: The Year Facebook's Platform Monetization Efforts Kicked In*, INSIDE

But Facebook realized that it could not compete on the merits in the existing virtual-currency services market because it demanded a fee several times higher than that charged by its competitors.

Part of Facebook's strategy was to get the largest social-game developers to exclusively use its Credits virtual-currency services. In early November 2009, Facebook began talks with the largest developers about adopting Credits.[8] But because the virtual-currency services market was robustly competitive and well-functioning, Facebook had to create a perceived need for an alternative, Facebook-backed virtual-currency service in order to justify its steep 30-percent fee.

Facebook was handed an opportunity when, at around the same time it was initiating those talks with developers, a minor controversy arose over allegedly "scammy" ads and offers in games running on Facebook. Though the purported controversy arose almost entirely as a result of a single online commentator,[9] Facebook exploited it to create the perception that there was a widespread problem that its virtual-currency service could address.

Until early November 2009, Gambit and Facebook had worked together cooperatively to ensure the quality of ads Gambit delivered to social games available on the Platform.

Then, on November 5, 2009, Facebook abruptly halted all communications with Gambit and sent it a cease-and-desist letter purporting to "ban" Gambit services from being used by developers on Facebook.

Facebook also announced publicly that it had "disabled" Gambit and another virtual-currency services provider, preventing them from providing virtual-currency services to social-game developers on Facebook.

---

FACEBOOK, Dec. 30, 2009, http://www.insidefacebook.com/2009/12/30/2009-the-year-facebooks-platform-monetization-efforts-kicked-in/.

[8] Eric Eldon, *Talking to Developers About New Plans for Its Virtual Currency*, INSIDE FACEBOOK, Nov. 25, 2009, http://www.insidefacebook.com/2009/11/25/facebook-talking-to-developers-about-big-new-plans-for-its-credits-virtual-currency/.

[9] Michael Arrington, *Scamville: The Social Gaming Ecosystem of Hell,* TECHCRUNCH (Oct. 31, 2009), http://www.techcrunch.com/2009/10/31/scamville-the-social-gaming-ecosystem-of-hell/.

Facebook's public relations and legal departments were quoted in a November 19, 2009 article published by Inside Facebook, an influential blog among members of the social media industry, as saying that Gambit was "banned from Facebook." Facebook also broadly asserted, "Gambit cannot be directly or indirectly involved in any activity on Facebook or provide services or ads to developers running applications on the Facebook Platform. If we find their ads running in applications, we will take appropriate action."

Facebook again called on developers to boycott Gambit on November 25, 2009, when it published on its Developers blog a list of "banned" "monetization providers" that included Gambit, and instructed developers to "refrain from using any monetization provider listed here."

At the time Facebook took these actions, Gambit was the second-largest virtual-currency services provider and widely recognized as one of the most ethical firms in the industry.[10] Gambit aggressively monitored ads and offers running in its system and quickly responded to any concerns raised by Facebook.

Rather, Facebook targeted Gambit because it wanted to tarnish the reputation of Gambit and the virtual-currency industry to create the perception that Facebook needed to step in with a "safe" alternative to allegedly problematic virtual-currency services provided by others. Gambit, widely recognized as one of the "good guys" in the industry who did not use such ads, did not fit with the storyline Facebook wanted to foster, so Facebook used the "scamville" controversy as a pretext to destroy Gambit's relationships with developers and preemptively eliminate Gambit from the market.

The boycott organized by Facebook succeeded in driving Gambit's virtual-currency services out of all business on Facebook. As a result of Facebook's demands, most of the clients and prospective clients for Gambit's virtual-currency services, including Zynga, Playdom, and 6waves, ceased doing business with Gambit.

---

[10] *See, e.g.* Michael Arrington, *Scamville Shakeout: Was Gambit The Right Fall Guy?*, TECHCRUNCH, July 23, 2012, http://techcrunch.com/2009/11/24/scamville-gambit-superrewards-facebook-zynga/

At the same time, Facebook was courting those developers to adopt its own virtual-currency services. The press reported that Facebook was "planning a major roll-out of Credits to third-party apps" made by these developers.[11] And at least one major developer, CrowdStar, had already launched one of its major games, Happy Island, "with Credits as the exclusive method of payment for virtual goods."[12]

In early 2010, Facebook's march toward dominance in the virtual-currency services market was accelerating as Facebook hired more people to fill out the payments team headed by its new payments Product Management Director so it could handle this "revenue growth area."[13] Rumors began to swirl that "Facebook will force all third-party developers to adopt Credits."[14]

As a precursor to that step, in May 2010, Facebook finally succeeded in coercing major developers like Zynga to adopt its Credits virtual-currency services.[15] Zynga initially refused to accede to Facebook's demands—because, after all, Facebook charged substantially more than Zynga's other providers.

