IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KICKFLIP, INC.      )
           )
    Plaintiff,   )
           )  C.A. No. 12-1369-LPS
   v.       )
           )
FACEBOOK, INC.      )
           )
    Defendant.   )

**OPENING BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

ASHBY & GEDDES
Steven J. Balick (#2114)
Tiffany Geyer Lydon (#3950)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
302-654-1888
sbalick@ashby-geddes.com
tlydon@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Defendant, Facebook, Inc.*

*Of Counsel:*

Thomas O. Barnett
Jonathan Gimblett
Caitlin R. Cottingham
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
Tel: (202) 662-6000

Dated:  January 4, 2013

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ......................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDING.......................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................. 3

STATEMENT OF FACTS ............................................................................................ 4

      A.     Facebook and the Facebook Platform................................................... 4

      B.     Facebook's Actions to Protect Its Users from Harmful Ads ................. 5

      C.     The Facebook Payments Policy for Its Platform .................................. 6

ARGUMENT ................................................................................................................ 8

I.     Kickflip Lacks Standing to Assert the Antitrust Claims in the Complaint......................... 8

II.    Kickflip's Monopolization and Attempted Monopolization Claims Should Be
Dismissed ................................................................................................ 11

      A.     Kickflip Has Not Alleged Facts Indicating the Existence of Its Alleged
Market for "Virtual-Currency Services" for Social Games. ............... 12

      B.     Kickflip Has Not Alleged Facts Indicating the Existence of Its Alleged
Market for "Social Game Networks" on Certain Social Networks. ..... 13

      C.     The Complaint Fails to Allege Facts Indicating that Facebook Has
Monopolized or Has a Dangerous Probability of Monopolizing the
Alleged Relevant Market for "Virtual-Currency Services" for Social
Games. ................................................................................................ 14

III.   Kickflip's Tying Claims Should Be Dismissed ................................................ 15

      A.     The Tying Claim Should Be Dismissed Whether the *Per Se* Rule or the
Rule of Reason Is Applied ................................................................. 15

      B.     The *Per Se* Rule Should Not Apply to the New and Technologically
Dynamic Industry in Which Facebook Competes. .............................. 17

IV.   The Tortious Interference Claims Should Be Dismissed Because Kickflip Fails to
Allege Facts Indicating that Facebook Acted in an Unjustified or Wrongful
Manner. ................................................................................................... 18

V.      Kickflip Divested Its Gambit Business in 2009 and Therefore Lacks a Basis for
        Asserting Any of the Claims in the Complaint. ................................................................. 19

CONCLUSION .......................................................................................................................... 20

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Agilent Techs., Inc. v. Kirkland*
    No. 3512, 2009 WL 119865 (Del. Ch. Jan. 20, 2009) ............................................19

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ........................................................................................8

*Beard Res., Inc. v. Kates*
    8 A.3d 573 (Del. Ch. 2010) ...........................................................................19

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007)................................................................................8, 10, 11

*Black & Decker Corp. v. Am. Standard, Inc.*
    679 F. Supp. 1183 (D. Del. 1988)....................................................................20

*Bldg. Materials Corp. of Am. v. Rotter*
    535 F. Supp. 2d 518 (E.D. Pa. 2008) ...............................................................14

*Broad. Music Inc. v. Columbia Broad. Sys., Inc.*
    441 U.S. 1 (1979)............................................................................................18

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*
    140 F.3d 494 (3d Cir. 1998)................................................................15, 16, 17

*Burtch v. Milberg Factors, Inc.*
    C.A. No. 07cv556, 2009 WL 840589 (D. Del. Mar. 30, 2009) .............................10

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*
    615 F.3d 159 (3d Cir. 2010)............................................................................8

*In re Burlington Coat Factory Secs. Litig.*
    114 F.3d 1410 (3d Cir. 1997).........................................................................1

*In re Ins. Brokerage Antitrust Litig.*
    618 F.3d. 300 (3d Cir. 2010).........................................................................8

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*
    466 U.S. 2 (1984)..........................................................................................17

*Kuhn Constr. Co. v. Ocean and Coastal Consultants, Inc.*
    844 F. Supp. 2d 519 (D. Del. 2012).................................................................19

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*
    551 U.S. 877 (2007).......................................................................................18

iii

*LiveUniverse, Inc. v. MySpace, Inc.*
   304 Fed. App'x 554 (N.D. Cal. 2008) ..................................................................17

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992)..........................................................................................9

*Molinari v. Consol Energy Inc.*
   No. 12cv1085, 2012 WL 5932979 (W.D. Pa. Nov. 27, 2012) ..............................11

*New Jersey Physicians, Inc. v. President of the United States*
   653 F.3d 234 (3d Cir. 2011)...............................................................................9

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*
   472 U.S. 284 (1985)........................................................................................18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*
   124 F.3d 430 (3d Cir. 1997).................................................................11, 12, 13

*Sambreel Holdings LLC v. Facebook, Inc.*
   No. 12cv668, 2012 WL 5995240 (S.D. Cal. Nov. 29, 2012) .................9, 10, 17, 18

