## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KICKFLIP, INC., a Delaware corporation,

    *Plaintiff*,

    v.

FACEBOOK, INC., a Delaware corporation,

    *Defendant*.

**C.A. NO. 12-1369-LPS**

**JURY TRIAL DEMANDED**

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Dated: February 1, 2013

Kenneth L. Dorsney (I.D. #3726)
Mary B. Matterer (I.D. #2696)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com
mmatterer@morrisjames.com

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
**NEWMAN DU WORS LLP**
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
(206) 274-2800
dn@newmanlaw.com
linke@newmanlaw.com

Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
**STRANGE & CARPENTER**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com

**ATTORNEYS FOR PLAINTIFF**
**KICKFLIP, INC., d/b/a GAMBIT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ................................... 2

SUMMARY OF ARGUMENT............................................................................................ 2

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ................................................................................................................... 6

A.   Kickflip has standing for its antitrust claims because Facebook's
     anticompetitive conduct caused it redressable injury............................................ 6

   1.   Facebook's 2009 ban of Kickflip, together with the 2011 exclusivity policy,
        was part of its attempted and actual monopolization of the virtual-currency
        market—causing Kickflip antitrust injury.................................................... 6

   2.   Facebook's 2011 exclusive-Credits policy was an independent material
        cause of Kickflip's antitrust injury.............................................................. 8

   3.   Kickflip still owns the causes of action it asserts in this case and
        its Delaware corporate status is in good standing.........................................10

B.   Facebook monopolized the virtual-currency market by exploiting its
     dominance in the social-game network market. .................................................. 11

   1.   Kickflip pleads a relevant market for virtual-currency services. ................... 11

   2.   Kickflip pleads a relevant market for social-game networks.........................13

   3.   Facebook has monopoly power in the virtual-currency services market. ...................14

   4.   Facebook obtained and has maintained monopoly power in the virtual-currency
        services market as a result of anticompetitive conduct. ...............................14

C.   Kickflip pleads a claim for illegal tying because it alleges that Facebook
     conditioned access by developers to its dominant social-game network
     on the exclusive use of its Credits virtual-currency services. ................................ 17

D.   Kickflip's claims for tortious interference allege that Facebook interfered
     with Kickflip's relationships without justification or in a wrongful manner................... 19

CONCLUSION ............................................................................................................... 20

# TABLE OF CITATIONS

## Cases

*A.I.B. Express v. FedEx Corp.*,
  358 F. Supp. 2d 239 (S.D.N.Y. 2004) ................................. 11

*Alternative Electrodes, LLC v. Empi, Inc.*,
  597 F. Supp. 2d 322 (E.D.N.Y. 2009) ................................ 11

*Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Group*,
  93 F. App'x. 1 (5th Cir. 2004) ..................................... 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................. 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ................................................ 18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................. 6

*Bonjorno v. Kaiser Aluminum & Chem. Corp.*,
  559 F. Supp. 922 (E.D. Pa. 1983) .................................. 10

*Broadcom Corp. v. Qualcomm, Inc.*,
  501 F.3d 297 (3d Cir. 2007) ..................................... 7, 11

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006) ...................................... 10

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992) ................................ 6, 7, 11, 15, 16, 17, 18

*Fair Isaac Corp. v. Equifax Inc.*,
  2008 U.S. Dist LEXIS 16664 (D. Minn. Mar. 4, 2008) ................ 16

*Fineman v. Armstrong World Indus., Inc.*,
  980 F.2d 171 (3d Cir. 1992) ...................................... 11

*Grunstein v. Silva*,
  2009 Del. Ch. LEXIS 206 (Del. Ch. Dec. 8, 2009). ................. 19

*Haverhill Gazette Co. v. Union Leader Corp.*,
  333 F.2d 798 (1st Cir. 1964) ....................................... 8

*Hayes v. Solomon*,
  597 F.2d 958 (5th Cir. 1979) ..................................... 10

*Image Technical Servs. v. Eastman Kodak*,
  125 F.3d 1195 (9th Cir. 1997) .................................... 13

*Khodara Envtl., Inc. v. Blakey*,
  376 F.3d 187 (3rd Cir. 2004) ...................................... 9

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951) ................................................. 7

*Multistate Legal Studies v. Harcourt Brace Jovanovich*,
    63 F.3d 1540 (10th Cir. 1995) ........................................................................ 16

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ............................................................................................ 17

*N.J. Physicians, Inc. v. President of the U.S.*,
    653 F.3d 234 (3d Cir. 2011).............................................................................. 9

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................................ 11

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) .......................................................................................... 8

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)............................................................................... 6

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)....................................................................... 11, 12

*Rescue Phone, Inc. v. Enforcement Tech. Group*,
    2007 U.S. Dist LEXIS 49401 (E.D. Va. July 9, 2007) .................................... 16

*Sambreel Holdings LLC v. Facebook, Inc.*,
    2012 U.S. Dist LEXIS 178528 (S.D. Cal. Nov. 29, 2012) ................................ 7

*Smith v. Ebay Corp.*,
    2012 U.S. Dist LEXIS 1211 (N.D. Cal. Jan. 5, 2012) .................................... 15

*Spectrum Sports v. McQuillan*,
    506 U.S. 447 (1993) ........................................................................................ 11

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*,
    2005 U.S. Dist LEXIS 15432 (D.N.J. May 3, 2005) ....................................... 11

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992).............................................................................. 18

*United States v Grinnell Corp.*,
    384 U.S. 563 (1966) ........................................................................................ 12

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ........................................................................................... 7

*United States v. Dentsply Int'l*,
    399 F.3d 181 (3d Cir. 2005).............................................................................. 14

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ........................................................................................ 15

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)............................................................................ 19

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984).............................................................................. 14

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ........................................................................................................ 8

## Statutes

15 U.S.C. § 1 (2006) ........................................................................................................ 2

15 U.S.C. § 2 (2006) ................................................................................................. 2, 13

## Rules

Fed. R. Civ. P. 12(d) ..................................................................................................... 12

Rule 12(b)(6) ................................................................................................................. 13

## Other Authorities

Restatement (Second) of Torts § 767 (1965) ............................................................. 24

## INTRODUCTION

Kickflip had a thriving business providing virtual-currency services to developers of games offered on social-game networks like Facebook. Developers relied on Kickflip to generate revenue by displaying advertising and selling in-game items to players. And Kickflip was a leader in a competitive market with other virtual-currency providers such as Offerpal, Super Rewards, TrialPay, and Sometrics. The virtual-currency services market was quickly growing and generating hundreds of millions of dollars in annual revenue.

Facebook is the dominant social-game network. Seeing how lucrative virtual-currency services were, Facebook sought to compete against Kickflip and the others. It launched its own virtual-currency services called Credits—for which it charged three times more than its rivals, while offering less services.

Credits was never successful when competing on the merits. So Facebook engaged in a course of conduct to eliminate its competition by exploiting its dominant social-game network. First, it banned Kickflip from providing services to any developer that published games on Facebook. Second, it coerced the largest game developers to use Credits exclusively on Facebook by threatening to shut off their Facebook games if they did not comply. Third, Facebook banned all developers on Facebook from using any virtual-currency services other than Credits. And Facebook required developers who offered games elsewhere to charge no less than the inflated Credits rate when doing business on other social-game networks like MySpace.

Since then, Facebook has received billions of dollars that would have otherwise gone to the competition, including Kickflip. Virtual-currency competition has almost been eliminated and Kickflip's business was destroyed. Facebook's anticompetitive conduct is monopolization and unlawful tying in violation of the federal antitrust law. And since Facebook forced developers to terminate their relationships with Kickflip in order to exclude it as a competitor, Facebook tortiously interfered with those relationships.

Facebook contends that Kickflip lacks standing to bring its antitrust claims since Facebook banned Kickflip before Facebook eliminated all competition. But even if Facebook now lifted that

ban—Kickflip could not compete because of Facebook's exclusive-Credits policy. Thus, both the ban and the exclusive-Credits policy are material causes of Kickflip's injuries. Kickflip cannot obtain redress for either violation without also obtaining redress for the other. Kickflip also has standing to challenge the exclusive-Credits policy because it has the "intention to enter the business and a showing of preparedness to [re-]enter the business" and would do so were it not forbidden by Facebook's unlawful policies.

Kickflip properly pled claims for monopolization, tying, and tortious interference—and respectfully requests that the Court deny Facebook's motion.

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Plaintiff Kickflip, Inc.—which did business as Gambit—filed this action against Defendant Facebook, Inc. on October 26, 2012. (D.I. 1) Kickflip's Complaint alleges that Facebook engaged in attempted monopolization, monopolization, and unlawful tying in violation of the Sherman Act, 15 U.S.C. §§ 1, 2 (2006), and tortiously interfered with Kickflip's contractual relations and prospective business expectancies under state law. (D.I. 1 at 13–27) On January 4, 2013, Facebook filed a motion to dismiss Kickflip's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (D.I. 11) Kickflip opposes Facebook's motion.

## SUMMARY OF ARGUMENT

1.     **Standing.** An antitrust plaintiff has standing where the defendant's anticompetitive conduct is a material cause of its injuries, or where the plaintiff has an "intention to enter the business and a showing of preparedness to enter the business." Kickflip alleges that Facebook's 2009 ban of Kickflip, and its 2011 exclusive-Credits policy, were each anticompetitive and a material cause of its injuries. It also has an intention to re-enter the business and is prepared to re-enter the business.

2.     **Monopolization Claims.** Monopolization or attempted monopolization claims require showing "the possession of monopoly power in the relevant market" and "the willful acquisition or maintenance of that power" by anticompetitive conduct. Kickflip pleads relevant markets for social-game networks and virtual-currency services. Kickflip also alleges that

Facebook has a 90% share of the virtual-currency services market and acquired market power by exploiting its dominance in the social-game network market, instead of competing on the merits.

3.   **Tying Claim.** In a tying arrangement, a supplier with market power "offers one product (the tying product) only under the condition that the buyer also purchase a separate product (the tied product), or agree not to purchase the tied product from any other supplier." Kickflip alleges that Facebook exploited control of its dominant social-game network to force developers to purchase Facebook's virtual-currency services exclusively instead of other virtual-currency services.

4.   **Tortious Interference Claim.** Tortious interference occurs where a defendant interferes with a contract without sufficient justification. Kickflip alleges that Facebook interfered with Kickflip's contracts with developers, and that Facebook unjustifiably did so motivated by an anticompetitive animus towards Kickflip, which it sought to eliminate as a competitor.

## STATEMENT OF FACTS

Facebook is the largest online social-game network with a 90% market share. (Compl. (D.I. 1) at 4, 21) It has one-billion users, far eclipsing other social networks such as MySpace and Google+. (*Id.* at 4–5) These social networks permit third-party software developers to distribute games to users on the social network ("social games"). (*Id.* at 3–4)

Social games are generally free to play. (*Id.* at 1) So developers make money through transactions involving in-game items called "virtual goods" that players buy with "virtual currency." (*Id.*) Players earn virtual currency by completing in-game tasks, participating in advertising offers, or buying it with real money. (*Id.*) Developers use third-party virtual-currency services to manage players' virtual-currency transactions, advertisements, payment processing, and for customer support. (*Id.* at 4–5)

In 2008, Kickflip was a leading virtual-currency services provider in a vibrant market competing for developers' business on quality and pricing. (*Id.* at 1, 2, 7) By using virtual-

currency services like those offered by Kickflip and its competitors—e.g., Super Rewards, Offerpal, and TrialPay—developers were able to monetize their social games and thrive. (*Id.* at 1)

In early 2009, Facebook launched its own virtual-currency services for developers called "Credits." (*Id.* at 8) Facebook charged a premium for Credits—for example, Kickflip typically charged developers a 10% fee for each transaction, whereas Credits cost 30%—despite offering fewer services. (*Id.* at 2, 8) Many developers continued to use other virtual-currency services, opting not to use Facebook Credits. So Facebook began pushing individual developers to adopt Credits with mixed success. (*Id.* at 9)

In November 2009, just a few months after Credits became available, Facebook's lawyers sent Kickflip a cease-and-desist letter "banning" Kickflip from offering its virtual-currency services to developers on Facebook. (*Id.* at 10) Facebook accused Kickflip of delivering offensive ads to games on Facebook that violated Facebook's terms of service. (D.I. 12 at Ex. 1) But Kickflip did not create those ads—or any ads; it merely provided the system through which advertisers could deliver ads to games distributed on Facebook by developers. (D.I. 1 at 17) The same ads that Facebook complained of were available through other virtual-currency services, including Facebook's own Credits. (*Id.*) Indeed, this ban was "pretextual." (*Id.*) Facebook then publicly announced that developers were prohibited from doing business with Kickflip for virtual currency on Facebook. (*Id.* at 10)

Later that month, Facebook published a list of "banned" "monetization providers"— including Kickflip—that Facebook forbade developers from using. (*Id.*) At the time, Kickflip was one of the largest virtual-currency service providers and widely recognized for its efforts to eliminate misleading and offensive ads. (*Id.*) The result of Facebook's publicly-announced ban of Kickflip was that Facebook successfully removed one of the largest competitors to Credits. (*Id.* at 17) The boycott that Facebook organized succeeded in driving Kickflip's virtual-currency services out of all business on Facebook. (*Id.* at 4–5) Most of Kickflip's clients—including Zynga, Playdom, and Six Waves—ceased doing business with Kickflip. (*Id.*)

In early 2010, with Kickflip eliminated, Facebook approached the largest developers—including Zynga—demanding that they switch to Credits exclusively. (*Id.* at 10–11) Zynga was wary of Facebook's aggressive tactics and excessive fees, and initially resisted Facebook's demands. (*Id.* at 11) But after several months of struggling, Facebook coerced Zynga into switching to Credits by threatening to "shut down Zynga's games altogether" if Zynga did not comply. (*Id.*) One by one, the largest developers caved to Facebook's demands. (*Id.*)

In January 2011, Facebook announced the final step in its plan to destroy Credits' competitors. (*Id.* at 12) It announced that in July 2011, all developers would be required to use Credits for games on Facebook. (*Id.*) The policy prohibited developers on Facebook from charging less for virtual currency on other social networks—which prevented them from competing on other social networks by offering better pricing. (*Id.* at 14) In less than two years from the first announcement of Credits, Facebook systematically wiped out all competition in the virtual-currency services market on the pretext that it was responding to issues with misleading advertisements. (*Id.* at 11–12) But it did so by targeting the competitors to its Credits system, rather than targeting the advertisers who created the ads, or the developers whose games actually displayed ads on Facebook. (*Id.* at 16–17)

In 2009 there were at least twenty companies competing to provide virtual-currency services to developers on Facebook. (*Id.* at 7) Two years later, Facebook Credits was the only one. (*Id.* at 18) Facebook's actions resulted in Kickflip and its competitors being shut out of the marketplace, losing money, and suffering irreparable harm. (*Id.* at 12–13) Ads violating Facebook Terms continued to run on Facebook. Facebook's exclusion of Kickflip and its competitors did not protect consumers from offensive advertising. The only meaningful result is that Facebook has captured the entire billion-dollar virtual-currency market for itself and driven up costs for developers, and ultimately the consumers who play their games on Facebook.

