```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
      KICKFLIP, INC.,
 4                                      :    CIVIL ACTION
                 Plaintiff,             :
 5                                      :
                 v.                     :
 6                                      :
      FACEBOOK, INC.,                   :
 7                                      :    NO. 12-1369 (LPS)
                 Defendant.
 8                              - - -

 9                         Wilmington, Delaware
                           Monday, July 29, 2013
10                         Oral Argument Hearing

11                              - - -

12    BEFORE:        HONORABLE LEONARD P. STARK, U.S.D.C.J.

13                              - - -
      APPEARANCES:
14

15

              MORRIS JAMES, LLP
16            BY:  KENNETH L. DORSNEY, ESQ.

17                 and

18            NEWMAN DuWORS, LLP
              BY:  DEREK A. NEWMAN, ESQ.
19                 (Seattle, Washington)

20                 and

21            STRANGE & CARPENTER
              BY:  BRIAN R. STRANGE, ESQ.
22                 (Los Angeles, California)

23                     Counsel for Kickflip, Inc., d/b/a
                       Gambit
24

25                         Brian P. Gaffigan
                           Registered Merit Reporter
```

1    APPEARANCES:   (Continued)

2

3                   ASHBY & GEDDES, P.A.
                    BY:  STEVEN J. BALICK, ESQ.

4                        and

5                   COVINGTON & BURLING, LLP
                    BY:  THOMAS O. BARNETT, ESQ.,
6                        JONATHAN GIMBLETT, ESQ., and
                         CAITLIN COTTINGHAM, ESQ.
7                        (Washington, District of Columbia)

8                        and

9                   FACEBOOK, INC.
                    BY:  PANKAJ VENUGOPAL, ESQ.
10                       (Washington, District of Columbia)

11                          Counsel for Facebook, Inc.

12

13

14

15

16

17

18

19                          - oOo -

20                      P R O C E E D I N G S

21                   (REPORTER'S NOTE:  The following hearing was

22   held in open court, beginning at 10:08 a.m.)

23                   THE COURT:  Good morning, everyone.

24                   (The attorneys respond, "Good morning, Your

25   Honor.")

 1                    THE COURT:  We'll start by having you putting

 2     your appearances on the record for me, please.

 3                    MR. DORSNEY:  Good morning, Your Honor.

 4                    THE COURT:  Good morning.

 5                    MR. DORSNEY:  For plaintiff, Kickflip.  Ken

 6     Dorsney from Morris James.  With me at counsel table, Brian

 7     Strange from Strange & Carpenter.

 8                    MR. STRANGE:  Good morning, Your Honor.

 9                    MR. DORSNEY:  And Derek Newman from Newman

10     DuWors.

11                    THE COURT:  Good morning to you.

12                    MR. NEWMAN:  Thank you.

13                    MR. BALICK:  Your Honor, good morning.

14                    THE COURT:  Good morning.

15                    MR. BALICK:  Steven Balick from Ashby & Geddes

16     for the defendant, Facebook.  From the Covington & Burling

17     firm, I'm joined from by Thomas Barnett, Jonathan Gimblett,

18     Caitlin Cottingham, and in the front row from Facebook is

19     Pankaj Venugopal.

20                    THE COURT:  Welcome to all of you.  So we are

21     here for argument on two motions.  We have the motion to

22     dismiss as well as the motion to strike.  To the extent you

23     want to say anything about the motion to strike, feel free

24     to do so but work it into your presentation on the motion to

25     dismiss.

1           So we'll hear first from the defendant in that

2    regard.

3           MR. BARNETT:  Thank you, Your Honor.  Thomas

4    Barnett.

5           I guess if I can ask, as an initial procedural

6    matter, I think you allocated an hour to each side.  If it's

7    possible, I'd like to be able to reserve maybe 15 minutes or

8    so for rebuttal.

9           THE COURT:  That's fine.

10           MR. BARNETT:  Assuming that is needed.  But I

11    promise not to -- at least try not to talk for longer than

12    necessary.

13           THE COURT:  Okay.

14           MR. BARNETT:  As I think you probably are aware

15    from the briefs, from our perspective, this is a case about

16    an advertising company that was serving false and deceptive

17    ads, it was banned from the Facebook site in November of

18    2009, who is now trying to come back and convert that into

19    an antitrust claim based on a policy that was adopted about

20    18 months later in the summer of 2011.

21           For the reasons that we have explained in our

22    brief and then I will try to elaborate on some here, we

23    believe that neither claims stand, neither the antitrust

24    claims or the tortious interference claims.  And,

25           We believe this is a good opportunity, or this

1    is exactly the sort of case that the Supreme Court was

2    talking about in *Twombly* when it said, "It is particularly

3    important to apply rigorously the standards of pleadings to

4    make sure that there is a plausible claim before you open

5    the floodgates."

6         Make no mistake that what the plaintiffs are

7    seeking here would be a very burdensome intrusive expensive

8    enterprise.  And while they're held to the same standards as

9    everybody else, it is important that they allege a coherent

10   theory and facts that support that coherent theory that make

11   their claim plausible.  And we think what they have done

12   is actually assert a set of vague allegations that, when

13   pressed, end up or turn out to be shifting grounds that do

14   not provide a solid support for moving forward.

15        So let me spend just a moment to talk a little

16   bit about Facebook and Kickflip to set the background.  I'm

17   cognizant this is a motion to dismiss and, in general, are

18   confining ourselves to the allegations in the complaint.

19   For the most part, I am going to be referencing attachments,

20   if you will, that are not challenged by the plaintiff in

21   terms of the motion to strike.  Where I do so, I will try to

22   be explicit about that.

23        The one exception to that I think will be the

24   Facebook platform policies and the development of payment

25   policies which are both explicitly referenced in the

1    complaint.  There is an URL cited to those policies in the

2    complaint and those policies were attached to our motion to

3    dismiss.

4             THE COURT:  Let's talk about that for a minute.

5    So as I understand it, if I were to follow the precise URL

6    that is in the complaint, I would, today, find the version

7    of the policy that you have attached to your motion to

8    dismiss; is that correct?

9             MR. BARNETT:  Well, I would say at the time we

10   filed our motion, that would have been correct.  If you

11   followed it today, it may well be different.

12            THE COURT:  So I guess that is really the

13   question.  What is in the record as to what I would have

14   found at the time the complaint was filed, had I clicked on

15   that URL?

16            MR. BARNETT:  I believe at the time the

17   complaint was filed and the time we filed our motion, it

18   would have been the same policy.

19            THE COURT:  For purposes of a motion to dismiss

20   and a motion to strike, do you think that whether the Court

21   can look at the policies turns on what date one might click

22   on an URL that is in a complaint?

23            MR. BARNETT:  Well, I think it's reasonable to

24   say that the plaintiff cited in their complaint at the time

25   they filed it to a specific policy that was available at the

1    time.  We pulled it down and that is available.

2          You know, in this world, I'm not sure how you

3    can ensure that something is continuously available.  There

4    may be ways in which you can access some of these things,

5    but at the end of the day you have our statement that we

6    pulled this down at the time and attached it.

7          THE COURT:  But you wouldn't argue that you all

8    control Facebook and that URL, if you, today, put your whole

9    responsive brief and an expert report defending this case at

10   that URL, you wouldn't say that suddenly I can look at that

11   for purposes of a motion to dismiss just because the

12   complaint is linked to that URL, would you?

13         MR. BARNETT:  No, I would not.  But I would also

14   point out that I don't think the plaintiffs have suggested

15   that there is anything in those policies that is any

16   different from what they understood them to be at the time

17   they filed the complaint.  And I would certainly not go as

18   far as that.

19         So what is Facebook?  Facebook at a general

20   level is, it's a website.  It allows users to register or

21   create a profile and essentially exchange information with

22   each other, either about themselves or other issues.  And

23   it's a way to connect with each other.

24         In addition, Facebook provides a platform, if

25   you will, that allows developers to develop applications.

1   For example, a game might be one application.  And they

2   are allowed to access certain functionality from Facebook

3   through the APIs -- the Application Program Interface -- and

4   by doing so, they can connect to Facebook.  And I won't go

5   into all the details about what that is, but I think at a

6   general level it's fair from the complaint that that is what

7   developers are doing.  They're connecting through Facebook

8   through certain APIs.  And,

9           Facebook itself, there is no allegation that

10  Facebook, for example, provides games on its own.  This is

11  something it provides to developers.  And other than this

12  payment processing fee that we will get to, there is no

13  allegation that Facebook charges anybody, any of the

14  developers for access to this site.

15          Kickflip, from what we can tell, we don't have a

16  lot of details, were largely an advertising company.  They

17  were doing something called offer ads.  And offer ads enable

18  the developer to, if they use the Kickflip or Gambit service

19  to post an ad, that the user could click on and do something

20  and get something of value for that.

21          Kickflip claims or asserts or alleges that it

22  also provides other services such as in-app currency.  And

23  what is that?  That means if I'm playing a game, I have gold

24  coins that I can use to pay for things in the game.  That

25  is referred to as an in-app currency, and they would help

1    developers provide that.

2              They provide something called pricing

3    optimization services.  How do you price things in a way

4    to optimize your revenue?  Payment processing, which is

5    the function of I'm a user, I want to buy something, how

6    do I actually execute that exchange of value between the

7    developer and the user?  Which is obviously an important

8    point we'll come back to.

9              In the fall of 2009, again this is in the

10   complaint, Facebook encountered something that has been

11   referred to as Scamville that is related to these offer ads.

12   And this was a problem because when users were clicking on

13   these offer ads, they were being tricked into or deceived

14   into paying more than they thought they were going to pay or

15   possibly giving up personal identifiable information.

16             If you look at, I believe it is Exhibit 6 to our

17   motion to dismiss, which is one of the articles referenced

18   in the complaint in which the plaintiffs have not challenged

19   in their motion to strike, it suggests that 20 percent of

20   the offer ads that were appearing at that point in time

21   willfully tricked users.  And this was an estimate from the

22   companies providing the ads, as I recall the article.  So

23   the suggestion that this was not a serious issue is not

24   plausible given the facts even as alleged in the complaint.

25             Kickflip, and it does not deny this, was one of

1    the offenders that was serving up these deceptive fraudulent

2    ads.  Facebook, to protect the integrity of its site to

3    protect its users -- remember, if users don't trust the

4    Facebook site they won't use it -- took action to ban

5    Kickflip from the site.

6              In a November 5th, 2009 letter, which is

7    referenced in the complaint which the plaintiffs do not seek

8    to strike, Facebook sets forth explicit reasons why Kickflip

9    was being banned from the sites:  Despite repeated warnings,

10   you are continuing to serve ads that violate our policies

11   and, as a result, you are banned from the site.

