IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KICKFLIP, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 12-1369-LPS |
| | : | |
| FACEBOOK, INC., | : | |
| | : | |
| Defendant. | : | |

Kenneth L. Dorsney, Mary B. Matterer, MORRIS JAMES LLP, Wilmington, DE.
Derek A. Newman, Derek Linke, NEWMAN DU WORS LLP, Seattle, WA.
Brian R. Strange, Keith L. Butler, STRANGE & CARPENTER, Los Angeles, CA.

    Attorneys for Kickflip, Inc.

Steven J. Balick, Tiffany G. Lydon, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE.
Thomas O. Barnett, Jonathan Gimblett, Caitlin R. Cottingham, COVINGTON & BURLING LLP, Washington D.C.

    Attorneys for Facebook, Inc.

**MEMORANDUM OPINION**

September 27, 2013
Wilmington, Delaware

**STARK, U.S. District Judge**:

Presently before the Court is Defendant Facebook, Inc.'s ("Defendant" or "Facebook") Motion to Dismiss Pursuant to Rule 12(b)(6) (D.I. 11) and Plaintiff Kickflip, Inc.'s ("Plaintiff" or "Kickflip") Motion to Strike Re: Facebook, Inc.'s Motion to Dismiss (D.I. 14).

## I. INTRODUCTION

Kickflip filed this action against Facebook on October 26, 2012, alleging antitrust violations and tortious interference, in relation to Facebook's virtual-currency service, Facebook Credits, and Facebook's social-gaming network. (D.I. 1) On January 4, 2013, Facebook moved to dismiss the case for failure to state a claim. (D.I. 11) Facebook also alleges that Kickflip lacks standing. (D.I. 12 at 8) The parties completed briefing on the motion to dismiss on February 11, 2013. (D.I. 12, 15, 16) During the briefing, on February 1, 2013, Kickflip moved to strike materials outside the pleadings from being considered in connection with Facebook's motion to dismiss. (D.I. 14) The parties completed briefing on Kickflip's motion on February 25, 2013. (D.I. 14, 18, 19) The Court heard oral argument on July 29, 2013. (D.I. 21) ("Tr.")

For the reasons discussed below, the Court will grant in part and deny in part Kickflip's motion to strike and will deny Facebook's motion to dismiss.

## II. LEGAL STANDARDS

### A. Motion to Strike

Pursuant to Federal Rule of Civil Procedure 12(d), "[i]f, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." This process is known as "conversion." *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir.

1

1999). However, a Court may consider, without converting, "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *see also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993). The Third Circuit has explained that "[p]laintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

**B.  Motion to Dismiss**

The sufficiency of pleadings for non-fraud cases is governed by Rule 8 of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, courts conduct a two-part analysis. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, courts separate the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. This first step requires courts to draw all reasonable inferences in favor of the non-moving party. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2000). However, the Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

Second, courts determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This is a context-specific determination, requiring the court "to draw on its judicial experience and common sense." *Id.* at 679. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks omitted). Finally, although a non-fraud claim need not be pled with particularity or specificity, that claim must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 555.

### III. DISCUSSION

#### A. Motion to Strike

Kickflip requests that the Court strike all materials relied upon by Facebook in support of its motion to dismiss that are outside the pleadings. (D.I. 14 at 1) These materials, and their related statements in Facebook's briefing, include:

> (1) An Exhibit entitled "Facebook Developer Payments Terms" (D.I. 12 Ex. 2);

