## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| KICKFLIP, INC., a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1369-LPS |
| | ) | |
| FACEBOOK, INC., a Delaware corporation, | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR SUMMARY JUDGMENT FOR LACK OF STANDING</u>

*Of Counsel*:

Thomas O. Barnett
Jonathan Gimblett
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
(202) 662-6000
tbarnett@cov.com
jgimblett@cov.com

*Counsel for Defendant Facebook, Inc.*

David E. Ross (Bar No. 5228)
Benjamin J. Schladweiler (Bar No. 4601)
SEITZ ROSS ARONSTAM & MORITZ LLP
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
dross@seitzross.com
bschladweiler@seitzcross.com

*Counsel for Defendant Facebook, Inc*

Dated:  December 31, 2013

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     STATEMENT OF FACTS .......................................................................................... 2

III.    SUMMARY OF THE ARGUMENT ......................................................................... 6

IV.     ARGUMENT ............................................................................................................... 7

        A.      Relevant Legal Standards .............................................................................. 7

        B.      Kickflip Lacks Standing Because It Assigned to Gambit Labs Any Claim
                Related to the Getgambit Business. ............................................................... 8

                1.      The November Agreement Transferred to Gambit Labs All
                        Kickflip's Assets Relating to the Gambit Business, Including Any
                        Legal Claims Arising from Pre-November 9 Conduct. ...................... 8

                2.      The December Agreement Did Not Alter the Result Achieved By
                        the November Agreement. ................................................................. 10

        C.      Kickflip Lacks Standing to Assert Claims Based on Conduct After It
                Transferred the Business to Gambit Labs. .................................................. 14

                1.      Kickflip Lacks Standing to Assert Its Tying Claim. ....................... 14

                2.      Kickflip Lacks Standing to Assert Its Tortious Interference Claims. ....... 16

                3.      Kickflip Lacks Standing to Assert Its Monopolization Claims. ............... 17

                4.      Kickflip Lacks Standing to Seek Injunctive Relief .......................... 18

V.      CONCLUSION ......................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU-NJ v. Township of Wall*,
  246 F.3d 258 (3d Cir. 2001).................................................................................................7

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001)............................................................................................16

*AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*,
  CIV. A. 4021-VCS, 2009 WL 1707910 (Del. Ch. June 16, 2009).........................................13

*Aramony v. United Way of America*,
  254 F.3d 403 (2d Cir. 2001)...............................................................................................11

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)............................................................................................................18

*Clapper v. Amnesty Int'l USA*,
  133 S.Ct. 1138 (2013).........................................................................................................8

*Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc.*,
  No. 04L-10-101 RRC, 2006 WL 2567916 (Del. Super. Ct. Aug. 31, 2006)..........................13

*Continental Ins. Co. v. Rutledge & Co., Inc.*,
  750 A.2d 1219 (Del. Ch. 2000)..........................................................................................12

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)..........................................................................................................18

*Drake v. Hercules Powder Co.*,
  55 A.2d 630 (Del. Super. Cr. 1946)....................................................................................12

*Emerson Elec. v. Le Carbone Lorraine, S.A.*,
  642 F. Supp. 2d 381 (D.N.J. 2008). ....................................................................................8

*Frazier v. American Airlines, Inc.*,
  434 F. Supp. 2d 279 (D. Del. 2006)....................................................................................11

*Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*,
  995 F.2d 425 (3d Cir. 1993)............................................................................................9, 11

*Haft v. Dart Group Corp.*,
  841 F. Supp. 549 (D. Del. 1993).........................................................................................11

*Hollingsworth v. Perry*,
570 U.S. __, 133 S.Ct. 2652, 2662, 186 L.Ed. 768 (2013) ...................................................14

*JFE Steel Corp. v. ICI Americas, Inc.*,
797 F. Supp. 2d 452 (D. Del. 2011).......................................................................................7

*Lerman v. Joyce Int'l, Inc.*,
10 F.3d 106 (3d Cir. 1993)................................................................................................7, 9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ...............................................................................................................7

*McNair v. Synapse Grp. Inc.*,
672 F.3d 213 (3d Cir. 2012)................................................................................................19

*New Jersey Physicians, Inc. v. President of U.S.*,
653 F.3d 234 (3d Cir. 2011)...........................................................................................7, 15

*O'Shea v. Littleton*,
414 U.S. 488 (1974).............................................................................................................18

*Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*,
604 F.3d 1291 (11th Cir. 2010) ..........................................................................................15

*Shinogi Pharm., Inc. v. Mylan, Inc.*,
2011 WL 3860680 (D. Del. 2011) ......................................................................................16

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
131 F.3d 874 (10th Cir. 1997) ............................................................................................15

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009).............................................................................................................18

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)..........................................................................................18, 19

## Statutes

15 U.S.C. § 1...............................................................................................................................15

15 U.S.C. § 2 ..............................................................................................................................15

## Other Authorities

Restatement (Second) of Contracts § 71 cmt. b.........................................................................12

