## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KICKFLIP, INC., a Delaware corporation, | |
| *Plaintiff*, | **C.A. NO. 12-1369-LPS** |
| v. | |
| FACEBOOK, INC., a Delaware corporation, | |
| *Defendant.* | |

**PLAINTIFF KICKFLIP, INC.'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION FOR SUMMARY JUDGMENT FOR LACK OF STANDING (D.I. 51)**

Dated: January 14, 2014

Mary B. Matterer (I.D. #2696)
Kenneth L. Dorsney (I.D. #3726)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com
kdorsney@morrisjames.com

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
**NEWMAN DU WORS LLP**
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
(206) 274-2800
dn@newmanlaw.com
linke@newmanlaw.com

Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
**STRANGE & CARPENTER**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com

**ATTORNEYS FOR PLAINTIFF KICKFLIP, INC., D/B/A GAMBIT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS .................... 2

SUMMARY OF ARGUMENT ............................................................... 2

STATEMENT OF FACTS ................................................................... 3

ARGUMENT .................................................................................. 5

A.    The November Agreement did not transfer any claims to Gambit Labs. ............................ 6

B.    The December Agreement supersedes the November Agreement in its entirety and
      confirms that Kickflip owns all claims against Facebook. ................................................... 8

      1.    The December Agreement expressly provides that Kickflip owns "any legal
            claims against Facebook arising out of the Facebook ban" and confirms that
            only certain Kickflip assets would be assigned to Gambit Labs. ................................ 9

      2.    The December Agreement is supported by consideration—specifically, Gambit
            Labs gained a substantial tax benefit from the share-transfer structure. .................... 11

      3.    Kickflip and Gambit Labs complied with their closing obligations under the
            December Agreement, but whether they did or not has no effect on the status
            of Kickflip's claims against Facebook. ...................................................................... 12

C.    Kickflip has standing to sue Facebook because its monopolistic and tortious conduct
      before and after the 2009 divestment to Gambit Labs caused redressable injury. ............... 14

      1.    Kickflip's divestment has no impact on its monopolization claims because
            Facebook's conduct arose before the divestment began and continued to harm
            Kickflip during and after the divestment. .................................................................. 15

      2.    Kickflip's divestment has no impact on its tortious interference claims because
            Facebook's conduct arose before the divestment began and continued to harm
            Kickflip during and after the divestment. .................................................................. 15

      3.    Kickflip has standing for its tying claim because Facebook's exclusive-Credits
            policy in 2011 caused it injury, even though Facebook's earlier ban meant
            Kickflip was already excluded from the market. ......................................................... 16

      4.    Kickflip has standing for its monopolization and tying claims because it intends
            to and is prepared to re-enter the market for virtual-currency services upon the
            removal of Facebook's unlawful ban and exclusive-Credits policy. ............................ 19

CONCLUSION ............................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Abraham Zion Corp. v. Lebow*,
761 F.2d 93 (2d Cir. 1985) ................................................................................. 10

*AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.*,
871 A.2d 428 (Del. 2005) ................................................................................... 12

*AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*,
No. 4021-VCS, 2009 WL 1707910 (Del. Ch. June 16, 2009) ......................... 13

*Aramony v. United Way of America*,
254 F.3d 403 (2d Cir. 2001) ........................................................................... 9, 10

*Bonjorno v. Kaiser Aluminum & Chem. Corp.*,
559 F. Supp. 922 (E.D. Pa. 1983) ..................................................................... 19

*Clapper v. Amnesty Int'l USA*,
133 S. Ct. 1138 (2013) ....................................................................................... 14

*Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church*,
No. 04L-10-101 RRC, 2006 WL 2567916 (Del. Super. Ct. Aug. 31, 2006) ....... 13

*Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*,
642 F. Supp. 2d 381 (D.N.J. 2008) ..................................................................... 8

*Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*,
No. 05-6042(JBS), 2009 WL 313754 (D.N.J. Feb. 4, 2009) ......................... 12

*Empire Box Corp. v. Jefferson Island Salt Mining Co.*,
42 Del. 432 (1944) .............................................................................................. 9

*Equitable Trust Co. v. Gallagher*,
99 A.2d 490 (Del. 1953) ..................................................................................... 11

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
995 F.2d 425 (3d Cir. 1993) ..................................................................... 6, 7, 8, 9

*Haft v. Dart Grp. Corp.*,
841 F. Supp. 549 (D. Del. 1993) ....................................................................... 10

*Haverhill Gazette Co. v. Union Leader Corp.*,
333 F.2d 798 (1st Cir. 1964) ............................................................................. 17

*Hayes v. Solomon*,
597 F.2d 958 (5th Cir. 1979) ............................................................................. 19

*Khodara Envtl., Inc. v. Blakey*,
376 F.3d 187 (3d Cir. 2004) ........................................................................ 17, 18

*Lee Builders v. Wells*,
92 A.2d 710 (Del. Ch. 1952) ............................................................................... 8

*Lerman v. Joyce International*,
10 F.3d 106 (3d Cir. 1993) ............................................................................. 7, 8

*Martino v. McDonald's Sys., Inc.*,
432 F. Supp. 499 (N.D. Ill. 1977) ....................................................................... 7

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................ 6

*N.J. Physicians, Inc. v. President of the U.S.*,
  653 F.3d 234 (3d Cir. 2011) ...................................................................... 19

