1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -
     KICKFLIP, INC.,
4                                        :    CIVIL ACTION
              Plaintiff,                 :
5                                        :
              v.                         :
6                                        :
     FACEBOOK, INC.,                     :
7                                        :    NO. 12-1369 (LPS)
              Defendant.                 :
8                              - - -

9                         Wilmington, Delaware
                          Friday, April 4, 2014
10                        *Oral Argument Hearing*

11                             - - -

12   BEFORE:        HONORABLE **LEONARD P. STARK**, U.S.D.C.J.

13   APPEARANCES:                  - - -

14
                 MORRIS JAMES, LLP
15               BY:  MARY MATTERER, ESQ., and
                     KENNETH DORSNEY, ESQ.
16
                     and
17
                 NEWMAN DuWORS, LLP
18               BY:  DEREK A. NEWMAN, ESQ.
                     (Seattle, Washington)
19
                     and
20
                 STRANGE & CARPENTER
21               BY:  BRIAN R. STRANGE, ESQ.
                     (Los Angeles, California)
22
                          Counsel for Kickflip, Inc., d/b/a
23                        Gambit

24

25                             Brian P. Gaffigan
                               Registered Merit Reporter

```
 1    APPEARANCES:  (Continued)

 2
                   SEITZ ROSS ARONSTAM & MORITZ, LLP
 3                 BY:  DAVID EVAN ROSS, ESQ.

 4                      and

 5                 COVINGTON & BURLING, LLP
                   BY:  THOMAS O. BARNETT, ESQ., and
 6                      JONATHAN GIMBLETT, ESQ.
                        (Washington, District of Columbia)
 7
                       and
 8
                   FACEBOOK, INC.
 9                 BY:  SANDEEP SOLANKI, ESQ.
                        (San Francisco, California)
10
                           Counsel for Facebook, Inc.
11

12

13

14

15

16

17

18

19                         - oOo -

20                 P R O C E E D I N G S

21            (REPORTER'S NOTE:  The following hearing was

22    held in open court, beginning at 12:02 p.m.)

23            THE COURT:  Good afternoon, everyone.

24            (The attorneys respond, "Good afternoon, Your

25    Honor.")
```

```
 1              THE COURT:  I'll have you put your appearances
 2  on the record for us, please.
 3              MS. MATTERER:  Good morning, Your Honor.  Mary
 4  Matterer on behalf of plaintiff, Kickflip.  And I have with
 5  me Brian Strange from the law firm of Strange & Carpenter
 6  and also Derek Newman from Newman DuWors.  And also from
 7  in-house at Kickflip, Christopher Smoak, CTO.
 8              THE COURT:  Okay.  Thank you very much.
 9              MR. ROSS:  Good morning, Your Honor.  David
10  Ross, from Seitz, Ross, Aronstam & Moritz on behalf of
11  defendant Facebook.  With me today is Thomas Barnett and
12  Jonathan Gimblett from the law firm of Covington & Burling.
13  Also with us is Sandeep Solanki, in-house counsel at
14  Facebook.
15              THE COURT:  Thank you.  Welcome to all of you.
16  Have a seat, please.
17              So we're here to hear argument on three pending
18  motions.  Have you all conferred on how you might like to
19  proceed this afternoon?
20              MR. STRANGE:  Yes, we have, Your Honor, but we
21  thought we would ask the Court how you would like to proceed
22  first?
23              THE COURT:  I really don't have a preference
24  here.  So if you all have reached an agreement, it will be
25  fine with me.  Have you reached an agreement?
```

1          MR. STRANGE:  I think so.  We agreed to hear the

2   summary judgment first and the motion to dismiss second.

3          THE COURT:  And the motion to strike in

4   connection with summary judgment?

5          MR. STRANGE:  Yes, Your Honor.

6          THE COURT:  Okay.  Well, then I think we will

7   hear from Facebook first then.

8          MR. GIMBLETT:  Good afternoon, Your Honor.

9          THE COURT:  Good afternoon.  Let me have you

10  pull that microphone closer to you.

11          MR. GIMBLETT:  Is that better?

12          THE COURT:  I hope so.  Yes.  Thank you.

13          MR. GIMBLETT:  Following discovery on standing,

14  it is now undisputed that Kickflip divested its Gambit or

15  Getgambit business to Gambit Labs on November the 9th, 2009.

16  As a consequence, it's also now clear that no injury

17  suffered by Getgambit after that date can support claims by

18  Kickflip in this litigation.

19          That's an important point because at a minimum,

20  an order from this Court to that effect would significantly

21  clarify and narrow the scope of this litigation.

22          What remains is a dispute over who, if anyone,

23  can assert claims based on injury to Getgambit before the

24  9th of November, 2009.

25          Gambit Labs and Kickflip have both at different

1    times asserted their right to do so:  Gambit Labs in its

2    letter of November 9th, 2009 to Facebook and Kickflip in

3    this litigation.  They cannot both be right.

4              If any injury was suffered before the 9th of

5    November, 2009, it was suffered by one business.  And

6    therefore, at a maximum, there can only be one claim.

7              THE COURT:  Let's talk about that November

8    letter.  Is it November 29th, I think, 2009?

9              MR. GIMBLETT:  That's correct, Your Honor.

10             THE COURT:  Is there a factual dispute, for

11   instance, as to who that was sent on behalf of or is that

12   undisputed in your view?

13             MR. GIMBLETT:  When asked about the letter,

14   during his deposition, Mr. Smoak said it spoke for itself.

15   The letter is very clear.  It's a letter on behalf of Gambit

16   Labs asserting claims against Facebook.

17             THE COURT:  All right.  So even if that is

18   undisputed on this record, there is the December 2009

19   agreement subsequent to that.

20             Does that December agreement then create a

21   factual dispute?

22             MR. GIMBLETT:  The December agreement is

23   unambiguous in Facebook's view as to its intent to transfer

24   all assets associated with the Gambit business to Gambit

25   Labs, and in that it was mainly repeating what had happened

1    in the November the 9th agreement.

2              Under the case law of the Third Circuit, that

3    all inclusive assignment of all assets -- and there is no

4    dispute of assets, the antirust claim is an asset.  Under

5    Third Circuit case law, that satisfies the standard in

6    *Lerman v Joyce* that an assignment must be all inclusive and

7    unambiguous.

8              THE COURT:  Now, what about there is a whereas

9    provision in the December agreement; correct?

10             MR. GIMBLETT:  There is.  So its recital is

11   somewhat ambiguous on its face because it doesn't state

12   clearly as it could that the agreement was retaining a claim

13   for Kickflip.  It talks in term of intent to maintain

14   Kickflip as an ongoing entity.

15             And under the ruling *Haft v Dart Group*, that

16   kind of ambiguous recital cannot detract from what is clear

17   language in the operative clause.  That language being the

18   transfer of all assets associated with the business.

19             THE COURT:  But there is no references to legal

20   claims anywhere else in the November or December agreement,

21   is there?  Other than that recital?

22             MR. GIMBLETT:  That's correct.  There doesn't

23   need to be because the rule in the Third Circuit isn't that

24   there has to be a particular term of art that is used in the

25   assignment.  "All assets" is unambiguous.  It included every

1    asset.  If an antitrust claim is an asset, then it is

2    included in the transfer.

3              THE COURT:  Why isn't there an ambiguity or fact

4    dispute when you contrast the recital clause in the December

5    agreement with the all assets language in the November or

6    December agreement?

7              MR. GIMBLETT:  Because as I mentioned under the

8    ruling in *Haft v Dart Group*, if the recital is ambiguous and

9    the operative language is clear, then it can't detract from

10   the force of the operative clause.

11             THE COURT:  Well, aren't we ultimately trying

12   to understand what the intent of the parties in this case

13   Kickflip and Gambit was?

14             MR. GIMBLETT:  We are.  And that comes out

15   clearly from the decision in *Lerman v Joyce*.  The point

16   about why we look for all inclusive unambiguous language is

17   to be sure that the intent of the parties was to assign the

18   claim.

19             And in this context, that letter of November

20   29th, 2009 is important and significant evidence of the

21   intent of the parties.  Gambit Labs as of November 29th

22   clearly understood it had the claim.  There was never any

23   letter from Kickflip contradicting that.  And there was

24   never any indication after the December the 15th agreement

25   saying we actually have taken that claim back to Kickflip

1    and it will be Kickflip who will be asserting its claims

2    against you.

3              THE COURT:  Well, I might agree that all of

4    what you just said is relevant to determining intent.  But

5    I'm still having trouble understanding why that recital

6    provision, which specifically talks about claims, isn't also

7    relevant in at least creating a factual dispute here.

8              MR. GIMBLETT:  Well, I would rest on our, the

9    case law support that we have invoked which is that from

10   this Court, and to our mind the facts of this case do fit

11   into that rule.  Clear operative language, ambiguous

12   recital.

13             It's important to note that the construction of

14   that agreement, the November agreement, is one of the   two

15   independent bases on which Facebook has moved for summary

16   judgment.

17             And returning to the issue of that stub period

18   before the 9th of November, 2009.  It is important that this

19   Court decide which of the two entities is able to assert a

20   claim, if either of them can.  Because failure to do so

21   risks violating the constitutional limitations on this

22   Court's subject matter jurisdiction by allowing an entity

23   without standing to pursue claims.  And, in addition, if

24   the issue is not resolved, Facebook faces the prospect in

25   the future of facing a duplicative claim.

1          So Facebook's summary judgment motion provides

2     the Court with two different independent bases for resolving

3     this issue.

4          The first is the one that we've been discussing,

5     which is the question of whether the November and December

6     agreements of 2009 transferred any claim that Kickflip might

7     have had to Gambit Labs.

8          The second, and I would postulate the simpler

9     and therefore probably the better argument, is that

10    Getgambit itself did not suffer the injury needed to support

11    the claims asserted by Kickflip in its complaint.  It didn't

12    suffer that injury before the 9th of November, 2009.  And,

13    therefore, as a result, neither Kickflip nor Gambit Labs

14    can assert claims against Facebook based solely on

15    pre-divestment conduct.

16         So let me return briefly to this question of why

17    it is that Kickflip cannot assert claims for injury incurred

18    by Getgambit after the 9th of November, 2009.