In response, Facebook threatened that it would "shut down Zynga's games altogether."[16]

As a testament to Facebook's enormous market power, Zynga was forced to cave and agreed to transition to the exclusive use of Credits. Zynga subsequently publicly disclosed that

---

[11] Eric Eldon, *CrowdStar Launches Social Tourism Game Happy Island, Using Only Facebook Credits*, INSIDE SOCIAL GAMES, Dec. 15, 2009, http://www.insidesocialgames.com/2009/12/15/crowdstar-launches-virtual-tourism-game-happy-island-using-only-facebook-credits/.

[12] *Id.*

[13] Eric Eldon, *Facebook is Building a New Payments Operations Team*, INSIDE FACEBOOK, Jan 7, 2010, http://www.insidefacebook.com/2010/01/07/facebook-is-building-a-new-payment-operations-team/.

[14] *Id.*; Eric Eldon, *Facebook's Increasing Focus on Credits Prompts Developer Speculation*, INSIDE FACEBOOK, Feb. 18, 2010, http://www.insidefacebook.com/2010/02/18/facebooks-increasing-focus-on-credits-prompts-developer-speculation/.

[15] Michael Arrington, *Zynga Gunning Up (And Lawyering Up) For War Against Facebook With Zynga Live*, TECHCRUNCH, May 7, 2010, http://techcrunch.com/2010/05/07/zynga-gunning-up-and-lawyering-up-for-war-against-facebook-with-zynga-live/.

[16] Leena Rao, *Central To The Facebook-Zynga Deal: Credits*, TECHCRUNCH, May 18, 2010, http://techcrunch.com/2010/05/18/central-to-the-facebook-zynga-deal-credits/.

Facebook forced it to switch to Credits, Zynga was harmed as a result, and that Zynga had no choice but to comply because of Facebook's dominance and control over the social-game network market.

Facebook forced similar arrangements other large developers, such as Playdom, Playfish, and CrowdStar.[17]

**E.**   **Facebook's next step in eliminating competition in the market for virtual-currency services was to make Credits mandatory.**

By the end of 2010, Facebook had cleared away major developer resistance and established a pretext based on a purported need to clean up the virtual-currency services industry. As a result, Facebook was positioned to take the final step in its march toward dominance in the virtual-currency services market by making Credits the mandatory and exclusive virtual-currency service for all social-games on Facebook.

So, in January 2011 Facebook told all social-game developers that as of July 2011 they would be required exclusively to use Credits as a condition on their access to Facebook's Platform and the valuable Facebook social-game marketplace.

Facebook's stated purpose for the policy change was to provide players with a safe and simple user experience and developers with improved monetization. Game developers were skeptical of Facebook's claimed purpose but had to accept Facebook's demand because Facebook controlled the dominant social-game network.[18]

The developers' skepticism and resistance were warranted—whatever purported benefits they received by using Facebook's mandatory and exclusive virtual-currency services, they were not worth paying Facebook's 30% fee.[19] The developers—the direct consumers of the virtual

---

[17] *Id.*

[18] Jason Kincaid, *Facebook to Make "Facebook Credits" Mandatory for Game Developers (Confirmed)*, TECHCRUNCH, Jan. 24, 2012, http://techcrunch.com/2011/01/24/facebook-to-make-facebook-credits-mandatory-for-game-developers/.

[19] Eric Eldon, *Facebook's Increasing Focus on Credits Prompts Developer Speculation*, INSIDE FACEBOOK, Feb. 18, 2012, http://www.insidefacebook.com/2010/02/18/facebooks-increasing-focus-on-credits-prompts-developer-speculation/.

currency services previously provided by Gambit and its competitors—lost money and were harmed because Facebook forced them to use Credits.

Gambit is also harmed because Facebook's monopolization and illegal tying of the virtual-currency market entirely foreclosed Gambit (and its former competitors) from the market and effectively shut down the competitive marketplace. Gambit has suffered lost profits since Facebook banned it as a step in its monopolistic scheme.

Facebook set out systematically to destroy competition in the market for virtual-currency services. Facebook succeeded. And Gambit, Gambit's game-developer customers, and ultimately consumers, were harmed as a result.