*Spectrum Sports v. McQuillan*
   506 U.S. 447 (1993)........................................................................................14

*Sports Racing Servs., Inc. v. Sports Car Club of Am.*
   131 F.3d 874 (1st Cir. 1997) .............................................................................16

*Sun Microsys., Inc. v. Versata Enters., Inc.*
   630 F. Supp. 2d 395 (D. Del. 2009)...................................................................15

*Syncsort Inc. v. Sequential Software, Inc.*
   50 F. Supp. 2d 318 (D.N.J. 1999) .....................................................................13

*Todd v. Exxon Corp.*
   275 F.3d 191 (2d Cir. 2001)..............................................................................11

*Ungar v. Dunkin' Donuts, Inc.*
   531 F.2d 1211 (3d Cir. 1976)............................................................................16

*United States v. Microsoft Corp.*
   253 F.3d 34 (D.C. Cir. 2001) ...................................................................3, 17, 18

*Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko*
   540 U.S. 398 (2004)....................................................................................9, 14

**INTRODUCTION**

A website operator does not violate the antitrust laws or the law on tortious interference by protecting its customers against misleading and fraudulent advertisements.  Kickflip, Inc. ("Kickflip") provided advertising services to developers whose applications were available through various websites, including facebook.com.[1]  In November 2009, Facebook, Inc. ("Facebook") notified Kickflip that it was barring Kickflip from Facebook for "run[ning] advertisements with deceptive offers within applications running on Facebook's Platform . . . and acquiring information from Facebook user profiles without authorization."[2]  The Complaint *does not deny* that Kickflip was serving advertisements ("ads") that were misleading, fraudulent, or otherwise in violation of Facebook's policies governing the use of its services (the "Facebook Terms").

Kickflip now seeks to challenge a Facebook payments policy implemented in July 2011, 19 months after it was barred from Facebook.  Similar to the policies of other popular technology platforms, such as Apple's iOS operating system, this policy requires developers that make game applications available through Facebook to use Facebook to process payments from users and to pay a service fee for each transaction.[3]  Kickflip claims that, by requiring game developers

---

[1] This memorandum uses the plaintiff's proper corporate name, Kickflip, and not "Gambit" as used in the Complaint.  As explained in Part V *infra*, Kickflip divested the Gambit business at issue in the Complaint in 2009 to a separate corporate entity, Gambit Labs, Inc., and consequently lacks a basis for asserting any of Gambit's claims.

[2] Ex. 1.  Cease and Desist Letter from J. Cutler to Kickflip, Inc. d/b/a www.getgambit.com (Nov. 5, 2009) (cited Compl. at 9) (the "Cease and Desist Letter")).  The Court may consider that letter and other materials on which the Complaint relies.  *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.").

[3] Ex. 2.  Facebook.com, Facebook Developer Payments Terms, *available at* http://developers.facebook.com/policy/credits/.  (Compl. 18, 23) ("Developer Payments Terms").

1

making their applications available through Facebook to use Facebook's payment processing, Facebook has committed monopolization and tying violations under federal antitrust law. Compl. at 13-24.  Kickflip also asserts claims for tortious interference under Delaware law relating to Facebook's decision in 2009 to remove Kickflip from Facebook.  Compl. at 24-27.

Kickflip's claims fail for multiple reasons.  Most fundamentally, the Complaint fails to establish antitrust standing because it fails to allege facts that make plausible the alleged connection between Facebook's removal of Kickflip for serving improper ads in November 2009 and Facebook's subsequent implementation of an industry-standard payments policy nearly two years later.  Further, the Complaint fails to allege facts rendering plausible key elements of the antitrust claims, such as the existence of the alleged relevant markets, market power, the existence of a tie, and harm to the competitive process.  Kickflip's state law claims also fail because the Complaint does not allege that Kickflip was complying with Facebook's Terms. Finally, Kickflip lacks a basis to assert any of its claims because it divested the business at issue in the Complaint to a separate corporate entity in November 2009.

## NATURE AND STAGE OF THE PROCEEDING

Kickflip filed its complaint on October 26, 2012, alleging attempted monopolization, monopolization, and tying claims under federal antitrust law and state law claims for tortious interference.  On November 19, 2012, the parties filed a joint stipulation extending Facebook's time to respond until January 2, 2013.  The parties filed a second joint stipulation on December 28, 2012, extending the response date to January 4, 2013.  Facebook now moves to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6).

## SUMMARY OF THE ARGUMENT

The Complaint should be dismissed in its entirety for multiple reasons.

First, Kickflip lacks standing to bring its antitrust claims because Kickflip was removed from Facebook in 2009 for serving ads that were misleading, fraudulent, and otherwise in violation of Facebook's Terms long before Facebook implemented the challenged 2011 policy. The Complaint fails to allege facts that adequately support Kickflip's assertion that this removal was a sham and that its injury can be traced to any alleged subsequent antitrust violation.