## ARGUMENT

On a Rule 12(b)(6) motion to dismiss, courts accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). A complaint is sufficient where the claim asserted is "plausible." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And a claim is plausible if the facts alleged permit a reasonable inference that the defendant has engaged in culpable conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); *see also Twombly*, 550 U.S. at 556 ("Asking for plausible grounds…does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the] illegal [conduct plaintiff alleges].").

**A. Kickflip has standing for its antitrust claims because Facebook's anticompetitive conduct caused it redressable injury.**

**1. Facebook's 2009 ban of Kickflip, together with the 2011 exclusivity policy, was part of its attempted and actual monopolization of the virtual-currency market—causing Kickflip antitrust injury.**

Kickflip's antitrust injury arises from Facebook's attempted and actual monopolization of the virtual-currency services market. (D.I. 1 at 13–19) Facebook acts of banning Kickflip in 2009 and imposing its exclusive-Credits policy in 2011 were both critical steps in the monopolization scheme which caused Kickflip's antitrust injury. Facebook claims it banned Kickflip in 2009 to "protect" its product from unwanted ads. (*Id.* at 16) But a purported justification for conduct that harms competition fails if it is pretextual. *Eastman Kodak Co. v. Image Technical Servs., Inc. (Kodak II)*, 504 U.S. 451, 483–84 (1992) (*Kodak II*) (finding that defendant's purported justification that only it could protect its brand was pretextual). The unwanted advertisements controversy was a smokescreen to mask Facebook's motive to monopolize the virtual-currency market through exclusionary conduct. If monitoring ads was Facebook's goal, it would have focused instead on the advertisers responsible for specific ads and the developers who were subject to its policies.

Facebook now argues that Kickflip lacks standing because it did not allege facts supporting its pretext claim. Facebook claims its 2009 Kickflip ban was justified because: (a) Facebook enjoys a

general right to refuse to deal with rivals and those who deal with rivals; (b) the severity of the unwanted-ad problem was "confirmed" by a blogger; (c) Kickflip does not deny that it was violating Facebook's Terms; and (d) Kickflip does not explain how tarnishing its reputation would have helped Facebook achieve a monopoly. None of these arguments succeeds.

Facebook's argument that it may refuse to deal fails because it relies on *Sambreel Holdings LLC v. Facebook, Inc.*, 2012 U.S. Dist LEXIS 178528 (S.D. Cal. Nov. 29, 2012) for the mistaken proposition that it "has a right to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product." (D.I. 12 at 9 (quoting *Sambreel*, 2012 U.S. Dist LEXIS 178528, at *9)) This proposition is rooted in *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), which held that "*[i]n the absence of any purpose to create or maintain a monopoly*, the [Sherman] act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (emphasis added.) The right to refuse to deal is "neither absolute nor exempt from regulation" by the Sherman Act. *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951); *see also Kodak II*, 504 U.S. at 483 n.32 (1992) ("It is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal."). A general refusal-to-deal right ends where an attempt to monopolize or an actual monopolization begins. *Lorain Journal*, 342 U.S. at 155. Facebook's 2009 ban of Kickflip and its subsequent exclusive-Credits policy were part of an attempted or actual monopolization of the virtual-currency market. Facebook cannot rely on a general right to refuse to deal with its competitors in that market—or with developers who deal with those competitors—to shield itself from antitrust liability.

Facebook's remaining arguments fail because they do not address the overarching problem that the 2009 ban was exclusionary because it was "unnecessarily restrictive." *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) (stating that conduct is exclusionary when it "impairs the opportunities of rivals and either does not further competition on the merits or does

so in an unnecessarily restrictive way"). First, banning *any* single virtual-currency provider could not have solved the unwanted-ad problem as virtual currency providers did not create or monitor the ads. Second, far less-restrictive means were available, such as working directly with advertisers and developers to create a consumer-friendly ad environment—or just suspending rather than banning Kickflip. (D.I. 1 at 16–17) Indeed, Kickflip had been working cooperatively and enthusiastically with Facebook up until the moment Facebook suddenly halted all cooperative communications with Kickflip with a heavy-handed cease-and-desist letter. (*Id.* at 9) Third, Facebook had no basis for singling out Kickflip. Kickflip was active in the campaign to prevent unwanted ads. The amount of ads that Facebook found offensive appearing via Kickflip's virtual-currency service was minimal and could have been individually removed. Fourth, Facebook had no basis for singling out any virtual-currency providers because it was the advertisers who created the ads and the developers who directly put them on Facebook. (*Id.* at 17)

### 2. Facebook's 2011 exclusive-Credits policy was an independent material cause of Kickflip's antitrust injury.

Kickflip also has standing based independently on the 2011 antitrust violation of the exclusive-Credits policy. Whether the 2009 ban is found to be a step in Facebook's scheme to monopolize the market or not, Facebook's 2009 Kickflip ban was tortious interference. A plaintiff suffers antitrust injury, and hence has standing, where the anticompetitive conduct is a material cause of the injury—even if the injury has multiple causes. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 142 (1968) (White, J., concurring) ("Normally, it would be enough with respect to causation if the defendant materially contributed to the plaintiff's injury, or substantially contributed, notwithstanding other factors contributed also."(internal quotations omitted)). It is not necessary to give rise to antitrust injury that the antitrust violation is the most significant causal factor resulting in the injury. *See, e.g., Haverhill Gazette Co. v. Union Leader Corp.*, 333 F.2d 798, 806 (1st Cir. 1964).

A plaintiff has standing where two causes each resulted in the same injury, even if one happened first. *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004). In *Khodara*, the plaintiff was prevented from developing land by the revocation of state permits. *Id.* The FAA later adopted regulations that prevented the same development. *Id.* The *Khodara* plaintiff challenged both the initial permit revocation and the FAA regulation. *Id.* The FAA moved to dismiss the challenge to its regulation on standing grounds, claiming that due to the earlier permit revocation, (a) the federal regulation was not a direct cause of plaintiff's injury, and (b) overturning the regulation would not redress plaintiff's injury. *Id.* at 192–93. The Third Circuit disagreed and rejected the FAA's but-for-causation analysis:

> Article III standing demands 'a causal relationship,' but neither the Supreme Court nor our Court has ever held that but-for causation is always needed. Moreover, it is well recognized that **but-for causation is problematic in precisely the situation present here, i.e., where an effect is causally over-determined, i.e., where there are multiple sufficient causes**…. '[I]f two causes concur to bring about an event and either one of them, operating alone would have been sufficient to cause the identical result, some other test [*i.e.*, other than but-for causation] is needed.'

*Id.* at 195. Facebook's implementation of its exclusivity policy prevented Kickflip from competing in the market for virtual-currency services "notwithstanding other factors contributed also…" *Cf. Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 142 (1968) (White J., concurring). Facebook's challenge to Kickflip's antitrust standing is identical to the FAA's position in *Khodara* in every relevant respect and should be rejected.

The tortious 2009 ban did not *negate* the effect of the Facebook exclusivity policy—it *over-determined* that effect. Lifting the 2009 ban on Kickflip's virtual-currency services would not redress Kickflip's injury by restoring it to the virtual-currency services market. *Cf. N.J. Physicians, Inc. v. President of the U.S.*, 653 F.3d 234, 238 (3d Cir. 2011) (stating that standing requires that it be "likely…that the injury will be redressed by a favorable decision"). Full redress requires remedying the 2011 antitrust violation as well.

Additionally, Kickflip has standing to challenge Facebook's 2011 exclusive-Credits policy even though Facebook wrongfully eliminated Kickflip as an active competitor in 2009. It is not

"necessary" to have an "actual going business to establish a private antitrust injury." *Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979). All that is needed is an "intention to enter the business and a showing of preparedness to enter the business." *Id.* A plaintiff is "prepared" where it can show the ability of plaintiff to finance the business and to purchase the necessary facilities and equipment; the consummation of contracts by the plaintiff; affirmative action by the plaintiff to enter the business; and the background and experience of plaintiff in the prospective business. *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 559 F. Supp. 922, 934-935 (E.D. Pa. 1983). Kickflip intends to re-enter the virtual-currency business. (*See* D.I. 1 at 28 (seeking injunction permitting competitors to offer virtual-currency services to developers on Facebook)). And Kickflip's previous status as a leading virtual-currency provider with contracts and industry-leading experience confirms its "preparedness to [re-]enter the business."

### 3. Kickflip still owns the causes of action it asserts in this case and its Delaware corporate status is in good standing.

Facebook also claims by citing a letter outside the pleadings that Kickflip lacks standing because it "divested the Gambit business" yet "makes no allegations that it has the right to pursue Gambit's" claims. (D.I. 12 at 19) But the Complaint alleges Gambit is Kickflip's "d/b/a". Facebook's assumption is mistaken and it misconstrued the letter it cites. Kickflip has the right to pursue its claims, which Facebook can confirm in discovery.

On a motion to dismiss, the court should only consider the pleadings and "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *see also* Fed. R. Civ. P. 12(d). This Court should not consider that letter on this motion because Kickflip's Complaint does not incorporate it by reference, nor is it integral to Kickflip's claims.

According to the Delaware Secretary of State, Kickflip, Inc.'s corporate status is "good standing." (*See* Ex. C, Del. Sec'y of State, Kickflip, Inc. Corporate Entity Status (Jan. 11, 2013)).

**B. Facebook monopolized the virtual-currency market by exploiting its dominance in the social-game network market.**

Monopolization or attempted monopolization claims require showing "the possession of monopoly power in the relevant market" and "the willful acquisition or maintenance of that power" by exclusionary conduct "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). Kickflip alleges that Facebook attempted to and did monopolize the market in virtual currency by exploiting its dominance in the social-network market instead of competing on the merits. (D.I. 1 at 13, 18) *Cf. Kodak II*, 504 U.S. at 479 n.29 ("[P]ower gained through some natural and legal advantage...can give rise to liability if a seller exploits his dominant position in one market to expand his empire to the next."); *see also Syncsort Inc. v. Innovative Routines Int'l, Inc.*, 2005 U.S. Dist LEXIS 15432, at *22 (D.N.J. May 3, 2005) (refusing to dismiss Section 2 monopoly-leveraging claim because plaintiff alleged that (1) the accused party has a monopoly in one market, and (2) the accused party has a "threatened or actual monopoly in the leveraged market") (citing standard established in *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 206 (3d Cir. 1992)); *A.I.B. Express v. FedEx Corp.*, 358 F. Supp. 2d 239, 250–51 (S.D.N.Y. 2004) (refusing to dismiss monopoly leveraging where FedEx terminated a profitable arrangement and leveraged into downstream services market).

**1.   Kickflip pleads a relevant market for virtual-currency services.**

To determine whether a defendant possesses monopoly power, it is necessary to define the relevant market in which the power is alleged to exist. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 459 (1993). Relevant market allegations survive a motion to dismiss under Rule 12(b)(6) Fed. R. Civ. P. 12(d) unless they are "facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997)). Usually, "proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza*, 124 F.3d at 436; *Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 333 (E.D.N.Y. 2009) ("Courts are reluctant to dismiss antitrust claims for failure to plead the relevant product market

because determining the relevant market requires a fact-intensive inquiry that is best served by allowing the parties discovery.") Facebook cannot show that either of Kickflip's proposed relevant markets are facially unsustainable.

A relevant market is determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City Pizza*, 124 F.3d at 436. Kickflip's virtual-currency market meets this standard. Virtual-currency services are not reasonably interchangeable with other products because "the only way for developers to effectively monetize social games is through the use of virtual currency services—there are no substitutes." (D.I. 1 at 5) The cross-elasticity of demand of the virtual currency market was illustrated when Facebook imposed Credits on developers. With no other virtual currency service available, developers were forced to adopt Credits—even with Facebook's steep price. (*Id.* at 11)

Facebook claims that Kickflip's Complaint fails to plead a relevant market in virtual-currency services because it: (1) "provides only a vague explanation of a range of services that might be included" in the market; (2) does not "clearly identify the companies that do and do not participate" in the market; (3) "fails to address why certain other services should be excluded from the market"; and (4) did not rule out the abstract possibility that other application developers could use virtual-currency services, too. (D.I. 12 at 12, 13) But dismissal is only appropriate where a relevant market is not defined with reference to "reasonable interchangeability or cross-elasticity of demand," or "clearly does not encompass all interchangeable substitute products." *Queen City Pizza*, 124 F.3d at 436. Facebook's four arguments misstate the standard and do not reflect any deficiency in the proposed market.

First, Kickflip's virtual-currency market definition is not vague. Kickflip's Complaint explains that virtual-currency providers offer a set of integrated services to social-game developers that include virtual-currency management, advertising delivery, payment processing, and related customer service. (D.I. 1 at 4–5) The virtual-currency services market is a "cluster market" in which a number of complimentary products or services are combined in a single market. *See United States v Grinnell Corp.*, 384 U.S. 563, 571 (1966) (finding a relevant cluster

market even though each of several providers of burglary and fire protection services offered a different array of services); *Image Technical Servs. v. Eastman Kodak* (*Kodak III*), 125 F.3d 1195, 1205 (9th Cir. 1997) (finding a relevant cluster market consisting of thousands of Kodak replacement parts, and noting that all competitors need not offer the same cluster of services to establish a relevant product market "where that combination [of services] reflects commercial realities"). The commercial reality is that developers need a system to monetize their social games. Only virtual-currency providers could meet that specific end through the cluster of services they provided. (D.I. 1 at 1) The fact that Kickflip and its competitors offered additional and complementary services to social-game developers does not undermine the proposed market. Rather, it highlights that Facebook provides much less service than the former vibrant market in exchange for its steep 30% fee.