12             Again, I think it's critical to this motion that

13   there is nothing that Kickflip has suggested that suggests

14   they were not in fact serving fraudulent and deceptive ads.

15             THE COURT:  Let's talk a little bit about that.

16   Because the allegation, as I understand it from Kickflip,

17   is that all of this is pretext for your attempted

18   monopolization.  Is it your view that if the facts as you

19   have just asserted them about Scamville and Kickflip's role

20   in that are correct, then even if you had monopolization or

21   even if everything else that the plaintiff alleges is true,

22   they still don't have a claim?

23             MR. BARNETT:  Well, I could make an argument

24   that we had an independent and sufficient reason for kicking

25   them off the site, whatever else we may have been doing.

1                But the argument, I think a more narrow argument

2    that I would like to focus you on is they need to allege

3    specific facts that suggests a linkage between their being

4    kicked off the site and this supposed monopolization scheme.

5    We'll get to the plausibility of the monopolization scheme,

6    but let's assume for the moment there was something going on

7    out there.

8                Merely asserting that this was part of this

9    broad scheme, it flies in the face of *Twombly*.  They need to

10   allege facts that suggest that there was in fact a linkage

11   between the two.  And I would suggest to you they have

12   failed to do so.

13               Start with the basic notion that, remember,

14   these were offer ads that we're talking about.  These were

15   ads that developers, in their application or games or

16   wherever else they would appear, people that click on them

17   would be deceived.

18               The policy that they are challenging, that was

19   adopted 18 months later, is a payments processing policy.

20   It's actually a very narrow policy.  And all it says is that

21   in terms of you can use whatever in-app currency you want.

22   You are not required to use Facebook's credits or anything

23   like that.  But when you do the exchange of value, you have

24   to run through our back-end and Facebook is going to take a

25   fee when you do that.

1         Now, Facebook was doing this certainly to

2    ensure -- I mean the exchange of value on a website is

3    obviously a very important function.  And if people are not

4    getting what they expect, if they're deceived, et cetera,

5    that causes problems for Facebook more generally.

6         As is alleged in the complaint, others in the

7    industry, in the Internet industry such as Apple, do similar

8    things.  They require you to go through that payment

9    processing, that narrow function so that they can have some

10   control over the reliability, safety and security of it.

11        That policy has nothing to do with offer ads.

12   It is separate.  And they need to allege some fact that

13   says banning a company in November of 2009 for putting

14   deceptive offer ads up has some logical connection to a

15   payment processing policy adopted in July of 2011 that is

16   unrelated to offer ads.

17        Now, they try to link those in some way.  First

18   of all, through -- well, in several ways.  First, they say

19   this was a sham.  You know, there was no good reason for it.

20   And the reasons they give are, in their opposition at least,

21   they say we weren't responsible for these ads.  It was the

22   advertisers who were doing it.

23        But if you look at the complaint, they contradict

24   their own complaint.  In the complaint, they say we were --

25   they acknowledge they should have been aggressively monitoring

1    these ads -- the ads that they were serving up on Facebook's

2    site.

3            And they are the logical place, if you are going

4    to look for responsibility, not the hundreds or thousands of

5    companies that creates ads but the relatively few companies

6    that are serving them up on Facebook's site, that you would

7    go after.  So the suggestion in their opposition that they

8    were not responsible is not, certainly contradicts the

9    complaint and is not credible or plausible.

10           THE COURT:  And that is enough for me to dismiss

11    the allegation that this was all a sham?

12           MR. BARNETT:  That is part of it.

13           THE COURT:  Okay.

14           MR. BARNETT:  Second.  I'm going through the

15    reasons that they give for why you think it's a sham.  They

16    say, well, Facebook should have focused on the developers

17    and the advertisers.  I have already talked about the

18    advertisers which are many and diffuse.

19           The developers, they did talk to the developers.

20    That's in the complaint.  Indeed, they complained that we

21    talked to the developers and said Kickflip is serving up

22    deceptive and fraudulent ads.  You can't use them.

23           So the idea that we were not focused on developers

24    is again contradicted by the complaints.

25           I come back to under *Twombly*, if you think about

1    the facts in *Twombly*, which were that the various regional

2    Bell operating companies after the deregulation didn't enter

3    each other's territories.  And Justice Souter, when he

4    writes *Twombly*, he says, look, there were obvious reasons

5    why they wouldn't enter each other territories.  You

6    plaintiffs have to allege specific facts that suggest

7    that's not the reason that there was an antecedent collusive

8    horizontal agreement that was the reason.

9              Here, the reason that Scamville is so important

10   is there were very clear facts that Facebook put to Kickflip

11   at the time as to why it was banning it from Facebook.

12   They need to come forward with more than just supposition

13   or raw assertion that suggests that this was part of some

14   scheme for a different product in a policy that was adopted

15   18 months later.  That, I would suggest to you, is a reason

16   why this complaint can be dismissed.

17             THE COURT:  What about the alleged timing?

18   Isn't it alleged that this credits program preceded the

19   letter even to Kickflip?

20             MR. BARNETT:  It's alleged that Facebook

21   developed payment processing and developed a credits

22   option -- a credit being its own version of an in-app

23   currency.  But it is not alleged that Facebook adopted a

24   policy until July of 2011 that, first of all, if you look

25   at the policy, only deals with payment processing.  It

1    doesn't deal with the in-app currency.

2             Developers have, and always have been, are

3    today able to use their own in-app currency.  Could use, if

4    Kickflip hadn't been banned, could use Kickflip currency.

5    But because they were banned for that independent reason

6    18 months before, they're one of the few companies who

7    cannot do that.

8             THE COURT:  Well, why don't you focus me on why

9    it's implausible when the timeline is you all introduced

10   credits, then you start enforcing this policy about ads and

11   then you subsequently, 18 months later, I suppose, have a

12   policy that effectively says you have to use credits and now

13   you are able to charge three times as much as everyone else

14   who used to do this.  Why is that implausible?

15            MR. BARNETT:  Well, first of all, I want to

16   underscore the distinction between the creation of payment

17   processing and of credits and the offer ads.  Those are

18   different.  So if I can use a rough analogy, I guess, if I

19   go rob a bank and then I am fired and you later find out

20   that I'm embezzling or something, they're unrelated events

21   and the fact that they may have overlapped in time to some

22   extent doesn't mean that they are connected.

23            THE COURT:  Sure.  But I think the allegation

24   as I understand it is your client was going to take over

25   this market, one way or another, and whatever they could do

1    to bloody the competitors along the way, they were going

2    to do.  And so each step along that way, maybe each step

3    looks separate, maybe you will prove that, but it's not

4    implausible to think that you start taking some cuts out

5    of the competition along the way to where you finally hit

6    on the policy that knocked them out at the end.

7              MR. BARNETT:  But I would suggest that those

8    cuts really need to be connected in some way to the credits

9    or the payment processing whereas this cut that we're

10   talking about had to do with offer ads which are different.

11   We'll get to their cluster market concept but they're

12   different and there is no logical connection between those

13   two other than the fact that they may have -- they happened

14   to be providing both.

15              It's an assertion that this was part of some

16   grand scheme, but there are no actual facts that explain

17   why banning somebody for serving fraudulent deceptive ads is

18   going to help Facebook, if you will, discredit the payment

19   processing industry, if you will, which was just different

20   from the offer ads industry.

21              THE COURT:  Well, I will give you time to break it

22   down, but it seems like you are saying a number of different

23   things.  Maybe they haven't adequately pled the overall scheme,

24   but for you to say you would suggest that they have to be

25   linked and logically related, I'm not sure where you are

1    getting that.  What is the authority for saying they have to

2    be logically related if they have adequately pled an overall

3    scheme just to get rid of us, however it is going to be done?

4              MR. BARNETT:  It goes to the causation of a

5    standing point.  If, for independent reasons, they have

6    legitimately been banned from Facebook, then they are not

7    harmed by whatever happened 18 months later.  And this goes

8    to I guess maybe one of your original questions.  If you

9    have that and it is independent, then they can't trace the

10   harm to the alleged antitrust violation.  And they wouldn't

11   -- the remedy in the antitrust case wouldn't remedy their

12   situation as we would still have an independent reason to

13   keep them off of Facebook.  That is why there needs to be

14   the linkage.

15             THE COURT:  Well, I have thrown a lot at you.

16   You go in whatever direction you think will be most effective.

17             MR. BARNETT:  That's fine.  Well, on this

18   point, I want to deal with the plaintiffs make the argument

19   on a causation point that their harm, if you will, is

20   overdetermined and they seek to rely on the *Khodara* case.

21             I would suggest to you there what was motivating

22   the Third Circuit was a Catch 22 situation where in either

23   one, the plaintiff tried to challenge either of the two

24   causes.  In each case, the other could point to the other

25   way and say there are two causes.  You don't have standing

1    to pursue either one.

2              This is fundamentally a different situation.

3    We're not suggesting that they don't have standing to bring

4    their tortious interference claim relating to their being

5    banned in November of 2009.  The payments policy indeed

6    doesn't even address the whole offer ad issue.  As I said,

7    it's separate.  So this isn't a question of interdependence

8    in such a way, and so you don't have that same Catch 22.

9              We do make arguments as to why their tortious

10   interference claim doesn't state a claim, but it's not a

11   standing argument.

12             Let me move to, if you will, some of the more

13   substantive aspects of their antitrust claims.

14             As I said, they need to allege a coherent theory

15   and a set of facts to support that theory that makes the

16   claim plausible.  It's very clear under their monopolization

17   claims to start with that they need to allege coherent

18   relevant markets relying upon cross-elasticity of demand

19   substitutability that support the existence of their alleged

20   relevant market.

21             I would suggest to you first off that their

22   virtual-currency services market is less than coherent and

23   certainly not sufficient at the pleadings stage.

24             As an initial matter, I will readily confess I

25   still don't understand exactly what is supposed to be in or

1  not in this "virtual-currency services" market.  I get some

2  of what is supposedly included:

3          Payment processing, obviously, since that is the

4  policy that they're challenging.

5          I think in-app currency is supposed to be

6  included, but that is not entirely clear to me.

7          Pricing optimization, relationships with

8  advertisers, those sorts of things that are mentioned.  It's

9  again unclear to me whether they intend to include all of

10  those or other things.

11          What they say in their opposition is it's not

12  any one thing, it's a cluster market.  And that is a known

13  concept.  If you go back to *Philadelphia National Banks*,

14  Supreme Court's decision back in the early 1960s, they

15  accept the concept of a possibility of a cluster of products

16  or services can constitute a single product market.

17          But there are specific requirements before you

18  can support such a market.  Specifically, what you have to

19  allege is people won't buy the component members of that

20  cluster separately.  They will only buy them in the cluster.