3

>(2) An Exhibit entitled "Facebook Platform Policies" (*id.* Ex. 3), and Facebook's related argument, "Facebook's Platform also enables developers to access Facebook's network via applications running 'off' of Facebook (*i.e.*, applications launched by the user from another site, such as the developer's own site). Such applications can use Facebook's authentication service ('Facebook Login'), social plugins (*e.g.*, the 'Like' button), and publishing (*e.g.*, with the user's permission, posting notices on the user's Facebook page that the user's friends may see)" (D.I. 12 at 4);
>
>(3) An Exhibit entitled "Statement of Rights and Responsibilities" (*id.* Ex. 4), and Facebook's related argument, "[t]he SRR provides that, '[i]f you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you'" (D.I. 12 at 5); and
>
>(4) Kickflip's responsive letter to Facebook's Cease and Desist letter (*id.* Ex. 10), and Facebook's related arguments, "Kickflip's November 12, 2009, response to Facebook's Cease and Desist letter represented that 'Kickflip divested itself of the Gambit service and brand which is now exclusively owned by Gambit'" (D.I. 12 at 20), and "Kickflip no longer owns the Gambit business that provided the alleged advertising and payment processing services" (*id.* at 4).

Kickflip also argues that the Court should exclude the following statements from Facebook's brief:

>(1) "Similar to the policies of other popular technology platforms, such as Apple's iOS operating system" (*id.* at 1); and
>
>(2) "This approach is consistent with the payment processing services provided on other platforms, such as the Apple iOS platform" (*id.* at 16).

Facebook argues that the Court may consider the above materials and statements. With respect to Exhibit 2, Facebook Developer Payment Terms, and Exhibit 3, Facebook Platform Policies, the Court agrees with Facebook. These exhibits are directly cited in the Complaint by their internet address (D.I. 1 at 20 n.20 & 23 n.21); having followed the links provided in

4

footnotes 20 and 21 of the Complaint, the Court arrived at the same Terms and Policies documents relied on by Facebook. As Kickflip's Complaint expressly incorporates by reference these exhibits, the Court will not strike them.[1] It follows that the Court also will not strike the statement in Facebook's brief related to Facebook's Platform Policies.

The Court also concludes that Exhibit 4, Statement of Rights and Responsibilities, is integral to Kickflip's Complaint. A key component of Kickflip's claims involves Facebook's 2009 banning of Kickflip and the Cease and Desist letter. (D.I. 1 at 9) The Cease and Desist letter explains that "Kickfl[i]p continues to violate Facebook's Statement of Rights and Responsibilities, Advertising Guidelines, and Platform Policies." (D.I. 12 Ex. 1) The letter further states that "[p]ursuant to Section 14 of Facebook's Statement of Rights and Responsibilities, you are hereby notified that, effective immediately, you . . . are no longer authorized to access the Facebook website . . . ." (*Id.*) Hence, the Cease and Desist letter – upon which the Complaint explicitly relies – provides the necessary link between the challenged exhibit and Kickflip's claims. Thus, the Court will consider the Statement of Rights and Responsibilities and Facebook's related argument in connection with assessing the motion to dismiss.

Similarly, because the Court (undisputedly) may consider the Cease and Desist letter, the Court concludes that it is appropriate also to consider the admittedly authentic version of Kickflip's letter responding to Facebook's letter.

The Court will strike the remaining two statements that Kickflip seeks to strike. Both

---

[1]Facebook has provided the 2009 and 2011 versions of the policies, in addition to the originally cited 2012 versions. (D.I. 18 Exs. 11-14) For purposes of the motion to dismiss, the Court will consider the 2009 and 2011 versions of the policies.

5

statements relate to purported similarities between Facebook's policies and services and those provided with the Apple iOS platform. The Court is not persuaded by Facebook's attempt to anchor these statements to the Complaint. The Complaint states only that "Facebook, following the model used by Apple, charged much higher commissions on its virtual-currency services." (D.I. 1 at 8 (citing Justin Smith, *Will Facebook Take a Cue from Apple on Payment Fees for Developers?*, Inside Facebook, June 4, 2009)) The Court agrees with Kickflip that this statement is not integral to its Complaint. Indeed, deleting "following the model used by Apple" and the corresponding citation would not change the substance of the Complaint. The statement in the Complaint does not open the door to broad Apple iOS comparisons on a motion to dismiss.

Thus, the Court will deny most of Kickflip's motion to strike but will strike the two Apple iOS related statements from Facebook's brief.