I.      **PRELIMINARY STATEMENT**

In its memorandum opinion of September 27, 2013, the Court granted Facebook's request for limited discovery on standing in light of Kickflip's representation to Facebook on November 12, 2009, that it had divested the "Getgambit" business.  Discovery has confirmed what Kickflip failed to disclose in its Complaint:  Kickflip divested "all of the properties and assets" of Getgambit in a November 9, 2009 transaction with Gambit Labs, Inc. ("Gambit Labs")—a company incorporated the same day by the same principals who owned Kickflip.  The apparent purpose of the divestment was to evade enforcement action by Facebook in response to Kickflip's repeated display of ads in gaming applications that were deceptive and violated Facebook's Terms.  Having assured Facebook on November 6, 2009, that Kickflip would comply with Facebook's cease and desist letter, Kickflip's principals instead immediately transferred Getgambit's assets and operations to Gambit Labs, while leaving any liabilities with Kickflip (including any that might arise from legal actions challenging Kickflip's deceptive practices).  Thereafter, Kickflip actively encouraged its developer customers to continue using Getgambit as customers of Gambit Labs.

The undisputed facts regarding Kickflip's November 9, 2009, divestment establish that Kickflip lacks standing for two independent reasons.

*First*, Kickflip does not own the claims it seeks to assert.  By transferring "all" of Getgambit's assets, Kickflip necessarily transferred any legal claim related to that business.  After the divestment, Gambit Labs (*not Kickflip*) threatened to sue Facebook for the same conduct as issue in this litigation.  A subsequent agreement of December 15, 2009, between Kickflip and Gambit Labs—which confirmed that "all assets" were transferred to Gambit Labs— did not change that result.

*Second*, irrespective of who owns the legal claims, Kickflip cannot rely on statements or actions by Facebook after the undisputed divestment of the Getgambit business to establish standing. Any injury from such alleged actions would have occurred to Gambit Labs, not Kickflip. For that separate reason, Kickflip lacks Article III standing to bring any of the claims in its Complaint.

## II.   STATEMENT OF FACTS

Prior to November 9, 2009, Kickflip was the owner of an Internet business called "Gambit" or "Getgambit." D.I. 1 (Complaint) at 1. Through its Getgambit business, Kickflip delivered ads containing various offers to the users of third-party game applications running on Facebook and other social networks. D.I. 1 ¶ 44. *See also* Ex. 1 (Kickflip Dep.) at 27:18–28:1. For example, a user wanting to acquire virtual currency within a game application would be shown the Gambit offerwall—a web page listing offers available through Kickflip which the user could complete in exchange for virtual currency. At the developer's option, the Gambit offerwall could be combined with a payment service, allowing users to pay directly to obtain virtual currency. *See* Ex. 1 (Kickflip Dep.) at 114:8–116:22.

Starting in April 2009, Facebook repeatedly brought to Kickflip's attention deceptive ads that Kickflip had served on applications available on Facebook Platform. D.I. 47 ¶¶ 9-13 (Defendant's Amended Answer and Counterclaims). By late 2009, the extent of deceptive advertising on social networks including Facebook was attracting strong press attention. One article estimated, based on a survey of ad companies serving ads with offers, that 20 percent of ads with offers "willfully trick users into things like paying more than advertised or providing personal information." Ex. 2 (Eric Eldon, *Can the Advertising Offers Business Find Redemption in Social Networks*, Inside Facebook, Nov. 19, 2009). Another article accused Facebook of turning a "blind eye to user protection" and suggested that if it and other social networks "won't

2

protect users, then the government will have to step in."  Ex. 3 (Michael Arrington, *Scamville: The Social Gaming Ecosystem of Hell*, TechCrunch, Oct. 31, 2009).

In view of Kickflip's continuing non-compliance with Facebook's terms and policies governing the use of its services (the "Terms"), Facebook sent Kickflip a letter on November 5, 2009, stating that Kickflip was "no longer authorized to access the Facebook website, use the Facebook development platform, advertise on Facebook, or use any of the services offered by Facebook, Inc. whatsoever for any reason."  Ex. 4 (Cease and Desist Letter).  The letter observed that Kickflip's ads violated Facebook's policies against "pop-ups, fake application closing behavior, acquiring information from Facebook user profiles without authorization," and promoting gambling and alcohol.  *Id.*  On November 6, 2009, Kickflip admitted that it had served non-compliant ads and outlined steps it claimed to be taking to come into compliance.  Ex. 5 (Letter of Nov. 6, 2009, from Eric Benisek to Joseph Cutler).

Three days later, Kickflip's counsel arranged for the incorporation of Gambit Labs, Inc.  Exs. 6 (Letter of Nov. 9, 2009 to Eric Benisek from The Company Corporation) and 7 (certificate of incorporation).  This new company had the same principal officers as Kickflip: Noah Kagan (President), Andrew Hunter (Chief Executive Officer) and Chris Smoak (Chief Technology Officer).  Ex. 1 ( Kickflip Dep.) at 46:12–47:2.  Messrs. Kagan, Hunter and Smoak were also the sole shareholders of Kickflip at the time.  *See* Ex. 8 (December Agreement) § 2.1.1, and Schedule A.

That same day, November 9, 2009, Kickflip and Gambit Labs entered into an Asset Assignment Agreement (the "November Agreement"), under which:

> [Kickflip] agrees to transfer and [Gambit Labs] agrees to receive,
> *all of the properties and assets* of the [Kickflip] related to
> [Kickflip's] "Getgambit" Internet payments business, whether
> tangible and intangible, real, personal or mixed, and wherever

3

> located, including without limitation all cash, accounts receivable,
> inventory, equipment, intellectual property rights, copyrights,
> computer programs, and [Kickflip's] good will related to the
> Internet server hosting business.