*Nesbitt Fruit Prods., Inc. v. Del Monte Beverage Co.*,
  177 Cal. App. 2d 353 (1st Dist. 1960) ...................................................... 11

*Pepsi-Cola Bottling Co. v. Pepsico, Inc.*,
  297 A.2d 28 (Del. 1972) ............................................................................ 12

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968) ................................................................................... 17

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ..................................................................................... 6

*Residential Reroofers Local 30-B v. A & B Metal & Roofing, Inc.*,
  976 F. Supp. 341 (E.D. Pa. 1997) ............................................................. 12

*Stabler v. Ramsay*,
  62 A.2d 464 (Del. 1948) ............................................................................ 10

*Standard Rolling Bearing Co. v. Hess-Bright Mfg. Co.*,
  275 F. 916 (3d Cir. 1921) .......................................................................... 12

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994) ....................................................................... 7

*United States v. Baird*,
  218 F.3d 221 (3d Cir. 2000) ...................................................................... 12

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ................................................................................... 17

**Rules**

Fed. R. Civ. P. 56 ........................................................................................ 6

**Statutes**

Cal. Civ. Code § 1614 ................................................................................ 12

Cal. Civ. Code § 1615 ................................................................................ 12

**INTRODUCTION**

In November 2009, Facebook announced that it would prohibit game developers from accessing Facebook's platform if they used Kickflip's virtual-currency services. Later, Facebook forced a policy that prohibited game developers from using any virtual-currency services that Facebook did not itself provide. This destroyed an entire market of virtual-currency services providers and left Facebook to receive billions of dollars that would have otherwise gone to the competition, including Kickflip.

To recover its lost business, Kickflip filed this lawsuit. Although the Court denied Facebook's motion to dismiss, it allowed Facebook limited discovery about whether Kickflip has standing to bring its claims relating to its divestment of assets to Gambit Labs. Armed with three months' unilateral discovery, Facebook now argues that Kickflip transferred its antitrust claims to Gambit Labs in 2009 and therefore lacks standing to bring them now. Facebook also contends that Facebook's unlawful conduct harmed Gambit Labs, and not Kickflip—and that even if the Court enjoins Facebook's anticompetitive practices, Kickflip is not prepared to re-enter the market.

But, an assignment of federal antitrust claims must be "express" and Kickflip never assigned any claims to Gambit Labs. Since Facebook's unlawful conduct began before Kickflip transferred any assets to Gambit Labs, Kickflip suffered injury and has standing to pursue this lawsuit. And, as the Court already ruled, Kickflip has standing to pursue the harm caused by the entire spectrum of Facebook's monopolistic behavior—beginning with the ban on Kickflip and extending to the adoption of its exclusive policy across the entire industry. Kickflip cannot obtain full redress unless the Court provides redress for both causes to Kickflip's injuries.

Finally, Kickflip remains ready, willing, and able to re-enter the virtual-currency services

market. Kickflip's shareholders still control the assets that it transferred to Gambit Labs, and they can return all assets necessary for Kickflip to re-enter the market as soon as Facebook's anticompetitive policies are enjoined. Accordingly, Kickflip has standing to bring its claims and the Court should deny Facebook's motion.

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

On October 26, 2012, Kickflip filed this action against Facebook alleging monopolization, attempted monopolization, unlawful tying, and tortious interference. (Complaint (D.I. 1).) On January 4, 2013, Facebook moved to dismiss Kickflip's Complaint under Rule 12(b)(6). (D.I. 11.)

On September 27, 2013, the Court denied Facebook's motion. (D.I. 22 at 9.) But the Court granted Facebook's request for discovery on the limited issue of standing based upon Kickflip divesting certain assets to Gambit Labs. (*Id.* at 10 n.4.) In October 2013, Facebook served Kickflip and Gambit Labs with document requests. In November 2013, Facebook deposed representatives from Kickflip and Gambit Labs' successor, Volume11 Media, Inc.

On December 31, 2013, Facebook filed its summary judgment motion. (D.I. 52.)

## SUMMARY OF ARGUMENT

1. **No Express Assignment of Claims.** Antitrust claims cannot be transferred via general assignments. Instead, any antitrust-claim assignment must be "express"—it must either make a specific reference to antitrust claims or it must unambiguously assign all legal claims. Kickflip never made any assignment of legal claims to any other entity. Thus, Kickflip retained all of its antitrust claims against Facebook and has standing to bring this lawsuit.

2. **The December Agreement Is Operative.** A new contract relating to the subject matter of a former agreement destroys the obligations of the former agreement if the parties intend that the new contract supersede the old contract entirely. Kickflip and Gambit Labs expressly

provided that the December Agreement supersedes the November Agreement. Thus, even if Kickflip transferred any claims under the November Agreement that transfer is void.

**3.   The December Agreement's "Whereas Clause" Confirms Kickflip Retained Claims.** A statement in a "whereas clause" may help interpret an ambiguous operative clause in a contract. The "whereas clause" in the December Agreement provides that any legal claims against Facebook arising out of the Facebook ban remain with Kickflip. Thus, the Court can rely on this clause to confirm the parties never intended to transfer Kickflip's legal claims against Facebook.