19         The agreement of the 9th of November which

20    transferred the business to Gambit Labs, transferred all of

21    the properties and assets of Kickflip related to the

22    Getgambit Internet payments business.

23         Now, Kickflip took immediate action following

24    that agreement to put the Getgambit business under the

25    operational control of Gambit Labs.  And in our motion, we

1    describe a number of those actions and they're undisputed.

2              For Article III standing, it's a fundamental

3    principle that plaintiff must be able to show injury in fact

4    that is both personal and individual before it can come into

5    federal court and seek relief.

6              But having given up its ownership of Gambit

7    Labs -- of Getgambit on the 9th of November, 2009 and turned

8    its control over to Gambit Labs, any injuries suffered by

9    Getgambit after that date accrued to Gambit Labs and not to

10   Kickflip.

11             Now, Kickflip doesn't dispute this in its

12   opposition brief.  It argues repeatedly that its claims

13   relate back to conduct before the 9th of November, which is

14   something that Facebook disputes.

15             Certainly, there is no evidence in the record

16   of any agreement between Kickflip and Gambit Labs whereby

17   Gambit Labs prospectively assigned claims based on future

18   injury to Kickflip.

19             So, at a minimum, if the Court does nothing

20   else, it should order that Kickflip's claims are limited to

21   injuries suffered by Getgambit before the 9th of November,

22   2009.

23             Let me move next to the second of the arguments

24   that we asserted.

25             THE COURT:  Before you do, I would be remiss if

1    I let you move on without talking about *Gulfstream* at least.

2    Do you believe you have to get past the *Gulfstream* analysis

3    in order to prevail on your first argument?

4            MR. GIMBLETT:  *Gulfstream* is the first of two

5    cases decided by the Third Circuit on this issue.  And, in

6    fact, factually it's very distinguishable from what we have

7    here.  *Lerman v Joyce* is the last word from the Third

8    Circuit.  That decision makes clear that there is not a test

9    for looking for particular terms of art.

10           But what is needed, it is all inclusive and

11   unambiguous assignment.  And other courts, Districts Courts

12   in this District have applied it flexibly, not looking for

13   language which is the replica of the language that the Court

14   upheld in *Lerman v Joyce*, but looking at this question of is

15   it sufficiently all inclusive and unambiguous to give us

16   confidence about the intent of parties.

17           THE COURT:  I guess another way to ask is, if I

18   disagree with that, if I think that the Third Circuit law

19   requires an express assignment of an antitrust claim, you

20   agree that is not here?  There isn't an express assignment

21   of an antitrust claim; correct?

22           MR. GIMBLETT:  If you interpret *Gulfstream* and

23   *Lerman v Joyce* to require the words antitrust claim to

24   appear in the agreement, I would agree.  I wouldn't read

25   *Lerman v Joyce* in that way because I think it provides a

1    more flexible case-by-case analysis.

2              THE COURT:  Okay.  Thank you.

3              MR. GIMBLETT:  And whatever, whatever way one

4    interprets *Gulfstream* and its progeny does not affect this,

5    the second argument which I'm going to turn to now.

6              You could find that there was no transfer of the

7    claim and yet still grant summary judgment on the basis that

8    Getgambit did not suffer the requisite injury by the 9th of

9    November, 2009.

10             So having explained why Kickflip's claim must

11    be limited to injury suffered by Getgambit in that period,

12    let's look at the various claims that they assert because as

13    one does, it becomes clear that each of them is based on

14    injury after the 9th of November.

15             So if we start with the tying claim, it's well

16    established that injury from a tying violation occurs at

17    the time that the tie is imposed.  And Kickflip itself

18    recognizes that in its complaint.  It alleges "when Facebook

19    imposed this illegal tying arrangement on developers, it

20    precluded Gambit from the share of revenues in this market

21    it would have rightfully have earned."

22             The problem is that the payment policy that

23    Kickflip alleges to be a tie was not put in place by

24    Facebook until July 2011, some 18 months after Kickflip

25    gave up its ownership interest in Getgambit.

1          Now, Kickflip tried to overcome this defect by

2     alleging that it intend to enter the market if the Court

3     grants relief based on the complaint.  And it cites *Hayes v*

4     *Solomon*, a Fifth Circuit case, for this purpose.

5          What it fails to do is to quote the following

6     sentence after the sentence that appears in Kickflip's

7     opposition brief which makes clear that the exception that

8     they're relying on is a principle that recovery can be had

9     for a wrongfully frustrated attempt to enter a business.

10         So to recover under this theory, Kickflip would

11    need to show that it was prepared to enter the market at the

12    time the tie was imposed or since then.  But what Kickflip

13    actually alleges is that if the Court grants the relief that

14    it requests in the complaint, it will have some future date

15    arranged to have the Getgambit assets transferred back to it

16    in Volume 11 which is the successor company to Gambit Labs.

17         As the complaint makes clear, the injury that

18    Kickflip is claiming is injury to the Gambit or Getgambit

19    business.  And even if that business was prepared to enter

20    in 2011 when the policy was imposed or at any time between

21    that and the filing of the complaint which Facebook does not

22    concede, the fact remains that at all relevant times,

23    Getgambit was owned by Volume 11 Media and not by Kickflip.

24         The claim for injunctive relief in the complaint

25    fails for similar reasons.  Kickflip cannot show affirmative

1    steps towards entry, and that deprives it of standing to

2    seek injunctive relief because it cannot establish any

3    imminent threat that it's going to get harmed in the future.

4              I won't belabor this point because Kickflip

5    didn't address it in their opposition and therefore

6    presumably has conceded it.

7              Tortious interference.  It's a necessary element

8    of any tortious interference claim that the defendant

9    interfere in some way in the relationships between the

10   plaintiff and its business partners, including its customers

11   in this case.

12             The complaint alleges statements by Facebook

13   on the 19th of November and the 25th of November which

14   allegedly interfered in such a way.  So, for example, the

15   allegation of the 25th of November is that Facebook issued a

16   block post and it named Gambit amongst all the providers who

17   were banned and, specifically, warned developers not to use

18   Getgambit services or risk facing enforcement action.

19             There is nothing in the complaint and nothing in

20   the record before the 9th of November, 2009 which satisfies

21   this requirement.  The cease and desist letter of November

22   the 5th, which is where the story begins effectively, was

23   directed to Kickflip alone and not the developers.  And that

24   fact cannot be a basis for a tortious interference claim.

25             In their opposition brief on this motion,

1    Kickflip refers to a November the 8th Tech Crunch article

2    which states that the Facebook has shut down a total of

3    four ad networks in the recent months for ad violations;

4    including Tattoo Media and Gambit.  But again, that doesn't

5    do it.  That doesn't constitute a threat, a statement

6    directed at Kickflip's customers designed to prevent them

7    from dealing with Getgambit.

8              There is no indication in that statement to when

9    the ban was imposed, no indication as to whether the ban

10   was still active and certainly no indication as to what the

11   implications were for Facebook's developers.

12             So with that, there is nothing in the complaint

13   or in the record on which Kickflip can hang a tortious

14   interference claim based on pre-divestment activity.  And

15   then,

16             Finally, let me turn to the monopolization

17   claims.  Here, I think the way that Kickflip alleges the

18   injury suffered as a result of the alleged monopolization is

19   very telling.  What they say is that "but for Facebook's

20   unjustified refusal to allow on Facebook any games using

21   Gambit's virtual currency services, Gambit would have

22   continued to be a leading provider of personnel currency

23   services to social game developers.  Thus, when Facebook

24   completed its illegal monopolization for market for virtual

25   currency services, it precluded Gambit from the share of

1     revenues in this market it would rightfully have earned."

2            So this explanation of the injury highlights two

3     fundamental problems if Kickflip must rely on pre-divestment

4     injury:

5            First, and rightly, they're not alleging to have

6     been injured by the cease-and-desist letter itself.  They're

7     referring to Facebook's refusal to allow developers to use

8     Getgambit.  And the earliest act that they can allege that

9     fits into that is the statement of the 19th of November,

10    2009, some two weeks after the divestment.

11           Second, the actual injury alleged to have

12    occurred is the loss of revenue Gambit would have been

13    earning when Facebook completed its monopolization by

14    introducing the July 2011 payments policy.

15           So, again, just as in the tying claim, the

16    injury as alleged in the complaint would have been incurred

17    at a time when Getgambit was owned not by Kickflip but by

18    Gambit Labs.

19           Even if the complaint is read as alleging injury

20    from lost revenue from 2009 onwards, which is not what it

21    says, there is still no allegation in the complaint, and

22    there is no evidence in the record that Kickflip was losing

23    revenue or has lost any customers by the 9th of November,

24    2009.

25           So for this, for these claims, these claims 1

1    and 2, just like the others claims, nothing in the record,

2    nothing in the allegations of the complaint before November

3    9th, 2009 gives Kickflip the injury it needs to establish

4    Article III standing.

5            So let me pause there.  I'd like to, if Your

6    Honor has any further questions on the presentation I just

7    made, I would like to reserve some time for rebuttal

8    following Kickflip's presentation.

9            THE COURT:  Yes.  But before you sit, I guess

10   one question perhaps pertinent here is, I think it is in

11   the standing briefing where the plaintiff makes absolutely

12   clear, as best as I tell, that the whole reason for this

13   corporate transaction was to avoid the effects of the ban

14   from Facebook.  If that is undisputed on this record, is

15   that a pertinent fact to any of the analysis I have to

16   undertake?

17           MR. GIMBLETT:  I don't think it overcomes the

18   failure to establish that Getgambit has not actually been

19   injured by the 9th of November, 2009.  What Kickflip was

20   doing was preemptively transferring the business to Gambit

21   Labs before injury was suffered.  And so whether they were

22   forced to or not, if Gambit Labs was intact on the 9th of

23   November, 2009, and the injury was suffered as a result of

24   subsequent actions, for example, the 19th of November, the

25   25th of November statements, then I don't think it's a

1    relevant fact.

2           THE COURT:  And I guess related to that, they

3    also, it seems now to be undisputed, the principals and the

4    majority of controlling shareholders of both of the entities

5    overlap, and so the suggestion seems to be this asset of

6    Getgambit can be moved back and forth at any time at the

7    total discretion of the controllers of Kickflip.  Is that

8    pertinent to the analysis?