## VI. FIRST CAUSE OF ACTION
## ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C. § 2

Gambit incorporates Paragraphs 1–63 of its Complaint by reference.

Facebook has engaged in illegal attempted monopolization of the market for virtual-currency services in violation of § 2 of the Sherman Act.

**A.    Facebook's conduct in making Credits the exclusive virtual-currency services for Platform developers was unjustly anticompetitive.**

Facebook's monopoly power in the market for social-game networks does not exempt its conduct in the virtual-currency services market from the antitrust laws. If Facebook wants to win a monopolist's share of the virtual-currency services market, it must do so as it did in the upstream markets: through competition on the merits.

Leveraging Facebook's monopoly power in the market for social-game networks to effect a ban of Gambit from the virtual-currency services market and compel developers to use Credits was not competition on the merits. These anticompetitive practices are inexcusable shortcuts that, in conjunction with the following elements, give rise to antitrust liability for attempted monopolization.

**B.    Facebook specifically intended to monopolize the market for virtual-currency services.**

Although direct evidence of specific intent to monopolize is rarely available, especially prior to discovery, specific intent may be inferred from a defendant's anticompetitive conduct.

In this case, Facebook's intent is evident from its comprehensive campaign to monopolize the virtual-currency services market. Facebook spent much of 2009 ramping up its Credits virtual-currency services, but was unable to gain market share competing on the merits. When the "scamville" opportunity presented itself, Facebook tarnished Gambit's reputation and orchestrated a developer boycott of Gambit by refusing access to Facebook's social-game network to any developer using Gambit's virtual-currency services.

After Facebook eliminated a "clean" virtual-currency provider (Gambit) whose business was inconsistent with its pretextual explanation about widespread industry issues with ads and offers, Facebook then coerced the largest developers to adopt Credits. Finally, with these obstacles removed, Facebook was able to make Credits the mandatory and exclusive virtual-currency service available on Facebook.

Not only did Facebook's contract terms with developers make Credits the exclusive virtual-currency services for social games published on the Platform, they also prohibited developers charging players less for virtual currency when using another virtual-currency services provider on a competing platform. This last term effectively hamstrings any attempts developers might make to migrate players away from the Facebook version of their games, where they would actually have the opportunity to hire a competing virtual-currency services provider. The opportunistic and malicious attack on Gambit, the coercion of large developers, and the onerous nature of Facebook's developer terms and conditions are, when viewed in light of the availability of reasonable less restrictive alternatives to accomplish the stated goal of a safe and seamless user experience (see below), strong circumstantial evidence of Facebook's specific intent to monopolize the market for virtual-currency services.

**C.      If Facebook has not already monopolized the market for virtual-currency services, there is a dangerously high probability that it will.**

Facebook now has a monopoly share of the virtual-currency services market. But after Facebook banned Gambit—before Facebook attained its monopoly share of this market—Facebook's actions reflected an intent to remove competition from the market for virtual-

currency services and created a dangerous probability that Facebook would monopolize the market for virtual-currency services.

And after Facebook banned the remaining competitors in the market for virtual-currency services, its share of the market became sufficient to establish as a matter of law a dangerous probability that Facebook would monopolize the market for virtual-currency services. This is especially evident given the high barriers to entry in this market due to network effects and switching costs, and the inability of competitors to expand output.

Network effects prevent competing social-game networks from gaining market share. It is easier for Facebook to simultaneously attract both new users and new game developers than it is for competing social-game networks (such as the Google+ social-game network) which have fewer users and fewer game developers.

Users want to be on a social-game network that has both a large number of other users, including friends, and a large number of available games. The more users there are on a social network offering a full slate of social games, the more likely it is that any given user will have a significant number of friends also playing games on that social network, and hence the more likely it is that the consumer will be able to enjoy the unique benefits of social games on that social network.

And Developers want to create games for a social network that has a larger number of users because more users means more potential players, and more players means greater economic potential for the developer's games.

Thus, in order for a social-game network with fewer users and fewer games to compete with Facebook, it must simultaneously increase its user-base and increase the number of available games. Because Facebook has a far greater number of users than competing social networks (*e.g.*, Google+), network effects ensure that consumers will continue to prefer games developed for Facebook over games developed for competing social networks, and developers will continue to prefer to develop games for Facebook rather than for another social network.