Second, the Complaint fails to allege facts that make plausible the existence of the asserted relevant markets. For example, the Complaint does not coherently identify the services included in the alleged market for "virtual-currency services" for social games, much less allege how those services are limited to social games. Nor does it allege facts indicating that Facebook has harmed competition in any such markets, much less monopolized them or attempted to do so.

Third, Kickflip's claim that Facebook ties access to its social game network to the use of its payment processing services fails under either the *per se* rule or the rule of reason because: (i) the policies on which the Complaint relies show that Facebook allows developers to access its network without using its payment processing services, and (ii) the Complaint does not support the existence of the alleged separate markets for social game networks and virtual-currency services. Further, the Complaint alleges harm only to Kickflip and not to the competitive process as required to state a claim under the rule of reason.

Fourth, in any event, Kickflip's *per se* tying claim fails because "the nature of the platform software market affirmatively suggests that per se rules might stunt valuable innovation." *United States v. Microsoft Corp.*, 253 F.3d 34, 92 (D.C. Cir. 2001). The *per se* rule should apply only to conduct that, unlike here, has an obvious "pernicious effect on competition" and that lacks "any redeeming virtue." *See id.* at 91-92.

Fifth, with respect to the pendent state law tortious interference claims, the Complaint fails to allege that Facebook took any wrongful action to interfere with Kickflip's business.

Sixth, because Kickflip no longer owns the Gambit business that provided the alleged advertising and payment processing services, it lacks standing to assert any of the claims in the Complaint.

## STATEMENT OF FACTS

### A.       Facebook and the Facebook Platform

Facebook is a California-headquartered company that designs, owns, and operates a social networking service that allows users to connect and share information with their friends and family.  In May 2007, Facebook introduced the Facebook Platform, a set of tools that enable third-party developers to access Facebook's social network in a variety of ways.  Compl. at 5. For example, using application programming interfaces ("APIs") that Facebook provides through Platform, developers can make their applications available to users on Facebook's desktop website or mobile service.

Facebook's Platform also enables developers to access Facebook's network via applications running "off" of Facebook (*i.e.*, applications launched by the user from another site, such as the developer's own site).  Such applications can use Facebook's authentication service ("Facebook Login"), social plugins (*e.g.*, the "Like" button), and publishing (*e.g.*, with the user's permission, posting notices on the user's Facebook page that the user's friends may see).[4] Games are one of the many kinds of applications that developers make available to users through Facebook's website, on other sites, or both.  Compl. at 5.

---

[4] Ex. 3.  Facebook Platform Policies, *available at* http://developers.facebook.com/policy/ (referenced and relied upon, Compl. at 20) ("Platform Policies").

The Facebook Terms are designed to make Facebook a safe and attractive place for users to interact and share information, as well as for developers to provide applications.  The Terms include (a) the Statement of Rights and Responsibilities ("SRR"), which applies to both users and developers; (b) the Platform Policies, which apply to developers; and (c) the Advertising Guidelines, which apply to all parties displaying ads on Facebook, including on applications that are made available on Facebook through the Facebook Platform.[5]  The SRR provides that, "[i]f you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you."[6]

Kickflip was a Delaware corporation formed in 2007 that forfeited its corporate status in October 2010.[7]  While Kickflip provided a variety of services, the Complaint references only its Gambit business that provided advertising and payment-related services. Compl. at 1, 7.

### B.       Facebook's Actions to Protect Its Users from Harmful Ads

One means by which developers, including developers of online games, monetize their applications is by serving ads within them.  Developers often enlist third-party ad services to provide the ads that appear in their applications.  Kickflip was one such ad service and, in at least some of the ads it served, users were promised rewards in return for accepting an offer, completing a survey, purchasing a subscription, or other activity.[8]

---

[5] *See* Ex. 1.  Cease and Desist Letter.

[6] *See* Ex. 4.  SRR, as revised Dec. 11, 2012.

[7] *See* Ex. 5.  Del. Sec'y of State, Kickflip, Inc. Corporate Entity Status (Dec. 28, 2012).

[8] *See* Ex. 6.  Eric Eldon, *Can the Advertising Offers Business Find Redemption in Social Networks?*, INSIDE FACEBOOK (Nov. 19, 2009) (quoted and relied upon, Compl. at 10, 24, 26).

On November 5, 2009, Facebook informed Kickflip that it was "no longer authorized to access the Facebook website, use the Facebook development platform, advertise on Facebook, or use any of the services offered by Facebook, Inc."[9]  The letter explained:

> Kickflip, Inc. d/b/a www.getgambit.com, continues to violate Facebook's Statement of Rights and Responsibilities, Advertising Guidelines, and Platform Policies (collectively, "Terms") despite repeated warnings by Facebook staff to bring your advertising practices into conformance with Facebook's Guidelines. Specifically, you continue to run advertisements with deceptive offers within applications running on Facebook's Platform.  Your advertisements violate Facebook's policies, including those against pop-ups, fake application closing behavior, and acquiring information from Facebook user profiles without authorization.  Moreover, some of your advertisements promote gambling and alcohol.