Second, although it is not required to do so, the Complaint expressly identifies companies in the market: "[t]he market for virtual-currency services included Gambit, Offerpal, TrialPay, Super Rewards, Sometrics, Facebook, and other competitors." (D.I. 12 at 12)

Third, Facebook's observation that other companies "enable people to engage in payment processing across the Internet" is a red herring. The consumers in Kickflip's proposed market are "software developers that publish[] games on Facebook and other social networks" (D.I. 1 at 1)—not "people" who engage in payments (D.I. 12 at 13). Facebook's challenge does not address "commercial realities faced by consumers" and should be rejected.

Finally, as to whether other application developers could use virtual currency, Facebook's speculation has no basis in "commercial realities," as discovery will show. Facebook's argument calls for a market defined in terms other than the demand-based interchangeability required by *Queen City Pizza*.

**2.   Kickflip pleads a relevant market for social-game networks.**

Kickflip's proposed market in social-game networks also satisfies the *Queen City Pizza* pleading standard. Kickflip explains that social networks provide a unique ability to distribute games designed to "leverage existing social networks" and features that create distinct economic

opportunities not available in other game marketplaces. (*Id.* at 4) Facebook has not identified any "clear" interchangeable substitute products—none of the "other platforms" it mentions (*see* D.I. 12 at 13–14) are based on "existing social networks" with the necessary features required by social-game developers. (D.I. 1 at 4-6)

### 3. Facebook has monopoly power in the virtual-currency services market.

Kickflip's claim that Facebook has a 90% share of the virtual-currency services market (*see id.* at 18) establishes Facebook's monopolization of that market. *See United States v. Dentsply Int'l*, 399 F.3d 181, 188–90 (3d Cir. 2005) (reversing the district court and ruling that 75% to 80% market share was "more than adequate to establish prima facie case of power" and finding that defendant's agreements with "new as well as long-standing dealers not to handle competitors' [product]," which had the effect to "exclude competitors from the dealers' network" and "block competitive distribution points," demonstrated defendant's "plan to maintain monopolistic power"); *Weiss v. York Hosp.*, 745 F.2d 786, 827 (3d Cir. 1984) (market share in excess of 80% establishes a prima facie case of monopoly power).

### 4. Facebook obtained and has maintained monopoly power in the virtual-currency services market as a result of anticompetitive conduct.

Kickflip sufficiently alleges that Facebook engaged in anticompetitive conduct "to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Broadcom Corp. v. Qualcomm Inc.*,,, 501 F.3d 297, 308 (3d Cir. 2007). Facebook's three arguments to the contrary are mistaken.

**First**, Facebook claims its conduct was lawful because it has not "applied its payment policy to social-game networks other than the Facebook Platform, such as MySpace, Google+ or any other third-party platform used by developers." (*See* D.I. 12 at 14–15). But Facebook's policy prohibited developers on Facebook from charging less for virtual currency on other social networks. (D.I. 1 at 4) Facebook's restriction on what developers charge on other social networks "impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Broadcom*, 501 F.3d at 308. In fact, this restriction

solidified Facebook's grip on the virtual-currency market. Developers could not offer players lower prices on other social networks and, as a result, could not provide players an incentive to switch to another social network where developers could use third-party virtual currency.

Regardless whether Facebook restricts pricing on other social networks, Facebook's social-game network—and the segment of the virtual-currency market for developers on Facebook—may themselves qualify as relevant markets. "[I]n some instances one brand of product can constitute a separate market." *Kodak II*, 504 U.S. at 482. The determining factor in market definition is the range of choices available to users and consumers—if a single brand of product is not interchangeable with other brands, then the boundaries of a relevant market can coincide with a single brand. *Id.*; *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("[w]hen a product is controlled by one interest, without substitutes available in the market, there is monopoly power"). Developers have no meaningful substitutes for Facebook's social network—which is entirely controlled by Facebook.

The Northern District of California recently rejected an identical "only within our platform" argument in a similar action against eBay, the operator of an online auction website. *See Smith v. Ebay Corp.*, 2012 U.S. Dist LEXIS 1211 (N.D. Cal. Jan. 5, 2012). In *Smith*, the plaintiff alleged that eBay monopolized and attempted to monopolize the market for "online payment systems for use in online auctions." Plaintiffs' First Amended Class Action Complaint & Jury Demand at 14, 16, *Smith*, 2012 U.S. Dist LEXIS 1211 (No. C-10-03825-JF(HRL)) (Attached as Ex. A). Specifically, eBay allegedly made its PayPal subsidiary the only viable payment option for sellers. *Id.* at 6, 7–8, 9–10. eBay moved to dismiss those monopolization claims under Rule 12(b)(6) on, among other grounds, the argument that its allegedly anticompetitive activities occurred "completely within the eBay platform." Defendants' Notice of Motion & Motion to Dismiss Plaintiffs' First Amended Class Action Complaint at 2, *Smith*, 2012 U.S. Dist LEXIS 1211 (No. C-10-03825-JSW) (Attached as Ex. B). The *Smith* court denied eBay's motion.

**Second**, Facebook claims that since the Complaint does not state Facebook's share of the social-game network market in 2009, Kickflip fails to allege that Facebook had a dangerous

probability of monopolizing the virtual-currency services market. (D.I. 12 at 15) Facebook is wrong for two reasons. The first is that it is unnecessary to plead market share where the complaint alleges other factors showing market power. *See, e.g., Broadcom*, 501 F.3d at 318–19 (reversing district court dismissal of attempted monopolization claim where complaint did not allege Qualcomm's current market share in the relevant market but did address other factors, including that Qualcomm's actions "effectively foreclosed" Broadcom's market entry); *Fair Isaac Corp. v. Equifax Inc.*, 2008 U.S. Dist. LEXIS 16664, at *21–22 (D. Minn. Mar. 4, 2008) (stating that market-share allegations are not a prerequisite to pleading dangerous probability of success); *Rescue Phone, Inc. v. Enforcement Tech. Group*, 2007 U.S. Dist LEXIS 49401, at *12–16 (E.D. Va. July 9, 2007) (plaintiff's attempted-monopolization claim withstood motion to dismiss where plaintiff failed to allege market share but alleged other factors about market power). The second is that pleading market share at the time of the attempted monopolization is unnecessary if the defendant's *current* market share is great enough. "The [market] share that is relevant for determining whether the defendant can satisfy the 'dangerous probability of success' requirement of attempted monopolization should be either that which he possesses at the time of litigation or the largest share he possessed during the period of the alleged offense." *Multistate Legal Studies v. Harcourt Brace Jovanovich*, 63 F.3d 1540, 1554-55 (10th Cir. 1995). Kickflip alleges that by 2011 Facebook had a 90% share in the social-game network market and the virtual-currency-services market. (D.I. 1 at 18, 21, 23)

**Third**, Facebook implies that Kickflip's Complaint is deficient because it does not allege that former competitors have gone out of business. (D.I. 12 at 14) But it is not necessary to show that competitors have gone out of business; it is enough that they were injured as a result of being foreclosed from the virtual-currency services market. *Cf. Kodak II*, 504 U.S. at 458 (Competitors "were unable to obtain parts from reliable sources, and many were forced out of business, while others lost substantial revenue.") (record citations omitted). Facebook's actions resulted in Kickflip and its competitors losing money and being shut out of the marketplace. (D.I. 1 at 13, 25)

**C. Kickflip pleads a claim for illegal tying because it alleges that Facebook conditioned access by developers to its dominant social-game network on the exclusive use of its Credits virtual-currency services.**

In a tying arrangement "a supplier offers one product (the tying product) only under the condition that the buyer also purchase a separate product (the tied product), or agree not to purchase the tied product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958). Tying is illegal when the seller forces it to buy the tied product by exploiting its control over the tying product. *Kodak II*, 504 U.S. at 464. Facebook exploited its control of the dominant social network to force developers to purchase Facebook's virtual currency exclusively—instead of those offered by Kickflip and other virtual-currency providers. Facebook raises four arguments on this point, none of which succeed.

**First**, Facebook asserts it has not "tied anything to access its social network" and that its payment policy "does not apply to games that access Facebook from other sites…." (D.I. 12 at 16) These arguments are red herrings—Kickflip's tying allegations relate to restrictions placed on developers with social games *on Facebook*. Those developers are barred from using other virtual currency in those games. If a developer creates another kind of game for distribution in a different marketplace (*e.g.* on a stand-alone website) or accesses Facebook in other ways (*e.g.* by using "Facebook Login" or social plugins), they are not participating in the social-game network or virtual-currency services markets.

**Second**, Facebook claims there has been no tying because its payment processing for transactions occurring on Facebook are simply part of Facebook's Platform (*see id.*)—implying the two cannot be separated for purposes of a tying analysis. But for years, there was a market for virtual-currency services separate from the Facebook Platform. (D.I. 1 at 5, 6) During that period, developers used virtual-currency services from third parties like Kickflip and its competitors. And until Facebook made Credits exclusive, developers continued to have the ability to choose between Credits and third-party virtual-currency services. Facebook's decision to force developers to exclusively use Credits does not transform the two products into a single indivisible

whole just because they couch them under the "Facebook Platform". *See, e.g., Kodak II*, 504 U.S. at 462–63 (history of independent sales demonstrates separate products).

And Facebook's reliance on Apple, Inc.'s iOS platform policy—as if it is legal authority—is misplaced. Unlike Facebook, Apple did not reverse a prior course of dealing in implementing its exclusive policy. When a monopolist previously allowed or encouraged competition—presumably because it was profitable to do so—but then withdraws the right to compete through a refusal to deal, an antitrust violation may lie. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602–05 (1985) (withdrawal from joint marketing of a multi-resort ski pass after such passes were sold profitably for years violated Section 2); *See also Kodak II*, 504 U.S. at 451 (denying summary judgment on tying and attempted monopolization claims where dominant firm in market for copier replacement parts reversed course of dealing that permitted vibrant aftermarket for service of firm's equipment using replacement parts); *Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Group*, 93 F. App'x. 1, 8 (5th Cir. 2004) (termination of prior course of dealing with rival held anticompetitive).

**Third**, Facebook repeats its argument that Kickflip fails to state a claim because the tying policy applies "only to the use of Facebook and to Kickflip only." (*See* D.I. 12 at 17). But it applies to other virtual-currency service providers and impacts other social-game networks. For full discussion, see *supra*, Part B.III.

**Finally**, Kickflip's allegations support a *per se* tying analysis and the Court should decline Facebook's request that it determine now—without the benefit of an evidentiary record—that Kickflip's tying claim must be analyzed under the rule of reason. A *per se* tying claim has three elements: "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992). Kickflip's Complaint alleges each element: (1) Facebook tied access by social-game developers to its social-game network to the exclusive use of its Credits virtual currency; (2) Facebook has market power in the tying product market for social-game networks because it has a 90% market

share and there are high barriers to entry; and (3) Facebook's conduct eliminated an entire industry of virtual-currency service providers and diverted hundreds of millions of dollars in revenue to Facebook. (D.I. 1 at 21–22)

Facebook asks the Court to apply only the rule of reason, arguing that "integration of new functionality into platform software is a common practice," and the "wooden application of per se [tying] rules in this litigation may cast a cloud over platform innovation." (D.I. 12 at 17–18 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001)) But *Microsoft* was decided on summary judgment, not a motion to dismiss. *See Microsoft*, 253 F.3d at 95 ("Our reading of the record" suggests that the *per se* rule is inapplicable here but "we have no present basis for finding the per se rule inapplicable to software markets generally"). A decision as to whether Facebook's conduct warrants *per se* treatment should be reserved until summary judgment so it may be resolved "on the particular facts disclosed in the record." *Kodak II*, 504 U.S. at 466-67 ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.").

### D. Kickflip's claims for tortious interference allege that Facebook interfered with Kickflip's relationships without justification or in a wrongful manner.

Kickflip alleges that by forbidding developers from using Kickflip's virtual currency in games on Facebook, Facebook intentionally interfered with Kickflip's relationships without justification. (D.I. 1 at 25) Whether an allegedly wrongful "action is improper is a factual determination not readily amenable to assessment by way of a motion to dismiss." *Grunstein v. Silva*, 2009 Del. Ch. LEXIS 206 (Del. Ch. Dec. 8, 2009). Under the Restatement (Second) of Torts, seven fact-intensive factors[1] must be examined by the trier of fact when determining justification. *See id.* at *16 ("Delaware generally follows the Restatement with respect to tortious

---

[1] The trier of fact must weigh the following seven factors to determine whether Defendant's interference was justified: (1) the nature of Defendant's conduct; (2) Defendant's motive; (3) the interests of Kickflip; (4) the interests sought to be advanced by Defendant; (5) the social interests in protecting the freedom of action of Defendant and the contractual interests of Kickflip; (6) the proximity or remoteness of Defendant's conduct to the interference; and (7) the relations between the parties. *See* Restatement (Second) of Torts § 767.

interference.") The "issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1965)).

Facebook claims that Kickflip "fails to allege facts needed to satisfy the requirement of unjustified or wrongful conduct" asserting the ban was "entirely reasonable" because "developers themselves would violate Facebook's terms if they ran non-compliant ads served by Kickflip." (D.I. 12 at 19) If Facebook is correct, it could have enforced its policy with those developers and advertisers responsible for creating and publishing ads. (D.I. 1 at 17) Facebook's own motion endorses the view that it should have "put the burden on developers to self-regulate by suspending their apps if bad offers are found." (D.I. 12 at 10 n.18) But instead it singled out Kickflip, which was arbitrary and motivated by an anticompetitive animus towards Kickflip to eliminate it as a competitor. (*Id.* at 18, 28–29) Facebook's action and motive were wrongful, and banning Kickflip was an unjustified means for dealing with Facebook's ad issues.