21  Therefore, it's proper to treat them as a cluster.

22          What is completely clear is the complaint not only

23  doesn't allege facts that suggest that the game developers

24  will only buy these things in a cluster, it even alleges facts

25  that tends to contradict that.

1          As an example, some of these products that

2   they include in their cluster market, Facebook is not

3   alleged to provide.  They acknowledge that Facebook's

4   payment processing is a very limited service.  Even the

5   credits, in-app currency option that is available is a more

6   limited option.

7          So you have got a provider, based on the

8   complaint that is specifically alleged, who is not selling

9   all of these things.  Developers are obviously getting the

10  rest from other people.

11         But, more fundamentally, they don't allege facts

12  and say, look, they only buy this way and not another way.  So

13  until they clarify -- and they can't do this in the papers,

14  they need to do it in the pleadings -- clarify exactly what is

15  and is not in this virtual-currency services market that they

16  talk about and then add facts that indicate that cluster does

17  constitute a single market, that is a grounds for dismissing

18  the antitrust claims.

19         Now, once you -- if the cluster market, and I

20  would suggest there are two reasons why -- I mean they can

21  tell you why they're trying to group them together, but

22  the reason that leaps out to me is they understand that the

23  offer ads that we were talking about that were false and

24  deceptive that got them into trouble were different from

25  the payment processing that was affected by the July 2011

1    policy.  And this is part of their effort to try to link

2    them in some way.

3            But they have to allege facts to support the

4    cluster market in order to establish the link in that

5    manner.  And I would suggest to you the complaint has not

6    done that.

7            Now, if you're just looking at payment processing,

8    it becomes particularly problematic for the plaintiff because

9    if you think about what that involves, that is simply getting

10   value from the user to the developer, whoever is running

11   the app through the various forms of payment that you have

12   available.  That happens all the time on the Internet.  It

13   happens on Facebook certainly.  But any site where there

14   is commercial transactions taking place, there is a payment

15   processing function that goes on.  There is nothing that

16   suggests that piece of it is particularly unique to this

17   situation.  So if you are talking about payment processing,

18   you are talking about a very broad market which obviously the

19   plaintiff would like to avoid.

20           Another problem that they run into is -- and

21   I want to underscore this -- they try to include this

22   constellation of services, if you will, within one product

23   market, but then challenge a policy that only affects payment

24   processing.  There is nothing in the July 2011 policy that

25   says somebody can't serve offer ads, can't serve two price

1     optimization services, can't provide in-game virtual-currency

2     services, basically any of the other things they want to

3     include in there.  So there is a mismatch, if you will,

4     between the policy that they're challenging and the various

5     services that they claim they're going to provide.

6              On a separate point, they want to establish a

7     market for games played on social networks.  This is obviously

8     very important to them both for their monopolization and their

9     tying claims, all of their antitrust claims.  But, ultimately,

10    all they really have is a series of assertions that these

11    are somehow unique.  They talk about a different monetization

12    strategy that if I'm an app developer, I develop a game and

13    I put it on the Xbox and Playstation 2 platform, I can charge

14    a fee for it upfront.  And on Internet games, there tends not

15    to be an upfront fee.  And I monetize, if you will, on the

16    back end.

17             That doesn't mean from the developers'

18    perspective that they can't put games on both kinds of

19    platforms.  And I would suggest to you that there are three

20    kinds of other platforms that are relevant here, and they

21    really only take into account one.

22             The first is social networks.  And even here,

23    this is the one that they tried to take into account.  Even

24    here they're inconsistent.  In the complaint they say, well,

25    games that are played on social networks, like Facebook or

1      Google+ or Myspace.  If you look at their opposition, they

2      now claim that they're only talking about games that are on

3      Facebook.  Games that are on another social network or even

4      games that are on another site that connect to Facebook,

5      they try to exclude from their relevant market.  But, again,

6      they have no facts alleged that support such a distinction.

7              That leads me into the second category, which

8      is other websites.  You don't have to be a social networking

9      site to put up a game.  Remember, Facebook has lots of games

10     on it.  Some of them, you interact with each other in the

11     game.  Some of them, you don't interact with each other on

12     the game.  Certainly, the latter category you can put on

13     any website.  But even games where you interact with other

14     players in the game, if you will, a social aspect to that,

15     they exist on other websites.  You don't have to be part of

16     or connected to a social network to have such a game.  And

17     there is nothing in the complaint that says.  Even the

18     similar games that appear on Facebook do not appear on other

19     websites.

20             Similarly, for the third category, for these

21     other platforms, people play with each other all the time.

22     And, again, there is nothing in the complaint that tells you

23     whether games that appear on Facebook do not appear on these

24     other platforms.  They have failed to allege that, and that

25     is critical because these are obvious alternatives that they

1    have not alleged facts to exclude, and without that, you

2    don't have a coherent relevant market so they're done in the

3    first instance, and you certainly don't have a basis for

4    inferring that it's plausible that they can establish market

5    power in the other elements of the complaint.

6            THE COURT:  So even on a motion to dismiss with

7    allegations here, it would be wrong for me to draw the

8    inference in their favor that there are some games that are

9    only available to folks through Facebook?

10           MR. BARNETT:  I mean if there are some games

11   that are only on Facebook, that doesn't establish a relevant

12   market.  They have to allege facts that there is, if you

13   will, a business.  And from the game developers' point of

14   view, they may choose to only put it on Facebook.  They

15   could have put it on Google+ or another website or even on

16   Playstation 2.  And for all we know from the complaint, they

17   do do that, but the fact that, you know, some developers for

18   some games have chosen a single distribution outlet doesn't

19   establish a relevant market.

20           If I am a clothing manufacturer and I only sell

21   to one set of retailers but not another set of retailers,

22   that doesn't mean there is not a retail clothing market that

23   is going on.  That is just my individual choice.

24           If there are other game developers, what they

25   would need to show is that for all of these developers, they

1    are only able to put these games on Facebook.  If you look

2    at what is in their opposition, if you look at what is in

3    their complaint, they would need to show it's on Facebook or

4    Google+ or other websites.  But they have not alleged that.

5              THE COURT:  Isn't the test, we're at the very

6    beginning of the case.  The test is whether their market is

7    facially unsustainable as alleged.  How could I reach that

8    conclusion from what your argument is?

9              MR. BARNETT:  Because, and the courts have held,

10   even in a 12(b)(6) motion to dismiss context, if they are

11   not addressing obvious other alternatives and alleging facts

12   as to why those alternatives aren't substitutable here, then

13   the complaint fails on its face.

14             And to take a simple fact.  The fact that they

15   have not alleged that these games do not appear on other

16   sites is a pretty telling omission.

17             THE COURT:  Do you oppose granting leave to amend?

18             MR. BARNETT:  No.

19             THE COURT:  Do you think the analysis of the two

20   markets rises and falls together or might we find that they

21   have adequately alleged one market but not the other?

22             MR. BARNETT:  I would put it slightly differently.

23   There are different reasons why we think they have failed to

24   allege adequately the two markets.  Therefore, I think you

25   can make an independent decision on each of those, which I

1    think is responsive to your question.

2                THE COURT:  Yes.  Thank you.

3                MR. BARNETT:  So I also want to step back and

4    talk about -- well, let me go to the -- yes, step back for a

5    moment on this whole monopolization front.  The entire --

6    one of the elements of *Twombly* is what is going on here

7    plausibly.

8                The whole story that they're trying to tell is

9    that Facebook has monopolized this virtual-currency services

10   market.  There are fundamental problems with that.  The

11   first of which we already alluded to, which is Facebook

12   doesn't even provide or is not alleged to provide many of

13   the services that they allege that we have monopolized,

14   which makes it pretty hard for us to monopolize them.

15               The second is, it's just a matter of common

16   sense.  They talk about Facebook's ability to charge a fee,

17   a 30 percent fee of these transactions that take place.

18               Put most simply, Facebook, all Facebook would

19   have to do, if it wanted to charge a fee, was just charge a

20   fee.  Say, any transaction that takes place on our site, you

21   have to give us 30 percent.  They could do that.

22               What they have done is something related to

23   this payments processing that has to do with the integrity,

24   safety and reliability of the site.  And they're trying to

25   shoot -- now, they are monetizing off of that.  Perfectly

1    reasonable thing for a company to do, because otherwise

2    this is all free for developers, and Facebook spends a lot

3    of money developing these things that the site is making

4    available.

5              But if all they wanted to do was earn money,

6    they don't need this grand scheme.  And I suggest that that

7    goes to the plausibility as to whether Facebook launched on

8    the grand scheme that they talked about.

9              On the time front here, there are several points

10   that I want to underscore.

11             The first is you have to have a time.  As I

12   pointed out earlier, for many of the products that they

13   are talking about in this virtual-currency collection, the

14   payments policy doesn't affect that.  Anybody who is not

15   banned from Facebook for other reasons can generally provide

16   those.  Therefore, there is no tie with respect to these

17   other products.

18             But the second point is a point that is just not

19   dealt with in the complaint or frankly in the opposition

20   papers, and that is if you look at the platform policy, that

21   deals with the payments processing policy.  It says if your

22   game is on Facebook, you are subject to this policy, and any

23   transaction that goes through your sites is going to have to

24   go through our back-end system and we'll take our fee.  But

25   if you are off of Facebook and you access the site through

1    plug-ins and log-in and publishing and news feed, you are

2    not subject to that policy.  Therefore, in order to "access

3    Facebook" in some way, the policy simply doesn't cover that.

4    There is an alternative means and there is nothing in the

5    complaints and there is nothing in the opposition that gives

6    you a reason to believe, even accepting facts alleged as

7    true, that that doesn't exist or doesn't work.  So there is

8    no tie at a very fundamental level.  And they have simply

9    not addressed that.

10            The final point -- well, two final points to

11   make on this front is, when we talked about what Facebook

12   is, with respect to developers, it is really just a series

13   of APIs.  Access to certain functionality.  Obviously,

14   people can't have access to the entire site.  If they have

15   access to too little functionality, it's not going to work.

16            So there is an evolution that goes on in terms

17   of what is the appropriate set of API interfaces that is

18   going to work for developers.  Facebook obviously determined

19   as the complaint alleges, as have others in the industry,

20   that this payment processing facility is an important part

21   of the APIs that should be available and used by developers.

22            That evolution, I would suggest to you, is just

23   part of the Facebook platform, if you will.  It's not a

24   separate product.  But even if it is, that underscores the

25   notion that in this context, it would not be appropriate to

1   apply the "per se" rule.  It would be appropriate to follow

2   the D.C. Circuit when it looked at another online antitrust

3   case and decided the rule of reason was more appropriate.

4           THE COURT:  But the response to that, of course,

5   was I think that was after summary judgment.  Aren't you

6   trying to rush things by trying to get me to say, on a

7   motion to dismiss, to apply "per se?"