**B.     Motion to Dismiss**

Facebook argues that the Court may grant its motion on several grounds, including: (1) Kickflip's lack of standing; (2) Kickflip's failure to allege the markets for virtual-currency services and social-game networks, and its failure to allege that Facebook has monopoly power in both markets; (3) the inapplicability of *per se* tying and Kickflip's failure to establish tying of products; and (4) Kickflip's failure to allege unjust conduct as part of its claim for tortious interference. The Court discusses each of these asserted grounds in turn below.

**1.     Standing**

**a.     Injury**

Standing requires three elements: "(1) an injury in fact; (2) a causal connection between the injury and the conduct complaint of – the injury has to be fairly traceable to the challenged

action of the defendant . . . ; and (3) a showing that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *N.J. Physicians, Inc. v. President of the U.S.*, 653 F.3d 234, 238 (3d Cir. 2011) (internal quotation marks omitted). Facebook argues that Kickflip lacks standing because the Complaint does not allege that Kickflip meets the second element. (D.I. 12 at 9) Facebook contends that it rightfully banned Kickflip to prevent "scammy" ads and that the ban was not a sham to enable Facebook's monopolization. (*Id.* at 9-10) Facebook also argues that Kickflip's Complaint fails to allege injury arising out of Facebook's 2011 payments policy. (*Id.* at 11)

Kickflip responds that its Complaint adequately alleges injuries from Facebook's pretextual banishment of Kickflip. This, in combination with Facebook's 2011 policy,[2] is alleged to have eliminated all of Facebook's virtual-currency services competitors. (D.I. 1 at 12; D.I. 15 at 6) Kickflip also argues that it has standing to challenge Facebook's 2011 policy as an independent cause of injury because it has an "intention to enter the business and" is prepared to enter the business. (D.I. 15 at 8-10)

The Court is persuaded that Kickflip has satisfied its burden of alleging an event causing injury to Kickflip, beginning with its 2009 ban from Facebook and culminating in the 2011 payments policy. (Tr. at 35) Although Facebook states that it rightfully banned Kickflip pursuant to several Facebook Terms (D.I. 12 at 9; *id.* Ex. 1), Facebook's reliance on *Sambreel Holdings LLC v. Facebook, Inc.*, 2012 WL 5995240, at *3 (S.D. Cal. Nov. 29, 2012), is misplaced. *Sambreel* relies on *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), which

---

[2]Kickflip alleges that the 2011 policy conditioned access to Facebook's social-game marketplace on the use of Facebook Credits. (D.I. 1 at 12)

7

holds:

> [i]n the absence of any purpose to create or maintain a monopoly, the [Sherman A]ct does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.

Facebook's argument ignores the caveat, "*in the absence of any purpose to create or maintain a monopoly.*" *Id.* (emphasis added). Kickflip's Complaint alleges that "Facebook targeted [Kickflip] because it wanted to tarnish the reputation of [Kickflip] . . . so Facebook used the 'scamville' controversy as a pretext to destroy [Kickflip's] relationships with developers and preemptively eliminate [Kickflip] from the market." (D.I. 1 at 10) In support, Kickflip cites in its Complaint to a 2009 article by Inside Facebook, in which Facebook publicly stated that it banned Gambit Labs, Inc. ("Gambit"), emphasizing that Gambit could no longer participate with Facebook in any way, and warned that if developers provide services to Gambit to run ads within Facebook, Facebook "will take appropriate action." (*Id.*) Kickflip highlights these allegations to provide a timeline for Facebook's systematic elimination of competition in order to secure a monopoly. (*Id.* at 9-13) The timeline includes: Gambit, the second-largest virtual-currency services provider at the time, "and another virtual-currency services provider," were banned form Facebook in 2009; Facebook published a list of other banned developers in 2009; as a result of Facebook's conduct, Gambit soon lost most of its clients, including Zynga, Playdom, and 6waves; around the same time, Facebook was "planning a major roll-out of Credits;" Facebook threatened to "shut down" games from Zynga, and other similar developers, for failing to adopt Credits; and, two years after banning Gambit, Facebook Credits was the only remaining virtual-currency services provider. (*Id.* at 9-13, 18) In summary, the Complaint alleges: "Gambit is also