Ex. 9 (November Agreement) § 1.1 (emphasis added).  Kickflip received payment of $1.00.  The

agreement was signed for both parties by the same individual—Andrew Hunter.  *Id.*

Pursuant to the agreement, Kickflip took immediate steps to transfer operation of the

Getgambit business to Gambit Labs.  *Id.* §§ 1.4-1.5.  On November 9, 2009, a total of

$2,513,782.50 was transferred out of Kickflip's bank accounts into accounts owned by Gambit

Labs.[1]  Kickflip's employees entered into new employment agreements with Gambit Labs.  *See*

Ex. 1 (Kickflip Dep.) at 42:21–43:17.  Kickflip encouraged its application developer customers

to enter into new contracts with Gambit Labs so that they could continue to use Getgambit

notwithstanding Facebook's enforcement action against Kickflip.  *See id.* at 53:21–54:8; Ex. 13

(Vol. 11 Dep.) at 52:3–10.[2]  Kickflip's principals asserted on the Getgambit website that

Getgambit was an independent service and could not be shut down by Facebook.  Ex. 16 (Email

of Dec. 16, 2009, from Noah Kagan to Alex Cyriac).

On November 12, 2009, Kickflip's counsel, writing on behalf of Kickflip, informed

Facebook's outside counsel that Kickflip had "divested itself of the Gambit service and brand,

which is now exclusively owned by Gambit."  Ex. 17 (Letter of Nov. 12, 2009, from Eric

Benisek to Joseph Cutler).  Facebook received no further communication from or on behalf of

Kickflip concerning the subject matter of this lawsuit until the filing of the Complaint nearly

three years later.

---

[1] *See* Ex. 10 (transaction receipts) and Exs. 11–12 (bank transaction histories for Gambit Labs).

[2] *See also, e.g.,* Ex. 14 (Application Developer Terms and Conditions issued by Gambit Labs); Ex. 15 (Advertising Services Agreement concluded on November 24, 2013, between Gambit Labs and Gonline (Beijing Limited)).

On November 29, 2009, Kickflip's counsel sent both Facebook and its outside counsel a "formal notice by Gambit Labs, Inc. ('Gambit'), provider of the 'Getgambit' service and www.getgambit.com . . . of Gambit's intent to bring immediate legal action." Ex. 18 (Letter of Nov. 29, 2009, from Richard Vasquez to Facebook and Joseph Cutler). The letter alleged conduct by Facebook beginning prior to November 9, 2009, giving rise to the antitrust and tortious interference claims that Gambit Labs intended to assert. *Id.* Those claims—which have no basis in fact and which Facebook vigorously disputes—are substantially identical to the claims asserted by Kickflip in this action.

On December 15, 2009, Kickflip and Gambit Labs signed a Contribution of Assets in Exchange for Shares Agreement purporting to "restate[ ], replace[ ] and supersede[ ]" the November Agreement. Ex. 8 ( December Agreement) § 1.1.3. Once again, Kickflip agreed to "transfer to Gambit all assets associated with Gambit offer service including the Gambit offerwall and payments service." *Id.* § 1.1.1. The agreement provided no consideration for Gambit Labs that had not already been provided to Gambit Labs in the November Agreement. It required Gambit Labs to issue three million shares each to the Kickflip shareholders who were also the principal officers of Kickflip and Gambit Labs: Noah Kagan, Andrew Hunter and Chris Smoak. *Id.* § 2.1.1. The agreement required each party to deliver to the other various documents as conditions of closing. *Id.*, Article 4.

In 2011, Gambit Labs merged into Volume 11 Media, Inc. ("Volume 11 Media"). Ex. 13 (Vol. 11 Dep.) at 11:21–12:19. The primary shareholders of Volume 11 Media include Noah Kagan, Andrew Hunter, and Chris Smoak. Ex. 13 (Vol. 11 Dep.) at 13:7–15.

On October 26, 2012, Kickflip filed a Complaint asserting federal antitrust claims and state law claims for tortious interference arising from alleged injury to the Getgambit business

D.I. 1.  These claims were identical in key respects to the claims that Gambit Labs had

threatened to assert against Facebook in November 2009.  Kickflip asserts that public statements

made by Facebook on November 19, 2009, and November 25, 2009—after it had transferred its

Getgambit business to Gambit Labs—tortiously interfered in Gambit's relationships with its

customers.  *See id.* ¶¶ 121, 123–24, 132.  Kickflip also claims that Facebook's introduction in

July 2011 of a policy requiring game application developers to use Facebook's payment

processing service constitutes monopolization and unlawful tying and has "precluded *Gambit*

from the share of revenues in this market it would rightfully have earned."  *Id.* ¶¶ 98, 118

(emphasis added).  The Complaint does not disclose that Kickflip transferred the

Gambit/Getgambit business to another company on November 9, 2009.

On September 27, 2013, the Court denied Facebook's motion to dismiss the Complaint

(D.I. 22 and 23) and ordered limited discovery related to Kickflip's divestiture and its effect on

standing (D.I. 22 at 10, n.4 and D.I. 24).