**4.   The December Agreement Provided Gambit Labs Valuable Consideration in the Form of Better Tax Treatment.** Under the December Agreement, Gambit Labs received substantially better tax treatment than it would have under the November Agreement while Kickflip shareholders received shares in Gambit Labs. Also, under the December Agreement, both Kickflip and Gambit Labs were allowed to suspend executory obligations under the November Agreement. Thus, the December Agreement is supported by consideration and is valid.

**5.   An Earlier Cause Does Not Eliminate Standing to Sue for a Later Cause of the Same Injury.** A plaintiff has standing where two causes each resulted in the same injury, even if one happened first. Kickflip suffered injury from both the initial 2009 ban and the 2011 policy. That Kickflip transferred assets to Gambit Labs after the first injury did not negate the second injury or deprive Kickflip of standing because Kickflip would be in business if not for both events.

## STATEMENT OF FACTS

In 2008, Kickflip provided virtual-currency services to software developers who published games on Facebook and on other online social networks. (Smoak Decl. ¶ 4.) In early 2009,

Facebook launched its own virtual-currency services for developers called "Credits." (*Id.* ¶ 6.)

In November 2009, Facebook publicly announced that game developers were prohibited from doing business with Kickflip for virtual currency on Facebook, and published a list of several banned virtual-currency companies including Kickflip. (*Id.* ¶¶ 11, 26–27, Ex. 3.) The result of this ban was that Facebook successfully removed one of the largest competitors to Credits. (*Id.* ¶ 28.)

On November 9, 2009, to mitigate the harm caused by Facebook's ban, Kickflip's shareholders formed a new entity called Gambit Labs, Inc. (*Id.* ¶¶ 13–18.) The same day, under emergency circumstances, Gambit Labs and Kickflip entered an Asset Assignment Agreement (the "November Agreement"). (*Id.* ¶ 19, Ex. 1.) It provided that Kickflip would transfer the Getgambit business to Gambit Labs so it could operate without the stigma of the ban. (*Id.* ¶ 20.) In exchange, Gambit Labs promised to pay one dollar to Kickflip, which it never paid. (*Id.*)

On December 15, 2009, since the November Agreement had been entered into hastily, Kickflip and Gambit Labs entered a Contribution of Assets in Exchange for Shares Agreement (the "December Agreement"). (*Id.* ¶ 30, Ex. 2.) The December Agreement was intended to completely replace the November Agreement, and provided that it "restates, replaces and supersedes any and all prior asset transfers between Kickflip and Gambit Labs including" the November Agreement. (December Agreement § 1.1.3.) The most important difference between the November Agreement and December Agreement was a substantially more favorable tax treatment for Gambit Labs under the December Agreement. (Smoak Decl. ¶ 34.) This was accomplished by replacing the one-dollar purchase price with a tax-free stock swap. (*Id.*) Gambit Labs' tax liability was reduced by hundreds of thousands of dollars. (*Id.* ¶ 35.)

The December Agreement expressly states in two separate clauses that all assets not

transferred to Gambit Labs would remain with Kickflip. (December Agreement §§ 1.1.1, 1.1.2.) Kickflip never transferred any legal claims to Gambit Labs under either agreement or otherwise, and Kickflip has always owned the claims it asserts in this lawsuit. (Smoak Decl. ¶¶ 21, 39.) The December Agreement has recitals that confirm the intent that "Kickflip . . . maintain[s] any legal claims against Facebook arising out of the Facebook ban." (December Agreement at 1.) The December Agreement provided that the parties could waive "any provision" and the parties voluntarily and intentionally waived any conditions that did not occur. (*Id.* § 6.10; Smoak Decl. ¶¶ 42, 45.)

Then in July 2011, Facebook forced all game developers doing business with Facebook to use only Credits, and prohibited them from using third-party services like Kickflip and its competitors. (*Id.* ¶ 46.) Upon the lifting of the ban against Kickflip and the policy banning all third-party virtual-currency services, Kickflip intends to immediately resume services to developers on Facebook and is prepared to do so. (*Id.* ¶¶ 49–59.) Kickflip has maintained the necessary business contacts, has the requisite experience in the virtual-currency marketplace, and has sufficient background and experience in the virtual-currency services market. (*Id.* ¶¶ 50–59.)

Kickflip's previous status as a leading virtual-currency provider with contracts and industry-leading experience confirms its preparedness to re-enter the business. (*Id.* ¶¶ 52, 55–59.) The controlling, majority shareholders of Gambit Labs' successor, Volume11, are the controlling, majority Kickflip shareholders and have been since the ban. (*Id.* ¶ 51.) So Kickflip has been able to, and remains able to, transfer the Gambit Labs assets back to Kickflip. (*Id.*)

## ARGUMENT

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). An assertion that a fact is, or cannot be, genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). On summary judgment, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## A.  The November Agreement did not transfer any claims to Gambit Labs.

"General assignments, without specific reference to antitrust claims [do not] transfer the right to pursue those claims." *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993). An assignment of antitrust claims must be "express." *Id.* Kickflip never made an express assignment and therefore could not have transferred its antitrust claims.

Facebook claims that Kickflip "sold any legal claim it may have had against Facebook when it transferred Getgambit to Gambit Labs on November 9, 2009." (D.I. 52 at 8.) It did so, according to Facebook, by transferring all of Kickflip's "properties and assets . . . whether tangible and intangible, real, personal or mixed, and wherever located" via the November Agreement. (*Id.*) Facebook summarily concludes, without legal or logical support, that this language constitutes an express assignment of all causes of action from Kickflip to Gambit Labs.