9           MR. GIMBLETT:  What would be pertinent, I think,

10   is if there was a demonstrated corporate relationship

11   between Kickflip and Gambit.  There is no evidence of that.

12   The only evidence as you suggest is that these two entities

13   have shareholders in common, not identical shareholders

14   because Volume 11 appears to have shareholders that do not

15   have an interest in Kickflip.

16          The argument that their ability to move

17   businesses from one entity to another without any hindrance

18   therefore means that they can assert standing here is a

19   curious application maybe of piercing the corporate veil.

20   Normally, we look at the entity, we don't look behind it to

21   shareholders, and impute either liabilities or rights to

22   them.  And that seems to be the effect of Kickflip's

23   argument here.

24          THE COURT:  All right.  On the motion to strike

25   the declaration, did you want to say anything further on

1  that?

2              MR. GIMBLETT:   I'll be very brief on this, Your

3  Honor.

4              You only need to reach the motion to strike if

5  you do not accept the second argument that I laid out, the

6  argument based on lack of injury to Getgambit before

7  November the 9th, 2009 and, further, if you do not agree

8  with our argument that the November and December agreements

9  by their language transferred the claims to Gambit Labs.

10 It's only if you reject those arguments and you therefore

11 need to consider our argument that there was no consideration

12 for the December agreement, and therefore it didn't close.

13 Or, I beg your pardon, that it is invalid and, secondly,

14 that the agreement didn't close that you would turn to the

15 motion to strike.

16             I think the briefing speaks for itself on that.

17 In Facebook's view, the three statements that we have

18 highlighted from the Smoak declaration, we tried to be

19 very targeted because there were very many things we could

20 have challenged, but the three statements that we have

21 highlighted fall within the scope of questioning at a

22 deposition.   That's the key question.

23             If it was within the scope of the questioning,

24 then I think the law is clear that Kickflip can't now rely

25 upon declarations made during summary judgment briefing

1    which contradict Mr. Smoak's previous lack of knowledge,

2    and nor can they introduce statements which effectively

3    were withheld previously on the grounds of attorney-client

4    privilege.

5             THE COURT:  Now, I recognize there is all those

6    preceding steps, so whether I get there or not is an open

7    question.  But if I got there, what would be wrong with the

8    alternative relief rather than strike it but giving you

9    another deposition of Mr. Smoak now that you do have his

10   declaration and allowing you all proper follow-up at a

11   deposition and perhaps supplement your briefing on standing,

12   if that is where we go?

13            MR. GIMBLETT:  This question has arisen in some

14   of the previous cases dealing with this whole situation.

15   Courts have tended to find that simply allowing another

16   deposition to be taken establishes the wrong set of incentives.

17   It doesn't deter the kind of conduct that is at issue here.

18   For that reason, our preference would certainly be that you

19   exclude the statements.  That would be more efficient.  We

20   had this limited period of discovery on standing.  Kickflip

21   had every opportunity to produce its information, and if it

22   failed to do so, I believe you should just strike what we

23   requested.

24            THE COURT:  Okay.  Fine.  Thank you.

25            MR. GIMBLETT:  Thank you, very much.

1          THE COURT:  We'll now hear from Kickflip on

2    these two motions.

3          MR. STRANGE:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. STRANGE:  Brian Strange on behalf of

6    Kickflip.

7          Your Honor, I'd like to address the summary

8    judgment in two parts.  The first dealing with the

9    assignment and the second on the Article III standing.

10         On the assignment issue is three points I want

11   to make:

12         The law in this Circuit and elsewhere provides

13   that an express assignment is necessary for antitrust

14   claims.  And even when you are not dealing with antitrust

15   claims, an express assignment means at a minimum assignment

16   of all causes of actions and legal claims.

17         No. 2.  The facts here are clear that not only

18   was there not an express assignment of the Kickflip claim,

19   there was an express reservation of that antitrust claim in

20   the December 15th agreement.  And,

21         No. 3.  Facebook's attempt to get around the

22   November and the December agreements has no basis in fact or

23   law.  Let me explain.

24         The November 9th agreement says nothing about

25   assigning any legal claims or causes of action, let alone

1    any antitrust claims.  As the Court can probably gather and

2    the evidence showed, this November agreement was hastily

3    drawn up after Facebook banned Kickflip in an attempt to

4    mitigate damages in an attempt to continue to do business.

5              Shortly after this emergency agreement was

6    drafted, when it had more time, Kickflip lawyers restated,

7    replaced, and superseded that agreement and all prior

8    transfers under the November agreement with an agreement

9    dated December 15th which expressly noted that Kickflip

10   maintained any legal claims against Facebook arising out

11   of the Facebook ban.

12             The Third Circuit in *Gulfstream III Associates*

13   made clear that antitrust claims such as we're discussing

14   here have to be expressly assigned.  Here, not only were

15   they not assigned, they were expressly reserved  in a later

16   agreement.  That should be the end of the analysis, Your

17   Honor.

18             Facebook attempts to argue that that provision

19   in *Gulfstream* was somehow modified by the later subsequent

20   decision.

21             The *Lerman* case didn't involve antitrust claims.

22   It involved a RICO claim.  And there the Court said "Here,

23   Litton expressly assigned to Joyce all of Litton's causes

24   of action, claims and demands of whatsoever nature."

25             And further noted is that the problem in

1    *Gulfstream* was that the agreement made no references to

2    legal causes of action or causes.  Rather, it referred only

3    to rights, titles, and interests.

4           Therefore, the *Lerman* court said it is an

5    express assignment of the RICO claim because it concerns, it

6    had an express revision about all legal causes of action.

7           There is no such provision in the November

8    agreement, so suggesting that somehow the November agreement

9    is controlled by *Lerman* is just incorrect.

10          THE COURT:  What about the alleged factual

11   distinction of *Gulfstream*?  It has to do with essentially I

12   think, it was related to a business and indirect or direct

13   assets.  What is your response to that?

14          MR. STRANGE:  Well, in dicta, it discusses the

15   direct or indirect issue, but that is really as it relates

16   to why antitrust claims have to be expressly assigned.  And

17   so the policy behind that still stands here, that antitrust

18   claim, because with the problems with damages need to be

19   expressly assigned.

20          I'll note, Your Honor, that in the *Sullivan v*

21   *NFL* case which we cited, that court, which was an antitrust

22   case, quoted *Gulfstream* and quoted *Lerman* and said that "all

23   assets" did not assign an antitrust claim which requires an

24   express assignment.  So there is a case directly on point

25   which deals with this issue.

1          And I will also note that the *Martino v*

2     *McDonald's* case said specifically that selling all rights

3     and titles and assets was not an assignment of antitrust

4     claims.

5          So there is substantial authority that you need

6     an express assignment of antitrust claims.  But even if you

7     didn't, the November agreement did not assign all legal

8     claims or causes of action and could not be interpreted

9     under *Lerman* as assigning an antitrust claim.

10          THE COURT:  All right.  Now, what about the

11     arguments that the reference to any claims is just merely in

12     a recital?  Does that have relevance here?

13          MR. STRANGE:  Well, yes, Your Honor.  I think, I

14     mean under the case law it's pretty clear that under the

15     recital, first you take the November agreement which said

16     nothing about assigning legal claims and then you have the

17     December agreement which expressly reserves the claims

18     against Facebook resulting from the ban.

19          That specific language in the recital can be

20     used to interpret language that talks about assigning

21     assets.  That's why they did it.  And it's, I think, the

22     issue to the Court, if it's useful in interpreting the

23     general clause of the agreement, you can use it.

24          So, clearly, as Your Honor pointed out, the

25     issue is whether Kickflip intended to reserve those claims

1    and that language is relevant to intent.  And at the very

2    minimum, it's an issue that precludes summary judgment

3    because it's an issue of fact on intent.

4              The further attempts of Facebook to try to get

5    around the November agreement because of that express

6    reservation by saying there is no consideration fail for a

7    number of reasons.

8              First of all, there is consideration because of

9    the favorable tax swap.  That is actually in the agreement.

10   Under California law --

11             THE COURT:  Don't you need the Smoak declaration

12   for that?

13             MR. STRANGE:  You don't need the Smoak declaration

14   for that because it's recited in the agreement.  And even if

15   you didn't have that, under California law, which the agreement

16   says it uses, a mutual cancellation of executory rights is

17   consideration.  And, here, the evidence is that Kickflip

18   never transferred all the assets and Gambit never paid a

19   dollar.  So based even on the face of that document, without

20   the Smoak declaration, there is adequate consideration.

21             Finally, on the closing argument, I think under

22   the *Emerson* case that Facebook doesn't even have grounds or

23   standing to challenge that because the issue is whether that

24   contract is voidable versus void.  And I think it's just

25   voidable by the parties, and the contract expressly provides

1    that the parties can waive the condition and the evidence is

2    they did.

3               THE COURT:  What is the relevance of the letter

4    sent in November 2009 apparently on behalf of Gambit asserting

5    or intending to assert these antitrust claims?

6               MR. STRANGE:  Your Honor, I think it's a fact.

7    I'm sure that the counsel, upon retrospection, sent that

8    letter, but this was an emergency situation where a company

9    that was making $20 million a year was completely banned

10   from Facebook's platform.  And so they were rushing around,

11   they formed Gambit.  And after the letter, the December

12   agreement came into effect, it made clear those claims

13   weren't assigned, that they remained with Kickflip.  So I

14   don't know why he sent that letter but maybe it's a piece

15   of evidence, but it certainly doesn't override the intent

16   of the agreement or the fact of what those agreements said.

17              THE COURT:  Well, on my record at this point,

18   isn't it an undisputed fact that Gambit Labs at least

19   asserted in this letter to Facebook that it had these

20   antitrust claims?

21              MR. STRANGE:  I think that letter was written on

22   behalf of Gambit.  It threatened to sue Facebook.  It didn't

23   say anything about whether Kickflip would or wouldn't sue

24   them, so I don't think, it's undisputed that Kickflip didn't

25   have its claims.

1          THE COURT:  But it's undisputed at least the

2    letter is sent on behalf of Gambit.

3          MR. STRANGE:  I think he says in the beginning

4    paragraph on behalf of Gambit.

5          THE COURT:  I don't have anything in the record

6    that contradicts that; correct?