Additionally, switching costs prevent competing social networks from gaining market share because the users that are already on Facebook's social network have invested time and energy establishing their connections on that social network and would need to replicate that effort in order to effectively switch to a competing social network. (And that effort might be futile anyway—each other social network has a much smaller user base than Facebook, so it is unlikely that all of a user's connections will be available following a switch.)

Similarly, developers who have invested in development on the Facebook Platform are less willing to make an equivalent investment in time and effort to learn to utilize a competing platform, particularly one that does not offer ready access to the large number of users available through Facebook.

Competitors cannot expand output in the market for virtual-currency services because they are banned from Facebook. Facebook has conditioned access to its large user-base on use of its virtual-currency services, and thereby made it impossible for any other virtual-currency services provider to enter the market without also offering developers a large user-base. Thus, to compete with Facebook's Credits, a competitor must enter both the upstream market for social-game networks and the market for virtual-currency services. There are currently no firms that can enter both markets, so there are no firms that can enter the virtual-currency services market to impose price-discipline on Facebook.

Any purported procompetitive justification Facebook might raise to rationalize this anticompetitive conduct will fail because it is pretextual or the conduct is unjustifiable given the availability of reasonable less restrictive alternatives, or both.

Facebook claims it forced developers to exclusively use Credits as a condition for use of its social-game network in order to create a safe and seamless user experience. These goals could have been accomplished reasonably by meaningful enforcement of Facebook's third-party Ad Guidelines and by competition on the merits. Enforcement of the Ad Guidelines would protect users from inappropriate ads, and if Facebook's Credits were in fact superior to competing virtual-currency services, the market would bear that out.

Instead, Facebook deliberately chose the most draconian means possible to accomplish its stated goal by electing to insert itself into Gambit's business relationships with social-game developers and, in effect, put Gambit out of business. Facebook arbitrarily and gratuitously singled out Gambit in addition to certain advertisers, while leaving other virtual-currency services providers, advertisers and developers untouched; but it was the advertisers who created the ads and offers, and the developers who used them, who were ultimately responsible for putting them on Facebook.

Facebook's actions were not motivated by a desire to maintain the quality of content on its website (in fact, Facebook itself published ads that violated its stated policies), but rather by an anticompetitive animus towards Gambit because Gambit represented an obstacle to the forced adoption of Facebook's own virtual-currency service.

Facebook was motivated to eliminate competitors to its own virtual-currency services, not because of alleged problems with non-compliant ads, but because it intended to monopolize the market for virtual-currency services and claim for itself the revenues virtual-currency services providers earned through their pioneering work in that market.

Facebook's actions were arbitrary and heavy-handed in a number of ways that undermine any claim that its conduct was reasonable. Facebook's obvious intent was to monopolize the market to reap monopoly rents, not to create a "safe and seamless" user experience.

**D.    Facebook's attempts to monopolize the market for virtual-currency services inflicted antitrust injury on Gambit.**

But for Facebook's unjustified refusal to allow on Facebook any games running Gambit's virtual-currency services, and its banning of all virtual-currency services providers other than itself, Gambit would have continued to be a leading provider of virtual-currency services to social-game developers. Thus, Facebook illegally attempted to monopolize the market for virtual-currency services and precluded Gambit from the share of revenues it should rightfully have earned in this market.

For all of the foregoing reasons, Facebook has engaged in illegal attempted monopolization in violation of § 2 of the Sherman Act and is liable to Gambit for damages in an amount to be determined at trial.

## VII.   SECOND CAUSE OF ACTION
## ILLEGAL MONOPOLIZATION UNDER 15 U.S.C. § 2

Gambit incorporates Paragraphs 1–88 of its Complaint by reference.

Facebook has acquired monopoly power in the market for virtual-currency services through the anticompetitive conduct described above and in so doing has inflicted substantial antitrust injury on Gambit, in violation of § 2 of the Sherman Act.

**A.**   **Facebook possesses monopoly power in the relevant market for virtual-currency services.**

Facebook's ability to control prices and exclude competition in the market for virtual-currency services is direct evidence of its monopoly power. Facebook charges a 30 percent commission on Credits, while competing virtual-currency services charged as little as 5 percent in exchange for a much wider range of services. And as a result of Facebook's coercion of game developers, it has essentially destroyed an entire competitive marketplace for virtual-currency services.