Kickflip's Complaint does not deny that the company violated Facebook's Terms prior to receiving Facebook's letter.[10]  Facebook had removed other ad services from its site for similar violations.[11]

As part of its response, Kickflip divested itself of the Gambit business.  Public records confirm that Gambit Labs, Inc. was incorporated in Delaware on November 9, 2009, with no indication of ownership by Kickflip.[12]  Gambit Labs, Inc. is not named as a plaintiff in the Complaint, which is brought solely by Kickflip.

### C.    The Facebook Payments Policy for Its Platform

Another way in which developers monetize applications is by enabling users to purchase virtual products for use in the applications, typically using a "virtual currency."  Compl. at 6.

---

[9] *See* Ex. 1.  Cease and Desist Letter.

[10] Nor could it.  An article relied upon in the Complaint confirms that Kickflip acknowledged serving non-compliant ads.  *See* Ex. 6.  Eldon, *supra* note 8; Ex. 7.  Michael Arrington, *Scamville Shakeout: Was Gambit the Right Fall Guy?*, Techcrunch (Nov. 24, 2009) (quoted Compl. at 10).

[11] *See* Ex. 6.  Eldon, *supra* note 8.

[12] *See* Ex 8.  Del. Sec'y of State, Gambit Labs, Inc. Corporate Entity Status (Nov. 12, 2012).

Users purchase the "in-app" virtual currency through a funding instrument, such as PayPal, Visa, Mastercard, Discover, or other credit card services.  *Id.*  When Facebook launched its Platform in May 2007, it did not include a function for processing payments through such funding instruments.  Compl. at 8-10.

In May 2009, Facebook introduced payment processing functionality on its Platform, Compl. at 8, designed to "enhance the quality, convenience, and security of the user experience on Facebook."[13]  In addition to connecting applications to funding instruments, the service helps to detect fraud, to manage the risk of credit card and other funding instrument chargebacks, and to streamline payment to developers.  The Complaint alleges that Facebook retains a fee of 30 percent of the value of the transactions for which it provides payment processing.  Compl. at 8.

Facebook also adopted a virtual currency, Facebook Credits ("Credits"), that developers could, at their option, use as an in-app virtual currency.  Facebook entered bilateral agreements with some application developers pursuant to which they began using Facebook's payment processing services and, in some cases, to use Credits as their in-app currency.  Compl. at 9.

In July 2011, Facebook implemented a policy requiring developers that make game applications available through Facebook to use Facebook's payment processing for transactions in that application.  Compl. at 12.  Game developers with applications on a non-Facebook site that access Facebook's network using Facebook Login, social plugins, or publishing are *not* required to use Facebook's payment processing.[14]  Regardless of how they access Facebook's network (*i.e.*, either through Facebook or from another site), all game developers remain able to use their own in-app virtual currency, and users remain able to use a range of funding

---

[13] *See* Ex. 2.  Developer Payments Terms.

[14] *See* Ex. 3.  Platform Policies, at I.13.

instruments.[15]  The Complaint does not allege that Kickflip was providing any services in July 2011 that were affected by the Facebook payments policy.

## ARGUMENT

To survive dismissal, Kickflip's claims must include "*factual allegations*" that "raise a right to relief above the *speculative level*."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (emphasis added).  Recognizing "the unusually high cost of discovery in antitrust cases," *Twombly* explained that courts should rigorously apply pleading requirements in order to avoid the time and cost associated with litigating "largely groundless claim[s]."  *Id.* at 558-59; *see also Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010).

Where a plaintiff seeks to infer the existence of a key fact, the plaintiff must allege facts that move the alleged conduct into the realm of the plausible.  *Twombly*, 550 U.S. at 556-57; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d. 300, 319 (3d Cir. 2010) ("The test . . . is whether the complaint alleges enough fact[s] to state a claim that is plausible to relief on its face, which is to say enough fact to raise a reasonable expectation that discovery will reveal evidence of illegality.") (internal quotation marks omitted).  If the allegations establish nothing more than "the mere possibility of misconduct," they do not establish a plausible claim for relief, and the complaint should be dismissed.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  For the reasons set forth below, the Complaint fails to meet this standard and should be dismissed.

## I.       Kickflip Lacks Standing to Assert the Antitrust Claims in the Complaint.

To establish standing to pursue its antitrust claims, Kickflip must show "(1) an 'injury in fact'; (2) 'a causal connection between the injury and the conduct complained of . . .'; and (3) a showing that it 'be likely, as opposed to merely speculative, that the injury will be redressed by a

---

[15] Ex. 2.  Developer Payments Terms.

favorable decision.'"  *New Jersey Physicians, Inc. v. President of the United States*, 653 F.3d 234, 238 (3d Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The antitrust claims should be dismissed because the Complaint fails to allege that Kickflip has suffered injury traceable to the alleged violation of the antitrust laws.