Finally, Facebook claims that Kickflip's tortious-interference claims are deficient because they "fail[] to deny that Kickflip was violating" Facebook's Terms of Service. (*See* D.I. 12 at 19) Since Kickflip's virtual-currency services were not provided under an agreement with Facebook, Kickflip could not have violated the Terms. The developers were subject to the Terms, and Facebook could have enforced its Terms with the developers.

## CONCLUSION

Kickflip has standing for its antitrust claims because both the 2009 ban and 2011 exclusive-Credits policy were wrongful actions that were material causes of its injuries. The 2009 ban was part of an attempted and actual monopoly leveraging from Facebook's dominant position in a well-defined market for social-game networks to a dominant position in a well-defined market for virtual currency. It was also a tortious interference with Kickflip's business. The 2011 policy was part of the same monopoly leveraging, and also was an unlawful-tying arrangement.

Kickflip's Complaint properly pleads antitrust claims and tortious interference, and the Court should deny Facebook's motion.

Dated: February 1, 2013

By:      _/s/ Kenneth L. Dorsney_____
Kenneth L. Dorsney (I.D. #3726)
Mary B. Matterer (I.D. #2696)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com
mmatterer@morrisjames.com

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
**NEWMAN DU WORS LLP**
1201 Third Avenue, Suite 1600
Seattle, WA 98101
(206) 274-2800
dn@newmanlaw.com
linke@newmanlaw.com

Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
**STRANGE & CARPENTER**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com

**ATTORNEYS FOR PLAINTIFF
KICKFLIP, INC., d/b/a GAMBIT**

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| CHARLOTTE SMITH, ET AL. | Case No. C-10-03825-JF(HRL) |
| Plaintiffs, | **PLAINTIFFS' FIRST AMENDED** |
| v. | **CLASS ACTION COMPLAINT** |
| EBAY CORPORATION, ET AL., | **AND JURY DEMAND** |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

NOW COMES CHARLOTTE SMITH, PAUL JACKSON, ART BELTRONE, LEE BELTRONE, JAMES MOUNTAIN, JEAN MOUNTAIN, REX STARK and PATTI STARK, individually and on behalf of all others similarly situated, by and through their attorneys, Macuga, Liddle, & Dubin, P.C., Peter W. Macuga, II, and Kevin J. McGiness and say as their First Amended Class Action Complaint against eBay, Inc., et al. ("the Defendant"), states as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action on their own behalf individually and on behalf of all individuals wherever located who are sellers that have and will continue to pay fees to utilize online auction/sales services from Defendant.

2. Plaintiffs effectively have and will continue to have no choice but to accept payment using only eBay owned PayPal, and as a result sellers are and will continue to be required to pay eBay through PayPal an additional fee up to 3% and .30USD per

transaction.  Defendant's actions constitute an unlawful tying arrangement resulting in an impermissible restraint of trade, in violation of federal law.

3.  The activities of Defendant have and will continue to threaten to have substantial adverse competitive effects upon interstate commerce within the United States.

4.  Plaintiffs allege that Defendant eBay, and its officers and owners, conspired to violate the Sherman Anti-Trust Act (15 USC §1, *et* seq), by purposefully creating an unlawful tying arrangement by effectively restricting sellers from accepting any forms of payment other than eBay owned Paypal, resulting in an impermissible restraint of trade.

## PARTIES, JURISDICTION, AND VENUE

5.  Plaintiff Charlotte Smith is an individual and resident of the State of Michigan residing at 2960 Parker, Dearborn, 48124, with the username *Mydadsdaughter*.

6.  Charlotte Smith is a "seller" utilizing Defendant's online auction/sales services and is forced to pay fees both to eBay for listing and selling items, and to eBay through the use of PayPal.

7.  Plaintiffs Art Beltrone and wife Lee Beltrone are individuals and residents of the State of Virginia residing a 6057 Gordonsville Road, Keswick, 22947 with the username *Beltroneco*.

8.  Art and Lee Beltrone is a "seller" utilizing Defendant's online auction/sales services and are forced to pay fees both to eBay for listing and selling items, and to eBay through the use of Paypal.

9.  Plaintiff Paul Jackson is an individual and resident of the State of North Carolina residing at 2328 Asheby Woods Ct., Kernersville, 27284, with the username *Barneyalexanders.*

10. Paul Jackson is a "seller" utilizing Defendant's online auction/sales services and is forced to pay fees both to eBay for listing and selling items, and to eBay through the use of Paypal.

11. Plaintiffs James Mountain and wife Jean Mountain are individuals and residents of the State of Massachusetts with mailing address at P.O. Box 1030 Ashburnham, MA 01430, with the username *jimmtn.*

12. James and Jean Mountain is a "seller" utilizing Defendant's online auction/sales services and are forced to pay fees both to eBay for listing and selling items, and to eBay through the use of Paypal.

13. Plaintiffs Rex Stark and wife Patti Stark are individuals and residents of the State of Massachusetts with a mailing address at P.O. Box 1029 Gardner, MA 01440, with the username *ladystark.*

14. Rex and Patti Stark is a "seller" utilizing Defendant's online auction/sales services and are forced to pay fees both to eBay for listing and selling items, and to eBay through the use of Paypal.

15. All Plaintiffs are a "seller" utilizing Defendant's online auction/sales services and is forced to pay fees both to eBay for listing and selling the item, and to eBay through the use of PayPal, and are thus a member of the Class defined herein.

16. Plaintiffs bring this class action on behalf of themselves and on behalf of the all persons who are a "seller" utilizing Defendant's online auction/sales services and were

and will be forced to pay fees both to eBay for listing and selling the item, and to eBay through the use of PayPal.

17. Defendant eBay Corporation is, and at all times relevant hereto was, a publicly-held Delaware corporation with its principal executive offices located at 2145 Hamilton Avenue, San Jose, California, 95125, and doing business throughout the United States.

18. Defendant is a corporation in good standing and has carried on continuous and systematic parts of its general business within the state of Michigan.

19. Defendant PayPal Corporation is, and at all times relevant hereto was, a wholly owned subsidiary of Defendant eBay with its principal executive offices located at 2145 Hamilton Avenue, San Jose, California, 95125, and doing business throughout the United States.

20. There are issues of Federal Question, and this court has jurisdiction pursuant to 23 U.S.C. §1331.

21. Venue is proper in this Court under 28 U.S.C. §1391 because a significant portion of events, acts, and omissions giving rise to this action occurred in the State of Michigan in this District and because eBay can be found in this District.

22. At all times herein mentioned, Defendant acted through its agents, servants and employees who, at all times herein mentioned, acted within the course and scope of their agency and employment with Defendant.

## **FACTUAL ALLEGATIONS**

23. Defendant is the largest online auction/sales service in Michigan and the United States, controlling in excess of an estimated 90% of the national online auction market.

24. On October 3, 2002, eBay acquired PayPal, the largest online payment system, and thus eliminated competition and expanded its own market dominance. eBay possesses effective monopoly power in online auction markets.

25. eBay has acted through its wholly-owned subsidiary PayPal to monopolize the available forms of payment that sellers can use on eBay, and has limited and banned competitors in an attempt to maintain its dominance in the online auction market.

26. eBay has implemented Accepted Payment Policies which effectively limits sellers to accepting payments only through eBay owned PayPal, and has thus created an improper tying arrangement between eBay and PayPal and caused an unreasonable restraint on trade.

27. Even before its acquisition of PayPal in 2002, eBay has and maintained dominance in the online auction market. eBay is the largest online auction house in the United States and its name has become synonymous with online auctions.

28. eBay's dominance as an online auctioneer is essentially self-fulfilling; because it has the largest amount of buyers and sellers in a single place, it is the place where most buyers and sellers will gravitate to sell their goods and services. This, in the aggregate, makes the barrier to entry for a competitor extremely high.

29. eBay possesses a dominant market position in online payment systems used with online auctions through its subsidiary, PayPal, a money transfer agent.

30. In order to maximize the number of bidders on a product, it is in the seller's interest to provide as many payment means as possible. eBay's dominant position in the market for online payment systems for use with online auctions, and use of affirmative anticompetitive activity, has ensured, however, that there are functionally no other real choices for online payment on eBay besides PayPal.

31. In April 1999, eBay acquired Billpoint online payment system. In March 2000, eBay launched Billpoint, but it failed in gaining any market share against another online payment system, PayPal.

32. From 1999 until 2002, when eBay acquired PayPal, eBay engaged in the following anticompetitive practices to extinguish PayPal as a competitor:

    a. Banning PayPal from eBay's community boards;

    b. Referring to Billpoint's payment service as "eBay Payments";

    c. Funneling buyers to Billpoint, thereby giving the impression that the eBay payment format, known as "buy it now," accepted only Billpoint payments;

    d. Declaring that sellers were required either to have a credit card merchant account and or accept Billpoint to be included in eBay stores, de facto excluding PayPal as a payment option;

    e. Giving preferential placement to Billpoint on eBay's end-of-auction e-mails;

    f. Replacing saved preferences for PayPal with Billpoint preferences; and

g.  Mandating that buyers use a "checkout" feature that presented marketing materials promoting Billpoint and even took the buyer to a Billpoint payment form.

33.  eBay's anticompetitive conduct, listed in ¶32, caused PayPal's previous management to threaten an antitrust lawsuit against eBay for engaging in an illegal bundling strategy.  PayPal's previous management also filed a complaint with the Department of Justice and with the Federal Trade Commission.

34.  On October 3, 2002, eBay acquired PayPal.  One of the conditions of eBay's purchase of PayPal was that eBay would shut down Billpoint, PayPal's chief competitor.  Thus, the acquisition by eBay of PayPal had the effect of eliminating competition in the market for online payment services.

35.  On or around November 16, 2005, eBay acquired Verisign's payment gateway business.  The acquisition of Verisign allowed eBay and PayPal the ability to process credit card payments internally, without relying on a bank or other intermediary, while at the same time eliminating Verisign as a rival online payment center.

36.  Since acquiring payment competitors and establishing a monopolistic dominance on the online auction and payment market, eBay has further abused its inferred monopoly power by effectively foreclosing sellers from using alternative online payment systems on its PayPal and eBay websites.

37.  For example, on or around July 3, 2006, Google Checkout was available for consumers' use on eBay.  Google Checkout allowed credit-card purchases, without the purchaser sharing credit-card information with merchants.  Google Checkout further promised to charge merchants $.20 and 2 percent per transaction, which was and is

considerably lower than PayPal's merchant fees. Only three days after Google Checkout became available, eBay announced it was banning sellers from requesting payment through Google Checkout and updated its Safe Payment Policies to reflect the ban.

38. In January 2007, eBay again tightened the noose around the necks of sellers wishing to operate outside the confines of the PayPal online payment system. On January 17, 2007, eBay doubled the PayPal Buyer Protection on its website, and in doing so effectively eliminated buyer protection for non-PayPal transactions.

39. In or around October, 2008, eBay announced a paperless payment policy, requiring sellers to accept electronic payments and effectively eliminating payments by cash, cashiers or personal check, or money order.

40. On or around October 6th, 2008 eBay acquired Bill Me Later, and merged its services with PayPal in an effort to further extend its leadership in online payments.

41. Since then eBay has further modified and restricted its Accepted Payments Policy to limit sellers to only accept PayPal, ProPay, Monebookers, Paymate, Merchant Seller Account, Payment upon Pickup, and Bill Me Later.

42. eBay specifically prohibits sellers from requesting payment via; cash through the mail, point-point cash transfer services(that are not banks), checks or money orders, bank-to-bank transfers, topping off a seller's prepaid credit or debit card, or online or other payment methods not specifically permitted in this policy.

43. eBay further requires sellers to specifically list which "acceptable" form(s) of payment in sellers listing.

44. As stated in eBay's Accepted Payments Policy, Sellers are prohibited from including in their listing the following:

    a. Ask buyers to contact them for additional payment methods.

    b. Offer a payment method to some buyers but not others.

    c. Discourage buyers from using any payment method the seller specified in the listing.

    d. Ask buyers to pay using a method not mentioned in the listing.

45. eBay's Accepted Payment Policy lists as examples of statements that sellers are prohibited in sellers statement from making to be;

    a. Contact us for payment information.

    b. Contact us for other payment methods.

    c. Contact us for your preferred payment method.

    d. Buyers may request to pay by check or money order.

46. The eBay prohibited actions stated in ¶44-45 apply to all transaction-related correspondence between a seller and a buyer as well as the listing.

47. If eBay believes that a seller has violated its Accepted Payment Policy the seller's listing will be removed and the seller may lose prepaid listing fees and have its selling privileges restricted.

48. While eBay lists purported alternative payment methods, eBay has through its intentional action made it so PayPal is the only viable option for sellers.

49. The purported additional payment options supposedly allowed by eBay are not viable alternatives for the following reasons;

a. ProPay: In order for a seller to use ProPay, the seller must be at an eBay Bronze status, thus precluding any sellers that do not move a volume of at least $3,000 a month for a consecutive 6 month period. In Addition, ProPay requires a $24.00 annual fee, and offers starting rates at 3.1% and .30USD per transaction.

b. Moneybookers: If a seller is less than an eBay Bronze level seller, Moneybookers will hold 100% of the payment for a period up to 40 days.

c. Paymate: In order for a United States Seller to use Paymate, the seller must first register with a merchant account, which holds higher fees. In addition, a US seller must first have a minimum 98% feedback with at least 10 sales in the prior 6 months, thus eliminating any new sellers.

d. Merchant Credit Card: Sellers would be required to set up a merchant account prior to registering through eBay. By eBay's own admissions, merchant accounts hold higher fees, and eBay recommends sellers to look to the other listed options.

50. eBay has designed its Accepted Payment Methods so that PayPal is the most favorable method, and thus only viable method to sellers. eBay has prohibited the use of any forms of payment that are more favorable than PayPal.

51. eBay has created a system by which sellers are required to pay eBay for listing and sales fees, as well as effectively being forced to accept PayPal and pay eBay an additional fee.

52. In or around April, 2011 eBay implemented further changes in its fee structure in order to force sellers to pay additional fees to eBay. eBay began charging as part of

its final value fee to each eBay seller an amount based upon a sales price of the sellers individual item with the addition of the shipping price amount paid for by the seller.