8           MR. BARNETT:  I wouldn't want to rush you,

9   but I believe we -- I think we have cited from authority

10  that suggests even if the motion to dismiss stage, it is

11  appropriate to dismiss a "per se" client if it does not

12  look like the facts are going to support that kind of claim.

13          Let me turn briefly to the tortious interference

14  claim.  I don't think this is particularly complicated from

15  our perspective.

16          They were serving false and deceptive ads.

17  They were harming our users.  The complaint itself includes

18  articles that suggest 20 percent of these offer ads were

19  fraudulent, "were willfully tricking users" is the phrase in

20  the article.

21          Facebook clearly has the right to defend the

22  integrity of its site and to protect its users.  That is

23  what it did.  It cited the reasons for doing so.  And it

24  informed the developer community that needed to know.  That

25  is all it did.  Under those circumstances, they have not

1    set forth a claim for tortious interference.  And,

2             Then as a final point, I would mention the

3    issues cited in the November 12, 2009 letter from Kickflip

4    to Facebook which is one of the letters that they have

5    challenged in the motion to strike.

6             I think you know the basic facts.  You know as

7    much as we know in that they suggest, they represent that

8    they did that with the Kickflip or Gambit business that

9    was at issue.  And so if that letter is in, they have not

10   responded to that.  They merely say we misunderstood it.

11   If the letter is not in, and you don't think you can get to

12   that, then we would suggest limited discovery on that point.

13            THE COURT:  Let's talk on the motion to strike,

14   whether it's in.  It's an interesting concept to me that

15   they rely clearly on one letter, and then I think it's

16   undisputed that the letter you want to rely on is a response

17   to that letter.

18            MR. BARNETT:  Correct.

19            THE COURT:  You are not arguing I don't think

20   that their claim relies on their responsive letter, so it's

21   sort of a completeness argument, but I'm not sure that that

22   gets it in on a motion to dismiss.  So I'm struggling with

23   that.

24            MR. BARNETT:  Well, I would say it depends on

25   what one means on by "rely."  In terms of particularly on

1    tortious interference and the claim that this was somehow a

2    sham, that exchange establishes the basis of what Kickflip

3    told -- I'm sorry -- what Facebook told Kickflip and what

4    Kickflip informed Facebook in terms of they didn't deny they

5    were doing what we asserted they were doing and we proceeded

6    ahead with the ban.

7           And a suggestion that this was a sham and not

8    based on this, I do think that entire exchange between the two

9    is relevant.  If you look at it, I think you were alluding to

10   this, it's not a situation where they didn't have access to

11   it.  So there is no unfairness prong on that front.  They have

12   selectively quoted, if you will, from one side of the exchange

13   and not from the other.  But I would ultimately base the

14   argument on the idea that it is relevant to their assertion

15   that this was a sham, this was not the reason we did it,

16   because it gives you the information available to Facebook at

17   the time.

18           THE COURT:  You mentioned that Apple, in

19   passing, addressed in the motion to strike context, whether

20   it's appropriate for me to look at the Apple documents given

21   they're just referenced really in passing in the complaint.

22           MR. BARNETT:  I could be wrong.  I don't think

23   we attached Apple documents.  I think there were a couple of

24   statements in the motion to dismiss.

25           THE COURT:  I think you might be right about that.

1          MR. BARNETT:  They referenced the fact that the

2    payment processing policy is basically identical to or

3    follows the model that Apple has.  And we may have used the

4    phrase "standard in the industry."  The complaint itself

5    alleges that we follow the Apple model in this regard.  And

6    so that is all that is intended.

7          If you want to substitute the statement from

8    the complaint for that statement in the motion to dismiss

9    and limit it to that point, we have no objection to that.

10         THE COURT:  On your policies which we talked

11   about way back at the beginning of your argument, I remember

12   now one of the arguments you're getting is that there is a

13   lack of authentication, no affidavit or anything.  What is

14   the response on that?

15         MR. BARNETT:  Yes.  Well, there are two sets

16   of policies.  One was a set of policies at the time the

17   complaint was filed.  They have not asserted a lack of

18   authentication for those policies, nor have they suggested

19   that there is anything wrong or unauthentic about them.

20         When they raise the issue of, well, these were

21   not the policies necessarily in effect in July of 2011, we

22   submitted the policies as they existed at that point in

23   time.  From my perspective, there is not a declaration.  If

24   that were the only barrier, that would be helpful, we could

25   submit a declaration, but there is not.

1          From my perspective, the appropriate thing to do

2    is to focus on the policies that were in place at the URL at

3    the time they filed the complaint which were the same as the

4    time we filed the motion to dismiss because that is what is

5    cited in the complaint, and it's reasonable to read the

6    complaint that is challenging the policy that was available

7    at the URL cited in the complaint.

8          THE COURT:  I think we've reached the time where

9    we're getting into your rebuttal time.

10          MR. BARNETT:  Okay.  Thank you.

11          THE COURT:  Thank you.

12          MR. NEWMAN:  Your Honor, I'd like to discuss

13    three issues.

14          THE COURT:  Okay.

15          MR. NEWMAN:  First, that Kickflip has standing.

16          Second, how Kickflip properly pled the antitrust

17    relevant markets and virtual-currency services and social

18    media network.  And,

19          Third, that Kickflip properly pled each of its

20    substantive causes of action for monopolization, tie-in and

21    tortious interference.

22          I'll start with standing.  Standing has three

23    elements:

24          An injury,

25          Causal connection between that injury and harm

1    that is alleged to have been committed by the defendant.  And,

2              Third, the likelihood that the Court can redress

3    the injury.

4              The first two, injury and causal connection, I

5    think is clear from the complaint.  The complaint alleges

6    that Facebook engaged in a monopolistic scheme to eliminate

7    competition in the virtual-currency services market.

8              The scheme began in May of 2009 when Facebook

9    launched its credits product to compete against Kickflip and

10   20 other competitors and did so at a 30 percent fee even

11   though all the other competitors were charging 5 or 10 percent.

12             The complaint says that, unsurprisingly,

13   Facebook was unable to gain market share because of that

14   price and because it offered less services.  So it set out

15   of a course of action to eliminate competition, the first

16   step of which was banning Kickflip.  And the complaint

17   explains why.

18             It says that Kickflip has customers like

19   Playdom, Zynga, and Crowd Star.  It's Facebook who was

20   courting those players at the time and thereby eliminating

21   Kickflip, the second largest virtual-service provider,

22   Facebook was free to move in and consummate deals with those

23   parties.

24             So there is an injury, and there is a causal

25   connection pled.

1          Facebook, though, contends there may not be

2    standing for the antitrust claim.  Facebook concedes their

3    standing for tortious interference and contends that

4    occurred in 2009, but if there was antitrust violation it

5    occurred in 2011.

6          The complaint which the Court must rely on and

7    draw all of these reasonable inferences in favor of the

8    complaint -- in favor of the plaintiff, says otherwise.  The

9    complaint says there was a monopolistic scheme, an anti-trust

10   violation that began in 2009 and culminated in 2011.  It was

11   one event.  It occurred over a two-year period.  The complaint

12   goes into detail about how it began with Facebook entering

13   the market, how it eliminated Kickflip.  How it then converted

14   certain high game dollar competitors like Zynga and then

15   later, after building infrastructure, it eliminated all

16   competition.  It was all one act.

17         But even assuming that Facebook was correct and

18   it was two acts, the Court should look at the Third Circuit

19   case, *Khodara v Blakey*.  In that case, Khodara was a land

20   developer and Khodara wanted to develop land near an airport

21   but the State of Pennsylvania revoked his permits so they

22   couldn't develop.  That occurred in 1996.  Four years later,

23   in the year 2000, the FAA passed a regulation eliminating

24   everybody from developing near the airport.

25         Khodara sued on both violations and the court

1   turned to the third prong of standing which is likelihood of

2   redressing injury, and the Court found that it could not

3   redress the 1996 injury without also dealing with the 2000

4   injury and similarly couldn't redress the 2000 injury

5   without dealing with the 1996 injury.  So even if they

6   were two separate injuries, *Khodara* has standing.  That

7   is the concept that Facebook refers to known as causal

8   overdetermination where there is two independent obstacles.

9   The plaintiff has standing to sue on both.

10          There is a third reason why Kickflip has

11   standing.  We would urge the Court to follow the Fifth

12   Circuit case of *Hayes v Solomon* which found even if a

13   business is not engaged, it has antitrust standing if it

14   has the intent and the preparedness to enter the market.

15          Kickflip clearly has the intent.  It's suing

16   for an injunction for the right to enter the market and it's

17   prepared.  The complaint discusses how Kickflip was the

18   second largest provider of virtual-currency services.  How

19   it had customers and generated tens of millions dollars in

20   revenue.  It had employees, contracts, infrastructure.  The

21   complaint calls it an innovator.  For those reasons,

22   Kickflip has standing.

23          THE COURT:  All right.  Let's talk about a few

24   of those things.

25          So what I can I rely on in the complaint to show

1    preparedness going forward?  This case isn't over today,

2    it's not going to be over tomorrow unless it's dismissed.

3    So all the things you talked about are history and, in this

4    market, kind of ancient history.  So on what basis could I

5    conclude you are prepared to reenter?

6              MR. NEWMAN:  The Court has to draw all

7    reasonable inferences in favor of the plaintiff, Kickflip.

8    And it's reasonable to infer from the complaint and the

9    facts that are alleged that since Kickflip has a history of

10   developing the business through innovation and technology

11   and infrastructure and contracts and relationships and

12   success, it's reasonable to infer that based upon that,

13   Kickflip is prepared to move forward.

14             THE COURT:  There is nothing else in the

15   complaint except your history; correct?  On preparedness.

16             MR. NEWMAN:  The complaint discusses in detail

17   the history because as of today, Kickflip no longer has a

18   business since Facebook eliminated all competition.

19             THE COURT:  All right.  And you are relying on

20   the Fifth Circuit decision, I think it's called *Hayes*.  Is

21   there anything in the Third Circuit that could show or that

22   I could rely on for intent and preparedness being adequate?

23             MR. NEWMAN:  There aren't any Third Circuit

24   cases with that standard, so I have argued that there are

25   three reasons why Kickflip has standing.

1          The first is it's one injury that occurred over

2     a two-year period.

3          The second is even if there are two injuries,

4     this Court must rely on the Third Circuit case of *Khodara v*

5     *Blakey*.  And,

6          The third reason is in the event the Court is

7     unpersuaded by the first two, we urge the Court to follow

8     the Fifth Circuit case.

9          But the answer to Your Honor's question is there

10    is not a Third Circuit case that holds the same.

11         THE COURT:  Let's talk about *Khodara,* which

12    is the Third Circuit case, and its application here.