8

harmed because Facebook's monopolization and illegal tying of the virtual-currency market entirely foreclosed Gambit . . . and effectively shut down the competitive marketplace." (*Id.* at 13) The Complaint further alleges that, as a result of Facebook's conduct, "Gambit has suffered lost profits." (*Id.*)

The Court concludes that these allegations of Facebook's pretextual conduct are sufficient to permit Kickflip's Complaint to survive Facebook's motion to dismiss.[3]

### b.     Divestment of Gambit

Facebook contends that Kickflip lacks standing because its Complaint rests on actions Facebook took against Gambit in 2009, yet Kickflip has divested itself of Gambit. (D.I. 12 at 19) In making this argument, Facebook relies on Kickflip's November 12, 2009 letter in response to Facebook's Cease and Desist Letter, in which Kickflip's counsel stated, "Kickflip divested itself of the Gambit service and brand." (D.I. 12 Ex. 10) Facebook also relies on its suspicion that because Gambit was incorporated on November 9, 2009, within days of Facebook banning Kickflip, Kickflip intended to sever its relationship with Gambit in order to transfer its virtual-currency business and avoid the ban on Facebook. (D.I. 16 at 10)

The Court concludes that counsel's statement in the responsive letter does not provide a sufficient basis to grant Facebook's motion to dismiss. Moreover, the Court will not speculate from the coincidental date of Gambit's incorporation that Kickflip divested itself of Gambit.

---

[3] As the Court has found that Kickflip has adequately alleged pretext, the Court need not reach Kickflip's other asserted grounds for surviving the motion to dismiss, i.e., Kickflip's theory of intent and preparedness to re-enter the virtual-currency market.

Thus, the Court will deny Facebook's motion on this ground.[4]

### 2. Monopolization Claims

Monopoly power under the Sherman Act requires: "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). To plead monopoly power, "a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market." *Id.* at 307. Defining a relevant market is a question of fact, and the plaintiff bears the burden of proof. *See id.* A court may dismiss a claim for failure to define the relevant market. *See id.* "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . , the relevant market is legally insufficient." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

Facebook moves to dismiss based on the assertion that Kickflip has failed to define the virtual-currency services and social-game markets. Facebook additionally argues that dismissal is appropriate because Kickflip fails to allege that Facebook has monopoly power in the relevant markets.

---

[4]Facebook requests that if the Court denies its motion, that the Court order discovery on the limited issue of standing. (D.I. 16 at 10 n.10) By separate order, the Court will grant this request.

10

### a. Virtual-Currency Services and Social-Game Networks Markets

Facebook contends that the Complaint fails to define the virtual-currency services and social-game networks markets. (D.I. 12 at 12; D.I. 16 at 5-6) Facebook also contends that the Complaint does not address "the nature of Facebook Platform as a set of services that support the distribution of applications" and fails to identify the market players. (D.I. 12 at 12) Finally, Facebook argues that any attempt to narrow the relevant market to "virtual-currency services" for social games is unsupported. (*Id.* at 13)

The Court concludes that Plaintiff's descriptions of the relevant markets are not "facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (citing *Queen City Pizza*, 124 F.3d at 436-37). The Complaint defines the virtual-currency market as including those "who offer virtual-currency services, payment-processing services, advertising, and related customer services to social-game developers." (D.I. 1 at 4) "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City Pizza*, 124 F.3d at 436. The relevant market must encompass "all interchangeable substitute[s]." *Id.* Kickflip pleads that "[c]urrently, the only way for developers to effectively monetize social games is through the use of virtual-currency services – there are no substitutes." (D.I. 1 at 5) Further, Kickflip alleges that the relevant market involves "software developers that publish[] games on Facebook and other social networks," such as Gambit. (D.I. 1 at 1) Kickflip also alleges that the relevant market used to include "Gambit, Offerpal, TrialPay, Super Rewards, Sometrics" and other competitors. (*Id.* at 5)