## III.    SUMMARY OF THE ARGUMENT

Kickflip lacks standing to pursue the claims in the Complaint because it assigned any

claim it may have had to Gambit Labs on November 9, 2009.  The all-inclusive transfer of the

entirety of the Getgambit business and "all of the properties and assets" related to it

unambiguously included all legal claims related to Getgambit.  Kickflip and Gambit Labs

confirmed this result when their outside counsel wrote to Facebook on November 29, 2009,

threatening that *Gambit Labs* would bring the antitrust and tortious interference claims that

Kickflip seeks to assert here.  The "restated" December Agreement does not change this result

because (i) it too transferred "all assets" relating to the Getgambit business to Gambit Labs; (ii) it

is not a valid contract because Gambit Labs received no consideration; and (iii) it failed to close

and therefore lacks legal effect.

Separately, because Kickflip indisputably transferred the Gambit/Getgambit business on November 9, 2009, Kickflip cannot establish the injury-in-fact needed for Article III standing based on statements and policies implemented by Facebook *after* Kickflip transferred the Getgambit business to Gambit Labs. Accordingly, Kickflip lacks standing to assert its tying claim, which is based on asserted injury that could not have occurred earlier than July 2011, when Facebook first required game application developers to use its payments processing system. Kickflip lacks standing to pursue its tortious interference claims because the Complaint alleges no disparagement by Facebook prior to November 9, 2009. Kickflip's divestment of Getgambit also renders it incapable of establishing antitrust standing to assert its monopolization claims. And Kickflip is not entitled to injunctive relief under any claim because it is no longer owns the Gambit/Getgambit business and cannot show any likelihood that it will be harmed again by the conduct alleged in the Complaint.

## IV. ARGUMENT

### A. Relevant Legal Standards

A plaintiff bears the burden to prove standing to pursue a claim. *ACLU-NJ v. Township of Wall*, 246 F.3d 258, 261 (3d Cir. 2001). In order to have standing, among other things, it must own the claim. *JFE Steel Corp. v. ICI Americas, Inc.*, 797 F. Supp. 2d 452, 465 (D. Del. 2011) (no standing where party had assigned right to recover costs to another entity) (citing *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112–13 (3d Cir. 1993) (assignments extinguish assignor's right to assert legal claims)).

Moreover, as the party invoking federal jurisdiction, a plaintiff bears the burden of establishing Article III standing, which requires an "injury that is both (1) 'concrete and particularized' and (2) 'actual or imminent, not conjectural or hypothetical'." *New Jersey Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 238 (3d Cir. 2011) (quoting *Lujan v.*

7

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Particularly at the summary judgment

stage, plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or

other evidence 'specific facts.'"  *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1148–49 (2013).

      **B.**      **Kickflip Lacks Standing Because It Assigned to Gambit Labs Any Claim Related to the Getgambit Business.**

Any claim Kickflip might have possessed was transferred to Gambit Labs on November

9, 2009, and cannot now be asserted in this litigation.

      **1.**      **The November Agreement Transferred to Gambit Labs All Kickflip's Assets Relating to the Gambit Business, Including Any Legal Claims Arising from Pre-November 9 Conduct.**

Kickflip sold any legal claim it may have had against Facebook when it transferred

Getgambit to Gambit Labs on November 9, 2009.  Under the November Agreement, Kickflip

agreed to transfer, and Gambit Labs agreed to receive, "all of the properties and assets of

[Kickflip] related to [Kickflip's] "Getgambit" Internet payments business, whether tangible and

intangible, real, personal or mixed, and wherever located."  Ex. 9 (November Agreement) § 1.1.

The agreement contained no exception for any Gambit-related assets.  The only assets it

excluded were those relating to Kickflip's separate software publishing business as well as

corporate records relating exclusively to Kickflip's organization and stock capitalization.[3]  *Id.*

The assignment of the entirety of a business' assets transfers ownership of legal claims

relating to that business, including any antitrust claims.  To avoid problems with split recoveries

---

[3] The November Agreement also excludes liabilities.  Ex. 9, § 1.2.  An antitrust claim is an asset, not a liability.  *Emerson Elec. v. Le Carbone Lorraine, S.A.*, 642 F. Supp. 2d 381, 389 (D.N.J. 2008).  The excluded liabilities would have included any damages arising from claims Facebook might have brought in relation to Kickflip's service of deceptive ads, *see* Ex. 19 (letter of Dec. 1, 2009 from Joseph Cutler to Richard Vasquez and Erik Benisek describing such claims), or from the claims of third parties with which Kickflip was in litigation at that time in relation to the Getgambit business, *see* Ex. 20 (*OfferPal Media, Inc. v. Kickflip, Inc.*, Case No. 09-CV-01734 MMC (N.D. Cal.) (First Amended Complaint, May 7, 2009)).

or duplicative liability, any assignment of an antitrust claim must be "express." *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993). An "unambiguous and all-inclusive" transfer of interests, like that at issue here, is "express" within the meaning of *Gulfstream*, even though it does not explicitly identify antitrust claims as within the scope of the assignment. *Lerman*, 10 F.3d at 112.