But in *Gulfstream*, the Third Circuit rejected a similar argument where the plaintiff

"assigned, transferred and set over . . . all of its rights, title and interest in and to the [G-III] and the Purchase Agreement." 995 F.2d at 431. Just as Facebook does here, the defendant in *Gulfstream* argued that this all-encompassing release necessarily included plaintiff's antitrust claims. The district court noted that "no language in plaintiff's assignment . . . so much as alluded to rights under the antitrust laws." *Id.* (internal quotations omitted). The *Gulfstream* court affirmed because "many routine transfers of ownership may involve a general assignment of rights [and] such transfers cannot carry with them the right to assert antitrust claims." *Id.*

Here, the November Agreement's language transferring Kickflip's "properties and assets . . . whether tangible and intangible, real personal or mixed and wherever located" is nearly identical to the language rejected in *Gulfstream*. And a slew of cases since *Gulfstream* have reaffirmed the basic tenet that a general assignment of assets is not an adequate substitute for an express assignment of an antitrust claim. *See Sullivan v. NFL*, 34 F.3d 1091, 1106 (1st Cir. 1994) (finding that sales contract transferring "all other assets" besides those specifically listed or excluded did not validly assign antitrust claims); *id.* ("Absent some express language to the effect that Sullivan was selling his football related 'antitrust claims' or, at the very least, 'causes of action,' we cannot find that Sullivan assigned the present antitrust claim . . . ."); *see also Martino v. McDonald's Sys., Inc.*, 432 F. Supp. 499, 504 (N.D. Ill. 1977) (finding "no factual or legal support" for the contention that language nearly identical to that at issue here—transferring "all rights, title and interest of all assets, tangible and intangible"—assigned an antitrust claim).

For its position, Facebook relies entirely on *Lerman v. Joyce International*, 10 F.3d 106 (3d Cir. 1993). In *Lerman*, the plaintiff expressly assigned all of its legal claims using clear, unmistakable language—the assignment referred "to 'all of' [the plaintiff's] 'causes of action' and 'claims . . .

of whatsoever nature.'" *Id.* at 112. In distinguishing *Gulfstream*, the *Lerman* court specifically relied on this language, noting that the *Gulfstream* assignment "made no reference to legal causes of action or claims. Rather, it referred only to Gulfstream III's 'rights, title and interest.'" *Id.*

A recent district court decision explained that under the *Gulfstream–Lerman* standard for valid assignments of antitrust claims, a party must establish that either: "(1) [*Gulfstream*] the assigning documents make express reference to the assignment of antitrust claims; or (2) [*Lerman*] the assignment of litigation claims is unambiguous and all-inclusive." *Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, 642 F. Supp. 2d 381, 385 (D.N.J. 2008). Neither of those apply here, and there is no authority providing that a general "asset transfer" without reference to claims or causes of action satisfies *Gulfstream* or *Lerman*.

The assignment in this case matches the inadequate assignment in *Gulfstream*—it transfers "all of the properties and assets" to Gambit Labs. (D.I. 52 at 8.) And unlike *Lerman*, the November Agreement contains no reference to any legal claim or cause of action. (*See* Smoak Decl. ¶ 22.) As a matter of law, such language is insufficient to assign an antitrust cause of action. Kickflip retained its antitrust claims and has standing to bring this lawsuit.

## B. The December Agreement supersedes the November Agreement in its entirety and confirms that Kickflip owns all claims against Facebook.

The December Agreement between Kickflip and Gambit Labs clarified their desired transaction and implementation details about transferring the Getgambit business. Under Delaware law, "a new contract relating to the subject matter of a former agreement" destroys "the obligations of the former agreement" if the "parties intend that the new contract supersede the old contract entirely." *Lee Builders v. Wells*, 92 A.2d 710, 715 (Ch. 1952), *rev'd on other grounds*, 99 A.2d 620 (Del. 1953). "If that is their intent, the old agreement is wholly abrogated

and superseded by the new contract . . . ." *Empire Box Corp. v. Jefferson Island Salt Mining Co.*, 42

Del. 432, 440 (1944). Facebook claims the December Agreement has no impact on the standing

analysis. Ironically, Facebook is correct about that because Kickflip never lost standing under the

November Agreement. But even the December Agreement standing alone confirms Kickflip's

standing. Facebook's arguments lack merit and are not supported by its cited authority.

1. **The December Agreement expressly provides that Kickflip owns "any legal claims against Facebook arising out of the Facebook ban" and confirms that only certain Kickflip assets would be assigned to Gambit Labs.**

Facebook first argues that the December Agreement transferred Kickflip's claims to Gambit

Labs because it includes a list of assets to be transferred to Gambit Labs "associated with the

Getgambit offer service." (December Agreement § 1.1.1.) But that list does not include claims

against Facebook or any other reference to claims or causes of action. (*See id.*) All other assets

remained Kickflip's property. (*Id.* §§ 1.1.1–1.1.2.) And under *Gulfstream*, the assignment of assets

associated with the "Getgambit offer service" is just a "routine transfer of ownership"

insufficient to convey the "right to assert antitrust claims."

Facebook asks the Court to ignore the December Agreement's statement that "any claims

against Facebook arising out of the Facebook ban would remain with Kickflip" because the clause

was in a recital. Facebook cites *Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir.