7          MR. STRANGE:  I don't believe so, Your Honor.

8    The only contradiction is the agreements themselves do

9    expressly reserve the claims to Kickflip.

10         So under *Lerman* and under *Gulfstream III*, and

11   clearly under the *Sullivan v NFL* case, antitrust claims need

12   to be expressly assigned and they were not in the November

13   agreement, and they were expressly reserved in the December

14   agreement.

15         And unless Your Honor has any questions, I will

16   move on to Article III standing.

17         THE COURT:  That's fine.

18         MR. STRANGE:  Your Honor, with respect to the

19   Article III standing, I want to make four points.

20         The first is that both the 2009 ban and the 2011

21   elimination of all competitors would operate independently

22   to deny Kickflip its right to operate the virtual currency

23   business.  So under the Third Circuit authority, Kickflip

24   has standing to address both and needs to address both to

25   afford complete relief.  I'll explain that further.

1           The second point I want to make is that Kickflip

2    remained a viable entity after the divestment to Gambit Labs

3    and had a right to provide the Gambit offer service to existing

4    clients using the Facebook platform and indeed had the right

5    to lease such service from Gambit Labs.  By that reason

6    alone, Kickflip was clearly damaged by the 2011 policy which

7    eliminated any chance for it to use the Facebook platform.

8           No. 3, as an actual competitor, Kickflip has the

9    ability and will immediately enter the market should that

10   ban be lifted.  And,

11          No. 4, Kickflip has the right to seek injunctive

12   relief based on a limited 2011 Credits policy.

13          With respect to the first point about the

14   elimination of both provisions independently affecting

15   Facebook, I don't think you can look at a standing issue in

16   a vacuum.  And I think the Court is aware that on a standing

17   issue, it's not plaintiff's time to prove damages at a

18   trial.  It's whether there is an injury in fact to support

19   standing.  This Court has held that that is a trifle amount

20   of damage necessary.

21          And I think one of the cases in this Circuit in

22   fact said that injury in fact is not Mount Everest.  That is

23   in the *Danvers Motors v Ford Motor Co.*, 432 F.3d 286 (Third

24   Circuit 2005).

25          The reason I mention that, Your Honor, is some

1    of these arguments in the summary judgment are going far

2    afield.  And I'm actually personally very familiar with

3    Mount Everest, and this kinds of reminds me of it because

4    you keep wanting to get to the summit of Mount Everest and I

5    keep wanting to get to the merits of this case which has

6    been difficult.

7            But the continuing course of conduct here that

8    we have alleged started prior to the ban in 2009 when

9    Kickflip -- excuse me -- when Kickflip decided to try to

10   compete on the merits.  And when it couldn't compete on the

11   merits of the virtual currency business, it started with

12   the ban, the complete ban of Kickflip in November 2009 and

13   culminated then in the 2011 policy which provided that only

14   Facebook could compete in that area and no one else.

15           As this Court noted on the its order on the

16   motion to dismiss, Kickflip's claim rests on a timeline

17   for Facebook's systematic elimination of competition.  Had

18   Facebook not banned Kickflip in 2009, then Kickflip would

19   never have formed Gambit Labs or transferred any assets.

20           So the forming of Gambit Labs was the

21   consequence of the ban while trying to preserve, save

22   themselves.  So had that not, the ban not have happened,

23   Kickflip would have been there and would have been a

24   thriving business but still would have been banned by the

25   2011 policy.  So but for the ban, Kickflip would have been

1    a viable entity.  But if the ban is lifted, Kickflip still

2    needs to address the credit policy or else it can't get back

3    into business or it can't have suffered damages.

4          So just like the Third Circuit case in *Khodara*

5    where the plaintiff faces two independent obstacles, Article

6    III allows a challenge to each.  In *Khodara*, Your Honor, we

7    talked about it in the papers, but the company owned a

8    landfill and there was two independent causes:  one, the

9    state denied his permit to develop the landfill and, two,

10   the FAA had an act which the FAA said precluded development

11   of that landfill because it was close to an airport.  The

12   FAA in that case said, well, we weren't the cause of your

13   damage.  It was really the fact that you couldn't get these

14   permits.  And the Third Circuit said, well, when the effect

15   is causally overdetermined by two events, you have standing

16   for both.

17         And the same here, which is that if Kickflip

18   cannot get complete relief unless it is able to litigate

19   the issue of the Credits ban and the ban in 2009, there is

20   clearly, casually related to the Credits policy, these two

21   policies.

22         And as the Supreme Court said in the *Perma Life*

23   *Mufflers* case, which we cited in our papers, the fact that a

24   defendant or a plaintiff does what he can to make good on a

25   bad situation, which is here, Kickflip tried to and did

1    operate another company, doesn't deny them the right to

2    recover damages.  It's not necessary that the injury be the

3    most significant connection.  It just has to be related.  And,

4            Your Honor, I wanted to point out that in one of

5    the cases cited by Facebook, and that's the *Sheroni Pharma v*

6    *Mylan* case, it's a Third Circuit District Court decision

7    from this Court.  The Court discussed standing on antitrust

8    grounds.  There, the Court said that Mylan was a potential

9    competitor but still was clearly injured by the antitrust

10   policy because it couldn't get into the market.

11           So if a potential competitor is injured, clearly

12   an actual competitor who has to form another business and

13   basically loses all of its business because of this conduct

14   has standing to pursue the claim.

15           So that's my first point about the standing

16   between those two bans.  But even if that wasn't the law in

17   the Third Circuit, under the assignment in December 15th,

18   Kickflip expressly remained a viable business entity.  And

19   what it said is:  to service ongoing business of those

20   publishers that continued to use Kickflip on the Facebook

21   platform.

22           That is in the same paragraph, Your Honor, about

23   the fact that Kickflip maintains the legal claims.  And in

24   that paragraph, Kickflip had the right to lease these

25   services from Getgambit or I meant from Gambit Labs, Inc. to

1    service those clients.  And that's in Mr. Smoak's

2    declaration and it's in the document itself.

3            So clearly there is damage to Kickflip from that

4    Credits policy which precluded any attempt by Kickflip to

5    use the Facebook platform.

6            THE COURT:  Is it your contention that Kickflip

7    was viable between the November agreement and the December

8    agreement or that they only became viable again on December

9    15th, 2009?

10           MR. STRANGE:  I think they were viable the whole

11   time.  They never stopped being viable.

12           THE COURT:  But it must be a different basis

13   because I think you are arguing that certain elements, the

14   liability only arose with these December provisions that you

15   have just referenced.  Is that correct?

16           MR. STRANGE:  No, Your Honor.  What I'm saying

17   is that the November provisions provide evidence that it

18   was viable at that time, Your Honor.  I'm saying it wasn't

19   viable before because what happened, Kickflip was still

20   around.  It had just transferred certain assets to Gambit

21   Labs to try to get around the ban, but the Kickflip entity

22   was always there.  The Kickflip principals were there.

23           THE COURT:  How about the right to lease back to

24   Gambit instrumentality through whatever they were?  Did

25   that exist between the date of the November and December

1    agreement?

2            MR. STRANGE:  Yes, Your Honor, I think it did.

3    Because the November agreement clarified that.  What

4    happened is Kickflip still had certain customers that it was

5    servicing or trying to service on the Facebook platform, so

6    it had contracts and that is in the record.

7            THE COURT:  So even between the November and the

8    December agreements, Kickflip was still operating and trying

9    to service those ongoing clients?

10           MR. STRANGE:  Yes, Your Honor.

11           THE COURT:  Okay.

12           MR. STRANGE:  But I don't think you have -- I

13   mean that is clearly a way of damages.  I don't think you

14   have to get there under the *Khodara* analysis because in this

15   standing argument, particularly where there is multiple

16   causes, I'm quoting now from a *Haverhill Gazette Co. v*

17   *Union*, it's a First Circuit case.  But the Court said:  "The

18   degree of certainty required in proving causation of damages

19   varies with the nature of the case."  This is particularly

20   true where there are multiple causes that aren't susceptible

21   to precise measurement.

22           Under the *Mylan* case, Your Honor, if a potential

23   competitor hasn't even entered the market yet has causation

24   for damages, clearly Kickflip does in a situation where

25   they're banned in November, they form a company to try to

1    get around the ban, and they subsequently could not rectify

2    the situation because of the 2011 Credits policy which

3    limited everybody's access to the Facebook platform.

4              And, Your Honor, even if that wasn't enough,

5    based on the Smoak declaration, Kickflip clearly has the

6    ability to enter back into the market because it maintains

7    relationships with companies and had its own software.  The

8    same people run the corporation, and Kickflip was a leading

9    competitor, was making over $20 million a year in the

10   virtual currency market in 2009.  A lot of the cases that

11   deal with the ability to enter the market are discussing

12   whether these companies are viable and whether they could

13   compete in the market.

14             This distinction of an actual competitor was

15   noted in the *Bubar* case which we cited.  That is a Ninth

16   Circuit case but that discusses a case called *Helix Milling*,

17   where the Court had held in *Helix Milling* said, look, we're

18   not talking about a potential competitor.  We're talking

19   about an existing competitor who is temporarily disarmed

20   from competing.  And that is exactly what we have here.  So

21   it's within all the parameters of the cases that Kickflip

22   has the ability to reenter the market.

23             And if that wasn't enough, you still have the

24   ability to request an injunction of this 2011 policy because

25   if you didn't, then Kickflip was in this case and it wins

1      the case on the ban, it still wouldn't have anything because

2      of the 2011 policy which precludes any competitor from

3      competing on the Facebook platform.

4              So for those four independent reasons, Your

5      Honor, there's standing here, particularly under this

6      Circuit which only requires an identifiable trifle of harm.

7      We're not at the damages stage.  We're at the standing

8      requirement on the summary judgment case.

9              And I might add that I wish we had more evidence

10     but plaintiffs have not been able to do any discovery.  It's

11     been one sided.  This has been the discovery by Facebook.

12     So clearly when the plaintiffs are able to do discovery, I

13     think the evidence will be even more compelling.

14             Your Honor, do you have any more questions for me?

15             THE COURT:  Well, I would like you to address

16     the motion to strike because it does seem a bit troubling

17     how you all handled Mr. Smoak and he seemed not to know that

18     much or be willing to answer questions at the deposition and

19     then we get the declaration and suddenly he's got a lot more

20     memory and willing to answer things.  So what do you say to

21     all that?