Circumstantial evidence also indicates that Facebook has monopoly power in the virtual-currency services market. Ninety percent of virtual currency transactions on social-game networks occur on the games played on Facebook. And under its terms and conditions effective as of July 2011, Facebook is the sole virtual-currency services provider for all social games offered on Facebook. Therefore Facebook effectively controls 90 percent of the virtual-currency services market, sufficient to establish monopoly power as a matter of law.

Unless a competing social-game network emerges as a credible threat to Facebook, which is unlikely given Facebook's dominant position in that market and the entry barriers due to network effects and switching costs that insulate it from competition in that market, Facebook's contractual exclusion of all competing virtual-currency services providers will indefinitely secure its monopoly power in the virtual-currency services market.

**B.**    **Facebook willfully acquired and maintained its monopoly power in the market for virtual-currency services.**

Facebook concededly gained a monopoly in the market for social-networks through competition on the merits, which, in turn, gave it a monopoly in the social-game-network market. But Facebook abused this market power to gain a monopoly in the virtual-currency services market.

Facebook exploited its dominance in the social-game network market to obtain control over the distinct virtual-currency services market by forcing social-game developers to not use services provided by Gambit and its competitors, but only Facebook's Credits virtual currency.

Facebook's anticompetitive conduct in orchestrating a boycott of Gambit and eviscerating the remaining competition by requiring social-game developers on its Platform to use Credits reflects a willful acquisition and maintenance of monopoly power.

Furthermore, as set forth previously, any purported procompetitive justification Facebook might raise to rationalize this anticompetitive conduct will fail because it is pretextual or the conduct is unjustifiable given the availability of reasonable less restrictive alternatives, or both.

**C.**    **Facebook's illegal monopolization inflicted antitrust injury on Gambit.**

But for Facebook's unjustified refusal to allow on Facebook any games using Gambit's virtual-currency services, Gambit would have continued to be a leading provider of virtual-currency services to social-game developers. Thus, when Facebook completed its illegal monopolization of the market for virtual-currency services, it precluded Gambit from the share of revenues in this market it would rightfully have earned.

For all of the foregoing reasons, Facebook has engaged in illegal monopolization of the market for virtual-currency services in violation of § 2 of the Sherman Act and is liable to Gambit for damages in an amount to be determined at trial.

### VIII.   THIRD CAUSE OF ACTION
### ILLEGAL TYING UNDER 15 U.S.C. § 1

Gambit incorporates Paragraphs 1–99 of its Complaint by reference.

When Facebook imposed its exclusive Credits policy on social-game developers, making them use "[Credits] as their sole and exclusive payment method for all virtual goods and currencies made available to users,"[20] it engaged in an illegal tying arrangement.

This tying arrangement serves no legitimate purpose. Rather, it was put into effect by Facebook to capture a monopoly in the market for virtual-currency services and extract supracompetitive fees from this market.

Facebook has sufficient power in the market for social-game networks to restrain competition unreasonably in the market for virtual-currency services, and by tying access to its social-game network to the use of Credits, Facebook has unjustly diverted hundreds of millions of dollars from developers and virtual-currency services providers.

Accordingly, Facebook has engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Facebook's conduct or its purported justifications.

But even a detailed analysis of Facebook's Credits tying arrangement would demonstrate that it violates the rule of reason and is illegal.

**A.**    **Facebook has imposed a *per se* illegal tying arrangement.**

**1.**    **Facebook has sufficient power in the market for the tying product (social-game networks) to restrain competition unreasonably in the tied product market (virtual-currency services).**

The tying product in this case is Facebook's social-game network. The relevant market for this product is the market for social-game networks in the United States. In this market, social networks offer platforms upon which developers can build social games, and a marketplace where users can acquire social games. A distinctive feature of the social games developed for social networks is that they utilize data input by users, most notably their connections with friends who also use the underlying social network. The access to social networks is valuable to developers because the games they create can reach a large and growing installed base of users.

---

[20] Facebook.com, Facebook Platform Policies, https://developers.facebook.com/policy/.

The games created by developers are valuable to social networks because those games attract users, which in turn allows the social network to attract and charge advertisers who want to reach those users.

Social games are distinct from other games because players can cooperate or compete with one another without having first to invest money to buy into the underlying game and invest time to find and connect with their friends. These investments of money and time, required of players of games that are *not* published on a social-game platform, prevent non-social games from reaching a critical mass of adoption that makes unique social features possible. Thus firms that wish to reap the unique benefits of developing social games, including the potential to market the games virally and to monetize them successfully by selling virtual goods, must develop their games to be published on a social-game network.