Any injury to Kickflip arose from the 2009 decision by Facebook to bar Kickflip from Facebook.  Facebook's Cease and Desist Letter explained that Kickflip had violated the Facebook Terms in numerous ways, including serving ads that were deceptive and/or misappropriated user information.[16]  The Complaint contains no allegation that Kickflip did not violate the Facebook Terms.

Kickflip does not contend that Facebook's removal of an ad service from its site would, by itself, violate the antitrust laws.  Nor could it.  As a court in the Southern District of California recently explained in dismissing antitrust claims against Facebook by another ad server:

> As an overarching premise, the Court is persuaded that Facebook has a right to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product.  Indeed, it is well settled that, "as a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."

*Sambreel Holdings LLC v. Facebook, Inc.*, No. 12cv668, 2012 WL 5995240, at *3 (S.D. Cal. Nov. 29, 2012) (quoting *Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004)).[17]

Instead, Kickflip seeks to avoid both the consequences of its misdeeds and Facebook's rights to protect its product by asserting without basis that Facebook's actions in November 2009

---

[16] Ex. 1.  Cease and Desist Letter.

were a sham designed to enable Facebook to monopolize an alleged market for "virtual-currency services" for social games.  Compl. at 10.  Kickflip dismisses its violations as a "minor controversy" and seeks to blame a "single online commentator" for helping to publicize the violations of Kickflip and others.  Compl. at 9.  Such bald assertions fail for several reasons to satisfy Kickflip's obligation to allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  *See also Burch v. Milberg Factors, Inc.*, C.A. No. 07-556, 2009 WL 840589, at *5 (D. Del. Mar. 30, 2009) ("The Court is not obligated to accept as true bald assertions, unsupported conclusions, and unwarranted inferences.") (internal citations omitted).

First, contemporaneous documents relied upon in the Complaint confirm that "scammy" ads were a serious concern.[18]  The Complaint does not deny that the public controversy about these ads could have undermined the confidence of both users and game developers in the integrity of Facebook's Platform.

Second, Kickflip does not deny that it and each of the other advertising companies that Facebook removed from its site was violating Facebook's Terms.  This failure undermines Kickflip's conclusory assertion that Facebook acted because it "wanted to tarnish the reputation of Gambit" to hurt the "virtual-currency services" business.  Compl. at 10.

---

[17] In *Sambreel*, the plaintiff had displayed its own ads on top of the Facebook website in violation of Facebook's Terms.  *Sambreel*, 2012 WL 5995240, at *3 n.2.

[18] *See* Ex. 6.  Eldon, *supra* note 8:

> The fact that offer companies were willingly running what they acknowledge to be scammy offers goes to show that regulation is needed.  Facebook and MySpace are in the best position to enforce this regulation, as they can put the burden on developers to self-regulate by suspending their apps if bad offers are found.  Facebook has been criticized for not acting more quickly.

Third, Kickflip alleges that Gambit was just one of many providers of "virtual-currency services" in 2009. Compl. at 5, 7, 9. Kickflip does not explain how tarnishing Gambit's reputation, while continuing to deal with many other providers, would have helped Facebook to monopolize the alleged market for virtual-currency services.

Fourth, the alleged fact that Facebook months later entered into agreements with certain developers to use Facebook payment processing and Facebook Credits, Compl. at 11-12, does not eliminate the violations by Kickflip that led to its removal from Facebook.

Because Kickflip fails to allege facts demonstrating that it was injured by reason of the challenged 2011 Facebook payments policy, as opposed to its 2009 removal from Facebook, all of its antitrust claims should be dismissed.

## II.    Kickflip's Monopolization and Attempted Monopolization Claims Should Be Dismissed

To survive a motion to dismiss, the Complaint must, among other things, allege facts that make plausible the existence of the alleged relevant market. *See, e.g.*, *Twombly*, 550 U.S. at 570; *Molinari v. Consol Energy Inc.*, No. 12cv1085, 2012 WL 5932979, at *5 (W.D. Pa. Nov. 27, 2012) ("[A]n alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes . . . and it must be reasonable.") (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)). As the Third Circuit has explained:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Kickflip's proposed relevant markets each fail to meet this standard. Further, the Complaint fails to support its allegation that Facebook has monopolized (or attempted to monopolize) any relevant market.

A.      **Kickflip Has Not Alleged Facts Indicating the Existence of Its Alleged
Market for "Virtual-Currency Services" for Social Games.**

The Complaint fails adequately to support the proposed relevant market for "virtual-currency services" for social games for several reasons.  Compl. 4-5, 18-19.

As an initial matter, the Complaint does not explain what it means to include in and exclude from this alleged relevant market, which is, in itself, grounds for dismissal.  *See Queen City*, 124 F.3d at 436 ("Plaintiffs have the burden of defining the relevant market.").  Despite repeated use of the term "virtual-currency services," Kickflip provides only a vague explanation of a range of services that *might* be included in the asserted relevant market.[19]  The Complaint does not, for example, indicate whether it includes in-app virtual currency as part of the "virtual-currency services" market.