53. Prior to April, 2011, eBay would charge a final value fee based upon the value and/or purchase price of the item, i.e. 9% of $100 dollar item sold, or $9.00. As of April, 2011, eBay included the shipping charge as part of the final value and then charged the same percent for both, i.e. 9% of $110, with $100 for item sold and $10 shipping, or a total fee of $9.90.

54. eBay does not provide shipping services to eBay sellers and the cost of shipping is either born by the eBay seller or the eBay purchaser.

55. Although eBay does not provide shipping or charge shipping costs to the eBay seller or eBay customer, eBay nevertheless bases its final value fee upon the cost of the individual item sold and the cost of shipping that item.

56. The addition of the shipping cost paid for by either the eBay seller or the eBay customer, to the eBay final value fee (profit to eBay) renders no service to either the eBay seller or eBay buyer.

57. By the addition of the shipping costs for an item sold to the eBay purchaser to the eBay final value fee eBay is imposing a charge for no goods, or for no service, and is requiring eBay sellers to pay yet another percent of their profit to eBay with no corresponding benefit to the seller from eBay.

58. As eBay is a self-admitted monopoly business is the internet sales forum, by the imposition of the final value fee on an eBay seller shipping costs eBay is further

imposing unnecessary costs, improper costs, and illegal costs for the use of its monopoly system.

59. Defendant's actions allow it to unfairly utilize its market power/economic power and/or monopoly in the United States market, thereby harming members of the class. All of the acts and activities of Defendant, as heretofore set out, were performed willfully, intentionally, maliciously, and knowingly.

## CLASS ACTION ALLEGATIONS

60. Plaintiffs advance this class action on behalf of themselves and all others similarly situated who were or are sellers on eBay that pay listing and sales fees to eBay and are effectively forced to utilize eBay owned PayPal as the sole accepted payment method while paying an additional service fee to PayPal, as members of the putative Plaintiff Class.

61. Excluded from the class is Defendant, its directors, officers, employees or members of their families.

62. This action is brought and may be maintained as a Class Action pursuant to Fed. R. Civ. P. 23(b)(3), and case related law.

63. The requirements of Rule 23, including numerosity, typicality, adequacy, predominance and/or superiority, are satisfied.

64. The illegal monopolization and tying arrangements have harmed and continue to harm the interests of the vast majority of eBay sellers throughout the United States. The members of the Class are so numerous that joinder of all members is impracticable.

65. Plaintiffs' claims are typical of the claim of all members of the Class because Plaintiffs, like every other member of the Class, have been and continue to be exposed to Defendant's conduct and practices, and are consumers with the same legal rights at stake, and seeks the same relief under the same causes of action as the other members of the class.

66. Plaintiffs will fairly and accurately protect the interests of the members of the Class and have retained competent and experienced counsel. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

67. Defendant's behavior is common to the class, thereby making appropriate injunctive relief with respect to the class as a whole.

68. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is not only impracticable, but impossible. The damages suffered by many members of the class are small in relation to the expense and burden of individual litigation and therefore it is highly impracticable for such members to attempt redress individually. There will be no extraordinary difficulty in the management of this class action. Common questions of law and fact exist with respect to all class members and predominate over any questions solely affecting individual members.

69. Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual class members. These common legal and factual questions include, among other things:

    a. Whether Defendant is liable to Plaintiff Class for violations of federal antitrust laws;

b.  The definition of the relevant product and geographic markets;

c.  Whether Defendant has sufficient economic power in the tying market to restrain appreciably competition in the tied product market;

d.  Whether Defendant uses coercion in the market for online payment systems for use in online auctions;

e.  Whether Defendant is abusing its monopoly power and/or is illegally maintaining its monopoly power;

f.  Whether Defendant's actions caused injury to Plaintiff Class and whether Defendant should be enjoined from further violations;

g.  Whether the practices are ongoing; and

h.  Whether Defendant is liable to Plaintiff Class for treble damages for its violation of federal antitrust laws;

70.  Plaintiffs envision no difficulty in the management of this litigation as a Class Action.

## COUNT I
**Class Action By All Plaintiffs Against Defendant For
Violations of The Sherman Anti-Trust Act §2 (Abuse of
Monopoly Power and Monopoly Maintenance) For Damages
And Injunctive Relief Under 15 U.S.C §§15, 26 Respectively.**

71.  Plaintiffs re-allege and incorporate herein by reference as though fully set forth herein each and every allegation in all preceding paragraphs.

72.  By reason of the foregoing conduct eBay has willfully acquired and maintained monopoly power by engaging in anticompetitive conduct in the market for online payment systems for use in online auctions.

73. The anticompetitive conduct complained of includes; (i) prohibiting many forms of payment, including cash, check, or money order; (ii) obliging sellers to accept online payment forms that carry additional fees; (iii) intimidating sellers into acceptance of these forms of payment; (iv) seeking to exclude new payment services by destruction or the acquisition of competitors; (v) excluding the use of alternative payment systems; (vi) limiting acceptable payment systems to those with less favorable terms than PayPal; and (vii) steering buyers to PayPal.

74. eBay's monopolization conduct has had and/or is likely to include the following anti-competitive consequences:

a. actual and potential competition in the market for online payment systems for use in online auctions has been injured, limited, reduced, restrained, suppressed, and effectively foreclosed; and

b. eBay sellers are effectively forced to accept PayPal and as a result have paid or are likely to pay artificially inflated and supra competitive fees to eBay by paying for both listing, selling, and PayPal charges.

75. To the extent eBay has sought to achieve any legitimate business purpose through its conduct, it has not used the least restrictive means for doing so, any claimed precompetitive benefit is outweighed by the anticompetitive harm, and any purported legitimate business justifications are mere pretexts for illegal monopoly maintenance.

76. As a result of eBay's violations of the Sherman Act, Plaintiffs and the other class members have been and are being injured in their business and property in amounts to be determined.

77. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

## COUNT II

### Class Action By All Plaintiffs Against Defendant For Violations of The Sherman Anti-Trust Act §2 (Attempted Monopolization) For DamagesAnd Injunctive Relief Under 15 U.S.C §§15, 26 Respectively.

78. Plaintiffs re-allege and incorporate herein by reference as though fully set forth herein each and every allegation in all preceding paragraphs.

79. eBay has had a specific intent to achieve monopoly power in the market for online payment systems for use in online auctions.

80. By reason of the foregoing conduct, eBay has achieved a dangerous probability of monopoly power in the market for online payment systems for use in online auctions.

## COUNT III

### Class Action By All Plaintiffs Against Defendant For Violations of The Sherman Anti-Trust Act §2 (Unlawful Tying) For Damages And Injunctive Relief Under 15 U.S.C §§15, 26 Respectively.

81. Plaintiffs re-allege and incorporate herein by reference as though fully set forth herein each and every allegation in all preceding paragraphs.

82. By reason of the foregoing conduct, eBay has tied its online auction system with its online payment system (PayPal).

83. At all relevant times, eBay had monopoly power and/or market power and/or economic power in the relevant tying markets sufficient to force Plaintiffs and the other

class members to pay listing/sale fees and to accept payment via PayPal and pay additional fees.

84. The continued employment of the tying arrangement achieves no legitimate efficiency benefit to counterbalance its anticompetitive effect of foreclosing competition for various payment methods.

85. Plaintiffs and the other class members have been and are being forced to pay and accept PayPal fees at supracompetitive prices.

86. The ability of Plaintiffs and the other class members to sell items on eBay via superior and less-costly payment systems has been effectively and substantially reduced, limited, and foreclosed by the conduct complained of herein.

87. eBay intended by its actions to:

    a. force Plaintiffs and the other class members into accepting PayPal as an accepted payment, and thus pay eBay (via PayPal) additional fees;

    b. reduce, limit, and foreclose merit competition in the product markets for online payment systems for use in online auctions; and

    c. injure and eliminate competition in the product markets for online payment systems.

88. eBay's tying conduct has had and/or is likely to have, among other things, the following effects:

    a. actual and potential competition in the online payment systems markets for online auctions has been injured, limited, reduced, restrained, suppressed, and effectively foreclosed,

b. eBay sellers are effectively forced to accept payment via PayPal and thus have paid or are likely to pay artificially inflated prices to eBay as a whole caused by reduced competition.

89. As a result of eBay's violations of the Sherman Act, Plaintiffs and the other class members have been and will be injured in their business and property in amounts to be determined.

90. Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

### COUNT IV

### Class Action By All Plaintiffs Against Defendant For
### Violations of The Sherman Anti-Trust Act §1 (Unlawful Tying)

91. Plaintiffs re-allege and incorporate herein by reference as though fully set forth herein each and every allegation in all preceding paragraphs.

92. Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. §1, makes it unlawful to enter into a contract in restraint of trade or commerce. Congress has granted a private right of action to those injured in violation of this provision.

93. Plaintiffs, on behalf of themselves and the Class, seek redress for Defendant's violation of Section 1 of the Sherman Anti-Trust Act.

94. Defendant improperly ties and bundles its online auction service (eBay) with its online payment system (PayPal). Specifically and as explained above, Defendant contracted with the Class to provide online auction services but only on the condition

that the Class also accepts payment using Defendant's online payment system, PayPal.

95. As a result, the Class effectively cannot unbundle the tied products (the online auction service and the online payment system).

96. Instead, the Class is forced to pay service fees to PayPal, in addition to fees for the online auction service. Defendant's conduct is particularly acute and egregious, given it is the largest online auction and online payment service providers in the entire United States.

97. Defendant has, at all times relevant to this action, maintained sufficient economic power in the online auction market to coerce Plaintiffs and the Class to accept the tied product.

98. Defendant's improper tying and bundling harms competition. Since the Class can effectively only accept payment via PayPal, there is little motivation for other online payment systems to enter the market, and those that do are foreclosed from offering their services directly to members of the Class at a lower, market-driven, cost.

99. There is a market for online and/or other payment systems that is separate and apart from the market for Defendant's online auction services. The online auction services and the payment methods are distinct and separate items.

100. Defendant has, at all times relevant to this action, maintained sufficient economic power in the online auction market to coerce Plaintiff Class to accept payment via PayPal that they would not otherwise accept from Defendant. This economic power will continue absent the relief sought herein.

101.    Defendant's conduct at issue involves a substantial amount of interstate commerce in the market for online auctions and online payment systems.

102.    Defendant's tying and bundling of its online auction service and its online payment system constitutes an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1.

103.    Defendant's tying and bundling activities have and continues to have an adverse impact upon online auction sellers and competition.

104.    There is no lawful business justification for eBay's actions.

105.    As a direct and proximate result of the aforesaid acts and activities of Defendant, Plaintiffs, and each of them, have been caused to sustain damage by virtue of amounts paid pursuant to the unlawful tying arrangement of online auction services and the online payment .

106.    All of the acts and activities of Defendant, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, and conspiratorially.

**COUNT V**

**Class Action By All Plaintiffs Against Defendant For
Improper Collection of Shipping Fees as Part of Final Value Fee.**

107.    Plaintiffs re-allege and incorporate herein by reference as though fully set forth herein each and every allegation in all preceding paragraphs.

108.    In or around April, 2011 eBay implemented further changes in its fee structure in order to force sellers to pay additional fees to eBay. eBay began charging as part of its final value fee to each eBay seller an amount based upon a sales price of

the sellers individual item with the addition of the shipping price amount paid for by the seller.

109.     Prior to April, 2011, eBay would charge a final value fee based upon the value and/or purchase price of the item, i.e. 9% of $100 dollar item sold, or $9.00.  As of April, 2011, eBay included the shipping charge as part of the final value and then charged the same percent for both, i.e. 9% of $110, with $100 for item sold and $10 shipping, or a total fee of $9.90.

110.     eBay does not provide shipping services to eBay sellers and the cost of shipping is either born by the eBay seller or the eBay purchaser.

111.     Although eBay does not provide shipping or charge shipping costs to the eBay seller or eBay customer, eBay nevertheless bases its final value fee upon the cost of the individual item sold and the cost of shipping that item.

112.     The addition of the shipping cost paid for by either the eBay seller or the eBay customer, to the eBay final value fee (profit to eBay) renders no service to either the eBay seller or eBay buyer.

113.     By the addition of the shipping costs for an item sold to the eBay purchaser to the eBay final value fee eBay is imposing a charge for no goods, or for no service, and is requiring eBay sellers to pay yet another percent of their profit to eBay with no corresponding benefit to the seller from eBay.

114.     As eBay is a self-admitted monopoly business is the internet sales forum, by the imposition of the final value fee on an eBay seller shipping costs eBay is further imposing unnecessary costs, improper costs, and illegal costs for the use of its monopoly system.

115.    Defendant improperly ties and bundles shipping charges with the final value fee.  Sellers are unable to sell goods without paying eBay of shipping costs, even though those shipping costs are expended costs of the sellers. Specifically and as explained above, Defendant contracted with the Class to provide online auction services but only on the condition that the Class also accepts paying eBay a percent value of any shipping charges along with final value fees for items sold.

116.    eBay's unlawful and improper actions of requiring Plaintiffs pay eBay a percentage value of shipping costs in order to sell items is a direct part of and in furtherance of its Anti-Trust activities.

117.    All of the acts and activities of Defendant, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, and conspiratorially.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, prays for a judgment against Defendant as follows;

     a.    For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as representatives of the Class, and appointing the law firm of Macuga, Liddle & Dubin, P.C. as counsel for the Class;

     b.    For an order that Defendant has violated the Sherman Anti-Trust Act;

     c.    For all recoverable compensatory and other damages sustained by Plaintiffs and the Class;

     d.    For injunctive relief prohibiting the future tying of online payment systems by Defendant;

e.   For injunctive relief prohibiting the future tying of shipping fees as part of the Final Value Fee;

f.   For all statutory damages available under the claims asserted;

g.   For payment of costs of suit herein incurred;

h.   For both pre-judgment and post-judgment interest on any amounts awarded;

i.   For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

j.   For such other and further relief as the Court may deem proper.