13         Help me understand how that does apply.  Let's

14    say at the end of the day, you prove that the 2011 policy is

15    monopolistic and unlawful but you were properly banned in

16    2009 for a violation of the advertisement policies.  How

17    would such a decision in any way redress the injury to you

18    all?

19         MR. NEWMAN:  Well Your Honor raises a

20    hypothetical.  Namely, we've gone through discovery, gone

21    through summary judgment and trial, and the Court finds

22    there was an antitrust violation but there wasn't tortious

23    interference.  And under that circumstance, perhaps Facebook

24    would then be able to prohibit Kickflip from reentering the

25    platform.  But the complaint, and that is what the Court

1    must rely on today, alleges that Facebook did it without

2    any justification and that there is mere pretext.  That it

3    was motivated by an anticompetitive animus, and that it

4    used this so-called Scamville controversy as an excuse and

5    wrongfully interfered with Kickflip's relationships.

6            So for purposes of today and whether to allow

7    the claim to move forward, the Court has to accept all well

8    pled allegations as true and as long as it's plausible that

9    Kickflip will prove those facts that I just stated, the

10   Court has to deny Facebook's motion.

11           But to answer Your Honor's question, in the

12   event that Facebook brings forth evidence and shows that it

13   was rightful as opposed to wrongful, then it wins that

14   portion of the tortious interference claim.  And Your Honor

15   is correct that Kickflip would not have a remedy under those

16   circumstances, which I'm confident will not arise since

17   we're familiar with the facts of the case.

18           So having discussed standing, I'll move to my

19   second point which is that Kickflip properly identified the

20   antitrust markets:  social game network and virtual-currency

21   services.

22           When looking at a relevant product market, the

23   Court has to undertake a factual inquiry into the commercial

24   realities of the consumer.  Here, the consumer is the game

25   developer.  We know this because the complaint expressly

1    pleads its developer is the consumer, and because it was the

2    developer who required a social game network in order to

3    publish its games, and it was the developer who engaged in

4    virtual-currency services in order to monetize the game.

5    And when looking at whether there is a market, the Third

6    Circuit requires a test of reasonable interchangeability of

7    use and cross-elasticity of demand for the product and

8    substitutes for it.

9           I think the case that best discusses it is

10   *Queen City Pizza* v *Domino's Pizza*.  In that case, the court

11   went through a detailed analysis discussing those two tests

12   and with respect to reasonable interchangeability and

13   cross-elasticity, the court gave an example.  If consumers

14   need to move, any transportation, well, a consumer can use a

15   Ford, but Ford isn't a market because consumer can also use

16   a Chevy.  And for short range transportation, well, the

17   consumer can buy a horse or go on a bicycle.  So they could

18   all potentially be in the same market.

19          Cross-elasticity of demand is another way of

20   measuring it.  That's the proposition that if price goes up

21   on one item in the market, then demand goes up for another

22   item in the market.  Kickflip has defined its markets with

23   respect to interchangeability of use and cross-elasticity of

24   demand.

25          I'll start with the social game network.

1    Kickflip's complaint pleads expressly that no other game

2    market is interchangeable with the social game network.  The

3    reason for it, and Kickflip's complaint goes into detail,

4    is a social game network provides a developer with ready

5    access to millions of players and allows the developer to

6    tap into their existing social network.

7              There is a distinct economic model that the

8    complaint discusses about how the developer makes money in

9    the social gaming community.  The developer spends very

10   little to create its game and earns very little per user.

11   So the way that it earns a living is based on the scale

12   that is only available with a social game network.  And

13   the complaint discusses that a social game developer cannot

14   sell games at the corner store or the stand-alone website or

15   mobile device.  The complaint expressly says that the only

16   market for a social game developer is the social game network.

17             And it gives a great example, Zynga.  Zynga is

18   the world's largest social game developer.  The complaint

19   discusses that Zynga did a billion dollars of revenue.  It's

20   a publicly traded corporation.  Because of that, it probably

21   has a lot of power and leverage, but yet when Facebook

22   demanded that "Zynga pay the 30 percent fee or that Facebook

23   would ban Zynga games altogether," which is a direct quote

24   from a complaint, Zynga succumbed and paid the 30 percent

25   fee even though it stated it would harm the business.

1           Why?  Because even though Zynga is huge and

2   has substantial resources, a social game on a social game

3   network is different from other games which makes the social

4   game network its own market for antitrust purposes.  And

5   that 30 percent fee illustrates cross-elasticity of demand.

6   Zynga had nowhere else to go.  The complaint does the same

7   with respect to virtual-currency services.

8           THE COURT:  Before you move on to that, do you

9   allege even with respect to Zynga that their games are not

10   available elsewhere through other platforms?

11           MR. NEWMAN:  The complaint doesn't discuss that,

12   but I'm happy to address the facts in real life if the Court

13   would like.

14           THE COURT:  Well, you can do that in a second,

15   but first tell me for purposes of the issue I have in front

16   of me, can I draw that inference in your favor?  Do I have

17   to draw that inference in your favor?

18           MR. NEWMAN:  Yes.  The Court can draw and must

19   draw that inference in favor of Kickflip because the

20   standard is the Court must draw all well pled inferences in

21   favor of the plaintiff and determine whether it's plausible

22   that the facts as stated are correct.  And,

23           Here, the complaint discusses in detail that

24   Zynga is the world's largest social game developer, that it

25   requires a social game network.  And then when Facebook said

1    that it would ban Zynga's games altogether, Zynga agreed to

2    pay the fee even though Zynga publicly stated that that

3    would harm its business.

4            THE COURT:  So specifically I can and must infer

5    that Zynga's game offerings are not available anywhere else

6    other than Facebook?

7            MR. NEWMAN:  Yes.  And if the Court would like

8    me to discuss outside the complaint, I'm happy to answer the

9    question.

10            THE COURT:  Well, only in regard to if I were to

11   allow an amended pleading, you can represent that you would

12   have a good faith basis to more explicitly make that sort of

13   allegation.

14            MR. NEWMAN:  Yes.  But, Your Honor, there is no

15   reason to require an amended pleading because all the facts

16   are there.  The additional pleading that we would make is

17   Zynga has tried a stand-alone website that was unsuccessful

18   because it requires a social game network and that Zynga

19   tried to make money through mobile that was unsuccessful.

20   These are all public facts.  It's a publicly traded

21   corporation.  The news business report is the same.

22            Those facts are unnecessary for the purposes of

23   pleading because this is about the social game network.

24   It's not about stand-alone websites, it's not about mobile,

25   and the complaint expressly explains why.  Because the

1    developer is unable to rely on that distinct economic model,

2    generate revenue through those means.  It's a separate

3    antitrust market.  The complaint explains why.  So amending

4    the complaint would be superfluous.

5              THE COURT:  Now, the inference includes the

6    inference that one can't play the Zynga game through Google+

7    and through MySpace and through other social networks;

8    correct?

9              MR. NEWMAN:  No, Your Honor.  The complaint

10   expressly says there are competitive social game networks,

11   but Facebook has a dominant share of social game networks.

12             THE COURT:  Is that alleged?

13             MR. NEWMAN:  It is.  The complaint alleges that

14   Facebook has a 90 percent share of social game networks

15   and discusses that the developer needs Facebook because when

16   it's left with just a ten percent, the competitors like

17   Google+, MySpace, and others is unable to earn a living of

18   because of Facebook's dominate share in the market.  So

19   while there are competitors, the developer needs Facebook

20   because Facebook has that 90 percent share and growing.

21             THE COURT:  And that 90 percent share is alleged

22   as of the date of the complaint?

23             MR. NEWMAN:  It is.  And Your Honor can draw a

24   reasonable inference that even back in 2009, there was an

25   intent to monopolize because the jurisprudence finds that

1    when you look at the relevant market today, it shows that

2    there was an intent to monopolize back then.  And if the

3    Court were to review the complaint and just search for

4    90 percent, the Court will find several references to it

5    showing that Facebook has a dominant share of the social

6    game network.  And,

7           Similarly with the virtual-currency service market

8    which Kickflip also plead with respect to interchangable of

9    use and cross-elasticity of demand, the complaint discusses

10    in several places that virtual-currency services is a cluster

11    where the virtual-currency service provider provides in-game

12    rewards for developers.  It connects advertising with payment

13    processing.  It provides customer service, data analytics,

14    fraud prevention and assist the developers in monetizing

15    their games.  The complaint expressly says "there are no

16    substitutes" and it then explains why.  Because the only way

17    a social game developer can generate revenue is through the

18    sale of virtual-currency services.

19           Before Facebook eliminated all competition,

20    there was a robust and competitive market where developers

21    had a selection of 20 different virtual-currency service

22    providers all competing based upon price and service.  Price

23    was generally at 5 percent or 10 percent commission.  It

24    wasn't until Facebook came in that anyone thought of

25    offering a 30 percent commission.

1          The complaint names the competitors

2     specifically.  It talks about the Metrics and TrialPay and

3     Offerpal and SuperRewards and talks about a vibrant and

4     competitive marketplace where these virtual-currency service

5     providers were innovative, trying to out-compete one another

6     and that there were several hundred million dollars in

7     revenue that were generated in the market before Facebook

8     eliminated all competition and capture that revenue for

9     itself.  And,

10          Cross-elasticity of demand is mentioned to the

11     extent that in the complaint at one time, the complaint

12     alleges, that virtual-currency services providers charged 5

13     or 10 percent.  Facebook came in and charged 30 percent and

14     the consumer, the developer, didn't use Facebook services.

15     Facebook could not compete on the merits, but when Facebook

16     eliminated all competition, at that point, because there was

17     no other alternative, because the virtual-currency is not

18     interchangeable with anything else, the developer was forced

19     to use Facebook's product.

20          Facebook contends that this is about payment

21     processing, and it cites examples like PayPal.  This is not

22     about payment processing.  Even though Facebook may repeat

23     that, the complaint alleges otherwise, and the Court must

24     rely on the complaint.

25          PayPal doesn't provide in-game rewards or

 1    customer service for game players or data analytics or fraud

 2    prevention.  It doesn't provide any advertising services.

 3    This isn't about payment processing.  The complaint

 4    discusses credits, a competitive virtual-currency service

 5    provider that Facebook owned and required its game developer

 6    customers to use or at least required them not to use any

 7    competitive virtual-currency.

 8            So we've established standing and the proper

 9    antitrust markets which leads me to my third point of

10    discussion, namely, that Kickflip has properly pled each

11    of its claims.

12            THE COURT:  All right.  Let's talk about the

13    virtual-currency market first before you move on to that.

14            Should I, does one reasonably infer that

15    Facebook offered that whole cluster of services that you say

16    defines, if I'm following correctly, the virtual-currency

17    market?