Kickflip defines "[t]he market for social-game networks" as including "Facebook, MySpace, Google+, and other social networks that offer social games to users." (D.I. 1 at 3-4) The Complaint distinguishes the relevant market from other platforms that offer games through websites, mobile devices, or stores selling games. (*Id.* at 4) For instance, social network games: allow interactions between players who are not directly connected to a console, are less elaborate and expensive, derive revenue primarily from advertising or in-game purchases, leverage an existing social network, and have a large user base. (*Id.*; Tr. at 40-42) Further, the social game network utilizes data input by users, which allows users to cooperate or compete with one another without first having to purchase the game. (D.I. 1 at 20-21)

These descriptions are sufficient to survive Facebook's motion to dismiss, particularly as defining the relevant market is a "deeply fact-intensive inquiry." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (collecting cases, including *Queen City Pizza*, 124 F.3d at 436).

### b. Monopolization of Relevant Market

Facebook argues that Kickflip fails to allege facts supporting the contention that Facebook has monopoly power, or a dangerous probability of achieving monopoly power over the relevant market. (D.I. 14 at 14-15)

Contrary to Facebook's contention, the Complaint specifically alleges:

> Facebook has monopoly power in the virtual-currency services market. Ninety percent of virtual currency transactions on social-game networks occur on the games played on Facebook. And under its terms and conditions effective as of July 2011, Facebook is the sole virtual-currency services provider for all social games offered on Facebook. Therefore Facebook effectively controls 90 percent of the virtual-currency services market, sufficient to establish monopoly power as a matter of law.

(D.I. 1 at 18) Citing to *United States v. Dentsply Int'l*, 399 F.3d 181 (3d Cir. 2005), Kickflip argues that its allegation of 90% market share is sufficient to establish a monopoly of the virtual-currency services market, as well as the social-game networks market using virtual-currency. *Dentsply* held that a 75-80% "share of the market is more than adequate to establish a prima facie case of power." *Id.* at 188-90; *see also Weiss v. York Hosp.*, 745 F.2d 786, 827 (3d Cir. 1984) (noting that "[a] primary criterion used to assess the existence of monopoly power is . . . market share" and holding that testimony in support of finding of 80% market share sufficient to find monopoly power). In Kickflip's view, Facebook's argument that the Complaint fails to disclose Facebook's market share at the time of alleged monopolization is a non sequitur because pleading the current market share is sufficient. (D.I. 15 at 15-16 (citing *Multistate Legal Studies v. Harcourt Brace Jovanovich*, 63 F.3d 1540, 1554-55 (10th Cir. 1995)))

The Court concludes that the Complaint adequately alleges that Facebook engaged in anticompetitive conduct to obtain a monopoly consisting of 90% of the market. (D.I. 1 at 12-13, 18) As already discussed, Kickflip's Complaint describes the timeline of events leading up to Facebook's monopolization of the virtual-currency services within Facebook. (*Id.* at 9-13) Part of the alleged conduct included banning Gambit, tarnishing Gambit's name, and forcing other developers, such as Zynga, Playdom, Playfish, and CrowdStar, to use Facebook Credits. (*Id.* at 11-12) Further, Kickflip alleges that Facebook was not competing on the merits, and instead charged a 30% fee compared to the typical 10% fee Gambit would have charged. (*Id.* at 8) The Court concludes that these allegations support a plausible inference that, at the pertinent time, Facebook had a dominant share of the market.

To the extent Facebook argues Kickflip fails to allege that Facebook's competitors

13

actually went out of business, the Court is not persuaded that this would be a necessary allegation. Kickflip adequately alleges that Facebook's conduct injured its competitors. (D.I. 1 at 13) The Court is also unpersuaded by Facebook's argument that its conduct cannot be deemed anticompetitive because it occurred within the Facebook platform. *See generally Smith v. Ebay Corp.*, 2012 WL 27718, at *8 (N.D. Cal. Jan. 5, 2012).