Here, the November Agreement unambiguously transferred all of Kickflip's assets related to the Getgambit business to Gambit Labs. Accordingly, any antitrust claim—and any other claim—Kickflip then possessed was transferred to Gambit Labs on November 9, 2009.[4]

The effect of the November Agreement is clear: Kickflip transferred its Getgambit business to a different company to evade Facebook's demand that "Kickflip" cease all activities on its service. Four days after receiving Facebook's cease and desist letter, Kickflip's owners formed a new company, Gambit Labs, and then entered into a two-page agreement to transfer Getgambit's assets to that company, while leaving any liability arising from its deceptive practices with Kickflip.

Kickflip's and Gambit Labs' conduct unambiguously confirms that Gambit Labs owned all of the Getgambit business as of November 9, 2009, including any claims against Facebook. On November 12, 2009, Kickflip informed Facebook that it had divested the Getgambit business. Ex. 17 (Letter of Nov. 12, 2009 from Erik Benisek to Joseph Cutler). On November 29, 2009,

---

[4] The November Agreement required as a closing condition that Kickflip "take all requisite steps to put [Gambit Labs] in actual possession and operating control of such assets and business of" Kickflip, including by delivering assets, records, and contracts. Ex. 9 (November Agreement) §§ 1.4 & 1.5. The undisputed record demonstrates that Kickflip did in fact take such steps and that the agreement therefore closed. *See, e.g.*, Ex. 1 (Kickflip Dep.) at 41:14–42:3; 52:13–17; 55:6–8); Ex. 13 (Vol. 11 Dep.) at 32:22–33:8; Ex. 11 and Ex. 12 (bank transaction histories evidencing transfer of $2,513,782.50 into bank accounts belonging to Gambit Labs on November 9, 2009).

Gambit Labs wrote to Facebook giving notice of its "intent to bring immediate legal action." Ex. 18 (Letter of Nov. 29, 2009, from Richard Vasquez to Facebook and Joseph Cutler). The letter listed the causes of action that Gambit Labs' believed it could assert against Facebook, including antitrust claims under the Cartwright Act and common law claims for tortious interference with contract and intentional interference with prospective economic advantage. *Id.* The letter also described the conduct by Facebook on which Gambit Labs intended to rely in proving its legal claims, including conduct occurring prior to November 9, 2009, when Kickflip owned the Getgambit business. *Id.* Gambit Labs thus asserted claims based on alleged acts directed towards Kickflip. Those claims could only belong to Gambit Labs because they were included in the transfer from Kickflip of all Getgambit-related assets, including the claims that Kickflip now seeks to assert in this litigation.

### 2. The December Agreement Did Not Alter the Result Achieved By the November Agreement.

Kickflip and Gambit Labs entered into an agreement on December 15, 2009, that purported to "restate[ ], replace[ ], and supersede[ ]" the November Agreement. This agreement has no impact on the standing analysis for three independent reasons.

### a) The December Agreement Confirms the Assignment Of All Getgambit's Assets to Gambit Labs.

Just like the November Agreement, the December Agreement provided for the transfer to Gambit Labs of the entirety of the Getgambit business. Ex. 8 § 1.1.1. ("Kickflip shall transfer to [Gambit Labs] *all assets* associated with the Gambit offer service including the Gambit offerwall and payments service.") (emphasis added). For the same reasons as in November, this all-inclusive transfer of the entire Getgambit business included all legal claims related to that business. *See supra* Part IV.B.1.

10

That result is not altered by the inclusion in the December Agreement of preambular language referring to the "intention of the Kickflip shareholders that Kickflip remain as a viable entity to service certain ongoing business of those publishers that continue to use Kickflip on the Facebook platform, and maintain any legal claims against Facebook arising out of the Facebook ban." Ex. 8 (fourth preambular clause). Having been assigned to Gambit Labs under the November Agreement, any legal claims related to the Getgambit business needed to be *expressly* assigned back to Kickflip in December in order for Kickflip now to have standing to pursue them. *Gulfstream*, 995 F.2d at 431. The December Agreement, including its preamble, contains no such express assignment of legal claims to Kickflip. To the contrary, the operative terms of the December Agreement are clear in transferring "all assets" associated with the Gambit offer service—an all-inclusive transfer that, as in the November Agreement—necessarily included all legal claims related to that business.

This application of *Gulfstream* comports with well-established rules of contract construction. It is a "fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language." *Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001) (quoting Restatement (Second) of Contracts § 203(c) (1981)). Accordingly, "if recitals are inconsistent with clear and definite language in the granting part of the contract the latter will prevail." *Haft v. Dart Group Corp.*, 841 F. Supp. 549, 575 n.37 (D. Del. 1993); *see also Aramony*, 254 F.3d at 413 (preamble "cannot create any right beyond those arising from the operative terms of the document").

          **b)**      **The December Agreement Is Invalid Because It Lacks Consideration.**

A valid contract requires consideration, whether the contract is wholly new or modifies an earlier one. *See Frazier v. American Airlines, Inc.*, 434 F. Supp. 2d 279, 291 (D. Del. 2006)

(a valid contract "requires good or valuable consideration"); *Haft*, 841 F. Supp. at 567–68 ("No modification is possible without 'all the requisite[s] of a valid and enforceable agreement,' including the consent of both parties and consideration.") (quoting *Drake v. Hercules Powder Co.*, 55 A.2d 630, 636 (Del. Super. Ct. 1946)).  Past consideration "cannot form the basis for a binding contract."  *Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1233 (Del. Ch. 2000).  Nor will "mere pretense" suffice.  Restatement (Second) of Contracts § 71 cmt. b.