2001), for the "fundamental rule of contract construction that specific terms and exact terms are

given greater weight than general language." (D.I. 52 at 11 (punctuation omitted).) But that

canon weighs in Kickflip's favor since the language assigning "assets associated with the Gambit

offer service" (December Agreement § 1.1.1) is more general than the language confirming that

"any legal claims against Facebook arising out of the Facebook ban" (*id.* at 1) will not be

transferred.

*Aramony* explains that specific language "will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate." *Aramony*, 254 F.3d at 414 (quoting 11 Richard A. Lord, Williston on Contracts § 32:10, at 449 (4th ed. 1999)). Thus, the specific language in the December Agreement providing that Kickflip would retain legal claims "will limit" the meaning of the more general language assigning assets to Gambit Labs.

Facebook also cites *Aramony* for the proposition that a "preamble 'cannot create any right beyond those arising from the operative terms of the document.'" (D.I. 52 at 11.) But the case provides that language in recitals may be considered in interpreting other contract language: "We have held that "although *a statement in a whereas clause may be useful in interpreting an ambiguous operative clause in a contract*, it cannot create any right beyond those arising from the operative terms of the document." *Aramony*, 254 F.3d at 413 (quoting *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985)) (punctuation in original, emphasis added). Here, the Court may use the recitals to interpret whether antitrust claims were assigned. The recitals confirm "any claims against Facebook arising out of the Facebook ban would remain with Kickflip." (December Agreement at 1.)

Facebook also cites dicta in a footnote in *Haft v. Dart Group Corp.*, 841 F. Supp. 549 (D. Del. 1993), which relies on the Delaware Supreme Court decision in *Stabler v. Ramsay*, 62 A.2d 464, 470 (Del. 1948). The *Stabler* court held that where a contract's "granting clause did not identify the property rights assigned," the "recitals must be referred to in order to determine" the scope of the assignment. *Id.* Here, the December Agreement generally refers to "assets associated with the Gambit offer service." (December Agreement § 1.1.1.) So under *Stabler* (and *Haft*, by

extension), the Court can look to the recitals to interpret that general language. The recitals

confirm that the general language did not include an assignment of legal claims, and that Kickflip

retained all causes of action against Facebook.

2. **The December Agreement is supported by consideration—specifically, Gambit Labs gained a substantial tax benefit from the share-transfer structure.**

Facebook contends that the December Agreement is void for lack of consideration. But

"[c]onsideration is to be detected if it is present anywhere in the transaction in question,

regardless of whether any label was put on it, and regardless of whether it was spelled out in the

paper-writing." *Equitable Trust Co. v. Gallagher*, 99 A.2d 490, 492–93 (Del. 1953). Consideration

may even "come into view when the attending facts and circumstances are examined." *Id.* at 493.

Under the December Agreement, Gambit Labs received a substantial new benefit in exchange

for its promises. (Smoak Decl. ¶ 34.) If the November Agreement was not superseded, Gambit

Labs would have been required to pay substantial taxes because the Kickflip assets would be

viewed as income. (*Id.*) But under the December Agreement, Gambit Labs enjoyed a tax-free

stock swap saving Gambit Labs hundreds of thousands of dollars. (*Id.* ¶ 35.)

Additionally, the December Agreement calls for the application of California law, which

provides that "mutual cancellation of executory rights is sufficient consideration for a new

contract." *Nesbitt Fruit Prods., Inc. v. Del Monte Beverage Co.*, 177 Cal. App. 2d 353, 361 (1st Dist.

1960). Under the November Agreement, both Kickflip and Gambit Labs had remaining executory

obligations—for example, Kickflip had not finished transferring the contemplated assets, and

Gambit Labs never paid the one dollar as promised. The December Agreement mutually

canceled all of those remaining obligations and is therefore "sufficient consideration."

And because the December Agreement is a written instrument, that is also presumptive

evidence it is supported by consideration. Cal. Civ. Code § 1614. The burden of showing a lack of

consideration for a written agreement lies with the party seeking to invalidate it. Cal. Civ. Code

§ 1615. Facebook has failed to meet its burden on summary judgment to show that the December

Agreement is not supported by consideration.

### 3. Kickflip and Gambit Labs complied with their closing obligations under the December Agreement, but whether they did or not has no effect on the status of Kickflip's claims against Facebook.

Finally, Facebook claims that Kickflip could not have retained antitrust claims under the

December Agreement because Gambit Labs and Kickflip did not complete closing conditions.

But a defendant does not have standing to challenge the validity of a contract assigning federal

antitrust claims to the plaintiff. *See, e.g.*, *Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, No. 05-

6042 (JBS), 2009 WL 313754, at *1 n.1 (D.N.J. Feb. 4, 2009) ("The Court agrees with Plaintiff

that any lack of authority to bind would make the contract voidable, not void, and Defendants do

not have standing to challenge the contract's validity on that ground." (citing *United States v.*

*Baird*, 218 F.3d 221, 230 (3d Cir. 2000); *Standard Rolling Bearing Co. v. Hess-Bright Mfg. Co.*, 275

F. 916, 920 (3d Cir. 1921); *Residential Reroofers Local 30-B v. A & B Metal & Roofing, Inc.*, 976 F.

Supp. 341, 346 (E.D. Pa. 1997))).