22             MR. STRANGE:  Well, Your Honor, when a nonlawyer

23     is put in a situation where they go to a deposition, I think

24     Mr. Smoak did the best he could.  And I think the natural

25     inclination when someone shows you a legal document is to

1    say my lawyer drafted that, and not wanting to make

2    mistakes, to do the best you can as a person testifying; and

3    I think he did that.

4              There is three, the three main points.  I mean

5    one is with respect to the stock swap and the consideration.

6    They never asked him about the stock swap, and they never

7    asked him about the consideration issue.  They could have

8    done that.  And those cases that do something other than

9    letting someone redepose the person are when there is

10   testimony that is exactly contrary to what they said.  That

11   is, I understand that.  But that is not what happened here.

12   There is some broad questions that could have been answered.

13             On the issue of the tax treatment, to the extent

14   there is now a waiver on that issue of the attorney-client,

15   he had the right to claim attorney-client on the question.

16   But to the extent Your Honor feels it is now waived by that

17   declaration, we'll produce him for further deposition on

18   that issue, but it's we're not trying to hide anything.  We

19   did the best we could at his deposition, but when Facebook

20   raised the issue of consideration and of closing, we had to

21   respond appropriately.

22             If they need to inquire further, that is fine,

23   but I don't think the remedy would be to strike it.  I think

24   it would be to allow a further deposition.

25             THE COURT:  What about having you pay the costs

1   associated with that further deposition?

2             MR. STRANGE:  Well, if Your Honor feels that

3   strongly that we didn't handle it properly, then that would

4   be proper.  I think that these kinds of issues are difficult

5   for clients under those situations, but clearly we didn't,

6   we didn't know what, until those questions, what Facebook

7   was interested in and we did the best we could.

8             THE COURT:  Well, I don't doubt that.  That you

9   did the best you could.  But it seems like in the light of

10  day, reading the deposition testimony and the arguments

11  about it, it just seems like you are drawing too fine a

12  distinction and asking a greater degree of precision to be

13  had in questioning than is consistent I think with the

14  spirit at least of discovery.

15            Now, I could be wrong.  That is why I want you

16  to respond to this, if you have a response.

17            MR. STRANGE:  Okay.

18            THE COURT:  So Facebook gives the example,

19  evidently they asked a question along the lines:  Why was

20  there a December transaction after the November transaction?

21  And your argument seems to be, well, we answered that as

22  best we could.

23            Had they only asked what are the effects, they

24  would have gotten everything they got ultimately in the

25  Smoak declaration.  If that is the kind of line you are

1    drawing, then I have the concern I have expressed.

2            MR. STRANGE:  Well, I think on that

3    particular issue that it's really more about a waiver of

4    the attorney-client because I think the response was that he

5    took the attorney-client privilege.  And I think that that

6    was a correct invocation of that privilege, and that when

7    he now says, well, one of the effects of the agreement was

8    that the company didn't have to pay taxes is something that,

9    without divulging attorney-client privilege, may be

10   something he learned from his lawyer afterwards.

11           So with respect to, I could see Your Honor

12   saying, look, you invoked the privilege and you now waived

13   it by putting in that declaration.  You need to put him up

14   for further examination.  I understand that.  I don't think

15   it is directly contrary, but we really did the best we

16   could based on some of the questions which called for legal

17   conclusions.

18           THE COURT:  All right.  Is there anything else

19   you want to say?

20           MR. STRANGE:  No, Your Honor.  Unless you have

21   any questions.

22           THE COURT:  No, thank you.  Nothing on that.  I

23   will hear any rebuttal you have on the two motions by

24   Facebook.

25           MR. GIMBLETT:  Thank you very much, Your Honor.

1          Reading the complaint, it is crystal clear that

2     the injury that is alleged throughout is injury to the

3     Getgambit business.  That is injury to one single business.

4     It cannot support claims by both Kickflip and Gambit Labs

5     for the same injury.

6          Listening to opposing counsel, it's hard to

7     detect that there was a sale.  It's as if Kickflip has

8     remained in control of Getgambit throughout.

9          But that is clearly not the case.  The facts

10    are, and this is very clear in the deposition testimony of

11    Mr. Smoak, the control of Getgambit was passed immediately

12    following the 9th of November, 2009 agreement from Kickflip

13    to Gambit Labs.  It's never returned, and nothing has

14    happened to Gambit Labs after the 9th of November 2009 to

15    support standing for claims by Kickflip.

16         Harkening back to the *Khodara* case which came

17    up on Facebook's original motion to dismiss doesn't help

18    Kickflip here.  The *Khodara* case is about double causation

19    of one injury.  The issue here is completely different.  The

20    issue here is there is an injury to one business:  which

21    entity owns that injury.

22         This becomes very clear when one looks at the

23    tying claim in particular.  Kickflip now argues that it was

24    a frustrated rival, it could have entered, but it is very

25    clear from the complaint that the injury that is claimed on

1    the tying claim is injury to Getgambit from not having

2    been able to be in the market in July 2011 and since.  And

3    it's Getgambit revenues that Kickflip seeks relief for

4    here.

5              But again, it's crystal clear from 2011 onwards,

6    Getgambit was owned by Gambit Labs, now Volume 11 Media, not

7    by Kickflip.  And it really does Kickflip no good at all to

8    say that, well, we could get those assets back, because the

9    test for standing for that injury claim isn't a prospective

10   one.  It's not like what might happen in a year or two or

11   when this case is finished.  The test is who was the

12   potential competitor at the time it was imposed, and between

13   that time and the filing time of the complaint, and the

14   record is clear.  It was Volume 11 Media as the successor to

15   Gambit Labs.

16             THE COURT:  What about the comparisons we heard

17   to some of the I guess pharmaceutical cases and Mylan?

18   Isn't Kickflip at least as potentially a competitor as some

19   of those types of entities in those other cases that were

20   referred to?

21             MR. GIMBLETT:  But I think here the record is

22   quite clear that Kickflip's status as a potential competitor

23   is derivative of Getgambit.  Their opposition brief, I

24   believe this is in Mr. Smoak's declaration as well, makes

25   clear that their ability to enter the market is dependent

1   on getting assets back from Volume 11 Media.  So long as

2   that is the case, you have to ask yourself, well, when is

3   this injury alleged to Getgambit and who owned Getgambit at

4   that time?  It wasn't Kickflip.

5           There is no evidence still and there is no

6   suggestion from opposing counsel that Kickflip -- I beg your

7   pardon -- rather, that Gambit Labs ever assigned to Kickflip

8   a claim arising in July 2011.  That's the only way that

9   Kickflip would have that claim today, and it didn't happen.

10          Mr. Strange referred to lease provisions that

11  were mentioned in the December agreement.  Again, there were

12  some questions asked about these lease provisions during Mr.

13  Smoak's deposition and no clear answers, no recollections

14  were given.

15          Today, we heard a very definite view that these

16  things were operational which simply was not in the record

17  before.

18          But even if it was true that these lease

19  provisions were operational, they wouldn't help Kickflip

20  here because at best, any injury they might have suffered

21  from not being able to use them was indirect and derivative

22  of an injury suffered by Gambit Labs, as the owner of

23  Getgambit.

24          The suggestion that Kickflip is, and has

25  remained throughout, a viable competitor ready to enter is

1      not reflected in the record.  Mr. Smoak admitted in his

2      deposition that it hasn't served a single developer in at

3      least the last two years.  And Facebook is not the only

4      platform on which a company like Kickflip could be entering

5      into agreements with developers.  There are developers that

6      are operating applications under Google Plus, on Apple.

7      These are very vibrant gaming platforms.  And yet despite

8      that alleged preparedness to be in the business, there is

9      no evidence that Kickflip has tried to build a business for

10     those developers.

11             On the motion to strike, the suggestion that Mr.

12     Smoak was doing his best and it is difficult for a nonlawyer

13     in those circumstances isn't really reflected when you look at

14     the deposition transcripts where repeatedly he is counselled

15     by his attorney not to answer questions, not to answer

16     questions not only for attorney-client privilege reasons but

17     because they call for legal conclusions, just about any

18     purpose you can imagine.

19             And the suggestion just now that Kickflip has

20     waived its privilege as to the statements about consideration,

21     again, that is a new point.  If that is the case, then, well,

22     first you would have to ask how is it that Kickflip can have

23     these blanket applications of attorney-client privilege during

24     the deposition and then selectively waive them later on?  And

25     if they are able to do that, then I think the appropriate

1    remedy is for them to turn over the privileged documents.

2    They can't just waive at their convenience.  Facebook should

3    have discovery of all the privileged documents relating to

4    that subject matter.

5              THE COURT:  So let's say for argument's sake, at

6    least for the moment, that I am going to give you some

7    relief on the motion to strike.  Where would that leave us

8    on standing?  Would you like to have the opportunity, if

9    you are going to get further discovery, if I deem there is

10   a waiver, to consider whatever comes out of that further

11   discovery before I make a final determination on the

12   standing question?

13             MR. GIMBLETT:  Well, firstly, I think you can

14   decide the motion for summary judgment without additional

15   discovery.

16             THE COURT:  On the second point?

17             MR. GIMBLETT:  On the second point.  That is

18   freestanding, doesn't rely on the motion to strike at all.

19             If Your Honor isn't persuaded by that argument,

20   then I think additional discovery would be appropriate on

21   this question.  But I think if you can rule on the second

22   argument, I would urge you to do so.

23             THE COURT:  Okay.  Thank you.

24             MR. GIMBLETT:  Thank you very much.

25             THE COURT:  I think we still have the

1    plaintiff's motion.

2              MR. STRANGE:  Your Honor, can I make two points?

3              THE COURT:  Sure.

4              MR. STRANGE:  Thank you.  First, I wanted to

5    make it clear that the ban that Facebook instituted was on

6    both Kickflip and Gambit Labs.  In the November 29th letter

7    which is in evidence as Exhibit 18, it makes that clear

8    where it says Facebook stated the following:  "Gambit and

9    all of their affiliated business are banned from Facebook."