As described in more detail above, Facebook's social-game network enjoys 90-percent market share in the market for social-game networks, and there are high barriers to entry in this market due to network effects and switching costs.

The tied product (virtual-currency services) is distinct from the tying product (social-game networks) because, when given the choice, developers prefer to shop for virtual-currency services independently of their decision to develop games for a particular social network. This was demonstrated by the vibrant and competitive market for virtual-currency services providers that existed before Facebook engaged in the tying arrangement giving rise to this action. Additionally, while Facebook's tying arrangement bundled the tying product and the tied product for games offered on Facebook, to the limited extent social games are available outside of Facebook, virtual-currency services are available separately from access to other social-game networks.

By tying access to its social-game network to Credits—and by forcing social-game developers to not use virtual-currency services from any other provider—Facebook has clearly and unreasonably restrained trade. Its conduct eliminated competition for virtual-currency services and caused third-party virtual-currency services providers, like Gambit and its

competitors, to lose hundreds of millions of dollars in revenue because their customers were forced to use Credits instead.

2.    **Facebook's illegal tying arrangement affects a substantial amount of interstate commerce.**

By forcing developers to use only its Credits virtual-currency services, Facebook has precluded third-party virtual-currency services providers from offering their services to social-game developers on Facebook. The effect of this conduct on interstate commerce has been substantial. In 2011, for example, with Credits mandatory for developers for only half the year, Facebook earned $557 million from its virtual-currency services.

This tying arrangement had a substantial negative impact on Gambit, which as a leading provider of virtual-currency services prior to Facebook's illegal conduct stood to make hundreds of millions of dollars from the growing market for virtual-currency services. And it also had a negative impact on Gambit's competitors, competition, and ultimately consumers. By foreclosing the ability of companies that publish social games on Facebook to obtain virtual-currency services other than Credits, Facebook is able to charge a supracompetitive price that harms social-game developers and ultimately harms the consumers who play their games.

B.    **Facebook's tying arrangement is also illegal under the rule of reason.**

If the Court finds that Facebook's tying of access to its social-game network to Credits is not *per* se illegal, it still violates Section 1 of the Sherman Act under the "rule of reason."

The restraints on trade imposed by Facebook are unreasonable. It is immediately evident there is less competition in the market for virtual-currency services now than there was before Facebook's tying arrangement went into effect because competing virtual-currency services providers have been foreclosed from the market, and the price developers pay Facebook for those services has increased dramatically. Moreover, by imposing the condition that social-game developers "may not incentivize logged-in Facebook users to make a purchase on your website or in an app on another platform by, for example, providing free or discounted goods or services

that are not available to purchasers on Facebook," Facebook reduced competition in the market for social-game networks.[21]

As discussed above, the tying market for social-game networks is distinct from other means through which other types of games are made available to users, such as dedicated websites, mobile devices, and stores that sell games that require consoles. A principal reason for this is that social games differ in material ways from games made available through other types of marketplaces. Thus, social-game networks are not interchangeable with marketplaces for other types of games.

With a 90-percent share of the social-game network market (see above), Facebook has market power and has used it to foreclose competition in the market for virtual-currency services and thereby unreasonably restrain trade. Facebook has conditioned access to its network on developers' use of Facebook's virtual-currency services and thereby eradicated an entire competitive market. Facebook's ability to impose a substantial increase by demanding a 30% share of all transactions is direct evidence of the anticompetitive effect on developers. Social-game consumers also likely experienced price increases in the form of higher prices for virtual goods and lower quality.

As discussed above, Facebook has offered procompetitive justifications for its conduct (*e.g.,* the need for a safe and seamless user experience), but these justifications fail because, as discussed above, there are reasonable, less restrictive alternatives available that would address Facebook's alleged justifications.

**C.     Facebook's illegal tying inflicted antitrust injury on Gambit.**

But for Facebook's unjustified refusal to allow on Facebook any games using Gambit's virtual-currency services, and but for Facebook's tortious interference with Gambit's contracts and prospective business opportunities, as set forth below, Gambit would have continued to be a leading provider of virtual-currency services to social-game developers. Thus, when Facebook

---

[21] Facebook.com, Facebook Developer Payments Terms, http://developers.connect.facebook.com/policy/credits/.

imposed its illegal tying arrangement on developers, it precluded Gambit from the share of the revenues in this market it would rightfully have earned.

As the foregoing considerations demonstrate, Facebook has engaged in an illegal tying arrangement in violation of § 1 of the Sherman Act and is liable to Gambit for damages in an amount to be determined at trial.