To the extent that the Complaint focuses on "payment processing," it does not address the nature of Facebook Platform as a set of services that support the distribution of applications through Facebook and why payment processing should be treated separately from the other services that constitute the Platform.

Similarly, Kickflip has not clearly identified the companies that do and do not participate in its alleged market.  While the Complaint alleges at one point that Kickflip was a "virtual currency and payment-processing provider" that was in the alleged market, Compl. at 1, it later describes funding instruments such as Paypal and credit-card companies as "payment processors" and appears to exclude them from its alleged relevant market.  Compl. at 6.

---

[19] Other services mentioned in the Complaint that might or might not be in the asserted relevant market include:  (i) "processing and tracking [the] various methods of acquiring virtual currency"; (ii) establishing and maintaining relationships with payment processors; (iii) establishing and maintaining relationships with advertisers; (iv) analyzing and dynamically adjusting pricing strategies for in-game purchases; (v) managing and serving advertising campaigns in real time; and (vi) detecting and combating fraud.  Compl. at 6-7.

Further, Kickflip's attempt to limit its alleged relevant "virtual-currency services" market to the provision of such services for social games, Compl. at 4, is wholly unsupported.  There is nothing inherently "social" in connecting an application to a funding instrument, detecting fraud, or in serving ads.  Kickflip does not, for example, allege that applications other than social games never require such services.  To the contrary, the Complaint acknowledges that PayPal, credit card companies, Amazon payment, telephone carriers, and other companies enable people to engage in payment processing across the Internet, Compl. at 4-5, but fails to indicate why the payment services provided by these companies should be excluded from the alleged market for virtual-currency services.  Similarly, Kickflip fails to allege that its services could only be used for social games and not for other sites or applications.

Accordingly, the monopolization and attempted monopolization claims should be dismissed.  *See Queen City,* 124 F.3d at 441; *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 330-31 (D.N.J. 1999) (*"Viability of claims of monopolization and attempted monopolization under Section Two of the Sherman Act are dependent upon demonstration by a plaintiff why a proposed market is the relevant market."*).

**B.      Kickflip Has Not Alleged Facts Indicating the Existence of Its Alleged Market for "Social Game Networks" on Certain Social Networks.**

Kickflip's allegations concerning the alleged market for social game networks suffer from similar defects.  Kickflip asserts that the product market for social game networks encompasses "Facebook, MySpace, Google+ , and other social networks that offer social games to users," but not "dedicated websites, mobile devices, and stores that sell games for dedicated hardware (*e.g*., a PlayStation video-game console)."  Compl. at 4.  The Complaint does not, however, allege that the platforms it seeks to exclude lack social components, that social games do not run on such platforms, or even that games on these platforms do not use "virtual-currency

13

services."  Kickflip does not allege, for example, that neither it nor its competitors provided

"virtual-currency services" to developers with games on other platforms.  There are no

allegations that developers that launch games on the Facebook Platform are unable to distribute

the same or similar games on dedicated websites, mobile devices, or video-game consoles.

These deficiencies also warrant dismissal of the monopolization-related claims.  *See*

*Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525-26 (E.D. Pa. 2008) (dismissing

monopolization claims for failure to allege "a relevant product market").

> **C.** **The Complaint Fails to Allege Facts Indicating that Facebook Has Monopolized or Has a Dangerous Probability of Monopolizing the Alleged Relevant Market for "Virtual-Currency Services" for Social Games.**

Kickflip's monopolization and attempted monopolization claims also require showings

of, respectively, monopoly power in a relevant market, *Verizon*, 540 U.S. at 407, and a

dangerous probability of achieving monopoly power, *Spectrum Sports v. McQuillan*, 506 U.S.

447, 456 (1993).  The Complaint fails to allege either.

First, the Complaint fails to allege in even a conclusory fashion that Facebook has

monopolized (or attempted to monopolize) many of the "virtual-currency services" described in

the Complaint, including the following:  (i) in-app virtual currencies; (ii) funding instruments

(*e.g.*, PayPal); or (iii) virtual-currency pricing-optimization services.  Compl. 4-5.  The Facebook

payments policy does not address these services, and the Complaint does not allege otherwise.

Second, the Complaint acknowledges that a number of companies provided "virtual-

currency services," including Offerpal, TrialPay, Super Rewards, Sometrics, and others, Compl.

at 5.  The Complaint does not allege that any of these companies has gone out of business as a

result of the 2011 Facebook payments policy.  Nor does the Complaint allege that Facebook has

applied its payments policy to social game networks other than the Facebook Platform, such as

MySpace, Google +, or any other third-party platform used by developers.  Indeed, the

Complaint does not even allege that the challenged policy applies to developers whose games on other platforms, including other websites or mobile platforms, nevertheless access Facebook through the Facebook Login, plugins, or publishing features.  In short, Kickflip's use of conclusory labels such as "dominant" or "monopolize" cannot substitute for specific factual allegations regarding the providers of "virtual-currency services" and their current shares.