Dated: August 12, 2011                    Respectfully submitted,

**MACUGA, LIDDLE & DUBIN, P.C.**

<u>/s/ PETER M. MACUGA, II</u>
Peter W. Macuga, II (P28114)
Kevin J. McGiness (P73281)
Attorney for Plaintiffs
975 E. Jefferson Avenue
Detroit, MI 48207-3101
(313) 392-0015

## DEMAND FOR TRIAL BY JURY

NOW COME the Plaintiffs, by and through the undersigned counsel and hereby demands a trial by jury of the within cause of action.

/s/ PETER M. MACUGA, II
MACUGA, LIDDLE & DUBIN, P.C.
Peter W. Macuga, II (P28114)
Kevin J. McGiness (P73281)
975 E. Jefferson Avenue
Detroit, Michigan 48207-3101
(313) 392-0015

Dated: August 12, 2011

# EXHIBIT B

THOMAS P. BROWN (S.B. #182916)
tbrown@omm.com
KATHERINE M. ROBISON (S.B. #221556)
krobison@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California  94111-3823
Telephone:      (415) 984-8700
Facsimile:       (415) 984-8701

Attorneys for Defendants
eBay Inc. and PayPal, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHARLOTTE SMITH, et al., | Case No. C-10-03825-JSW |
| Plaintiffs, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| EBAY CORP., et al., | Hearing Date:  December 16, 2011 |
| Defendants. | Time:  9:00 a.m.<br>Place:  Courtroom 11, 19th Fl.<br>Judge:  Hon. Jeffrey S. White |

# NOTICE OF MOTION

**TO PLAINTIFF AND THEIR ATTORNEYS OF RECORD:**

NOTICE IS HEREBY GIVEN that on December 16, 2011 at 9:00 a.m., or as soon thereafter as counsel may be heard on this matter, in the above-captioned Court, at 450 Golden Gate Ave., San Francisco, CA 94102, in Department 11, Defendants eBay Inc. and PayPal, Inc. will and hereby do move the Court to dismiss Plaintiffs' First Amended Complaint. This motion is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiffs have failed to state a claim on which relief can be granted. Specifically, Plaintiffs have not alleged facts to plead any cause of action against eBay or PayPal under the Sherman Act or any other cause of action.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the Declaration of Thomas P. Brown in support of the motion, the argument of counsel, and any other matters properly considered by the Court at the hearing on this motion.

Dated: October 4, 2011

O'MELVENY & MYERS LLP


By: /s/ Thomas Brown
     Thomas Brown
Attorneys for Defendants
eBay Inc. and PayPal, Inc.

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT .................................................................................. v

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

INTRODUCTION .................................................................................................. 1

STATEMENT OF THE CASE .............................................................................. 1

    A.   The Parties .................................................................................. 1

    B.   Paying for Purchases in eBay's Electronic Marketplace ......................... 2

    C.   Plaintiffs' Claims ............................................................................ 2

         1.   Monopolization and Attempted Monopolization ...................... 2

         2.   Tying (Sherman § 2) .................................................................. 3

         3.   Tying (Sherman § 1) .................................................................. 3

         4.   "Improper Collection of Shipping Fees as Part of Final Value Fee" ........................................................................................ 3

         5.   Injury ......................................................................................... 3

    D.   In re eBay Seller Antitrust Litigation ...................................... 4

LEGAL STANDARD ............................................................................................ 4

ARGUMENT .......................................................................................................... 5

    I.    PLAINTIFFS' ANTITRUST CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ...................................................... 5

    II.   PLAINTIFFS DO NOT ALLEGE AN ILLEGAL TYING ARRANGEMENT ......................................................................... 6

        A.   Plaintiffs Do Not Sufficiently Allege the Existence of a Tying Arrangement .................................................................... 7

        B.   Plaintiffs Do Not Allege an Actual Adverse Effect on Competition .......... 7

    III.  PLAINTIFFS FAIL TO STATE A SECTION TWO CLAIM OR A SECTION ONE TYING CLAIM BECAUSE THEY FAIL TO ALLEGE FACTS SUPPORTING THEIR RELEVANT MARKETS ................................... 8

    IV.  PLAINTIFFS FAIL TO ESTABLISH ANTITRUST STANDING BECAUSE THEY HAVE NOT ESTABLISHED A CAUSAL CONNECTION BETWEEN AN ANTITRUST INJURY AND ANY ANTICOMPETITIVE ACTION ...................................................... 11

    V.   PLAINTIFFS' FIFTH COUNT FAILS BECAUSE IT HAS NO LEGAL BASIS ............................................................................................. 13

CONCLUSION ...................................................................................................... 14

1

**TABLE OF AUTHORITIES**

2

**Page**

3

<u>**CASES**</u>

4

*Amerinet, Inc. v. Xerox Corp.*,

5

    972 F.2d 1483 (8th Cir. 1992)..................................................................................................... 7

6

*Apple, Inc. v. Psystar Corp.*,

7

    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ..................................................................................... 6

*Ashcroft v. Iqbal*,

8

    129 S. Ct. 1937 (2009).................................................................................................... 5, 7, 14

9

*Atl. Richfield Co. v. USA Petroleum Co.*,

10

    495 U.S. 328 (1990).................................................................................................................. 11

*Aurora Enters. v. NBC*,

11

    688 F.2d 689 (9th Cir. 1982)..................................................................................................... 6

12

*Bell Atl. Corp. v. Twombly*,

13

    550 U.S. 544 (2007)................................................................................................................... 5

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,

14

    182 F.3d 1096 (9th Cir. 1999)................................................................................................... 9

15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,

16

    429 U.S. 477 (1977)................................................................................................................. 11

*Chapman v. N.Y. State Div. for Youth*,

17

    546 F.3d 230 (2d Cir. 2008)..................................................................................................... 10

18

*Colonial Med. Group, Inc. v. Catholic Healthcare W.*,

19

    No. C-09-2192-MMC, 2010 WL 2108123 (N.D. Cal. May 25, 2010).................................... 10

*Driskill v. Dallas Cowboys Football Club, Inc.*,

20

    498 F.2d 321 (5th Cir. 1974)..................................................................................................... 8

21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,

22

    504 U.S. 451 (1992)................................................................................................................... 7

*Forsyth v. Humana, Inc.*,

23

    114 F.3d 1467 (9th Cir. 1997)............................................................................................. 9, 11

24

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,

25

    No. C-09-3854-MMC, 2010 WL 1541257 (N.D. Cal. Apr. 16, 2010)...................................... 9

*In re eBay Seller Antitrust Litig.*,

26

    545 F. Supp. 2d 1027 (N.D. Cal. 2008) ........................................................................... 4, 7, 8

27

*In re eBay Seller Antitrust Litig.*,

    No. 10-15642, 2011 WL 1749206 (9th Cir. May 9, 2011) ....................................................... 4

28

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

**TABLE OF AUTHORITIES**
(continued)

Page

*In re eBay Seller Antitrust Litig.*,
  No. C 07-01882 JF, 2010 WL 760433 (N.D. Cal. Mar. 4, 2010) .................................. 4, 10, 12

*In re Online DVD Rental Antitrust Litig.*,
  No. M 09-2029, 2010 WL 2680837 (N.D. Cal. July 6, 2010) ................................. 12

*In re Online DVD Rental Antitrust Litig.*,
  No. M-09-2029, 2009 WL 4572070 (N.D. Cal. Dec. 1, 2009) ................................. 12

*Kypta v. McDonald's Corp.*,
  671 F.2d 1282 (11th Cir. 1982)................................................................... 13

*Legal Econ. Evaluations, Inc. v. Met. Life Ins. Co.*,
  39 F.3d 951 (9th Cir. 1994)....................................................................... 11

*Les Shockley Racing v. Nat'l Hot Rod Ass'n*,
  884 F.2d 504 (9th Cir. 1989)..................................................................... 11

*Moss v. U.S. Secret Serv.*,
  572 F.3d 962 (9th Cir. 2009)...................................................................... 5

*N. Pac. R. Co. v. United States*,
  356 U.S. 1 (1958) ................................................................................. 7

*Pace Indus., Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987)...................................................................... 6

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)....................................................................... 9

*Rick-Mick Enters., Inc. v. Equilon Enters. LLC*,
  532 F.3d 963 (9th Cir. 2008)...................................................................... 9

*Salsman v. Access Sys. Americans, Inc.*,
  No. C 10-01865-PSG, 2011 WL 1344246 (N.D. Cal. Apr. 8, 2011)....................................... 14

*Siegel v. Chicken Delight*,
  448 F.2d 43 (9th Cir. 1971)...................................................................... 7, 8

*Stagner v. Luxottica Retail N. Am., Inc.*,
  No. C 11-02889 CW, 2011 WL 3667502 (N.D. Cal. Aug. 22, 2011) ..................................... 14

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  No. CV F 09-0560-LJO(SMS), 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ......................... 6

*United Magazine Co. v. Murdoch Magazines Distrib., Inc.*,
  146 F. Supp. 2d 385 (S.D.N.Y. 2001)........................................................... 8

**TABLE OF AUTHORITIES**
(continued)

**Page**

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ............................................................................................ 9

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ............................................................................................ 8

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965) ............................................................................................ 9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) ............................................................................................ 5

**STATUTES**

15 U.S.C. § 15(a) ............................................................................................ 11, 12

15 U.S.C. § 15b ............................................................................................ 5

**OTHER AUTHORITIES**

Timothy J. Muris, *Payment Card Regulation and the (Mis)Application of the
   Economics of Two-Sided Markets*, 2005 Colum. Bus. L. Rev. 515 (2005) ............................. 13

**RULES**

Fed. R. Civ. P. 8 ............................................................................................ 12, 13, 14

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

## SUMMARY OF ARGUMENT

This case reduces to a single question: whether Plaintiffs can convert a personal dissatisfaction with eBay's fees into a federal antitrust case based on eBay's acquisition of PayPal nearly a decade ago. As the First Amended Complaint makes clear, the answer is no.

Plaintiffs' antitrust claims are time-barred because they stem from eBay's acquisition of PayPal in 2002, well outside the applicable four-year statute of limitations.[1] Nor can Plaintiffs evade the statute of limitations by alleging that they continue to pay "supracompetitive" fees as a result of that acquisition, because continued payment of fees does not convert the PayPal acquisition into a "continuing violation" for purposes of restarting the statute of limitations.[2]

Plaintiffs' claims also fail for other reasons as well. They challenge as a "tying arrangement" a practice—offering PayPal as a payment method on eBay—that does not meet the legal definition of a tying arrangement.[3] The allegations that they offer in support of their alleged market for "online payment systems for use on online auctions" does not take into account reasonably interchangeable alternatives or explain why such a market must be limited to "online auctions."[4] They do not forge a causal link between any allegedly anticompetitive conduct and the injury about which they complain—"supracompetitive" fees.[5] And Plaintiffs have not and cannot allege that they suffered "net economic harm," the appropriate measure of harm in a two-sided industry such as the one in which eBay and PayPal operate.[6] Finally, Plaintiffs' claim based on eBay's final value fee fails because they do not even identify the legal basis for that claim.[7] The First Amended Complaint must therefore be dismissed.

---

[1] 15 U.S.C. § 15b.

[2] *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-0560-LJO(SMS), 2010 WL 3521979, at *16 (E.D. Cal. Sept. 3, 2010).

[3] *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992).

[4] *Colonial Med. Group, Inc. v. Catholic Healthcare W.*, No. C-09-2192-MMC, 2010 WL 2108123, at *4 (N.D. Cal. May 25, 2010).

[5] *In re Online DVD Rental Antitrust Litig.*, No. M-09-2029, 2009 WL 4572070, at *6 (N.D. Cal. Dec. 1, 2009).

[6] *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982).

[7] *Salsman v. Access Sys. Americans, Inc.*, No. C 10-01865-PSG, 2011 WL 1344246, at *3 (N.D. Cal. Apr. 8, 2011).

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs' First Amended Class Action Complaint ("FAC") fails to state a claim under the federal antitrust laws for a host of reasons, both procedural and substantive. And there is no reason to believe that any of these errors can be corrected. The FAC replicates a failed antitrust action that was litigated in this Court. All of the claims in the earlier action were rejected at the motion to dismiss and summary judgment stages, and the Ninth Circuit affirmed the summary judgment on appeal. Plaintiffs, despite an opportunity to amend, have failed to rehabilitate these fundamental deficiencies. Defendants respectfully request that the Court dismiss the FAC with prejudice.

## STATEMENT OF THE CASE

### A. The Parties

eBay offers, among other things, online platforms for the buying and selling of goods and services. (FAC ¶ 28.) PayPal is one of several payment options available to eBay sellers. (*Id.* ¶¶ 29, 41.) eBay acquired PayPal on October 3, 2002, more than seven years before Plaintiffs filed their original complaint in April 2010. (*Id.* ¶ 34.) Plaintiffs do not, and cannot, allege that PayPal is available exclusively on eBay because PayPal is used by any number of sales platforms, merchants, and websites. And Plaintiffs do not and cannot allege that eBay sellers may only accept payments on eBay through PayPal, or that PayPal charges fees that differ depending on whether a transaction occurs on or off eBay. Altogether, these failures preclude any viable antitrust action.

The named plaintiffs are residents of various states who claim to use eBay's "online auction/sales services," although they do not specify which of eBay's many services they use. (*Id.* ¶¶ 5-15.) Plaintiffs purport to represent a class of "sellers on eBay that pay listing and sales fees to eBay and are effectively forced to utilize eBay owned PayPal as the sole accepted payment method while paying an additional service fee to PayPal." (*Id.* ¶ 60.)

Plaintiffs' FAC never mentions the party without which there would be no eBay transactions—buyers. (*Id.* ¶¶ 5-15, 60.) It does not, therefore, discuss the impact on buyers of

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

1    the practices to which Plaintiffs claim to object or explain how the impact on buyers may relate

2    back to sellers in terms of transaction volume, duration of listing for items listed for sale, or

3    closing prices of sales in the alleged online marketplace.

4        **B.      Paying for Purchases on eBay's Electronic Marketplace**

5            Plaintiffs' FAC implicitly recognizes that every sale, whether online or off, must involve

6    payment. Once a buyer and seller have agreed to terms, they must exchange value. (*See id.*

7    ¶¶ 26, 39, 43.) Payments are a complement to a sales platform business and for this reason, eBay

8    acquired PayPal in 2002. (*Id.* ¶ 34.)