18            MR. NEWMAN:  Yes.  The complaint states that

19    Facebook is in the virtual-currency services market but the

20    complaint also states that Facebook offered less services

21    than its competitors.  So the core of virtual-currency

22    services providing in-game rewards, connecting advertising

23    and payment processing.  The complaint notes that Facebook

24    credits provide no services, but the complaint also notes

25    Facebook provided less services than its competitors.  It

1   was able to do that because it monopolized the market which

2   is the first claim that Kickflip pleads.

3            In order to plead a claim for monopoly, Kickflip

4   has to show that Facebook had a dominant market share and

5   created a monopoly.  And it did.  It alleges a 90 percent

6   market share on virtual-currency services and that Facebook

7   acquired that monopoly by way of willful acquisition as

8   distinguished from growth from a superior product, business

9   acumen or historic accident, and the complaint discusses

10  those.

11           The complaint says Facebook intended to eliminate

12  competition and that is how it acquired the market.  It wasn't

13  a superior product.  The complaint discusses expressly that

14  Facebook's product was inferior, higher prices, less services.

15  It wasn't as a result of innovation or business acumen.  The

16  complaint says expressly that the competitive market, the

17  vibrant and competitive market of virtual-currency service

18  providers, they were innovators.  The complaint calls them

19  pioneers and says that Facebook did not develop.

20           So Kickflip has properly plead its monopolization

21  claim.

22           Similarly, it pled a time claim.  Time is an

23  agreement where a company will provide one product known as

24  the timing product only on the condition that its customer

25  accept the second product known as the tied product, or at

1    least that the customer will not buy the tied product from

2    anyone else.  The essence of an illegal time is when the

3    company that is providing these products has a dominant

4    market share and the time market and exploits control over

5    that time market in order to force customers to buy the

6    tied product or at least not to buy it from another source.

7            In this case, the complaint alleges that

8    Facebook had a 90 percent market share in the social gaming

9    network market and that it exploited its control over that

10   market in order to force developers to use Facebook credits

11   or at least not to use virtual-currency from any other

12   source, such as Kickflip, SuperRewards, TrialPay, Offerpal,

13   Simetrics are some of the other competitors that are

14   mentioned in the complaint.  So Kickflip has pled tying.

15           THE COURT:  So the tying is, to use what it

16   already has, monopoly in one of your markets, to extend that

17   to your other market?

18           MR. NEWMAN:  Precisely.  Time is having control

19   over one market.

20           THE COURT:  But I mean you specifically are

21   alleging -- because you are alleging two markets here;

22   correct?

23           MR. NEWMAN:  Yes.

24           THE COURT:  And your allegation for tying is

25   that they exploited their monopoly power in one of the

1      markets you pled, the social game network, into the other

2      market you pled, the virtual-currency services market.  Do I

3      understand that correctly?

4              MR. NEWMAN:  Yes, but there is a distinction.

5      The complaint concedes that Facebook acquired its power

6      in the social game network market legitimately through

7      competition on the merits.  There, it was an innovator.  But

8      with respect to virtual-currency services, Facebook did not.

9      It wasn't an innovator.  It eliminated all competition by

10     exploiting control over that social network game market

11     in order to gain control over the tied market which is

12     virtual-currency services and consequently eliminated all

13     competition, not through competition on the merits but

14     through exploitation of control and, because of that, there

15     is tying.

16             Facebook asks this Court to apply a rule of

17     reason analysis instead of a per se analysis when analyzing

18     tie in.  But the Court doesn't need to reach a conclusion

19     today which standard it will apply and the reason for that

20     is because the difference of rule of reason and per se is

21     rule of reason allows the Court to consider facts that weigh

22     in favor of the defendant's pro-competitive justification.

23             But the complaint pleads, and the Court must

24     rely on the allegations in the complaint, that Facebook

25     had no pro-competitive justifications.  And the complaint

1    describes that once there was a vibrant competitive

2    marketplace or virtual-currency providers.  That Facebook

3    eliminated all competition.  That prices went up for

4    developers.  That virtual-currency service providers went

5    out of business.  That those developers now paying the

6    30 percent fee have to pass it along to their end consumers,

7    the players, and the competition was harmed.

8            So because there are these allegations that

9    there aren't any pro-competitive justifications, the Court

10   does not have to decide today whether to apply per se or

11   rule of reason standard.  And we would suggest that the

12   Court should not, because there should be a detailed factual

13   record about the technology at issue which could assist

14   the Court in determining which standard is proper.  But for

15   purposes of the motion to dismiss, the complaint has all

16   allegations necessary for the Court to conclude that the

17   tie-in existed.  And,

18           Kickflip pled a claim for tortious interference.

19   Tortious interference requires a wrongful interference with

20   a contract.  The complaint pleads that Facebook interfered

21   with the contract because it was hoping to eliminate all

22   competition.  That the so-called Scamville controversy was

23   mere pretext and that Facebook did so without justification.

24           Even if Facebook has a good reason, it still must

25   be the least restrictive alternative to withstand scrutiny

1    for tortious interference and an antitrust violation.  And the

2    complaint notes that Facebook had other alternatives and thus

3    acted without justification.

4           So Kickflip has properly pled a claim for

5    monopolization, tie-in, and tortious interference.  As

6    standing, to properly define the market, it pled each of its

7    causes of action, and this Court should deny Facebook's

8    motion to dismiss.

9           I believe I have remaining time; and I would

10   appreciate if I could respond to additional points that

11   Facebook may make.

12          THE COURT:  Well, possibly but let me have you

13   respond to some questions from me.

14          MR. NEWMAN:  Please.

15          THE COURT:  What about Gambit?

16          MR. NEWMAN:  You are talking about the standing

17   issue?

18          THE COURT:  Well, I think that is where it comes

19   up, but what is your relationship with Gambit and shouldn't

20   we get to the bottom of that?

21          MR. NEWMAN:  Of course.  The complaint reads,

22   that Gambit is a d/b/a for Kickflip.  Kickflip did business

23   as Gambit.  And, Kickflip's registration with the State of

24   Delaware is active and in good standing.

25          Kickflip did -- and this is not in the

1    complaint, nor it needed to be.  This is perhaps a defense

2    that Facebook could try and prove later, but this isn't

3    necessary for the Court to deny the motion to dismiss.

4    Kickflip created a wholly owned subsidiary and spun off

5    some, but not all, of its business operations.  Kickflip

6    expressly held in its parent corporation the causes of

7    action that it is raising today and Gambitland, which is a

8    subsidiary, was ultimately absorbed back into Kickflip.

9          So Kickflip, even though it spun off some but

10   not all of it corporations, has all the operations in the

11   parent.  There is only now one company.  That's Kickflip

12   Games, the plaintiff, which always has done business with

13   Gambit.  And that is the reason why the complaint refers to

14   it as Gambit.

15          THE COURT:  So why shouldn't we have discovery

16   and hold you to your burden on that, now that has been put

17   in dispute at this point?

18          MR. NEWMAN:  Well, the Court should not limit

19   discovery to the standing issue.  I believe during this

20   motion to dismiss, Facebook has alleged all kinds of

21   defenses that it has.  That is one.  Because I know the

22   facts and I have spoken with my client, I know that Facebook

23   isn't going to succeed on that defense any more than it

24   would succeed on whether it had justification for banning

25   Kickflip.

1          I don't think the Court should limit discovery

2     whether it has justification either.  I think the Court

3     should allow the case to proceed, discovery will open,

4     Facebook could serve discovery requests on the standing

5     issue, and then ultimately Facebook will be convinced.  And

6     I anticipate that at summary judgment, that won't even be

7     an issue because the facts are clear that Kickflip is one

8     company that did business as Gambit and that it has standing

9     to bring the claims that it does today.

10          THE COURT:  On the record that I have in front

11    of me, must I conclude that Kickflip was involved in serving

12    ads that were misleading, fraudulent or otherwise in

13    violation of Facebook's policies?

14          MR. NEWMAN:  No.  On page 9 of the complaint,

15    Kickflip discusses and pleads expressly that it vigorously

16    monitored ads, and that it was not serving improper ads.  It

17    was for that reason that it was especially surprising that

18    Facebook picked on Kickflip.  And the complaint discusses

19    that the reason Facebook did that is because Kickflip had

20    contracts with customers who Facebook was courting.  And

21    that since Facebook was able to eliminate Kickflip, it could

22    take a substantial step forward in monopolizing the entire

23    market, which is a scheme it had developed in 2009 and

24    completed by 2011.  And,

25          I would add an additional point.  I answered

1    the Court's question but I would note that even in the

2    event that Kickflip did serve improper ads, the complaint

3    expressly pleads that virtual-currency service providers

4    all did, including Facebook's own credits.  And that by

5    eliminating Kickflip, Facebook did not help the problem

6    because there are other virtual-currency service providers,

7    including credit itself and the unwanted ads remained.  It

8    was mere pretext by eliminating Kickflip, and there were

9    least restrictive alternatives that Facebook could have taken

10   and the law requires them to take the least restrictive

11   alternatives in order to avoid the claims that Kickflip

12   brings today.

13           THE COURT:  Didn't you argue in your brief,

14   though, that Kickflip did not monitor ads?

15           MR. NEWMAN:  No, Your Honor.  That is a

16   misstatement that Facebook made.  The complaint expressly

17   says that it was the virtual-currency currency providers who

18   did not monitor ads.  It was speaking generally in with

19   respect to the industry and Kickflip, as the complaint says,

20   aggressively monitored ads.

21           The opposition doesn't say otherwise.  The

22   opposition just points out that Facebook shouldn't eliminate

23   any single virtual-currency service providers because they're

24   not responsible for monitoring ads.  Rather, Facebook could

25   have gone after the advertisers or gone after the developers

1      who could control the ads that the developers served.  But the

2      opposition has nothing that is inconsistent with the complaint.

3      The complaint speaks generally about virtual-currency service

4      providers and the opposition points that out.

5              If the Court reviews the opposition, the Court

6      will see that it doesn't say that Kickflip didn't monitor

7      ads.  It says the opposite.

8              THE COURT:  What about the attachment to the

9      complaint?  One of the articles, I believe it is Exhibit 6,

10     seems to have your client confirm that it did serve

11     noncompliant ads.  Do I take that as true?

12             MR. NEWMAN:  No, Your Honor.  We structure this

13     complaint somewhat unconventionally where we had footnotes

14     citing to articles.  Those articles aren't facts that we're

15     pleading and those aren't evidence.  We did that because we

16     wanted to provide context in case the Court wanted to look

17     further into the allegations that were made.

18             We're not relying on those articles.  We're just

19     noting that a lot of the facts that we're stating are public.

20     It's public that there was a vibrant and competitive

21     marketplace.  It's public that Facebook decided to eliminate

22     all competition.  It's public as the Court can read in the

23     articles that the core developers and the core virtual-currency

24     service providers anticipate that Facebook may do it.