Accordingly, the Court will deny Facebook's motion to dismiss Kickflip's monopolization claims.

### 3. Tying Claims

Tying involves conditioning the sale of one good on the purchase of another, separate good. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510 (3d Cir. 1998). "The antitrust concern over tying arrangements arises when the seller can exploit its market power in the tying market to force buyers to purchase the tied product which they otherwise would not, thereby restraining competition in the tied product market." *Id.* Kickflip argues that Facebook exploited its social-game network and tied that control to its virtual-currency services. (D.I. 15 at 3, 17)

As a threshold matter, Facebook contends that the *per se* tying rule is inapplicable. (D.I. 12 at 17-18) Facebook emphasizes that the *per se* rule should be cautiously applied, particularly in dealing with new functionalities in software platforms. (*Id.*)

The Court concludes that dismissing Kickflip's *per se* claim at this stage would be inappropriate. A determination of the applicability of the *per se* rule is better undertaken after careful consideration of the evidentiary record. *See generally Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992) ("Legal presumptions that rest on formalistic

14

distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'"); *United States v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001) (relying on "reading of the record" to hold *per se* rule inapplicable, but observing that *per se* rule may be applicable to software markets).

Facebook further contends that Kickflip's Complaint fails to allege facts sufficient to plead the necessary elements of either a *per se* or rule-of-reason tying claim, primarily because users can access Facebook's social network without using Facebook Credits. (D.I. 12 at 15-17; D.I. 16 at 8-9) Further, Facebook argues that Kickflip fails to allege harm to the competitive process. (*Id.*)

Under a *per se* analysis, Kickflip would have to plead: "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992). Kickflip adequately alleges each of these essential elements: (1) Facebook ties virtual-currency services to the distinct product of social-game networks (D.I. 1 at 21); (2) Facebook has a 90% market share (*id.*); and (3) Facebook's conduct eliminated competing virtual-currency providers, allowing Facebook to earn $557 million from its virtual-currency services (*id.* at 22). Under a rule of reason tying analysis, Kickflip must also allege harm to the competitive process in the tied market. *See Brokerage Concepts*, 140 F.3d at 519. Kickflip has adequately alleged such harm, for reasons including its allegation that Facebook's conduct essentially consumed the virtual-currency services market, eliminating it from being a market distinct from Facebook itself. (*See* D.I. 1 at

15

5-6)

Thus, the Court will deny Facebook's motion to dismiss the tying claims.

### 4. Tortious Interference Claims

A tortious interference claim requires the following: "1) a contract, 2) about which the defendant knew, 3) an intentional act that is a significant factor in causing the breach of contract, 4) without justification, and 5) which causes injury." *Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 531 (D. Del. 2012). Facebook argues that Kickflip fails to plead the fourth element, lack of justification. (D.I. 12 at 18-19)

Whether Facebook's conduct was without justification or wrongful will require a fact-intensive determination. *See Grunstein v. Silva*, 2009 WL 4698541, at *16 (Del. Ch. Dec. 8, 2009) (noting that such factual inquiry is "not readily amenable to assessment by way of a motion to dismiss"). Taking the allegations of the Complaint as true, Kickflip has adequately pled its tortious conduct claims. The Complaint asserts that Facebook could have adopted less restrictive means to accomplish its stated goal of removing non-compliant ads from its site. Instead, Facebook engaged in anticompetitive behavior by singling out Gambit and tarnishing its name, while failing to take similar action against other offending companies. Kickflip further alleges that Facebook itself ran non-compliant ads. Taken together, these allegations adequately plead that Facebook's conduct was unjustified.

Thus, the Court will deny Facebook's motion to dismiss the tortious interference claims.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Kickflip's motion to strike, and will deny Facebook's motion to dismiss. An appropriate Order follows.