The December Agreement imposed new obligations on Gambit Labs—for example, to issue shares to Kickflip's shareholders—but gave Gambit Labs no genuine consideration in return.  Gambit Labs already owned Kickflip's former assets related to the Getgambit business as of the closing of the November Agreement.  The December Agreement therefore offers Gambit Labs only the "pretense" of consideration:  "Existing cash" in Kickflip's bank account and assignment of a convertible note from The Hit Forge.  These were already part of the business that had been transferred to Gambit in November.  Indeed, Gambit Labs had received substantially all of Kickflip's cash on November 9, 2009, in the form of two bank transfers for a total of $2.5 million.  *See supra* note 1.  Likewise, Kickflip had already taken steps nearly a month before the purported December Agreement to assign the convertible note to Gambit Labs.  Ex. 21 (letter from Erik Benisek to The Hit Forge contemplating transfer of the latter's rights in Kickflip to Gambit Labs).

Thus, the December Agreement modified the November Agreement entirely to Kickflip's benefit because it did not purport to convey anything to Gambit Labs that was not already conveyed in the November Agreement.  In the absence of "true consideration" there cannot be an effective contract modification or substitution.  *See Continental Ins.*, 750 A.2d 1219, 1232 (Del. Ch. 2000) (party alleging contract modification could not rely on preexisting duty as

consideration).

           **c)**      **The December Agreement Lacks Legal Effect Because It Never Closed.**

Even if the December Agreement was capable of transferring ownership of the legal

claims back from Gambit Labs, Kickflip offers no evidence capable of meeting its burden to

establish that the agreement closed.  A closing is a condition precedent that must be met in order

for the contract to have any legal effect.  *Commonwealth Constr. Co. v. Cornerstone Fellowship*

*Baptist Church, Inc.*, No. 04L-10-101 RRC, 2006 WL 2567916, at *21 (Del. Super. Ct. Aug. 31,

2006).  When an agreement that seeks to replace an existing contractual relationship fails to

close, the existing contract remains in force.  *See AQSR India Private, Ltd. v. Bureau Veritas*

*Holdings, Inc.*, CIV. A. 4021-VCS, 2009 WL 1707910, at *8 (Del. Ch. June 16, 2009) (holding

that a first agreement remained in force absent a second, superseding agreement closing).

The December Agreement had several conditions precedent to closing, including that

Kickflip "have executed and delivered to the Gambit [sic] all documents necessary to transfer the

assets" and that Gambit deliver to Kickflip and Kickflip's shareholders a variety of documents,

including "a certificate of good standing for Gambit issued by the Secretary of State of the

jurisdiction of its incorporation and dated not more than 20 business days prior to the Closing

Date."  Ex. 8 (December Agreement) §§ 4.1(d) & 4.3(c).

Neither Kickflip nor Volume 11 Media have produced any evidence of compliance with

the closing provisions.  There is no evidence of an executed bill of sale, and the Rule 30(b)(6)

representative for both Kickflip and Gambit Labs testified that he was unaware if one had ever

issued.  *See* Ex. 1 (Kickflip Dep.) at 130:13–16;  Ex. 13 (Vol. 11 Dep.) at 45:11–19.  Nor is there

any evidence that that the documents necessary to close were actually delivered.[5]

### C.    Kickflip Lacks Standing to Assert Claims Based on Conduct After It Transferred the Business to Gambit Labs.

Separate and apart from the ownership of any legal claims that might have existed on November 9, 2009, discovery has confirmed that Kickflip had no economic interest in the Getgambit business after November 9, 2009.  The record now indisputably shows that Kickflip transferred all interest in the Getgambit business to Gambit Labs, Inc. on November 9, 2009, and that Gambit Labs immediately thereafter began to operate the business.  *See supra* note 4.  Contrary to the impression that the Complaint seeks to convey,[6] therefore, it is now clear that any alleged injury resulting from conduct after November 9, 2009, was sustained by Gambit Labs and not by Kickflip.  Kickflip cannot establish Article III standing to redress putative injuries based on conduct occurring *after* its divestment of the relevant business.  *See Hollingsworth v. Perry*, 570 U.S. __, 133 S.Ct. 2652, 2662, 186 L.Ed. 768 (2013) ("To have standing, a litigant must seek relief for an injury that affects him in a personal and individual way.") (internal quotation marks and citation omitted).  For that reason, Kickflip lacks Article III standing to pursue any of the asserted claims.

### 1.    Kickflip Lacks Standing to Assert Its Tying Claim.

Kickflip asserts a stand-alone tying claim under 15 U.S.C. § 1 that is separate and apart from its monopolization claims under 15 U.S.C. § 2.  The tying claim is based on allegations that in July 2011 "[w]hen Facebook imposed its exclusive Credits policy on social-game developers,

---

[5] In its document requests to both Kickflip and Volume 11 Media, Facebook specifically asked for all documents relating to performance under the December Agreement, including but not limited to any bill of sale resulting from the transaction.  Exs. 22 and 23.  None were produced.