In any event, Kickflip and Gambit Labs were permitted to waive their respective closing

obligations, and they did so with respect to any that were not completed. Waiver is the

"voluntary and intentional relinquishment of a known right." *AeroGlobal Capital Mgmt., LLC v.*

*Cirrus Indus.*, 871 A.2d 428, 444 (Del. 2005) (quotation omitted). Kickflip and Gambit Labs

voluntarily and intentionally waived any remaining closing obligations imposed under the

December Agreement. (Smoak Decl. ¶ 45.) Any provision in a written agreement may be waived

or modified by the parties' conduct. *See Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28, 33

(Del. 1972) (holding that even a written contract "prohibition against amendment except by written change" may be modified without a writing by the parties' course of conduct). Kickflip and Gambit Labs have always acted as if the contract closed, and their conduct confirms that any conditions were either satisfied or waived.

Facebook cites the unpublished decision at *Commonwealth Construction Co. v. Cornerstone Fellowship Baptist Church*, No. 04L-10-101 RRC, 2006 WL 2567916 (Del. Super. Ct. Aug. 31, 2006), for the proposition that "a closing is a condition precedent that must be met in order for the contract to have any legal effect." (D.I. 52 at 13.) But that was not the holding. In *Commonwealth Construction*, a construction company sued a church for alleged nonpayment under a construction agreement. The church counterclaimed for breach of contract, alleging that the construction company failed to comply with the agreement's pre-litigation dispute resolution procedure. The court held that compliance with the parties' agreed dispute-resolution procedure was a condition precedent to bringing a claim in litigation—not that failure to perform a condition precedent renders an entire contract without "any legal effect" as Facebook claims.

Facebook also cites *AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*, No. 4021-VCS, 2009 WL 1707910 (Del. Ch. June 16, 2009), for the proposition that "[w]hen an agreement that seeks to replace an existing contractual relationship fails to close, the existing contract remains in force." (D.I. 52 at 13.) In *AQSR India Private*, the parties' disputed agreement "expressly state[d] when the parties' obligations under under [*sic*] the [parties' existing agreement] would extinguish: when the [disputed agreement] closed." *AQSR India Private, Ltd.*, 2009 WL 1707910, at *8. In contrast, Kickflip and Gambit Labs' agreement that the November Agreement would be superseded was not conditioned on closing. (*See* December Agreement § 1.1.3.)

**C. Kickflip has standing to sue Facebook because its monopolistic and tortious conduct before and after the 2009 divestment to Gambit Labs caused redressable injury.**

Finally, Facebook attempts to re-litigate the argument that Kickflip was deprived of standing because it was not in business when Facebook completed its monopoly in 2011. But as the Court held when ruling on Facebook's earlier motion to dismiss, Facebook first caused Kickflip's injury when it began its monopolistic scheme in 2009. (*See* D.I. 22 at 7 ("The Court is persuaded that Kickflip has satisfied its burden of alleging an event causing injury to Kickflip, beginning with its 2009 ban from Facebook and culminating in the 2011 payments policy.").)

Facebook cites *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013), for the proposition that at summary judgment, a party may not rest on mere allegations but must set forth specific facts. (D.I. 52 at 8.) In that case, the Supreme Court held the plaintiffs lacked standing because they "merely speculate[d]" and "assumed" that the challenged governmental practices would affect them. *Clapper*, 133 S. Ct. at 1148. The Court held that at summary judgment, standing required them to "set forth . . . specific facts demonstrating that the communications of their foreign contacts will be targeted," which they could not do. *Id.* at 1149. Nor could they show that any alleged "injury" would be traceable to the challenged governmental activity. *Id.* Accordingly, the *Clapper* plaintiffs lacked standing.

In contrast, Kickflip has set forth specific facts showing that Facebook's unlawful conduct caused its injuries, without reliance on any speculation or assumptions. And discovery[1] has shown that Facebook made public statements before the divestment. (*See* Newman Decl., Ex. 1,

---

[1] Only Facebook has been permitted to take discovery. Yet even with Facebook's one-sided discovery advantage, this evidence contradicting Facebook's version of the facts already emerged. Kickflip anticipates that general discovery will uncover substantially more evidence of Facebook's tortious and monopolistic conduct. But this material alone is sufficient to create a genuine issue of material fact, so Facebook is not entitled to summary judgment.

at 103:8–14 (discussing a November 8, 2009 statement by Facebook on its website and to the press indicating that Kickflip had been banned from Facebook).)

1. **Kickflip's divestment has no impact on its monopolization claims because Facebook's conduct arose before the divestment began and continued to harm Kickflip during and after the divestment.**

Kickflip's antitrust injuries arise from Facebook's attempted and actual monopolization of the virtual-currency services market. (D.I. 1 at 13–19.) As the Court held, Kickflip's allegations of "Facebook's pretextual conduct [are] sufficient to permit Kickflip's" claims to proceed. (D.I. 22 at 9.) Facebook claims that "Kickflip's [monopolization] allegations of injury are based on the impact on the Getgambit business from Facebook's alleged efforts to dissuade developers from using its services." (D.I. 52 at 17.) But the Court held that Kickflip's claims rest on "a timeline for Facebook's systematic elimination of competition in order to secure a monopoly" (D.I. 22 at 8), beginning before Facebook's pre-divestment ban of Kickflip in 2009 and continuing through and after its exclusive-Credits policy in 2011, which were both critical steps in the monopolization scheme that caused Kickflip's antitrust injury.