10   And the reason is this means that Gambit cannot directly or

11   indirectly be involved with any activity on Facebook or

12   provide services or add to developers, running applications

13   on the Facebook platform.  So Facebook knew that Kickflip

14   had organized Gambit Labs Inc. and banned both of them.  So

15   that is one issue.

16             The second issue is that the declaration of Mr.

17   Smoak makes clear that Kickflip still owns the proprietary

18   software.  That even Volume 11 has clients that may be

19   interested in a virtual currency platform on Facebook.  And,

20   again, just with respect to that issue, if a potential

21   competitor is damaged by a policy, clearly, Kickflip would

22   be damaged by this policy in 2011.

23             Thank you, Your Honor.

24             THE COURT:  All right.  If you want to have the

25   last word on these motions, if you have anything to add you

1    may.

2              MR. GIMBLETT:  I have nothing further to add.

3              THE COURT:  All right.  Then let's move on to

4    the remaining motion.

5              MR. NEWMAN:  Good afternoon, Your Honor.

6              THE COURT:  Good afternoon.

7              MR. NEWMAN:  My name is Derek Newman, and I'm

8    going to address the motion to dismiss.

9              The Court should dismiss Facebook's counterclaims

10   for two basic reasons:

11             The first is all four are barred by the statute

12   of limitations.  The second is that none of the four state a

13   claim.

14             I'm going to start with the statute of

15   limitations issue which at its most basic level is very

16   simple.

17             There are four state law claims in Delaware.

18   Nobody disputes this has a three year statute of limitations.

19             Facebook alleges harm that occurred in 2009.

20   Facebook waited until four years later, 2013, to bring its

21   counterclaims.  So under a strict reading, they're barred.

22             Facebook asks this Court to relate back to

23   Kickflip's original complaint, the filing date for these

24   counterclaims.  But in Delaware, it is settled law that

25   counterclaims do not relate back to the filing of the

1    original claim.

2            So Facebook asks this Court to disregard

3    Delaware law, but the United States Supreme Court held in

4    *Guaranty Trust Co. v York*, which is 326 U.S. 99, that if a

5    claim is barred by the statute of limitations in state

6    court, a federal court may not grant relief.

7            So under that Supreme Court precedent which has

8    never been challenged and is still good law, this Court must

9    follow state substantive law, and since the Delaware law

10   requires that the statute of limitations bars counterclaims

11   and does not relate them back to the original filing of the

12   complaint, this Court must follow that.

13           Facebook argues that this Court should instead

14   follow a District Court case from the Eastern District of

15   Pennsylvania called *Giordano*, but *Giordano* erred.  In

16   *Giordano*, there was no discussion of this Supreme Court

17   case.  In fact, it missed the issue entirely.  It didn't

18   discuss whether to apply state substantive law or federal

19   substantive law.  Rather, *Giordano* just applied federal law

20   and it did so because it relied on another District Court

21   case called *Albert Einstein Medical*.

22           *Albert Einstein Medical* though properly analyzed

23   its issue.  Its issue was a federal statute that was an

24   ERISA claim, and so since it was an ERISA claim, you would

25   apply state law, not federal law.  And *Albert Einstein*

1   *Medical*, relied on the Fourth Circuit Court of Appeals case,

2   *Burlington,* and the *Burlington* case similarly analyzed it

3   correctly because it was analyzing a federal issue, namely,

4   a federal antitrust issue.

5           But this case is about state substantive law.

6   The U.S. Supreme Court has said you must follow the state

7   law, and since these claims should be barred in state court

8   they are barred in federal court.

9           THE COURT:  So, I recognize you tell me this

10  is the wrong way to analyze this.  But at a broader level,

11  shouldn't I be concerned that if you are right, a party in

12  your position can effectively cut off a defendant from

13  bringing their counterclaims and shouldn't further be

14  concerned that that may have the unintended consequences

15  of defendants flooding the courts with claims that really

16  aren't particularly ripe since they don't know if you are

17  going to turn around and sue them?

18          MR. NEWMAN:  Your Honor cites a valid public

19  policy concern that other courts and Facebook have cited,

20  and if Facebook wishes to take that up with the United

21  States Supreme Court it can.

22          I don't think there should be a concern.

23  Because in this case, Kickflip was fighting for its business

24  and it filed claims when it did because it had to.  It was

25  trying to bring business back.  That didn't occur.  It was

1    in a position where its statute was running.  It had to

2    bring a lawsuit.  It didn't do it for tactical reasons.  It

3    did it because it required affirmative relief.

4           I would think the Court would be more concerned

5    with a defendant that for tactical reasons brings counterclaims

6    because it distracts from the real issues in the lawsuit,

7    and so they argue that they can relate back to the original

8    complaint when in fact there wasn't a claim because if there

9    was, then it would have been brought timely.  It's not

10   brought timely.

11          So I would encourage the Court to follow the

12   Supreme Court precedent, *Guaranty Trust Co. v York*, and

13   under that I believe the Court must apply state substantive

14   law regardless of the public policy concern.

15          Facebook also claims that the statute of

16   limitations should be ignored because there was fraudulent

17   concealment.  Specifically, Facebook alleges that not until

18   it had the opportunity to conduct its unilateral discovery

19   did it discover that Kickflip divested assets to Gambit.

20          But that is a red herring because the conduct

21   that Facebook complains of occurred in 2009.  The harm that

22   Facebook alleges occurred in 2009.  We know this because

23   Facebook sent a demand letter to Kickflip back in 2009 and

24   then it asserted these same claims.  So nothing was concealed.

25   And, in fact, the harm that it complains of specifically of

1    so-called misleading ads, well, those misleading ads, if

2    they existed, weren't concealed from Facebook because

3    Facebook brought them to Kickflip's attention back in 2009.

4              Then, in addition, there was no fraudulent

5    concealment of the divestment of assets.  Rather, when

6    Kickflip brought its motion to dismiss, Facebook's response

7    was submitting a letter that it received from Kickflip back

8    in 2009 announcing this divestment.  So there couldn't have

9    been a fraudulent concealment, and the Court should apply

10   the statute of limitation, and must apply Delaware law,

11   which means these claims are barred because they became ripe

12   in 2009, the statute expired in 2012, and Facebook didn't

13   file until 2013.

14             If the Court disagrees and believes that the

15   statute of limitations was tolled, then the Court should

16   dismiss the counterclaims because none of them properly

17   state a claim.

18             I'll start with the first which is breach of

19   contract.  Facebook points out that the elements of a

20   contract are that there has to be a contract, that there

21   have to be a breach and damages.

22             But Facebook doesn't allege facts to properly

23   state that there is a contract.  Under *Iqbal* and *Twombly*,

24   this Court is required to separate legal conclusions from

25   factual allegations and confirm that factual allegations

1     give rise to those legal conclusions.

2               Facebook says that Kickflip is asking this Court

3     to require it to plead with particularity, and that is not

4     what Kickflip is doing.  Rather, Kickflip just asked

5     Facebook to plead an offer and acceptance, but Facebook's

6     complaint doesn't do that.  Nowhere in the complaint does

7     Facebook indicate how Kickflip could have possibly agreed

8     to its so-called agreement.

9               It doesn't really say what the agreement is.  It

10    cites a user agreement with all users of Facebook but doesn't

11    say that Kickflip agreed to it.  It cites advertising

12    guidelines but doesn't even say that those guidelines were a

13    contract or anything more than just mere guidelines which is

14    what title says they are.

15              Nowhere in the complaint is there any indication

16    of an offer and an acceptance or that Kickflip agreed to the

17    contract that they are suing under.

18              Nor is there a proper allegation of breach.

19    Even if you look at the user agreement, the user agreement

20    governs the use of Facebook and every user must agree to it

21    in order to get an account.

22              But Facebook doesn't allege that Kickflip was

23    using an account.  Rather, Facebook says Kickflip was doing

24    business with third-party developers who had contracts.  And

25    that Kickflip breached as a result, not because it was using

1    Facebook's site.  So there is no allegation of breach.

2             Similarly, the allegation of the advertising

3    guidelines when there is no contention that it's a contract

4    in the first place can't give rise to a breach.

5             Finally, damages are too speculative to qualify.

6    They would be special damages and those must be pled with

7    particularity.

8             The only damages that Facebook alleges is

9    unfavorable press coverage, and it wasn't press coverage about

10   Kickflip that damaged just Facebook.  Rather, it was press

11   coverage about lots of different advertising providers,

12   including, but not limited to, Kickflip that caused damage to

13   Facebook and other social networks.

14            So that leads to the conclusion if Kickflip was

15   never around, this unfavorable press attention would have

16   occurred because there were these other ad providers that

17   are unidentified that caused the same injury.  And since the

18   injury would have arisen in any event, Kickflip couldn't

19   have caused that injury.  Thus, no damages are pled.  And if

20   damages are pled, they must be pled with particularity

21   because they don't arise, they don't flow directly from the

22   contract.  They're indirect, they're special damages.  They

23   should be pled with particularity.

24            I'll move on to the tortious interference claim.

25            The Court should dismiss the tortious interference

1    claim because in order for there to be a tortious

2    interference with a contract, there has to be a breach of

3    the contract.  Here, Facebook does a nice job of identifying

4    several developers with whom it did business, but the complaint

5    does not identify a breach by any of these developers.

6             The complaint talks about how Kickflip knew

7    there was going to be a breach and was negligent in its

8    operation because there would be a breach, but nowhere in

9    the complaint is a breach identified.  And without a breach,

10   there can't be a tortious interference.

11            Then finally the fraud claim.

12            Rule 9 of the Federal Rules of Civil Procedure

13   requires fraud to be pled with particularity.  That means

14   Facebook as the putative claimant here has the burden of

15   showing the who, what, when, and where of the claim.  They

16   have to cite the fraudulent misrepresentation.  They have to

17   say who said it.  They have to say that it was reasonable

18   reliance on their part and that they suffered damages and

19   that the speaker knew that the statement to be false.

20            There is only two statements identified.  One

21   by Kickflip's Noah Kagan that in May 2009, Kickflip was

22   not serving ads with adult content.  And the second is a

23   statement by a lawyer in November of 2009 stating that at

24   the time, Kickflip intended to comply with Facebook's

25   demand.