## IX. FOURTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### DELAWARE COMMON LAW

Gambit incorporates Paragraphs 1–119 of its Complaint by reference.

Facebook's intentional conduct in inducing social-game developers, some of which it knew or reasonably should have known had contracted with Gambit for the provision of virtual-currency services, to abrogate their contractual relations with Gambit substantially damaged Gambit in violation of Delaware's common law.

A.    **Gambit states a _prima facie_ case of intentional interference with contractual relations.**

There existed several valid contracts between Gambit and third-party social-game developers.

Facebook demonstrated knowledge of these contractual relations on November 19, 2009 when it told reporters from Inside Facebook, "Gambit cannot be directly or indirectly involved in any activity on Facebook or provide services or ads to developers running applications on the Facebook Platform. If we find their ads running in applications, we will take appropriate action."

Facebook again demonstrated knowledge of these contractual relations on November 25, 2009 when it posted to its Developers blog a list of "banned" "monetization providers" that included Gambit, and instructed developers to "refrain from using any monetization provider listed here." Facebook would not have issued these statements if it was unaware that Gambit had relationships with social-game developers, and must have reasonably known that these relationships were memorialized in contracts.

Moreover, by issuing these statements Facebook engaged in intentional acts that were significant factors in causing developers to terminate their contractual relations with Gambit.

Because of these statements, several of Gambit's clients including Zynga, Playdom, and 6waves, ceased their contractual relations with Gambit.

Losing so many of its contractual relations with clients caused substantial damages to Gambit, forcing it to abandon the virtual-currency services industry and ultimately close its business.

**B.      Facebook's conduct was unjustified.**

While Facebook has a right to control access to and police the contents of its website, it has no right to control the third parties with whom the developers that access its Platform contract. Facebook's actions went far beyond exercising its right to control its own website—Facebook affirmatively took steps to disrupt Gambit's contracts with developers.

Facebook's actions were arbitrary and heavy-handed in a number of ways that undermine any claim that its conduct was "fair and reasonable under the circumstances," a necessary condition of invoking privilege to defeat a *prima facie* case of tortious interference. First, Facebook could have adopted far less restrictive means to accomplish its stated goal of eliminating non-compliant ads and offers. Instead it deliberately chose the most draconian means possible to accomplish that goal by electing to insert itself into the contractual relationships between Gambit and social-game developers and ultimately put Gambit out of business. Second, Facebook arbitrarily singled out Gambit as opposed to the advertisers that provided offending offers or the social-game developers to whose games those offers were delivered. It was these developers that were the parties ultimately responsible for the offending offers being run on Facebook, yet Facebook publicly attacked Gambit alone while leaving others unaffected. Third, Facebook did not take action with respect to most of the virtual-currency services providers that competed with Gambit even though those other providers were directly implicated in providing offending offers to games on Facebook. Fourth, Facebook's actions were not motivated by a justifiable desire to keep its website free of non-complaint ads and offers—in fact, Facebook itself ran ads that did not comply with its stated policies—but rather by an anticompetitive animus towards Gambit because Gambit represented a major competitor for Facebook's own

Credits virtual-currency service. Fifth, Facebook was motivated to eliminate competitors to its own virtual-currency services, not because of problems with non-compliant ads, but because it intended to monopolize the market for virtual-currency services.

For all of the foregoing reasons, Facebook has engaged in intentional interference with Gambit's contractual relations in violation of Delaware common law and is liable to Gambit for damages in an amount to be determined at trial.

## X.  FIFTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITIES
## DELAWARE COMMON LAW

Gambit incorporates Paragraphs 1–130 of its Complaint by reference.

Facebook's intentional conduct in inducing social-game developers, some of which it knew or reasonably should have known had contracted with Gambit for the provision of virtual-currency services, to abrogate their prospective economic relationships with Gambit substantially damaged Gambit in violation of Delaware's common law.

**A.     Gambit can state a *prima facie* case of intentional interference with prospective economic advantage.**

There existed economic relationships between Gambit and third party social-game developers, which, absent Facebook's conduct, would have bestowed future economic benefits to Gambit.

Facebook's conduct in issuing statements to the press and on its Developers blog indicated that it was aware of these economic relationships.

Facebook's conduct in issuing these statements amounted to intentional acts designed to induce disruption of these economic relationships.