Finally, there are no allegations concerning the share of Facebook or anyone else in the alleged "social game network" relevant market in 2009 when Kickflip was barred from Facebook, and thus no suggestion that Facebook had monopoly power or a dangerous probability of achieving monopoly power in the putative market.  *See Sun Microsys., Inc. v. Versata Enters., Inc.*, 630 F. Supp. 2d 395, 403 (D. Del. 2009) ("[T]he Court concludes that it must dismiss [the monopolization claims] because Versata has not adequately pleaded . . . that Sun possessed sufficient power within that market to come dangerously close to monopolization").

III.    **Kickflip's Tying Claims Should Be Dismissed**

Kickflip's tying claims also should be dismissed because the Complaint fails to support necessary elements of either a *per se* or rule-of-reason tying claim and, in any event, the *per se* rule should not apply in this context.

A.    **The Tying Claim Should Be Dismissed Whether the *Per Se* Rule or the Rule of Reason Is Applied**

To prevail on either its *per se* or its rule of reason tying claim, Kickflip must establish, among other things, that Facebook conditioned the sale of one product in a properly defined relevant market on the purchase of a separate product in another properly defined relevant market.  *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510-11 (3d Cir. 1998).  Kickflip's rule of reason tying claim also requires allegations of harm to the competitive process in the tied market.  *Id.* at 519.  The Complaint fails to satisfy any of these elements.

First, the Complaint fails to allege facts necessary to establish that Facebook has tied anything to access to its social network.  The July 2011 Facebook payments policy, Compl. at 22-23, applies to games available through Facebook.com or through Facebook accessed on mobile devices.[20]  It does not apply to games that access Facebook from other sites to use Facebook Login, social plugins, or publishing.[21]  The ability of game developers to access the alleged Facebook "social game network" without having to use Facebook's payment processing services is fatal to Kickflip's tying claim.  *See Ungar v. Dunkin' Donuts, Inc.*, 531 F.2d 1211, 1226 (3d Cir. 1976) ("It is only when the buyer's freedom to choose a given product is restricted that the tying doctrine comes into play.") (internal citations omitted).[22]

Second, Kickflip's tying claims fail because, as explained above, the Complaint fails to allege facts supporting either its alleged tying or tied product markets.  Indeed, Kickflip fails to explain why payment processing for transactions occurring in applications accessed through Facebook's Platform should be treated as a separate product as opposed to part of the integrated set of services that make up the Facebook Platform.  This approach is consistent with the payment processing services provided on other platforms, such as the Apple iOS platform.  If payment processing is not a separate product, there can be no tying claim.  *See Brokerage Concepts*, 140 F.3d at 510.

Third, the Complaint fails to allege facts indicating that Facebook's conduct has harmed the competitive process in a tied market.  As explained above, the Complaint alleges no market

---

[20] Ex 3.  Platform Policies, at I.13.

[21] *Id.*

[22] *See also Sports Racing Servs., Inc. v. Sports Car Club of Am.*, 131 F.3d 874, 887 (1st Cir. 1997) ("Critical to a tying claim is the fact that the seller forced the buyer to purchase the tied product in order to get the tying product.").

shares for other providers of "virtual-currency services."  Nor does the Complaint allege that

Facebook's 2011 policy restricts payment processing, or any other form of "virtual-currency

service," offered by any company, outside of the context of games played through Facebook.

Because the Complaint alleges anticompetitive conduct pertaining to the use of Facebook only

and to Kickflip only, the Court should dismiss the rule of reason tying claim for failure to

adequately allege anticompetitive harm in the tied market.  *Sambreel*, 2012 WL 5995240, at *10.

*See also LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed. App'x 554, 557 (N.D. Cal. 2008)

("LiveUniverse does not explain how MySpace's actions *on its own website* can reduce

consumers' choice or diminish the quality of their experience on *other* social networking

websites, which is the relevant market.").

> **B.     The *Per Se* Rule Should Not Apply to the New and Technologically Dynamic Industry in Which Facebook Competes.**

In any event, the Court should dismiss Kickflip's *per se* tying claim to avoid the "high

risk" that *per se* analysis of Facebook's policies for its Platform "may produce inaccurate

results."  *Microsoft*, 253 F.3d at 92 (declining to apply *per se* rule from *Jefferson Parish Hosp.*

*Dist. No. 2 v. Hyde*, 466 U.S. 2, 15 (1984), to tying claims relating to software platform).  "It is

only after considerable experience with certain business relationships that courts classify them as

*per se* violations."  *Broad. Music Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979).  As

the Supreme Court has explained:  "Restraints that are *per se* unlawful include horizontal

agreements among competitors to fix prices . . . or to divide markets . . . that would always or

almost always tend to restrict competition and decrease output."  *Leegin Creative Leather*

*Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal citations omitted) (striking down

*per se* rule for resale price maintenance).

Because "integration of new functionality into platform software is a common practice," the "wooden application of per se [tying] rules in this litigation may cast a cloud over platform innovation." *Microsoft,* 253 F.3d at 95.  Alleged ties in this context do not "fall[] into the category of agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 289 (1985).