9            Plaintiffs acknowledge that sellers on eBay can accept online payments in a variety of

10   ways, including at least three other online payment services besides PayPal—Propay,

11   Moneybookers, and Paymate—or through a Merchant Seller Account or Payment upon Pickup.

12   (*Id.* ¶ 41.)

13       **C.      Plaintiffs' Claims**

14           Although Plaintiffs acknowledge that eBay sellers may accept other forms of payment,

15   they seek to make an antitrust case out of eBay's nine-year-old acquisition of PayPal. The FAC

16   contains five claims: three under Section Two of the Sherman Act, 15 U.S.C. § 2; one under

17   Section One, 15 U.S.C. § 1; and one for which no legal basis is provided.

18               **1.      Monopolization and Attempted Monopolization**

19           Plaintiffs assert that eBay has monopolized (or attempted to monopolize) the market for

20   "online payment systems for use in online auctions." (FAC ¶¶ 72, 79.[1]) According to Plaintiffs,

21   eBay created and maintained a dominant position in the alleged market for payments by engaging

22   in a number of allegedly anticompetitive activities—all completely within the eBay platform—

23   involving accepted methods of payment. (*Id.* ¶ 73.)

24               **2.      Tying (Sherman § 2)**

25           Plaintiffs allege that eBay engaged in an illegal tying arrangement in violation of Section

26   _____

27   [1] Earlier, the FAC states that eBay "has limited and banned competitors in an attempt to maintain
     its dominance in the online auction market." (FAC ¶ 25.) The counts alleging monopolization
     and attempted monopolization, however, do not mention the alleged "online auction market."

28   (*See id.* ¶¶ 71-80.)

                                            DEFENDANTS' MOTION TO DISMISS
                                            PLAINTIFFS' FAC
                                            C-10-03825-JSW

Two of the Sherman Act. Notably, Plaintiffs do not allege a proper "tying" or "tied" product market, but allege that eBay has "tied" its "online auction" system with the PayPal payment system. (*Id.* ¶ 82.) Plaintiffs allege that this "tying" arrangement somehow forces them to pay "listing/sale fees" to eBay. (*Id.* ¶ 83.)

### 3. Tying (Sherman § 1)

Plaintiffs also assert that eBay has engaged in an illegal tying arrangement in violation of Section One of the Sherman Act. Again, they fail to properly define the "tying" or "tied" product markets, but instead allege that "Defendant" (not specified as either eBay or PayPal) "contracted with the Class to provide online auction services but only on the condition that the Class also accepts payment using . . . PayPal." (*Id.* ¶ 94.) In other words, Plaintiffs allege that they were forced to use PayPal as a condition of selling items on eBay, and because of that they were "forced to pay service fees to PayPal." (*Id.* ¶ 96.) While Plaintiffs provide reasons why they believe some of these methods are "not viable alternatives" to PayPal, they admit that other payment methods are clearly available to eBay buyers and they do not allege that eBay requires eBay sellers to process payments with PayPal either on or off eBay. (*Id.* ¶¶ 41, 49.)

### 4. "Improper Collection of Shipping Fees as Part of Final Value Fee"

Plaintiffs also bring a claim entitled "improper collection of shipping fees as part of final value fee." (*Id.* ¶ 107.) The FAC does not identify a statute or a common law cause of action on which this count is based. Instead, Plaintiffs allege that eBay changed its fee structure to calculate the "final value fee" for an item based on the sales price plus the shipping price, even though eBay does not provide shipping services to sellers (*id.* ¶¶ 52-55) and that this change in fee structure was " a direct part of and in furtherance of its Anti-Trust activities" (*id.* ¶ 116). Plaintiffs do not specify whether this change in fee structure applies to all sales on eBay or just a subset of eBay sales.

### 5. Injury

Plaintiffs claim that a single injury—"supracompetitive fees"—flows from Defendants' allegedly anticompetitive actions. (*Id.* ¶¶ 74b, 85.) But Plaintiffs neither explain which of eBay's many different fees were allegedly supracompetitive, nor do they allege any facts that would

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

1   support a conclusion that any of eBay's fees were supracompetitive.  And the FAC does not

2   allege anything that would support a conclusion that fees are the appropriate measure of harm

3   instead of individual sellers' profits or returns on the goods they list and sell on eBay.

4          **D.**    *In re eBay Seller Antitrust Litigation*

5         On April 4, 2007, a group of eBay sellers brought a class action complaint[2] against eBay

6   (the "*Seller* Action") in this Court, alleging various federal and state antitrust and unfair

7   competition claims.  *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1029 (N.D. Cal.

8   2008).  Among the claims asserted were (1) abuse of monopoly power and monopoly

9   maintenance for "online auctions" and person-to-person online payment systems; (2) attempted

10   monopolization in those alleged markets; and (3) *per se* unreasonable tying.  *Id.*  In March 2008,

11   the court dismissed the tying claim because plaintiffs did not sufficiently allege that a tie actually

12   caused harm to competitors in the tied market.  *Id.* at 1034.  Two years later, the court granted

13   eBay's motion for summary judgment as to the remainder of plaintiffs' claims, finding no proof

14   of antitrust injury.  *In re eBay Seller Antitrust Litig.*, No. C 07-01882 JF, 2010 WL 760433, at

15   *14 (N.D. Cal. Mar. 4, 2010).

16         One month later, Plaintiffs here filed the original complaint in this action in the United

17   States District Court for the Eastern District of Michigan.  Docket No. 1.  The complaint recited,

18   at times verbatim, many of the factual allegations in the *Seller* Action complaint.  *Id.*  The action

19   was subsequently transferred to this Court, related to the *Seller* Action, and stayed pending the

20   Ninth Circuit's resolution of the appeal in the *Seller* Action.  Docket Nos. 20, 24, 25.  On May 9,

21   2011, the Ninth Circuit affirmed the district court's dismissal of the *Seller* Action in a per curiam

22   decision.  *In re eBay Seller Antitrust Litig.*, No. 10-15642, 2011 WL 1749206, at *1 (9th Cir.

23   May 9, 2011) (per curiam).  After the return of the mandate in the *Seller* Action, the Court lifted

24   the stay, Docket No. 31, and Plaintiffs filed their FAC on September 28, 2011.  Docket No. 42.

25                         **LEGAL STANDARD**

26         To survive a motion to dismiss, a complaint must plead "enough facts to state a claim for

27

28   [2]     A copy of the complaint is attached as Exhibit A to the Declaration of Thomas P. Brown, filed concurrently with this motion.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

1  relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A

2  formulaic recitation of the elements of the claims will not suffice, and the Court cannot assume

3  the truth of conclusory allegations unsupported by facts. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950

4  (2009). Further, the complaint's "non-conclusory 'factual content,' and reasonable inferences

5  from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss*

6  *v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). Here, Plaintiffs' FAC fails on both

7  accounts. Not only do the allegations rest on conclusory legal assertions, the facts fail to

8  plausibly support any of the claims.

9  **ARGUMENT**

10    Plaintiffs' FAC suffers from a number of incurable procedural and substantive defects.

11  eBay respectfully requests that the Court dismiss the complaint without leave to amend.

12    As an initial matter, Plaintiffs' claims under the Sherman Act are time-barred. All of the

13  claims are premised on eBay's acquisition of PayPal. As the complaint alleges, this acquisition

14  took place in 2002, nearly nine years ago and more than three years before the start of the

15  applicable limitations period.

16    Even if the claims were not time-barred, they would fail. The FAC does not (1) contain

17  facts sufficient to support the conclusion that a tying arrangement exists; (2) contain facts

18  necessary to support the conclusion that the practices labeled as a "tying" arrangement pose a

19  threat to competition; (3) identify facts capable of supporting the relevant markets allegedly

20  harmed by the allegedly wrongful conduct; and (4) allege facts sufficient to support a conclusion

21  that these plaintiffs have suffered any injury from the challenged conduct. Plaintiffs' fifth

22  count—essentially a criticism of how eBay sets one category of its fees—separately fails because

23  Plaintiffs fail to articulate any legal basis for such a claim.

24  **I.  PLAINTIFFS' ANTITRUST CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS**

25

26    Federal antitrust claims are subject to a four-year statute of limitations. 15 U.S.C. § 15b.

27  A cause of action accrues when the defendant commits an act that injures the plaintiff's business.

28  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-39 (1971). While a plaintiff

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

may allege a continuing violation—that is, "one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured," the plaintiff must still allege some overt act by the defendant within the limitations period that restarts the statute of limitations. *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987).

Plaintiffs' antitrust claims derive from eBay's acquisition of PayPal in October 2002, which Plaintiffs claim "had the effect of eliminating competition in the market for online payment services." (FAC ¶ 34.) But this event took place well outside the four-year statutory period preceding the filing of Plaintiffs' original complaint on April 12, 2010.

Nor do Plaintiffs allege any overt act by Defendants that would restart the statute of limitations. Although Plaintiffs claim, without alleging facts to support such a claim, that eBay sellers pay "artificially inflated and supra competitive fees" (*see id.* ¶ 88b), the continued use or purchase of Defendants' services is insufficient to establish a continuing violation. *See Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-0560-LJO(SMS), 2010 WL 3521979, at *16 (E.D. Cal. Sept. 3, 2010) ("[c]ontinual purchasing of the products . . . does not inflict a 'new and accumulating' injury on plaintiff") (citing *Aurora Enters. v. NBC*, 688 F.2d 689, 694 (9th Cir. 1982)).

Because Plaintiffs' antitrust claims arise from an action that took place outside of the statute of limitations, and Plaintiffs do not allege facts supporting a continued violation, this Court should dismiss Counts One through Four as time-barred.

## II. PLAINTIFFS DO NOT ALLEGE AN ILLEGAL TYING ARRANGEMENT

Plaintiffs' allegations of unlawful tying under both Sections One and Two[3] of the Sherman Act fail because they focus on a practice that is plainly not a tying arrangement. Furthermore, Plaintiffs have not alleged a *per se* tying arrangement, and so they bear the burden of proving that the alleged tying arrangement unreasonably restrained competition. Plaintiffs have failed to allege facts that would be sufficient to do so.

---

[3] "[C]ourts also allow tying theories under Section 2, at least where there is monopolization or attempted monopolization." *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1195 n.2 (N.D. Cal. 2008). As outlined in Sections III-IV, below, Plaintiffs fail to state a claim for monopolization or attempted monopolization. Therefore, their Section Two tying claim also fails.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

**A. Plaintiffs Do Not Sufficiently Allege the Existence of a Tying Arrangement**

In this case, the alleged "tie" is not really a tie at all. As the Supreme Court has repeatedly observed, a tying arrangement is a type of "requirements" contract. *See N. Pac. R. Co. v. United States*, 356 U.S. 1, 5-6 (1958) (tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier"). In the absence of an explicit agreement, a plaintiff may still demonstrate an illegal tie "if the defendant's policy makes the purchasing of the tying and tied products together 'the only viable economic option.'" *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992). Plaintiffs fail to follow either path when alleging a tying arrangement.

Plaintiffs do not, and cannot, allege that eBay "requires" sellers who use its services to use PayPal to accept payments. *Cf. In re eBay Seller*, 545 F. Supp. 2d at 1031 (plaintiffs alleged that they were required to accept separate PayPal products to use PayPal at all); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992) (finding a tie where defendant "would sell parts to third parties only if they agreed ***not to buy service*** from [competitors]" (emphasis added)). Rather, despite their representations that sellers are "effectively forced to accept payment via PayPal" (FAC ¶ 88), Plaintiffs concede that eBay's Accepted Payments Policy allows sellers to accept at least three payment options in addition to PayPal. (*Id.* ¶ 49.)

The Court may not accept as true Plaintiffs' conclusory claims that various conditions render these options "not viable alternatives" to PayPal. The FAC does not offer any facts to support this conclusion. (*Id.*); *see Iqbal*, 129 S. Ct. at 1950. Indeed, the FAC at best alleges that "PayPal is the most favorable method" (FAC ¶ 50), far short of the required showing that accepting payment via PayPal on eBay sales is "the only viable economic option." *See Xerox Corp.*, 972 F.2d at 1500.

**B. Plaintiffs Do Not Allege an Actual Adverse Effect on Competition**

"[T]he hallmark of a tie-in is that it denies competitors free access to the tied product market." *In re eBay Seller*, 545 F. Supp. 2d at 1034 (quoting *Siegel v. Chicken Delight*, 448 F.2d 43, 47 (9th Cir. 1971)). "Numerous federal courts have rejected tying claims" in the absence of

sufficient allegations that a tie actually caused harm to competitors in the tied product market. *Id.* (citing *United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 400 (S.D.N.Y. 2001); *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974)). Plaintiffs have failed to sufficiently allege actual harm to competitors. Instead, they allege that

> actual and potential competition in the online payment systems markets for online auctions has been injured, limited, reduced, restrained, suppressed, and effectively foreclosed, [and] eBay sellers are effectively forced to accept payment via PayPal and thus have paid or are likely to pay artificially inflated prices to eBay as a whole caused by reduced competition.

(FAC ¶ 88.)

The court in the *Seller* Action rejected plaintiffs' nearly identically worded allegations of harm. In that case, plaintiffs alleged that

> actual and potential competition in the person-to-person online payment systems has been injured, limited, reduced, restrained, suppressed, and effectively foreclosed; and eBay auction sellers that accept PayPal have paid or are likely to pay artificially inflated prices caused by reduction in competition.

*In re eBay Seller*, 545 F. Supp. 2d at 1034. The court held that plaintiffs "ha[d] not alleged sufficiently that a tie actually caused harm to competitors in the online auction market." *See id.* (citing *Siegel*, 448 F.2d at 47).

As in the *Seller* Action, Plaintiffs' conclusory allegations of harm fall short. Plaintiffs allege no facts that PayPal's competitors in the alleged payments market were harmed, whether by exclusion from or reduced access to the universe of payments for online (or offline) transactions, or in any other discernible way. Accordingly, Plaintiffs' tying claims under Sections One and Two of the Sherman Act must be dismissed.