25             That was anticipated in 2009, and it ultimately

1    culminated in 2011.  And then Facebook said we didn't intend

2    to monopolize the market, but the articles show that everybody

3    was concerned about it as early as 2009.

4              We're not relying on those articles.  We're just

5    providing context.  Later, Facebook and Kickflip will submit

6    evidence to try to prove whichever facts weigh in favor of

7    the respective party.  But those articles aren't evidence.

8              THE COURT:  But you attached them to the

9    complaint, so can I consider them on a motion to dismiss or

10   not?

11             MR. NEWMAN:  No, because the complaint doesn't

12   say "attached as an exhibit is an article and we rely on

13   each of the facts incorporated by reference."  The facts are

14   pled expressly, and then to support some of the facts there

15   might be a citation from an article so that the Court could

16   gain greater context.

17             THE COURT:  Is there anything in your motion to

18   strike or any of the briefing that would have told me that

19   you think I can't rely on, for instance, this article that's

20   specifically attached to the complaint?

21             MR. NEWMAN:  Yes.  Your Honor, in the motion to

22   strike, Kickflip cites the applicable legal standard which

23   is that it has to be integral to the allegations in the

24   complaint.  And it explains in the motion how none of those

25   articles were integral to the allegations in the complaint.

1              But I take it a step further and I would note

2    that even if the Court disagrees with me and decides that it

3    has to consider all of those articles, that doesn't change

4    the fact that Kickflip pleads that it was mere pretext.

5    Kickflip's complaint acknowledges that there were improper

6    ads and says all the virtual-currency services providers and

7    Facebook itself served the improper ads.  And so even if the

8    Court assumes those articles are true and that Kickflip did

9    it, that doesn't mean that Facebook did not act out of an

10   anticompetitive animus and that its actions were mere

11   pretext without legitimate justification and that there were

12   least restrictive alternatives.  There were less restrictive

13   alternatives.  So even if you assume those claims are true,

14   Kickflip proper plead the claim and the Court should deny

15   the motion to dismiss.

16             THE COURT:  Well, I'm getting a little confused

17   by your position.  Because as I read your motion to strike,

18   you listed specifically what it was you didn't want the

19   Court to consider, and it's only a few exhibits and a few

20   statements in the brief.

21             Should I now understand that you think I can't

22   consider all of these things that are attached to your

23   complaint?

24             MR. NEWMAN:  Your Honor must rely on the motion

25   that we made and we ask to strike specific items, I agree,

1   but I was responding to the Court's question whether the

2   Court could consider the articles.  The Court can't consider

3   the articles because they're not actual allegations.

4              THE COURT:  Cannot?

5              MR. NEWMAN:  Cannot, and they're not allegations.

6              THE COURT:  I think you further told me that I

7   should have understood that from your briefing.  You are not

8   now saying that, are you?

9              MR. NEWMAN:  I regret if I said something

10  inconsistent with the briefing.  We stand by the briefs.  I

11  would just note that the Court understands the standard, and

12  that the articles aren't evidence and they're not factual

13  allegations, and even if they are, the Court should still

14  come to the same conclusion.

15             THE COURT:  Well, I think this is a pretty

16  important point because you are arguing pretext.

17             MR. NEWMAN:  Yes.

18             THE COURT:  Do I have to find that it's at

19  least a reasonable inference and a plausible allegation that

20  what was happening in 2009 was part of a pretext for a

21  monopolization scheme in order for you to prevail on a

22  motion to dismiss?

23             MR. NEWMAN:  No.  The Court has to find that the

24  complaint pleads that there was a scheme to monopolize and

25  that the excuse that the defendant makes was mere pretext.

1          THE COURT:  All right.  So in that regard, isn't

2     it pretty important for me to know?  Because as you point

3     out, I'm not a fact-finder at this point, but you all did

4     make allegations and you did attach articles.  From how I

5     read it coming in here today, you never suggested before a

6     few moments ago that I couldn't look at those articles on

7     the motion to dismiss in trying to determine if you have

8     plausible and reasonably alleged pretext.  It seems to me

9     whether or not I can look at those articles or not may have

10    a big impact.  So your position is I cannot.

11         MR. NEWMAN:  No, our position is not that the

12    Court should not look at the articles.  Our position is

13    that the articles are not substantive allegations pled.  And,

14         Second, that even if they were, the Court should

15    not weigh facts.  So the Court shouldn't look at those articles

16    and decide, well, here it says that the virtual-currency

17    service providers were serving bad ads and I'll weigh that

18    against all the other allegations in the complaint.  The

19    Court can't do that, and because of it whether the Court

20    considers it or not, the same conclusion arises.

21         We cited those articles in our complaint because

22    we wanted to provide context.  So contrary to the Court

23    shouldn't look at the articles, we would encourage the Court

24    to look at everything, but we didn't rely on those articles.

25    Those aren't our pleadings.

1          If the Court finds otherwise, well, the Court

2    shouldn't be weighing facts and thus the Court should allow

3    the case to proceed so that Facebook can prove the facts in

4    those articles that are in its favor and Kickflip will prove

5    the facts in its favor.

6          THE COURT:  At this stage of the proceedings,

7    how do I decide that you are not an admitted violator of the

8    term in 2009?

9          MR. NEWMAN:  By reading the complaint that says,

10   on page 9, that Kickflip wasn't serving improper ads when it

11   was working cooperatively with Facebook to prevent unwanted

12   ads, and that Facebook acted abruptly and arbitrarily to

13   eliminate Kickflip.  And,

14          The Court shouldn't be weighing facts.  Even if

15   Kickflip was an admitted violator, Facebook acted without

16   justification because there were less restrictive alternatives.

17   And as the Court knows, there probably isn't an antitrust

18   case or tortious interference case in history where the

19   defendant doesn't have some excuse.  The defendant always

20   says I did it because I have justification and that requires

21   fact-finding and a weighing of facts.  That's not appropriate

22   at the motion to dismiss stage.  It's not even appropriate

23   for summary judgment.

24          So here, Kickflip could very well be an admitted

25   violator but if Facebook acted without justification or

1    under pretext because of an anticompetitive animus, Kickflip

2    wins.

3              THE COURT:  And on your motion to strike, let's

4    talk about the cease-and-desist letter and your response to

5    it.  First off, I guess I need to confirm do you rely on the

6    cease-and-desist letter?  Is that something proper for the

7    Court to consider on this motion to strike?

8              MR. NEWMAN:  We rely on the fact that the

9    cease-and-desist letter was sent but not that the facts

10   stated in the cease-and-desist letter are true.  And,

11             Similarly, the letter in response is without

12   context.  Kickflip was being banned from the Facebook

13   platform.  Its business was eviscerated.  That is what the

14   victim's complaint alleges.  So Kickflip has to do something

15   to try and win Facebook's goodwill.  So it sent a letter

16   saying we really want to work with you.  It didn't make any

17   excuses, and it didn't state the facts that were in its

18   favor because it didn't want to offend Kickflip.

19             Now, that is outside the complaint, what I just

20   said, but those are the facts that will have proven later

21   after discovery.  Facebook will take Kickflip's discovery

22   deposition and say why did you say this and why didn't you

23   say that?  And,

24             Kickflip similarly will take Facebook's

25   deposition and ask upon what basis did you have a right to

1   ban Kickflip when it had no impact on the controversy that

2   you said occurred?  That even though you banned Kickflip

3   there is still unwanted ads.  That Facebook itself was

4   serving unwanted ads.  And we'll ask Facebook, how was it

5   this wasn't a wrongful interference when it had no impact on

6   the integrity of the system that you claimed to protect?

7           These are factual questions.  They develop them

8   discovery.  If the record is in dispute at summary judgment,

9   then the Court can rule.  If not, these go to a jury.  But

10  for purposes of a motion to dismiss, the Court must draw all

11  inferences in favor of the plaintiff; and even if Kickflip

12  served unwanted ads, that doesn't mean that it doesn't win

13  at the end.

14          THE COURT:  I understand you draw all reasonable

15  inferences.  I think my question is why can't I look, in

16  determining what the reasonable inferences are to be drawn in

17  your favor, why can't I look at your own letter responding to

18  a letter that your complaint relies on?

19          MR. NEWMAN:  The Court can look at any of the

20  materials here.  If I was the Judge, I would look at all

21  of them, too.  But the Court can only rely on the factual

22  allegations in the complaint.  The letter doesn't contain

23  factual allegations.  The allegation that the letter was

24  sent, that is the allegation, not that the facts that

25  contain them are true.  They provide factual issues that the

1   parties will resolve, but those facts are not allegations

2   pled.

3              THE COURT:  All right.  You do have about

4   20 minutes left.  I'll let you reserve five minutes of it,

5   if you want.  Though I will give Facebook the chance, if

6   they have time left, to have the last word, but you also can

7   talk for 20 more minutes now if you want to.  But you have

8   answered my question.

9              MR. NEWMAN:  I will yield anything more than

10  that to the bench, and I'm grateful for the five minutes.

11             THE COURT:  Okay.  Great.  Thank you.

12             We'll hear from Facebook.  You have about

13  12 minutes left.  And if you want to save any of it to have

14  the last word, you can do so.

15             MR. BARNETT:  If can save three minutes, that

16  would be great.

17             THE COURT:  Okay.

18             MR. BARNETT:  I guess several points to

19  emphasize here.

20             In terms of the points you were discussing with

21  counsel for plaintiff at the end about of what happens if

22  they serve fraudulent ads?  First of all, I will say that

23  I've read the complaint multiple times.  I just re-read page

24  9.  I see no denial that they ever served fraudulent or

25  deceptive ads.  They say they were trying to work

1    cooperatively but that is different.

2                 THE COURT:  They say you acted arbitrarily.

3    Doesn't that, if I draw everything in their favor, suggest

4    they're perfectly innocent?

5                 MR. BARNETT:  No.  Well, they say something

6    slightly different, I think.  They're trying to say that

7    others were bad, too.

8                 In the particular instance where you are

9    serving fraudulent deceptive ads, I don't know that it's

10   particularly compelling defense to say that others rely on

11   the users as well.  And we would suggest that as under the

12   facts as alleged in the complaint and incorporated, and the

13   standard I believe is explicitly referenced or integral to

14   the complaint.

15                "Integral" tends to deal with where it is not

16   referenced but they're just, they're trying to prevent the

17   Court from seeing an underlying court document such as the

18   policies in this instance.