[6] Plaintiff refers to itself in the Complaint as "a Delaware  corporation, d/b/a Gambit" and studiously avoids mentioning that the Gambit/Getgambit business has in fact been owned and operated by a different entity since November 2009.

making them use '[Credits] as their sole and exclusive payment method for all virtual goods and

currencies made available to users,' it engaged in an illegal tying arrangement."  D.I. 1 ¶ 101.[7]

Yet Kickflip cannot establish that it sustained any concrete or actual injury resulting from

this discrete alleged tying arrangement imposed after Kickflip had left the business.  *See New*

*Jersey Physicians, Inc.*, 653 F.3d at 238 (Article III standing requires injury-in-fact that is both

"concrete and particularized" and "actual or imminent").  As a matter of law, no injury could

have resulted from the alleged tying arrangement until the July 2011 payments policy was

introduced.  *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 889

(10th Cir. 1997) ("An illegal tie is not consummated, and its anticompetitive effects are not

realized, until the tied purchaser is forced to forego his free choice among competitors, and

competitors are thereby denied free access to the market."); *see also Palmyra Park Hosp. Inc. v.*

*Phoebe Putney Memorial Hosp.*, 604 F.3d 1291, 1304 (11th Cir. 2010) (no injury suffered by

plaintiff until insurers gave effect to tying arrangement instigated by competitor hospital).  By

that time, Kickflip had been out of the business for more than eighteen months.

Nor can Kickflip salvage its claim by arguing that it was injured by virtue of being

precluded from re-entering the business as a potential competitor.  Not only is the Complaint

devoid of any allegation that *Kickflip* was foreclosed from re-entering the business,[8] but also

Kickflip offers no evidence capable of meeting its burden to establish the requisite intent and

---

[7] Facebook disputes the accuracy of this description of its policy, but it is the date of the policy (July 2011), not its contents, that are pertinent to this motion.

[8] The only references to foreclosure in the Complaint are limited to the Gambit business after 2011:  "[W]hen Facebook imposed its illegal tying arrangement on developers, *it precluded Gambit* from the share of the revenues in this market it would rightfully have earned."  D.I. 1 ¶ 118 (emphasis added).  Kickflip cannot sustain its burden of establishing standing based on a theory of harm that a former business (now owned by another corporate entity) was precluded from competing in the market two years following divestment.

preparedness to enter the market as a potential competitor.  In order to establish antitrust standing

under such a theory, a potential competitor must demonstrate "both its intention to enter the

market and its preparedness to do so."  *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799,

806 (D.C. Cir. 2001).  Specifically, a plaintiff must establish "adequate background and

experience in the new field, sufficient financial capability to enter it, and the taking of actual and

substantial affirmative steps toward entry, 'such as the consummation of relevant contracts and

procurement of necessary facilities and equipment.'"  *Shinogi Pharm., Inc. v. Mylan, Inc.*, 2011

WL 3860680 at *5 (D. Del. 2011) (quoting *Andrx Pharma.*, 256 F.3d at 799).

Kickflip provides no evidence of any such preparations.  On the contrary, discovery has

established that Kickflip's contracts were transferred to Gambit Labs in 2009 and thereafter

assumed by Volume 11 Media, whose business incorporates the former Getgambit business.  Ex.

1 (Kickflip Dep.) 53:21–54:14; Ex. 13 (Vol. 11 Dep.) 12:15–19.  Its cash balance was transferred

to Gambit Labs on November 9, 2009 with the exception of a residual amount needed to fund

certain outstanding liabilities.  *See* Kickflip Dep. 44:1–2; *see also* Ex. 11 and Ex. 12 (bank

transaction histories).  Indeed, by its own admission Kickflip has not provided any service to a

game developer within at least the last two years.  Ex. 1 (Kickflip Dep.) 20: 3-8.  Accordingly,

Kickflip lacks both Article III and antitrust standing to pursue the tying claim, and summary

judgment should be granted.

### 2.     Kickflip Lacks Standing to Assert Its Tortious Interference Claims.

In addition to its antitrust claims, Kickflip alleges two state law claims for tortious

interference, both of which require an "intentional act" that causes interference with either an

existing contractual relationship or a prospective business opportunity.  To satisfy this element,

Kickflip alleges in its Complaint that Facebook intentionally made disparaging statements about

the Gambit business and that these statements caused developers to terminate their contractual

relationship with Kickflip and also interfered with potential future relationships.  *See* D.I. 1 ¶¶ 125, 134, 135.  Kickflip relies on two alleged statements by Facebook: on November 19, 2009, in an article in an online publication, and on November 25, 2009, in a posting on Facebook's Developers blog.  *See id.* ¶¶ 123–25, 134; s*ee also id.* ¶ 135 ("Facebook's conduct in issuing *these statements* [to the press and on its Developers blog] amounted to intentional acts designed to induce disruption of these economic relationships") (emphasis added).

By the date on which the alleged statements were made, however, Kickflip had already transferred all of its interests and ownership of the Gambit business to Gambit Labs.  As such, any injury sustained as a result of the alleged statements would have been incurred by Gambit Labs, not Kickflip.  Accordingly, Kickflip is unable to show that it has suffered injury-in-fact in connection with these claims and therefore lacks Article III standing to assert them.