Had Facebook not banned Kickflip in 2009, Kickflip would never have formed Gambit Labs or transferred any assets to Gambit Labs. (Smoak Decl. ¶¶ 16, 18–20, 32, 48.) And had it not banned the whole industry in 2011, Kickflip would still be a thriving business. (*Id.* ¶ 48.)

2. **Kickflip's divestment has no impact on its tortious interference claims because Facebook's conduct arose before the divestment began and continued to harm Kickflip during and after the divestment.**

Facebook also claims that Kickflip lacks standing to sue for Facebook's tortious interference because the Complaint cites statements that Facebook made after Kickflip transferred assets to Gambit Labs. (D.I. 52 at 16–17.) Facebook's tortious interference with Kickflip's business began on November 5, 2009—before Kickflip's divestment—when Facebook sent a cease-and-desist

letter, and was the start of an ongoing public campaign to tarnish Kickflip's name within the virtual-currency services market. (D.I. 1.) That Facebook continued to tarnish Kickflip's name after it divested certain assets to Gambit Labs does not affect Kickflip's standing to sue. Moreover, discovery has shown that Facebook made public statements *before* Kickflip divested certain assets to Gambit Labs on November 9, 2009. (*See* Newman Decl., Ex. 1, at 103:8–14 (discussing a November 8, 2009 statement by Facebook on its website and to the press indicating that Kickflip had been banned from Facebook); Smoak Decl., Ex. 3 (November 8, 2009 article stating "Facebook has also shut down . . . ad networks in recent months . . . including Gambit.").)

Facebook's 2009 ban was only a part of a protracted effort to interfere with Kickflip's business relations with developers. (D.I. 22 at 7 (standing satisfied by "an event causing injury to Kickflip, beginning with its 2009 ban from Facebook and culminating in the 2011 payments policy").) After Facebook banned Kickflip, it published on its website a list of banned companies that included Kickflip and made public statements to the same effect. (*See* Smoak Decl. ¶ 11, Ex. 2.) The ban and public notification occurred before Kickflip divested assets to Gambit Labs on November 9, 2009. (*See id.*, Ex. 3.) That Facebook's tortious conduct continued throughout November 2009, as Facebook itself concedes, does not alter the decisive fact that Facebook began this conduct prior to the ban and caused Kickflip to divest certain assets to Gambit Labs— the very act that Facebook now claims shields it from liability.

**3. Kickflip has standing for its tying claim because Facebook's exclusive-Credits policy in 2011 caused it injury, even though Facebook's earlier ban meant Kickflip was already excluded from the market.**

Facebook's alleged tying arrangement was part of the ongoing monopolization scheme that initially forced Kickflip to divest many of its assets to Gambit Labs. (*See* D.I. 22 at 8 ("The

timeline includes: Gambit . . . banned from Facebook in 2009; Facebook published a list of other

banned developers in 2009; as a result of Facebook's conduct, Gambit Labs soon lost most of its

clients, including Zynga, Playdom, and 6waves; around the same time, Facebook was planning a

major roll-out of Credits; Facebook threatened to shut down games from Zynga, and other

similar developers, for failing to adopt Credits; and, two years after banning Gambit, Facebook

Credits was the only remaining virtual-currency services provider.").)

Facebook argues, like it did in its motion to dismiss, that Kickflip lacks standing to assert its

tying claim because Facebook imposed its exclusive-Credits policy in 2011 after Kickflip divested

many of its assets to Gambit Labs. But a plaintiff suffers antitrust injury, and hence has standing,

where the anticompetitive conduct is a material cause of the injury—even if the injury has

multiple causes. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969);

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 142 (1968) (White, J., concurring)

("Normally, it would be enough with respect to causation if the defendant materially contributed

to the plaintiff's injury, or substantially contributed, notwithstanding other factors contributed

also." (internal quotations omitted)). It is not necessary to give rise to antitrust injury that the

antitrust violation is the most significant causal factor resulting in the injury. *See, e.g.*, *Haverhill

Gazette Co. v. Union Leader Corp.*, 333 F.2d 798, 806 (1st Cir. 1964). Rather, a plaintiff has

standing where two causes each resulted in the same injury, even if one happened first. *Khodara

Envtl., Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004).

In *Khodara*, the plaintiff was prevented from developing land by the revocation of state

permits. *Id.* The FAA later adopted regulations that prevented the same development. *Id.* The

*Khodara* plaintiff challenged both the initial permit revocation and the FAA regulation. *Id.* The

FAA moved to dismiss the challenge to its regulation on standing grounds, claiming that due to the earlier permit revocation, (a) the federal regulation was not a direct cause of plaintiff's injury, and (b) overturning the regulation would not redress plaintiff's injury. *Id.* at 192–93. The Third Circuit disagreed and rejected the FAA's but-for-causation analysis:

> Article III standing demands "a causal relationship," but neither the Supreme Court nor our Court has ever held that but-for causation is always needed. Moreover, it is well recognized that **but-for causation is problematic in precisely the situation present here, i.e., where an effect is causally over-determined, i.e., where there are multiple sufficient causes**. . . . "[I]f two causes concur to bring about an event and either one of them, operating alone would have been sufficient to cause the identical result, some other test [*i.e.*, other than but-for causation] is needed."