1              As to Noah Kagan's statement, there is no

2    allegation that when he said Facebook was not serving adult

3    content ads, that it was faulty.  That, in fact, that they

4    were serving adult content ads.  Nor that Mr. Kagan believed

5    that they were serving adult content ads when he says that

6    they weren't.  And if it were a statement of present

7    intention, which it is not, that is Facebook's argument,

8    there is nowhere in the complaint that alleges that after

9    May of 2009 that Kickflip ever served an ad that contained

10   adult content.  Thus, that statement couldn't qualify as a

11   fraudulent misrepresentation.

12             As to the lawyers' letter, similarly in

13   November, when the lawyers sent the letter saying that

14   Kickflip intended to comply with Facebook's demand, there is

15   no allegation that the lawyer believed that statement to be

16   false.  There is no allegation that Kickflip believed that

17   to be false.  And, more importantly, there is no allegation

18   that after November 2009 Kickflip ever served an ad that

19   violated Facebook's policy.

20             To the contrary, Facebook banned Kickflip.  There

21   weren't any ads served.  So even if that statement was false

22   that Kickflip intended to comply, which it wasn't, since there

23   was never an ad later served, then that statement could not

24   have been false, damages also couldn't have arisen, and the

25   Court should dismiss the fraud claim because it wasn't pled

1    with particularity.  The two statements that were provided

2    don't give rise to a fraud claim.

3              So I think I would conclude by saying that this

4    is a very simple issue.  It's the statute of limitations.

5    It's a three year statute.  The Court cites public policy

6    concerns that Facebook writes about, but the United States

7    Supreme Court says this Court must follow Delaware law, and

8    it is settled in Delaware that the filing of the counter-

9    claims do not relate back to the filing of the original

10   complaint, the statute has run, and the claim should be

11   dismissed.

12             Thank you.

13             THE COURT:  Thank you very much.  I'll hear from

14   Facebook.

15             MR. GIMBLETT:  Thank you, Your Honor.  I'll move

16   quickly.

17             Let me begin with the statute of limitations

18   point, and, specifically, whether this Court is compelled to

19   apply Delaware State law on tolling of the counterclaims.

20             Let me start by pointing out that plaintiff

21   acknowledges that this rule only applies to affirmative

22   counterclaims.  Therefore, if Your Honor was to agree with

23   them on this point, Facebook would ask you to construe the

24   counterclaims as defensive ones for recoupment or offset.

25   Alternatively, if you believe an amendment would be necessary,

1    to give leave to amend.

2           But you don't need to go there because you do

3    have the discretion to apply a majority federal rule here

4    which is contrary to Delaware's.  You have that discretion

5    because under *Erie*, *Erie* is not a dictate to you that there

6    has to be at all times complete powers, parallelism of the

7    outcome that would have prevailed in state court.

8           The Supreme Court has been very clear on this

9    in *Hanna v Plumer* and the *Byrd* case that if you are

10   confronted with a situation where applying federal law or

11   state law is outcome dispositive, then it's appropriate to

12   weigh the policies behind the *Erie* doctrine:  discouragement

13   of forum shopping, the equitable administration of justice,

14   along with any countervailing federal interests.  And

15   Facebook would submit that when you do that, that both of

16   those twin interests actually argue in favor of applying the

17   federal law here and that there are strong federal law

18   policy interests that are implicated here.

19          So forum shopping.  This claim could be brought

20   in a California court.  That is where the underlying events

21   took place.  California has a shorter statute of limitations

22   but it has the opposite rule on tolling of counterclaims.

23   And so applying Delaware State law here rewards plaintiffs

24   for forum shopping.

25          The equitable administration of law.  There is

1    no doubt, as you pointed out in your questions to opposing

2    counsel, that the effect of the timing of this complaint is

3    to create an unequal playing field to allow plaintiffs to

4    assert affirmative claims.  But if you follow that advice

5    and apply the state law, you deny Facebook the ability to

6    counter that with affirmative counterclaims of their own.

7            In terms of federal interests, opposing counsel

8    tried to suggest that we're hanging this argument on a

9    single Eastern District of Pennsylvania case which was

10   misguided.  But actually federal courts do this all the

11   time.  Federal courts do weigh the federal policy interests.

12           And since a lot of new cases are being cited

13   today, I'd point you to *Esfeld v Costa Crociere Spa*, if I'm

14   pronouncing that correctly, an 11th Circuit case, 289 F.3d

15   1300, in which precisely this process of weighing the

16   federal interest, weighing the implication of the *Erie*

17   policies was gone through, and that Court decided it was

18   going to apply federal law rather than state law when the

19   usual operation of *Erie* might have counseled the application

20   of state law.

21           The interests here is that there is nothing

22   to be -- there is a strong federal interest in avoiding

23   unnecessary litigation.  That is why there is a policy in

24   favor of arbitration.  That is why courts actively encourage

25   ADR as opposed to litigating outcomes.  And on the facts

1    of this case, applying state law does create this perverse

2    incentive where a party in Facebook's situation to avoid the

3    kind of prejudice that it faces now would have affirmatively

4    have brought suit itself as opposed to allowing the issue to

5    die at the expiration of the statute of limitations.

6           Let me move on to the individual claims and the

7    suggestion that they have not been pled sufficiently.

8           What plaintiff has tried to do here is a

9    familiar tactic since *Iqbal* and *Twombly*, which is to raise

10   the pleading burden to incredible levels.  But *Iqbal* and

11   *Twombly* did not displace Rule 8 which counsels a short

12   simple statement of claim.

13          On each of these claims, Facebook has met its

14   pleading burden.

15          On breach of contract, our burden was to allege

16   a contract.  We've done that.  We alleged that.  The

17   Facebook terms are applicable to all users of Facebook.

18   They're applicable for all uses of Facebook.  We allege,

19   paragraph 8 of the counterclaims, that Kickflip used the

20   website and was therefore subject to the terms.

21          Did Facebook need to pled its damages with

22   particularity?  Well, no, because as the District of

23   Delaware case that we cite in our brief makes clear, the

24   only damages that need to be pled with particularity are

25   those that are not the natural and proximate result of the

1    conduct at issue.

2         But, here, you have by Kickflip's own admission,

3    reputation being an incredibly importantly thing on a social

4    network platform like Facebook and therefore it is entirely

5    natural and foreseeable that the constant serving of

6    non-compliant ads, adult content, deceptive advertisements

7    is going to undermine trust in the platform, create a state

8    of adverse press attention, and the counterclaims cite a

9    number of articles which specifically single out Facebook as

10   a place where users are being scammed.  And it is entirely

11   foreseeable from that that there will be a loss of users and

12   there will be monetary implications.

13        THE COURT:  So to be clear, the contract that

14   you are alleging existed directly between you and Kickflip

15   is your terms of use policy.

16        MR. GIMBLETT:  Correct, because they were a

17   user of Facebook, and they admit as much in their letter of

18   November the 9th, 2009 in which they tell Facebook we ceased

19   our use of Facebook.  We're removing our applications.

20        In fact, in their letter of November the 12th,

21   which is also attached to the motion of summary judgment,

22   there is something like 100 applications that they say they

23   have shut down.

24        THE COURT:  So it's your contention that there

25   is offer and acceptance of a contract in a contractual

1    relationship simply by any use of Facebook?

2             MR. GIMBLETT:  What we needed to plead in the

3    complaint was that there was a contract, and we have done

4    that because we say that it's a required term of use for

5    Facebook that users abide by these terms, by the Facebook

6    terms.

7             THE COURT:  On that theory, is it Facebook's

8    belief that it has a breach of contract action against any

9    user, no matter how big or small, if they simply violate any

10   provision of the terms of use?

11            MR. GIMBLETT:  Well, if you look at the terms of

12   use, you will find that they are, particularly addressing

13   your point about small users, regular Facebook users.  You

14   will see that there are not many terms there that are

15   particularly demanding.  The demanding terms enter into the

16   picture when you have third parties or developers who are

17   putting content into the ecosystem which can undermine its

18   integrity, which can destroy user confidence in it.

19            And, yes, I believe Facebook should be able to

20   enforce its terms to prevent other parties from free-riding

21   on the platform and destroying its value both to Facebook

22   and to this huge user population around the world.

23            THE COURT:  And where is the allegation of a

24   breach by Kickflip?

25            MR. GIMBLETT:  The counterclaims set out in the

1    early paragraphs the whole series of terms.  And then there

2    are three specific non-exhaustive examples of ads that

3    violated those terms.  I believe for each of those examples,

4    we explain in counterclaims what was the term that was

5    breached.

6              So you have one ad which purported to give users

7    free credits for just $4.95 packaging.  Then these users,

8    without their knowledge, suddenly signed up to a $20 per

9    month continuation fee.  Deceptive, and that clearly

10   violates the terms that are recited in the early part of the

11   counterclaims.

12             Other examples that go to adult content.  Again,

13   that's clearly set out in the amended counterclaims as a

14   term that for obvious reasons Facebook doesn't want its

15   users being bombarded with adult content without the

16   appropriate age restrictions.

17             THE COURT:  On the damages allegations, what

18   about the argument that this reputational damage would have

19   existed basically saying whether or not Kickflip existed or

20   not?

21             MR. GIMBLETT:  That sounds like the reverse of

22   the *Khodara* argument.  The idea that, well, just because but

23   for if we weren't doing it, there would be an injury

24   anyway is precisely the sort of argument that *Khodara*

25   rejected.  Double causation.  The fact others might have

1   been doing it still doesn't excuse Kickflip for their own

2   violations.

3            Let me move on to the inducement of breach of

4   contract where really I find somewhat bemusing the suggestion

5   that we didn't plead that sufficiently.  The amended counter-

6   claims are very clear.  In paragraph 8, there is a list of

7   developers who were solicited by Kickflip to run their ads.

8   One of those users is Zynga.

9            In paragraph 13, I believe it is, there is a

10  description of a warning that was given to ad networks to

11  clean up their acts on October 26th, 2009.  Then there is an

12  allegation that after that date, Kickflip's noncompliant ads

13  continued to run on a Zynga application.

14           I think if you put those two things together, it's

15  absolutely clear that we have pled breach of the contract by

16  one of these developers after being induced by Kickflip.

17           THE COURT:  So the claim should be read as

18  alleging at least in part a breach of a contractual relation-

19  ship by Zynga with Facebook.