Furthermore, Facebook's conduct had the improper anticompetitive motive and effect of putting Gambit, its competitor in the market for virtual-currency services, out of business so that Facebook could go on to illegally monopolize this market with its Credits service.

After Facebook issued these statements, most of Gambit's prospective clients severed their relationships with Gambit, eliminating Gambit's prospect of deriving future economic benefits from these relationships.

When the chance of gaining future revenues in the market for virtual-currency services vanished, Gambit was forced to abandon the market and suffered substantial financial damages as a result.

**B.      Facebook's conduct was unjustified.**

While Facebook has a right to control access to and police the contents of its website, it has no right to control what third parties the developers that access its Platform conduct business with. Facebook's actions went far beyond exercising its right to control its own website; Facebook affirmatively took steps to disrupt Gambit's economic relationships with developers.

Facebook's actions were arbitrary and heavy-handed in a number of ways that undermine any claim that its conduct was "fair and reasonable under the circumstances", a necessary condition of invoking privilege to defeat a prima facie case of tortious interference. See Paragraph 129, above.

For all of the foregoing reasons, Facebook has engaged in intentional interference with Gambit's prospective economic advantage in violation of Delaware common law and is liable to Gambit for damages in an amount to be determined at trial.

## XI. DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of this action.

## XII.    PRAYER FOR RELIEF

1.   WHEREFORE, Plaintiff Kickflip, Inc., d/b/a Gambit, asks this Court to enter judgment against Defendant Facebook, Inc., and against its subsidiaries, affiliates, agents, servants, employees and all persons in active concert or participation with them, granting the following relief:

A.      A judgment or order declaring Facebook's conduct, as alleged, unlawful under § 1 of the Sherman Act;

B.      A judgment, order, or award of damages adequate to compensate Gambit for Facebook's illegal tying arrangement, based on lost sales, lost profits, price erosion, loss of market share, or any other applicable theory, together with prejudgment interest from the date the illegal tying arrangement began;

C.      A judgment or order declaring Facebook's conduct, as alleged, unlawful under § 2 of the Sherman Act;

D.      A judgment, order, or award of damages adequate to compensate Gambit for Facebook's illegal monopolization of the market for virtual-currency services, or its attempted monopolization thereof, based on lost sales, lost profits, price erosion, loss of market share, or any other applicable theory, together with prejudgment interest from the date the illegal monopolization began;

E.      A judgment or order declaring Facebook's conduct, as alleged, unlawful under Delaware common law;

F.      A judgment, order, or award of damages adequate to compensate Gambit for Facebook's tortious interference with contractual relations and prospective economic advantage, based on lost sales, lost profits, price erosion, loss of market share, or any other applicable theory, together with prejudgment interest from the date the tortious interference began;

G.      A permanent injunction prohibiting Facebook from further illegal tying of its Platform to Credits or from excluding the use of other virtual-currency services by developers on its Platform;

H.      A permanent injunction prohibiting Facebook from further illegal monopolization and attempted monopolization of the market for virtual-currency services;

I.      An award to Gambit of its reasonable attorneys' fees and costs as provided by 15 U.S.C. § 15;

J.      Treble damages pursuant to 15 U.S.C. § 15, together with prejudgment interest; and

K.      Such other and further relief as this Court or a jury may deem proper and just.

Dated: October 26, 2012

By:        */s/ Mary B. Matterer*
        Kenneth L. Dorsney (I.D. #3726)
        Mary B. Matterer (I.D. #2696)
        **MORRIS JAMES LLP**
        500 Delaware Avenue, Suite 1500
        Wilmington, Delaware 19801
        (302) 888-6800
        kdorsney@morrisjames.com
        mmatterer@morrisjames.com

        Derek A. Newman (*pro hac vice* to be filed)
        Derek Linke (*pro hac vice* to be filed)
        **NEWMAN DU WORS LLP**
        1201 Third Avenue, Suite 1600
        Seattle, WA 98101
        (206) 274-2800
        dn@newmanlaw.com
        linke@newmanlaw.com

        Brian R. Strange (*pro hac vice* to be filed)
        Keith L. Butler (*pro hac vice* to be filed)
        **STRANGE & CARPENTER**
        12100 Wilshire Boulevard, Suite 1900
        Los Angeles, California 90025
        (310) 207-5055
        lacounsel@earthlink.net
        kbutler@strangeandcarpenter.com

        **ATTORNEYS FOR PLAINTIFF**
        **KICKFLIP, INC., d/b/a GAMBIT**