Like *Microsoft*, this case concerns the product design choices of a platform owner in a new-economy industry where the antitrust analysis needs to proceed with caution and application of the *per se* rule is not appropriate.  *See Sambreel*, 2012 WL 5995240, at *3 (observing that Facebook's interactions with developers, advertisers, and users present "novel technological issues that, apparently, have yet to be addressed by the courts in the antitrust context.").  It should be a reason for additional caution that the particular design choice challenged by Kickflip -- to include payment processing as part of the platform -- is consistent with that previously adopted by other platforms.  Compl. at 8.

## IV.    The Tortious Interference Claims Should Be Dismissed Because Kickflip Fails to Allege Facts Indicating that Facebook Acted in an Unjustified or Wrongful Manner.

"A claim for tortious interference with contractual relations requires proof of five elements under Delaware law:  (1) a contract; (2) about which the defendant knew; (3) an intentional act that is a significant factor in causing the breach of contract; (4) *without justification*; and (5) which causes injury."  *Kuhn Constr. Co. v. Ocean and Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 531 (D. Del. 2012) (emphasis added) (internal quotation marks omitted).  Similarly, "[a]n alleged interference in a prospective business relationship is only actionable if it is wrongful."  *Agilent Techs., Inc. v. Kirkland*, No. 3512, 2009 WL 119865, at *8

(Del. Ch. Jan. 20, 2009).[23]  The Complaint fails to allege facts needed to satisfy the requirement of unjustified or wrongful conduct.

The Cease and Desist Letter listed many ways in which Kickflip's ads violated Facebook's Terms.[24]  The Complaint fails to deny that Kickflip was violating those Terms.  To the contrary, the Complaint cites materials recording Kickflip's contemporaneous admission that it was serving non-compliant ads.[25]  Further, it was entirely reasonable for Facebook to list Kickflip's service as a "banned' monetization provider[ ]," Compl. at 10, as developers would themselves violate Facebook's Terms if they ran non-compliant ads served by Kickflip. Kickflip's characterization of Facebook's actions as "heavy-handed," Compl. at 25, does not cure its failure to allege that Facebook lacked a basis for removing Kickflip from its site.

## V.     Kickflip Divested Its Gambit Business in 2009 and Therefore Lacks a Basis for Asserting Any of the Claims in the Complaint.

Finally, Kickflip's claims rest on its allegations that Facebook took actions against its "Gambit" services, Compl. at 9-10, but Kickflip divested its Gambit business in 2009.  Public records confirm that Gambit Labs, Inc. was incorporated in Delaware on November 9, 2009, with no indication of ownership by Kickflip.[26]  Having divested its Gambit business, Kickflip makes no allegations that it has the right to pursue Gambit's ostensible claims on behalf of that

---

[23] "The tortious interference with prospective business relations standard is arguably more favorable to a defendant than the tortious interference with contractual relations standard because, under the former standard, a court must consider the defendant's privilege to compete or protect his business interests in a fair and lawful manner."  *Beard Res., Inc. v. Kates*, 8 A.3d 573, 608 (Del. Ch. 2010).

[24] *See* Ex. 1.  Cease and Desist Letter

[25] *See* Ex. 2.  Eldon, *supra* note 8; Ex. 7.  Arrington, *supra* note 10.

[26] Ex. 9.  Del. Sec'y of State, Gambit Labs, Inc., Cert. of Incorporation (Nov. 9, 2009).

divested business.[27]  *See Black & Decker Corp. v. Am. Standard, Inc.*, 679 F. Supp. 1183, 1190

(D. Del. 1988) ("[T]o have standing, there must not only be an actual or threatened injury but

also the litigant must personally be affected by the allegedly illegal conduct of the defendant.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss Kickflip's Complaint in its entirety

and with prejudice.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

*Of Counsel:*                              _____
                                           Steven J. Balick (#2114)
                                           Tiffany Geyer Lydon (#3950)
Thomas O. Barnett                          Andrew C. Mayo (#5207)
Jonathan Gimblett                          500 Delaware Avenue, 8th Floor
Caitlin R. Cottingham                      P.O. Box 1150
COVINGTON & BURLING LLP                    Wilmington, DE  19899
1201 Pennsylvania Avenue, N.W.             302-654-1888
Washington, D.C.  20004-2401               sbalick@ashby-geddes.com
Tel: (202) 662-6000                        tlydon@ashby-geddes.com
                                           amayo@ashby-geddes.com


                                           *Attorneys for Defendant, Facebook, Inc.*

Dated:  January 4, 2013

---

[27] Kickflip's November 12, 2009, response to Facebook's Cease and Desist letter represented that "Kickflip divested itself of the Gambit service and brand which is now exclusively owned by Gambit." Ex 10.  Letter from E. Benisek to J. Cutler (Nov. 12, 2009).  This letter is indirectly referenced in the Complaint as part of the core issue of Kickflip's removal from Facebook.