## III. PLAINTIFFS FAIL TO STATE A SECTION TWO CLAIM OR A SECTION ONE TYING CLAIM BECAUSE THEY FAIL TO ALLEGE FACTS SUPPORTING THEIR RELEVANT MARKETS

A claim for monopolization under Section Two requires (1) possession of monopoly power in the relevant market, and (2) "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

540 U.S. 398, 407 (2004). A tying claim similarly requires allegations of market power in a legally cognizable relevant market. *Rick-Mick Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971-72 (9th Cir. 2008). Because Plaintiffs have failed to allege facts supporting their relevant markets, they have failed to state a claim under either theory.[4]

Every antitrust claim must be predicated on a properly defined relevant market. *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104-05 (9th Cir. 1999). Courts routinely dismiss complaints that, as here, fail to appropriately define a relevant market because "[w]ithout a definition of that market there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *see also Big Bear*, 182 F.3d at 1105 (affirming dismissal of plaintiff's Sherman Act claims because plaintiff did not sufficiently allege a relevant product market).

A properly alleged market begins with the product at issue and an appraisal of the cross-elasticity of demand and the reasonable interchangeability of products by consumers. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956). Because a relevant product market includes all products that are reasonably interchangeable, a plaintiff must assert the allegations in those terms. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Courts have not hesitated to dismiss claims that fail to properly plead a relevant market under this test. *See, e.g.*, *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, No. C-09-3854-MMC, 2010 WL 1541257, at *5 (N.D. Cal. Apr. 16, 2010)

---

[4] To state a claim for attempted monopolization, a plaintiff must show (1) specific intent to control prices or destroy competition, (2) predatory or anticompetitive conduct directed toward accomplishing that purpose, (3) a dangerous probability of success, and (4) causal antitrust injury. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997). For the reasons discussed below, Plaintiffs have also failed to state a claim for attempted monopolization.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

1   (dismissing complaint because plaintiff failed to reference the rule of reasonable

2   interchangeability).

3         For example, in *Chapman v. New York State Division for Youth*, the Second Circuit held

4   that plaintiff's allegation of a market for "restraint training services to private child care

5   providers" was legally insufficient because plaintiff failed to allege facts to show how the alleged

6   market "is any different from the larger market for restraint training services to other businesses,

7   agencies, and organizations." 546 F.3d 230, 238-39 (2d Cir. 2008); *see also Colonial Med.*

8   *Group, Inc. v. Catholic Healthcare W.*, No. C-09-2192-MMC, 2010 WL 2108123, at *4 (N.D.

9   Cal. May 25, 2010) (rejecting market definition where complaint failed to include any allegations

10  to support a finding that medical services provided to prison inmates were not reasonably

11  interchangeable with medical services provided to inmates of local jails or other locked facilities).

12        Although Plaintiffs label eBay a "monopoly," they do not define the markets that they

13  accuse eBay of monopolizing in terms of interchangeability. Plaintiffs base their antitrust claims

14  on an impermissibly narrow market: the alleged market for "online payment systems for use on

15  online auctions" (FAC ¶¶ 71, 79). Plaintiffs fail to allege facts to show how this purported

16  market is any different from the larger market for online payment systems for use on other sales

17  formats, both on eBay and other online platforms. Plaintiffs do not, and cannot, allege that

18  PayPal itself is available only "for use on online auctions." *See In re eBay Seller*, 2010 WL

19  760433, at *1 ("Though PayPal provides the preferred payment method on eBay, it serves many

20  other companies and institutions as well."). Even if the Court finds that Plaintiffs' limited

21  definition of the market is appropriate, the alleged market still fails because Plaintiffs do not and

22  cannot claim that PayPal is the only way for people to make payments on eBay. Indeed, Plaintiffs

23  identify several interchangeable payment methods, including Merchant Seller Accounts and

24  Payment upon Pickup. (*Id.* ¶¶ 41, 49.)

25        Nor can the alleged "online auctions market" (*id.* ¶¶ 24-25) save Plaintiffs' FAC. Putting

26  aside that Plaintiffs never allege that their antitrust claims arise in the alleged "online auctions

27  market," Plaintiffs fail to acknowledge the many alternatives to eBay's online auction-style sales

28  format, let alone distinguish their purported market from the pool of obvious substitutes. Further,

10

1   they neither claim that eBay is the only place to buy the things sold on its platform nor that

2   eBay's sales platform serves as the only forum on which buyers and sellers of such things can

3   interact. Such a position would be untenable.

4   **IV. PLAINTIFFS FAIL TO ESTABLISH ANTITRUST STANDING BECAUSE THEY**
        **HAVE NOT ESTABLISHED A CAUSAL CONNECTION BETWEEN AN**
5       **ANTITRUST INJURY AND ANY ANTICOMPETITIVE ACTION**

6          Plaintiffs seeking to recover damages in a private antitrust action must first establish

7   antitrust standing by demonstrating that they have been "injured in [their] business or property by

8   reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). The injury alleged must

9   be "of the type the antitrust laws were intended to prevent and which flows from that which

10  makes the defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328,

11  334 (1990) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 (1977)).

12  Furthermore, "the private plaintiff must link its own injury to the ***anticompetitive*** aspect of the

13  defendant's conduct." *Legal Econ. Evaluations, Inc. v. Met. Life Ins. Co.*, 39 F.3d 951, 954 (9th

14  Cir. 1994) (emphasis in original). Failure to show that the injury to the plaintiff "flow[s] from

15  injury to competition in the relevant market" is fatal to a claim. *Id.* at 956.

16         Failure to demonstrate reduced competition in the relevant market also defeats a finding of

17  antitrust injury. *Forsyth*, 113 F.3d at 1478. It is not enough to allege, in a conclusory fashion,

18  that a defendant's actions caused injury to competition by reducing or restraining competition in

19  the relevant market. *See Les Shockley Racing v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th

20  Cir. 1989) (holding plaintiff "may not merely recite the bare legal conclusion that competition has

21  been restrained").

22         Plaintiffs here fail to allege causal antitrust injury. Plaintiffs' injury allegations are either

23  non-existent or wholly conclusory, and fail to demonstrate how their "injuries" flow from the

24  allegedly unlawful conduct. In Counts One and Three, Plaintiffs allege that they paid

25  "supracompetitive fees" to either eBay, PayPal, or both. (FAC ¶¶ 74, 85.) In Count Four,

26  Plaintiffs simply allege they had to pay fees to PayPal and eBay. (*Id.* ¶ 96.) These allegations

27  provide no basis for believing that Plaintiffs have, in fact, suffered "net economic" harm.

28

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

1     These conclusory allegations do not satisfy the minimal requirements of Federal Rule of

2   Civil Procedure 8. *In re Online DVD Rental Antitrust Litigation* illustrates the burden that

3   antitrust plaintiffs must shoulder in identifying the source of their injury and linking that injury to

4   the challenged conduct. No. M-09-2029, 2009 WL 4572070 (N.D. Cal. Dec. 1, 2009). In that

5   case, plaintiffs identified the specific price that they claimed was "supracompetitive," namely, the

6   subscription price that Blockbuster had set for online rentals. They claimed that Blockbuster had

7   been able to set its rate at supracompetitive levels "as a result" of an allegedly anticompetitive

8   agreement between defendants Netflix and Walmart.com. *Id.* at *1-2. The district court

9   dismissed the first version of the complaint because it concluded that plaintiffs had "fail[ed] to

10  demonstrate a sufficient causal link" between the subscription rate plaintiffs paid and the

11  agreement between defendants. *Id.* at *6. It accepted the second version of the complaint with

12  "significant reservations" only after the plaintiffs had provided specific allegations to link the

13  allegedly supracompetitive price to the challenged acts. *In re Online DVD Rental Antitrust Litig.*,

14  No. M 09-2029, 2010 WL 2680837, at *7 (N.D. Cal. July 6, 2010).

15    Plaintiffs have forged no such link here. Indeed, they do not identify which of the various

16  fees charged by eBay and PayPal are allegedly supracompetitive, let alone claim to have paid the

17  supracompetitive fees. The fee schedules for eBay and PayPal are a matter of public record. *See*

18  *In re eBay Seller*, 2010 WL 760433, at *1 ("The fees eBay charges for all of its services,

19  including the auction format, are listed and published in its 'rate cards.'"). Yet Plaintiffs make no

20  effort to explain which of eBay's fees are too high or how the allegedly anticompetitive acts have

21  affected eBay's rate card over time. To satisfy the requirements of Rule 8, Plaintiffs must

22  identify which elements of the rate card are allegedly supracompetitive, link the allegedly

23  supracompetitive rates to specific conduct, and affirmatively claim to have paid the

24  supracompetitive rates.

25    Further, Plaintiffs have made no effort to allege that the challenged acts actually caused

26  them "net economic" harm. Section 4 of the Clayton Act requires an antitrust plaintiff to prove

27  injury "in his business or property." 15 U.S.C. § 15(a). When a given act produces multiple

28  effects, the antitrust plaintiff is obliged to prove "net economic harm," which is especially

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

1  significant in the context of tying cases because tying arrangements necessarily affect the price of

2  both elements of an allegedly tied package.  *See Kypta v. McDonald's Corp.*, 671 F.2d 1282,

3  1285 (11th Cir. 1982).

4        The issue arises here also because both eBay and PayPal compete in what are generally

5  known as "two-sided" industries.  A two-sided industry exists when a particular good or service

6  must appeal to two distinct groups of customers to be useful to anyone.  *See generally* Timothy J.

7  Muris, *Payment Card Regulation and the (Mis)Application of the Economics of Two-Sided*

8  *Markets*, 2005 Colum. Bus. L. Rev. 515 (2005).  For eBay, the two sides are sellers and buyers of

9  items.  (FAC ¶ 28.)  For PayPal, as with any payment system, the two sides are people accepting

10  payments, generally merchants, and people making payments, generally consumers.  (*See id*.

11  ¶ 44.)

12        In a two-sided industry, a given act can affect both sides of the industry at the same time,

13  and even if one effect is negative, the net effect may be positive.  For example, assume that

14  Plaintiffs could allege that the acquisition of PayPal and integration of PayPal into the website

15  enabled eBay to raise final value fees because of the elimination of a potential competitor.  (Such

16  an allegation is, of course, absent from the FAC.)  Even if that were true, the acquisition and

17  integration of PayPal into eBay could leave sellers better off.  The acquisition may have made it

18  easier for buyers to use PayPal, and PayPal may have been safer and cheaper for buyers than

19  forms of payment that had been popular on the site before the acquisition.  If so, these changes

20  would make buyers willing to bid more for items, resulting in higher prices paid to the seller.

21  Viewed in those terms, rather than Plaintiffs' limited focus on the fees sellers pay to eBay and

22  PayPal, the acquisition may actually have left sellers better off.

23        In order to allege injury, Plaintiffs must do more than assert that they paid

24  supracompetitive fees.  Because the FAC simply asserts that conclusion, it must be dismissed.

25  **V.    PLAINTIFFS' FIFTH COUNT FAILS BECAUSE IT HAS NO LEGAL BASIS**

26        The only new claim included in the FAC is styled "improper collection of shipping fees as

27  part of final value fee," but Plaintiffs fail to identify any statute, either federal or state, or any

28  common law cause of action that could possibly form the basis for this purported claim.  (FAC

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FAC
C-10-03825-JSW

¶¶ 107-117).  Courts in this District have dismissed claims even where plaintiffs have provided some detail regarding the legal basis for their claims.  *See, e.g.*, *Salsman v. Access Sys. Americans, Inc.*, No. C 10-01865-PSG, 2011 WL 1344246, at *3 (N.D. Cal. Apr. 8, 2011) (dismissing claim that defendant "violated the Uniform Commercial Code" because complaint "[did] not identify the provision of the UCC . . . that now provides [plaintiff] with a cause of action"); *Stagner v. Luxottica Retail N. Am., Inc.*, No. C 11-02889 CW, 2011 WL 3667502, at *7 (N.D. Cal. Aug. 22, 2011) (dismissing claim for "failure to compensate for all hours worked" because "the theory behind [p]laintiff's claim [wa]s not apparent").

Because Plaintiffs have not identified any federal or state statute or any recognized common law cause of action that could form the basis for their "final value fee" claim, that claim is nothing more than an "unadorned, the defendant-unlawfully-harmed-me accusation" and must be dismissed.  *Iqbal*, 129 S. Ct. at 1949.

## CONCLUSION

For the foregoing reasons, Defendants eBay and PayPal respectfully request that this Court grant Defendants' motion to dismiss and dismiss Plaintiffs' FAC in its entirety for failure to state a claim.

Dated: October 4, 2011

THOMAS BROWN
KATHERINE M. ROBISON
O'MELVENY & MYERS LLP


By:    /s/ Thomas Brown
                    Thomas Brown
Attorneys for Defendants
eBay Inc. and PayPal, Inc.

# EXHIBIT C

Delaware.gov | Text Only

Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

### HOME
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

### SERVICES
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service
Survey

### INFORMATION
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request
How to Form a New
Business Entity
Certifications, Apostilles
& Authentication of
Documents

Frequently Asked Questions   View Search Results   Summary of Charges   Logout

## Entity Details

| | | | |
|---|---|---|---|
| **File Number:** | **4414990** | Incorporation Date / Formation Date: | **08/31/2007** (mm/dd/yyyy) |
| **Entity Name:** | **KICKFLIP INC.** | | |
| **Entity Kind:** | **CORPORATION** | Entity Type: | **GENERAL** |
| **Residency:** | **DOMESTIC** | State: | **DE** |
| **Status:** | **GOOD STANDING** | Status Date: | **01/11/2013** |

### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | **GKL REGISTERED AGENTS, INC.** | | |
| Address: | **3500 S DUPONT HWY** | | |
| City: | **DOVER** | County: | **KENT** |
| State: | **DE** | Postal Code: | **19901** |
| Phone: | **(800)446-5455** | | |

Additional Information is available for a fee of $20.00. This information will include current franchise tax assessment, current filing history and more..

Would you like ○ Tax & History Information   [Submit]

[Back to Entity Search]

To contact a Delaware Online Agent click here.

site map   |   about this site   |   contact us   |   translate   |   delaware.gov