19                But they explicitly referenced these articles.

20   And given the lack of a denial and the specific allegations

21   in the November 5th letter that is referenced in their

22   complaint, I don't see how the Court can approach this

23   motion without understanding that Kickflip was serving

24   fraudulent and deceptive ads.  And,

25                Under those circumstances, I come back to

1    *Twombly*.   In order -- and as the Court is probably aware,

2    we're not supposed to federalize the law of tort by making

3    everything an antitrust claim.   There needs to be specific

4    allegations that suggest there is a linkage between their

5    ban and this supposed antitrust scheme.   And as we have gone

6    through before and I won't go through again, we think the

7    linkage that they have given here is inherently deficient.

8         We're dealing with advertising, and they're

9    challenging a payment processing policy.   Those things are

10   very distinct, and I just won't repeat my efforts there.

11        I will also note I believe counsel acknowledged

12   that if you find they do not have a tortious interference

13   claim, their antitrust standing falls out the window.

14        Now, he said it turns on the end at the case, if

15   we lose on the tortious interference, then maybe Facebook

16   has a reason for kicking out the antitrust claim on standing

17   grounds.   But if you find they have failed to state a claim

18   for tortious interference at this point, I would also

19   suggest, based on their being banned in 2009, that that

20   underscores, that is an independent reason, why they're not

21   on Facebook suggests that any remedy in the antitrust case

22   would not redress their situation because we would continue

23   to have an independent reason to ban them from the site

24   which is because they were serving fraudulent and deceptive

25   ads.

1          I wanted to go to the antitrust allegations a

2     little bit.  And they're, with respect, being a bit fast and

3     loose on some of what they're alleging.

4          Let me go to the virtual-currency market.

5     Your Honor asked the question, well, is Facebook in the

6     virtual-currency market?  Well, yes, but it's supposedly a

7     cluster market, meaning you have to sell the cluster to be

8     viable in a cluster market.  That's the whole point.

9          But when you ask him, does Facebook provide all

10    of those other services?  He acknowledged that they don't,

11    which shows there is an inherent contradiction here in terms

12    of what is the relevant market.

13          Now, he said each of these element is not

14    interchangeable.  That is a different point from saying

15    they have to be sold in a group.

16          I'm not sure I accept -- I don't accept that

17    they're not interchangeable with payment processing sold

18    elsewhere.  But there are no facts that suggests that the

19    only way game developers buy these is in this one entire

20    group.  And, indeed, they acknowledge there is at least one

21    provider, if not others, who don't provide the whole group.

22    That just shows the incoherence of this virtual-currency.

23          THE COURT:  But they are arguing that one

24    provider that can get away with that is Facebook and it's

25    because you are a monopoly.  That is in the article.

1          MR. BARNETT:  Fair enough.  But even setting

2    that aside for a moment, what are the facts that say as a

3    game developer, I will only buy payment processing from

4    somebody who also does offer ads or pricing monetization,

5    optimization customer ads, those sorts of things?  There are

6    not facts alleged that indicate you have to only buy those

7    things in a group from one provider.

8          And you come back to the policy that they have

9    challenged only addresses payment processing.  They have not

10   alleged who is providing in-app currency on Facebook games

11   today.  Do they allege the percentage of games on Facebook

12   that use Facebook credits?  They don't.  That's a telling

13   omission.  Do they allege who provides pricing optimization

14   services?  They don't.  That is a telling omission.

15         Go through the who provides offer ads.  They

16   don't allege anything about what is happening today on

17   Facebook in terms of games and who is providing all of these

18   service that are at issue.  That kind of monopolization

19   claim, that is a fairly fundamental position.  It's fairly

20   important.

21         Also, on the same point, the 90 percent share,

22   they don't tell you what the share was back in 2009.  They

23   don't allege or talk about the fact that MySpace, for

24   example, was a very prominent social networking site,

25   similar size, and they don't suggest that Facebook had

1   dominance at that point in time or even was close to

2   achieving dominance at that point in time.

3             THE COURT:  That is not even a reasonable

4   inference to draw?

5             MR. BARNETT:  It's a very dynamic industry in

6   terms of what is true in 2013 versus what is true in 2009

7   and somebody who adopts a policy, if you will, when they are

8   not dominant tends to be doing it for legitimate business

9   reasons.

10             THE COURT:  Right.

11             MR. BARNETT:  I'm just pointing out that the

12   facts that they alleged, they very carefully alleged this in

13   2013.  They have not alleged what was going on back in 2009.

14             Kickflip itself, they have not, they have never

15   alleged how much of its business was dependent upon games on

16   Facebook.  There is a lot of atmospherics around that but

17   they don't allege it.  And,

18             You go back to the articles.  I believe this

19   is Exhibit 7 to the motion to dismiss.  Another article

20   referenced in the complaint that they have not moved to

21   strike.  And it says specifically that Kickflip Gambit has a

22   strong business on other platforms.

23             This goes to the notion that selling to game

24   developers just on Facebook is not a coherent relevant

25   market.  That fact is before you, legitimate to consider,

1    but they have alleged nothing that explains how that

2    business was or why that shouldn't be considered as part

3    of the market.

4            I want to mention -- oh.  In the opposition, on

5    tying.  An alternative way of accessing Facebook without

6    being subject to the payment processing policy.  They didn't

7    address that at all.  If you had an alternative, that

8    undercuts the tie-in claim.

9            Again, when you come back to consistency, and it

10   being clear about what is going on, are they responsible for

11   monitoring ads?  Are they not responsible for monitoring

12   ads?  I think I heard sort of two different answers to that,

13   and the fact that they were involved in ads is I think not

14   really seriously in dispute.  On the one hand, when it is

15   convenient, they want to run from that.  On the other hand,

16   they acknowledge it.

17           I think what I want to come back to, and I will,

18   other than my two minutes I will leave at the end of the

19   day, unless you have further questions, is this complaint in

20   my mind is not coherent.  It's important both in terms of

21   ensuring that there is a plausible claim and in terms of

22   reasonable structure of litigation going forward.  Even if

23   you were ultimately, for example, to grant it, they were to

24   amend, and if it survived you have a more focused litigation.

25           There is a benefit to requiring them to step up

1   to the plate and articulate a coherent theory with facts to

2   support it, if they can do so.  I would suggest that that is

3   well worth doing in this context.

4            THE COURT:  Okay.  We'll save two minutes for

5   you.  Thank you.

6            MR. NEWMAN:  Your Honor, I cited page 9 when I

7   should have cited page 10.

8            THE COURT:  Of the complaint?

9            MR. NEWMAN:  Yes, Your Honor.  I will read that

10  paragraph just so that the Court has it.

11           The paragraph on page 10 that I'm referring to

12  says:

13           "Facebook targeted Gambit because it wanted to

14  tarnish the reputation of Gambit and the virtual-currency

15  industry to create the perception that Facebook needed to

16  step in with a safe alternative to allegedly problematic

17  virtual-currency services provided by others.  Gambit,

18  widely recognized as one of the good guys in the industry

19  who did not use such ads, did not fit with the story-line

20  Facebook wanted to foster, so Facebook used the Scamville

21  controversy as pretext to destroy Gambit's relationships

22  with developers and preemptively eliminate Gambit from the

23  market."

24           So I wanted to correct myself and read the

25  paragraph on page 10.

1      I also wanted to point out that complaint pleads

2  several times that Kickflip did not create those ads and

3  that the developers delivered the ads.  So Facebook had less

4  restrictive alternatives.  And then,

5      Finally, with respect to the cluster market.

6  The complaint does allege that Facebook was in the

7  virtual-currency services market, and the fact that it may

8  have offered less services doesn't change the fact it was in

9  the market.

10      An example I would give is banks.  Some banks

11  offer safety deposit boxes.  Some do not.  Some offer only

12  business checking while others will also offer personal

13  checking.  The fact there are services that are more or less

14  the same, even if one competitor offers less or more,

15  doesn't mean they're any less in the same market.

16      And if the Court has no further questions?

17      THE COURT:  Just one.  What about this point

18  about the alternative ways of accessing Facebook and there

19  are some ways allegedly where you don't need to use credits?

20  How does that fit in?

21      MR. NEWMAN:  Your Honor, there that is a red

22  herring.  I'm familiar with the log-in and plug-in that

23  counsel refers to.  The complaint does not discuss them.

24  That is not accepting the social gaming network.  That is

25  accessing other features of Facebook that don't come into

1    play with respect to the allegations in the complaint

2    because social game developers aren't using those in the

3    way the complaint discusses.  It's a separate feature.

4              For example, I am a member of the Wall Street

5    Journal website, and I have the option of logging in with my

6    Wall Street Journal user password, or I can use a Facebook

7    user password.  That's the example of the Facebook log-in,

8    but that has nothing to do with the social gaming network.

9              Thank you.

10             THE COURT:  Okay.  Thank you very much.

11             MR. BARNETT:  Your Honor, very quickly.  It's

12   important.  I want to be precise.

13             I appreciate counsel pointing me to the other

14   page.  And I read this sentence.  I read it several times.

15   It doesn't actually say that they didn't serve fraudulent

16   ads.  It says they were widely recognized as one of the good

17   guys in the industry who did not use such ads.  So they very

18   carefully wording this to say, they avoid the Rule 11 issue

19   by not saying we didn't serve scammy ads.  They said others

20   may not have thought that we served scammy ads.

21             But Facebook had direct access to the information.

22   The November 5th letter goes directly to that point.  And I

23   would suggest such an artfully crafted sentence in the

24   complaint does not eliminate the obvious proposition that they

25   were serving fraudulent deceptive ads.

1           On the log-ins, first of all, by definition
2    we're outside the complaint.  He acknowledges the complaint
3    doesn't deal with this issue.  But it is in the policies
4    that say you can access it through this other means.  You
5    are not subject to the payment processing policy.
6           So if he thinks that they're not adequate, the
7    complaint again needs to address obvious alternatives, that
8    would mean that there is no tie.  He is actually -- if we're
9    going to step outside a little bit, he is wrong in the
10   sense that it doesn't affect what goes on with the social
11   networking.
12          When you are inside a game, you are playing the
13   game.  You may be playing with other people, and that is
14   true whether the game is on Facebook or Xbox or a website or
15   whatever.  That is the functionality inside the game.
16          The socializing aspect, to the extent there is
17   one, is letting your friends know that I'm on Farmville or I
18   did such-and-such.  Publishing as an example is one of the
19   things that is expressly permitted by the policy for people
20   accessing off the site.
21          I only use it as an illustration that there is
22   a burden on the plaintiff to allege facts that suggest that
23   this is not an adequate alternative.  Since by omission they
24   don't even address it, they could not have alleged facts
25   that meet that burden.

1           THE COURT:  Well, I thank you very much.  I

2    thank both sides for helpful argument.  And we will take the

3    issues under advisement.  We will be in recess.

4           (Hearing ends at 11:56 a.m.)

5

6        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

7

8                       /s/ Brian P. Gaffigan
                        Official Court Reporter
9                         U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25