### 3.    Kickflip Lacks Standing to Assert Its Monopolization Claims.

Similarly, now that it is clear that Kickflip divested itself of the Getgambit business on November 9, 2009, it also is clear that Kickflip is unable to establish Article III standing for its monopolization claims because it has failed to allege that Facebook's actions prior to that date caused Kickflip any injury-in-fact.  Kickflip's allegations of injury are based on the impact on the Getgambit business from Facebook's alleged efforts to dissuade developers from using its services.  See D.I. 1 ¶¶ 87, 98 (alleging that Facebook's refusal "to *allow on Facebook any games running Gambit's virtual-currency services*") (emphasis added); *see id.* ¶ 69 (alleging that "Facebook tarnished Gambit's reputation and orchestrated a developer boycott of Gambit by refusing access to Facebook's social-game network to any developer using Gambit's virtual-currency services").  With the benefit of discovery, it is now clear that the statements by Facebook alleged in the Complaint—on November 19 and 25, 2009—occurred after Kickflip had transferred its entire interest in Getgambit to Gambit Labs.   Discovery has also made clear

that Kickflip fails to identify any relationship with any developer that was terminated or otherwise adversely affected prior to its sale of the business to Gambit Labs. Having failed to allege injury-in-fact arising from Facebook's alleged acts prior to its divestment of Getgambit, Kickflip accordingly lacks Article III standing to pursue its monopolization claims.

### 4.     Kickflip Lacks Standing to Seek Injunctive Relief.

Kickflip has the burden to establish Article III standing for each type of relief that it seeks, including injunctive relief. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought") (quotations omitted). Even if Kickflip could establish that it suffered an injury, equitable relief in the form of an injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Having transferred its entire business in 2009 and lacking any evidence of actual steps to re-enter, Kickflip cannot demonstrate the requisite likelihood that it will be wronged again.

The Third Circuit has held that a plaintiff lacks standing to seek injunctive relief where the evidence amounts only to the mere possibility of plaintiff's re-entry into the business. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012) (no standing for injunctive relief where plaintiff had ended its manufacturing business but "expressed no concrete desire to . . . reenter the market); *see also Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009) (holding "some-day intentions —without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of . . . actual or imminent

injury" sufficient to establish standing for injunctive relief.)  A Plaintiff is "required to set forth

sufficient facts to show that they were entitled to prospective relief, including that they were

'*likely* to suffer future injury.'"  *ZF Meritor, LLC*, 696 F.3d at 302 (quoting *McNair v. Synapse*

*Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)).

      Here, Kickflip has not even alleged its intention to re-enter (much less any evidence in

support).[9]  Nor can Kickflip overcome its standing deficiency by simply asserting that it is ready

and willing to re-enter the business.  In *ZF Meritor*, the court found insufficient the statement by

a corporate official pointing to "discussions at the company about the possibility of reentry" and

identifying evidence that plaintiff continued to monitor the industry, had a thorough

understanding of the product market, and was "actively considering what [its] alternatives might

be."  *Id.*  Kickflip offers even less evidence in this case—in fact, the evidence demonstrates that

Kickflip has conducted *no business* for at least two years—and summary judgment should be

granted as to Plaintiff's claims for injunctive relief.

## V.     CONCLUSION

      For the foregoing reasons, the Court should grant summary judgment in favor of

Facebook on all claims asserted by Kickflip.

---

[9] In Plaintiff's Opposition to the Motion to Dismiss (D.I. 15), it asserted:  "Kickflip intends to re-enter the virtual-currency business."  But Kickflip cited only to its Prayer for Relief, which does nothing more than ask for a permanent injunction.  (*Id.* at 10; D.I. 1 at 28).  The Complaint makes no factual allegations regarding Kickflip's intent, plan, or ability to re-enter.

Respectfully submitted,

SEITZ ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

Thomas O. Barnett
Jonathan Gimblett
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
(202) 662-6000
tbarnett@cov.com
jgimblett@cov.com

*Counsel for Defendant Facebook, Inc.*


Dated:  December 31, 2013

*/s/ David E. Ross*
David E. Ross (Bar No. 5228)
Benjamin J. Schladweiler (Bar No. 4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
dross@seitzross.com
bschladweiler@seitzross.com

*Counsel for Defendant Facebook, Inc.*

## CERTIFICATE OF SERVICE

I, David E. Ross, hereby certify that on December 31, 2013, a true copy of the foregoing

*Defendant's Memorandum in Support of Motion for Summary Judgment for Lack of*

*Standing* was served via electronic mail upon the following counsel of record:

Kenneth L. Dorsney
Mary B. Matterer
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
kdorsney@morrisjames.com
mmatterer@morrisjames.com

*Counsel for Plaintiff Kickflip, Inc.*

Derek A. Newman
Derek Linke
Newman DuWors LLP
1201 Third Avenue
Suite 1600
Seattle, WA  98101
dn@newmanlaw.com
linke@newmanlaw.com

Brian R. Strange
Keith L. Butler
STRANGE & CARPENTER
12100 Wilshire Boulevard
Suite 1900
Los Angeles, CA  90025
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com

*Counsel for Plaintiff Kickflip, Inc.*

/s/ David E. Ross
David E. Ross (Bar No. 5228)