*Id.* at 195 (emphasis added). The tortious 2009 ban did not *negate* the effect of the Facebook exclusivity policy in 2011—it *over-determined* that effect.

Under *Khodara*, the existence of a prior overdetermining cause of Kickflip's injury does not deprive Kickflip of standing to sue for damages caused by the later over-determining cause of Kickflip's injury. *Khodara* provides two independent bases for Kickflip's standing. First, Kickflip's injury was caused both by Facebook's monopolistic conduct in 2009—before the divestment—and by Facebook's later tying arrangement in 2011. Under *Khodara*, Kickflip has standing for its tying claim by virtue of both causes of its injury. But for Facebook's monopolistic conduct in 2009, Kickflip would have been in the virtual-currency services market in 2011 when Facebook implemented the illegal tie.

Second, Kickflip's injury was also caused both by Facebook's tortious interference in 2009—before the divestment—and by Facebook's later tying arrangement in 2011. Again, under *Khodara*, Kickflip has standing for its tying claim by virtue of both causes because, but for Facebook's tortious interference in 2009, Kickflip would have been in the virtual-currency

services market in 2011 when Facebook implemented the illegal tie. (*See* Smoak Decl. ¶ 48.)

Lifting the 2009 ban on Kickflip's virtual-currency services would not redress Kickflip's injury

by restoring it to the virtual-currency services market. *Cf. N.J. Physicians, Inc. v. President of the*

*U.S.*, 653 F.3d 234, 238 (3d Cir. 2011) (stating that standing requires that it be "likely . . . that the

injury will be redressed by a favorable decision"). Full redress requires remedying the 2011

antitrust violation as well. So Kickflip has standing.

**4.  Kickflip has standing for its monopolization and tying claims because it intends to and is prepared to re-enter the market for virtual-currency services upon the removal of Facebook's unlawful ban and exclusive-Credits policy.**

It is not "necessary" to have an "actual going business to establish private antitrust injury."

*Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979). All that is needed is an "intention to enter

the business and a showing of preparedness to enter the business." *Id.* There is no dispute that

Kickflip intends to re-enter the virtual-currency business. (*See* D.I. 1 at 28 (seeking injunction

permitting competitors to offer virtual-currency services to developers on Facebook); *see also*

Smoak Decl. ¶¶ 49–59.) And a plaintiff is "prepared" where it can show the ability to finance the

business and to purchase the necessary facilities and equipment; the consummation of contracts

by the plaintiff; affirmative action by the plaintiff to enter the business; and the background and

experience of plaintiff in the prospective business. *Bonjorno v. Kaiser Aluminum & Chem. Corp.*,

559 F. Supp. 922, 934–35 (E.D. Pa. 1983).

There is significant evidence demonstrating that Kickflip is "prepared to do so"—it has the

ability to finance the business, both by the Kickflip shareholders and via their existing

relationships with venture capitalists. (Smoak Decl. ¶¶ 49, 54–55.) It has existing business

relationships through Volume11 that would be immediately available to Kickflip, including

advertisers, payment processors, and others. (*Id.* ¶ 53.) It has retained all hardware and software

necessary to operate the Gambit offerwall and provide it to developers on the Facebook Platform. (*Id.* ¶ 58.) And Kickflip has years of experience actually operating this business before Facebook's ban and exclusive-Credits policy that forced it out of the market. (*Id.*)

Facebook's ban was the only reason assets were transferred. (*Id.* ¶ 16.) The Kickflip shareholders controlled Gambit Labs and its successor Volume11 at all times. (*Id.* ¶ 51.) So at any time, Kickflip has had and still has the ability to cause Gambit Labs or Volume11 to return to Kickflip all previously "divested" assets necessary to offer the Getgambit offer service, all related commercial relationships, and other resources, as well as any other assets of Volume11 that would further support Kickflip's re-entry into the virtual-currency services market. (*Id.*)

## CONCLUSION

Kickflip transferred certain business assets to Gambit Labs in an effort to mitigate the damages caused by Facebook's anticompetitive conduct. Gambit Labs would never have been formed except for Facebook's ban, and no assets would have ever been transferred. And even then, Kickflip never transferred its claims against Facebook, just the assets necessary for Gambit Labs to be able to carry on the service elsewhere without the stigma of Facebook's ban.

Facebook is now trying to use this consequence of its own wrongful conduct to shield it from liability. But Kickflip always maintained the causes of action against Facebook that it alleges in this action, and Kickflip would be a thriving virtual-currency provider today if Facebook did not monopolize the market. And even now, Kickflip intends to and is fully prepared to, immediately reenter the market and provide virtual-currency services if Facebook's unlawful policies are removed. Kickflip has standing for all of its claims and the Court should deny Facebook's motion.

Dated: January 14, 2014

By:   /s/ Kenneth L. Dorsney
Mary B. Matterer (I.D. #2696)
Kenneth L. Dorsney (I.D. #3726)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com
kdorsney@morrisjames.com

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
**NEWMAN DU WORS LLP**
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
(206) 274-2800
dn@newmanlaw.com
linke@newmanlaw.com

Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
**STRANGE & CARPENTER**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com

**ATTORNEYS FOR PLAINTIFF
KICKFLIP, INC., D/B/A GAMBIT**