20           MR. GIMBLETT:  Right.  It's in the nature of this

21  inducement claim, also described as tortious interference,

22  that if this third party comes in and causes the breach by

23  Zynga, then they're liable under this theory.

24           THE COURT:  But you are acknowledging that you

25  will have to prove, if this claim stays in the case, that

1    Zynga breached a contractual relationship with Facebook.

2               MR. GIMBLETT:  Correct, Your Honor.  But at

3    this stage, all we have to do is plausibly allege it, and we

4    did more than that in the amended counterclaims.

5               Then, finally, moving on to the fraud claim.

6               We cite in our opposition brief a case which

7    makes clear from this Circuit that our burden is to plead

8    with sufficient particularity to put the plaintiff on

9    notice of the claim.  Again, this idea that we have to use

10   precisely the words that were uttered by a speaker or any

11   other number of details is not supported by the case law.

12   We need to put them on notice, and that is what our claims

13   do.

14               We allege repeated statements that were misleading

15   throughout this period.  We have given two very concrete

16   examples.  The statement of May 22nd by Noah Kagan and the

17   letter from Mr. Benisek of November the 6th.

18               The plaintiff argues that these weren't

19   misleading, but there is a certain amount of repackaging of

20   what was said.  So Mr. Kagan, as our amended counterclaim

21   makes clear, represented that none of the ads that were

22   being served by Kickflip contained adult content.  And when

23   that statement is repeated time and time again, it's not

24   limited to a statement, well, the ads that are out there

25   right now at this very instant being shown by developers, none

63

 1    of them had adult content.  It is a broader representation.

 2    It's a representation of this is our policy.  We do not show

 3    ads with adult content.  And yet, in fact, time and again,

 4    Kickflip had to be brought up because of their service of

 5    noncompliant ads, including ads with adult content being given

 6    in the amended counterclaims, in fact, the gaming examples.

 7            The statement on November the 6th by Kickflip's

 8    lawyer is an even clearer example of a misleading statement

 9    of present intention.

10            There, the message that was being passed to

11    Facebook was we want to clean up our act.  We want to make

12    sure that we're compliant with your cease-and-desist order.

13    We are pulling all our ads off the system and pulling our

14    applications off, and yet it is an absolutely plausible

15    inference of the allegations in the amended counterclaim

16    that this statement being made on a Friday;   on the Monday

17    following that, Gambit Labs is incorporated, Gambit Labs

18    enters into an agreement with Kickflip, the   same

19    shareholders.  The arrangements between Gambit Labs  and

20    Kickflip for the transition contemplated Kickflip continuing

21    to serve developers in a transitional role until the

22    contracts could be transferred on to Gambit Labs.  And so

23    the proximity of those ads with the statement which gave

24    every appearance of assuring Facebook that Kickflip was

25    going to comply was certainly misleading and Facebook has

1    met its pleading burden there.

2              If Your Honor has no further questions, I

3    will ...

4              THE COURT:  No further questions.  Thank you.

5    We'll hear some brief rebuttal.

6              MR. NEWMAN:  Your Honor, in response to our

7    statute of limitations arguement, and our citation to a U.S.

8    Supreme Court case, Facebook argues that this Court has

9    discretion under *Erie* to apply whatever standard it wishes.

10             I would turn to the language of that Supreme

11   Court case.  I think it is pretty clear.  The holding is,

12   "If the statute of limitations would bar recovery in a state

13   court, a federal court ought not afford relief."

14             And in support, Facebook cites a new case that I

15   just read for the first time today.  I don't believe it was

16   in the briefing.  It was *Esfeld v Costa Crociere Spa,* 289

17   F.3d 1300.

18             That case did not discuss this issue.  The

19   question wasn't whether to apply state law or federal law to

20   a statute of limitations issue.  Rather, the issue that we're

21   discussing here has been decided by *Guaranty Trust Co. v York*.

22   That case was about forum non conveniens, and in that case the

23   11th Circuit held that there is strong federal interest in

24   forum non conveniens, and based upon that it is a federal

25   procedure issue, not a state substantive issue, and so under

1      *Erie*, it would be a federal procedure issue.  You apply

2      federal law.  This case is distinguished because here we're

3      talking about the statute of limitations and the Supreme Court

4      said that is under state substantive law and the Court does

5      not have discretion.

6                  As to whether the counterclaims are defensive

7      recoupment, they're not.  Defensive recoupment counterclaims

8      would be like if there was a breach of contract claim and

9      the plaintiff had breached.  Since the plaintiff breached,

10     there is a defense.  That would be defensive recoupment.

11                 Here, the four state law counterclaims that

12     Facebook brings aren't defensive or recoupment to the

13     antitrust claims that Kickflip brings.  And then,

14                 Finally, as to the contract issue.  Even if

15     Kickflip were a user, there is no allegation that Kickflip

16     ever accepted a contract.  And, more importantly, there

17     is no citation to any clause in the contract that would

18     forbid Kickflip from doing the business that it did with

19     developers.  So even if there is a clause that says that

20     when you are on Facebook you can't display deceptive ads,

21     and I don't think that Facebook has even gone that far,

22     there is no clause that says you can't do business with a

23     third party who may display deceptive ads.  Thus, there is

24     no claim stated for breach of contract.

25                 And if the Court doesn't have any further

1     questions?

2              THE COURT:  No further questions at this time.

3              MR. NEWMAN:  Thank you.

4              THE COURT:  Thank you.  Do you have something

5     you want to say?

6              MR. STRANGE:  Your Honor, I have a practical

7     solution that I wanted to raise with the Court and see how

8     you would like us to handle it, which is that while, based

9     on the authority, I believe we should prevail on this

10    motion, I don't want to have this issue hanging over our

11    head about Gambit Labs even on appeal, if we go there.  And

12    since we control Gambit Labs, we have a number of options,

13    and probably the simplest is for us to merge Gambit Labs

14    claims into Kickflip and file an amended complaint.

15             So I wanted to raise that issue with the Court

16    because if we do that, it may affect how the Court wants us

17    to proceed.  I have not raised it with Facebook.  I'm just

18    doing it now.  But I wanted to raise that now, and I will

19    meet and confer with them and let the Court know because it

20    just seems like there is a simple solution to this issue of

21    whose claim is it, and since we control above, it may be

22    the solution to what we're dealing with here today.

23             THE COURT:  All right.  Well, that is certainly

24    an interesting suggestion.  I'm not going to rule anything

25    in that.  I do want to give Facebook a chance to respond at

1    least initially to it but I'm ultimately going to have you

2    talk to one another.  Go ahead.

3                MR. GIMBLETT:  Thank you, Your Honor.  Of

4    course, this solution was available 15 months ago when

5    Facebook filed its motion to dismiss and raised the very

6    question of divestment and whether Kickflip was able to

7    assert claims on behalf of Gambit Labs.  That would have

8    been the time to amend.

9                There is a bigger problem here, though, which

10   is that you need to satisfy yourself before any amendment that

11   you have subject matter jurisdiction over this complaint,

12   because if there is no subject matter jurisdiction, Gambit

13   Labs can't now come in and try to bootstrap itself to nothing.

14   So if the motion should be granted as submitted, summary

15   judgment should be entered, there should be no question of the

16   amended complaint.

17               THE COURT:  All right.  Well, I'm not taking a

18   view yet about anything.  Have a seat for a moment.

19               Even before that last suggestion, I was going

20   to need some assistance from you all as to how to proceed,

21   but certainly in light of the most recent issue, I certainly

22   want to give you time to meet and confer and give me your

23   respective proposal or proposals as to how this case should

24   proceed.  Whether there should be an amendment, whether

25   there is going to be a corporate transaction, I don't know.

1    I don't mean to preclude anything either way.

2              So here is what I'm ordering.  I want to hear

3    back in a week, a week from today.  Get me a joint status

4    report.  And it should include at a minimum your proposal or

5    proposals as to how the case should proceed in light of any

6    developments there may be or anticipated to be in relation

7    to Gambit Labs or anything else.

8              I also would like to know if there had been

9    cases cited I think here today that weren't in the briefs.

10   If either side wants an opportunity to be heard in writing

11   as to what impact, if any, there is to the newly cited

12   authorities, tell me you want that opportunity and how you

13   propose to take advantage of that.  And then,

14             Finally, with respect to the motion to strike,

15   I am inclined to grant some relief to the defendant.  My

16   inclination at the moment would be that it would be in the

17   nature of an additional deposition.  There may be some

18   discovery to the extent privilege is not being asserted or

19   is found to be waived, and I'm inclined to shift some costs

20   in connection with that.  But I also understand Facebook's

21   argument that maybe I should first make the decision on

22   their other grounds that are already fully briefed before we

23   go down that road.

24             So I want you all to talk about that and put in

25   this joint status report whether you have reached agreement,

1    and if you haven't, how you suggest that I proceed in light

2    of all of what I have just said.

3             So I need you all to put your heads together and

4    get back to me a week from now, and then I will decide how

5    to proceed.

6             Are there any questions about that or any other

7    issues from the plaintiff?

8             MR. NEWMAN:  Your Honor has suggested

9    supplemental briefing on new authority.  And I believe that

10   there has only been one new authority cited today, Facebook

11   cited it; and if there is any other, I would change my

12   position, but if that is it, I would suggest there not be

13   any supplemental briefing.

14            THE COURT:  And I also can't tell how many were

15   new and not new, but you all figure that out, and if it's

16   just one and nobody wants it, then put that in your report

17   next week.

18            MR. STRANGE:  I did cite a case, and I'm happy

19   to give that.

20            THE COURT:  You will report back to me next week

21   on that.  Is there anything else from plaintiff?

22            MR. STRANGE:  Do you have any thoughts about the

23   page limits for the status report?

24            THE COURT:  I'll just say the less the better,

25   but no, I don't.

1          MR. STRANGE:  All right.  Thank you, Your Honor.

2          THE COURT:  Are there any questions about what I

3     have said or any questions, other issues from defendants?

4          MR. GIMBLETT:  Nothing from Facebook.  Thank

5     you, Your Honor.

6          THE COURT:  All right.  Thank you all very much.

7          (Hearing ends at 1:50 p.m.)

8

9          I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.

10

11                        /s/ Brian P. Gaffigan
                          Official Court Reporter
12                         U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25