IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KICKFLIP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1369-LPS |
| | ) | |
| FACEBOOK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Mary B. Matterer, Kenneth L. Dorsney, MORRIS JAMES LLP, Wilmington, DE
Derek A. Newman, Derek Linke, NEWMAN DU WORS LLP, Seattle, WA
Brian R. Strange, Keith L. Butler, STRANGE & CARPENTER, Los Angeles, CA

    Attorneys for Plaintiffs

David E. Ross, Benjamin J. Schladweiler, SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, DE
Thomas O. Barnett, Jonathan Gimblett, COVINGTON & BURLING LLP, Washington, D.C.

    Attorneys for Defendants

March 31, 2015
Wilmington, DE

**STARK, U.S. District Judge:**

Plaintiff Kickflip, Inc., doing business as Gambit (hereinafter "Plaintiff" or "Kickflip") filed this action against Defendant Facebook (hereinafter "Defendant" or "Facebook") on October 26, 2012 alleging antitrust violations, as well as tortious interference with Gambit's contracts and prospective business opportunities, in relation to Facebook's virtual-currency service, Facebook Credits, and Facebook's social-gaming network. (D.I. 1) Facebook filed its answer and counterclaims against Kickflip on October 18, 2013 (D.I. 31), which Facebook then amended on December 3, 2013 (D.I. 47). Facebook's amended counterclaims assert against Kickflip: breach of contract (Count I), inducement to breach of contract (Count II), and fraud (Count III). (*Id.*) Facebook requests compensatory and injunctive relief in addition to judgment in its favor on the three counterclaims. (*Id.*)

On December 31, 2013, Kickflip moved to dismiss Facebook's amended counterclaims under Delaware's statute of limitations and Federal Rule of Civil Procedure 12(b)(6). (D.I. 49) The Court heard argument on Kickflip's motion on April 4, 2014. (*See* D.I. 72) ("Tr.")[1]

## I. BACKGROUND

Facebook operates a social networking service that enables users to connect and share information with their friends and family. (D.I. 47 ¶ 1)[2] Kickflip is a virtual currency and payment processing provider, and offers its services to software developers that publish games on

---

[1] Also argued at the same hearing was Defendant's Motion for Summary Judgment for Lack of Standing (D.I. 51), which remains pending, as briefing and discovery are ongoing according to the schedule stipulated to by the parties (*see* D.I. 83).

[2] Unless otherwise specified, numbered paragraph references to D.I. 47 refer to Facebook's counterclaims section of its answer.

1

Facebook and other social networks.³ (D.I. 1 ¶ 2) These games are typically free to play, but players can "improve the game experience" by acquiring virtual goods and spending "virtual currency," which can be bought with real money or earned by viewing advertisements or otherwise interacting with an in-game advertiser. (*Id.* ¶ 3) While game developers recognize the value of monetizing their game play, according to Kickflip "most social-game developers remain[] focused on game development and hire[] third-party virtual-currency service providers." (*Id.* ¶ 34)

In 2007, Facebook launched its "Platform," allowing developers to make their applications and games available via Facebook, which allowed developers to "create games in which players can cooperate and/or compete with their real-world friends with minimal effort spent signing up or connecting." (*Id.* ¶¶ 25, 28) Facebook has developed a series of terms and policies (hereinafter "Terms") governing the use of its services. As alleged in Facebook's counterclaims:

> . . . Developers and other operators of Platform applications are required to agree to the Terms applicable to them as a condition of their use of Facebook's services. The Terms include (a) the Statement of Rights and Responsibilities ("SRR"), which applies to both users and developers; (b) the Platform Policies, which apply to developers; and (c) the Advertising Guidelines, which apply to all parties displaying advertisements on Facebook, including on applications that are made available on Facebook through the Platform.
>
> The operative SRR in November 2009 incorporated by reference the Platform Policies and Advertising Guidelines as "Special Provisions Applicable to Developers/Operators of Applications and Websites." The SRR further provided that "[i]f

---

³The Facebook Platform enables third-party developers to make their applications (including games) and other services available to Facebook users. (D.I. 47 ¶ 1)

2

you violate the letter or spirit of this Statement, or otherwise create possible legal exposure for us, we can stop providing all of part of Facebook to you."

The obligations assumed by developers under the SRR included the following commitments designed to keep Facebook safe:

- You will not develop or operate a third party application containing, or advertise or otherwise market alcohol-related or other mature content without appropriate age-based restrictions.

- You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory.

- You will not facilitate or encourage any violations of this Statement.

Developers that displayed advertisements on Facebook also were prohibited under the operative Advertising Guidelines from:

- Developing advertisements or using the Facebook website in ways that violate Facebook's Advertising Guidelines.

- Misleading Facebook users.

- Sending users to different landing pages than the advertised page when they click on the advertisement.

- Using landing pages that generate pop-ups, pop-overs, pop-unders, or "fake" application close behavior.

- Promoting gambling without authorization from Facebook.

- Promoting alcoholic beverages in violation of Facebook's specific guidelines.

- Giving data you receive from Facebook to third

3

> parties, including ad networks, or using data you receive or collect through running an ad, including information you derive from your targeting criteria, for any purposes off of Facebook, without user consent.
>
> - Using misleading advertisements to promote subscription services.
>
> The operative Platform Policies included the following obligations for developers:
>
> - You must not confuse, mislead, surprise, or defraud anyone.
>
> - You must not give data you receive from us to any third party, including ad networks.
>
> - You much not promote or provide content (including any advertising content) referencing, facilitating, containing or using . . . adult content . . . liquor, beer, wine or other alcoholic beverages . . . gambling . . . [or] other advertising or marketing content that violates applicable laws, regulations or industry standards.

(D.I. 47 ¶¶ 2-6) (internal paragraph numbering omitted)

Kickflip began developing social games soon after Facebook's Platform launched, but in 2008 stopped developing games and began exclusively providing virtual-currency services[4] and advertising services to social-game developers. (D.I. 1 ¶ 36; D.I. 47 ¶ 8) Facebook describes Kickflip's business in 2009 in its amended answer and counterclaims.

> In 2009, Kickflip operated an advertising service for application developers including developers on the Facebook platform. Kickflip operated its advertising service under the trade

---

[4]Facebook's answer submits that the phrase "virtual currency services" is vague and ambiguous. (*See, e.g.*, D.I. 47 ¶¶ 34, 36, 39) The Court does not attempt to define the term at this time, but uses it in the context in which it is presented by Plaintiff's complaint.

> name "Gambit." In at least some of the advertisements that Kickflip served on applications available through Platform, Facebook users were promised rewards in return for accepting an offer, completing a survey, purchasing a subscription or other activity.

(D.I. 47 ¶ 8)

In April 2009, Facebook determined that deceptive ads[5] were appearing on Facebook's Platform, and that some of those ads had been served by Kickflip. (*Id.* ¶ 9) Facebook asserts that it contacted Kickflip to discuss the ads, and others that appeared in the following months, which "were deceptive or otherwise violated the Facebook Terms." (*Id.* ¶ 10) Facebook states that it asked Kickflip to take corrective action regarding these ads. (*Id.* ¶ 9)

According to Facebook, Kickflip repeatedly assured Facebook that it would comply with the Facebook Terms. (*Id.* ¶ 11) It is undisputed that on May 22, 2009, Noah Kagan, a principal of Kickflip, "represented that none of the ads with offers served by Kickflip contained adult content." (*Id.*) However, Kickflip allegedly continued to provide non-compliant ads to developer applications. (*Id.*)

> Despite Facebook's repeated warnings, and Kickflip's repeated representations that it would comply with the Facebook Terms, Kickflip continued to serve ads to developer applications on Facebook that violated the Facebook Terms. Kickflip knew that the appearance of these non-compliant advertisements on applications available to Facebook users through Facebook Platform placed both Kickflip and the developers of those applications in violation of their contractual obligations to Facebook.

---

[5]Facebook's amended answer gives examples of the offending ads, including ads that promoted gambling and alcohol, and one ad that "purported to award in-game currency in the user paid 'just $4.95 for shipping and handling'" . . . Users who accepted the offer would, however, subsequently receive a 'continuity program' bill for Can$89.95 every month." (D.I. 47 ¶ 10)

5

(*Id.*)

Facebook also asserts that in late October and early November 2009, "the extent of deceptive advertising on Facebook and other social networks by Kickflip and other companies attracted strong press attention . . . This press coverage caused significant harm to Facebook's reputation with users as a safe environment in which to share with friends and family." (*Id.* ¶ 12)

According to Facebook, on October 29, 2009, Facebook sent Kickflip and other offending ad providers a notice asking for all violations to be corrected, and warned that enforcement action would follow. (*Id.* ¶ 13) Facebook alleges that Kickflip continued to serve ads that violated the Facebook Terms. (*Id.*) In a blog post published on November 4, 2009, Kickflip admitted that it had been serving "higher risk" ads and that as a result, Kickflip had been receiving a "fair share of user complaints." (*Id.* ¶ 14) On November 5, 2009, Facebook sent Kickflip a "cease and desist" letter stating that, because of Kickflip's "failure to conform its advertising practices to the Facebook Terms, Kickflip was no longer authorized to access the Facebook website, use the Facebook Platform, advertise on Facebook, or use any of the services offered by Facebook." (*Id.* ¶ 15)

On November 6, 2009 Kickflip assured Facebook that it was taking steps to comply and it expected to be in compliance by November 9, 2009. (*Id.* ¶ 16) On November 9, 2009, Kickflip informed Facebook that it had "discontinued its use of the Facebook website and Platform and will continue to do so until reinstated by Facebook." (*Id.*) On November 12, 2009, Kickflip told Facebook that "at least 99% of all Gambit traffic is off of Facebook, and likely 100%." (*Id.*)

However, Facebook alleges that during this time Kickflip and its principals told developers that the Gambit service was "100% compliant" with the Terms and not banned from

Facebook. (*Id.* ¶ 17) A November 25, 2009 email signed by "Andrew, Chris, Noah, and the rest of the Gambit Team," represented that Kickflip was still running ads on the Facebook Platform and that the Gambit services "are, and have always been, up and running without disruption." (*Id.*) Facebook fielded "numerous inquiries" from developers regarding Kickflip's communications after November 5, 2009, and "sought clarification on whether they could use the Gambit service." (*Id.* ¶ 18)

On November 25, 2009, Facebook published on its Developer Blog a list of service providers, including Gambit, that were no longer permitted to operate on Facebook. (*Id.*)

## II. LEGAL STANDARDS

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gittis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Thus, the Court may grant such a motion only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). While heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be

alleged. *Twombly*, 127 S.Ct. at 1974. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter School Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## III. DISCUSSION

### A. Statute of Limitations

Delaware law imposes a three year statute of limitations for claims of breach of contract, inducement to breach of contract, and fraud. *See* 10 Del. C. § 8106(a). Facebook filed its original answer in October 2013, amending it and asserting the additional breach of contract counterclaim in December 2013.[6] Thus, its counterclaims were untimely if they arose before 2010 – unless a tolling doctrine applies. The claims Facebook seeks to press – breach of contract, inducement to breach of contract, and fraud – all accrued, at the latest, in November 2009, as Facebook does not allege that any ads in violation of the Terms were displayed to Facebook users after November 2009.

---

[6]Although the breach counterclaim was asserted after the original counterclaims, and thus arguably the statute of limitations began running later for that claim, the difference is immaterial in the present context because the facts supporting all the counterclaims arose during or before November 2009.

Facebook contends that its counterclaims are, nonetheless, timely because they are compulsory counterclaims. The majority view in federal court is that "the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim." *Giordano v. Claudio*, 714 F.Supp.2d 508, 523 (E.D. Pa. 2010). The Federal Rules of Civil Procedure define a compulsory counterclaim as one which "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A).[7]

Kickflip's complaint alleges antitrust violations and tortious interference with business prospects resulting from Facebook unilaterally banning Kickflip from providing virtual-currency services on the Facebook Platform. (*See* D.I. 1) Facebook's counterclaims allege breach of contract, inducement to breach of contract, and fraud, resulting from repeated violations of Facebook's Terms by Kickflip's advertisements, which led to Kickflip being banned. The counterclaims brought by Facebook "arise out of the transaction or occurrence that is the subject matter of" Kickflip's original claims; in fact, the two sets of allegations are merely two sides to the same coin. At bottom, Kickflip asserts that it was wrongly banned from Facebook, alleging that Facebook's monopolistic drive was the motive for the ban, while Facebook justifies its ban based on Kickflip's noncompliance with the Terms. Facebook's counterclaims, in effect, are a defense against Kickflip's allegations.

---

[7]Kickflip argues that it is "settled law" in Delaware that counterclaims are usually not tolled. (D.I. 64 at 1) The cases cited by Kickflip stand for the proposition that *affirmative* counterclaims are not tolled. "It is settled law that affirmative counterclaims may not be instituted after the applicable period of the statute of limitations has expired for the reason that such claims are regarded as independent causes of action." *Nalley v. McClements*, 295 F. Supp. 1357, 1360 (D. Del. 1969).

Hence, because Facebook's counterclaims are compulsory counterclaims, they relate back to the filing of the complaint and are, therefore, timely. This suit was filed in October 2012, shortly before the three-year statute of limitations had run. Having reached this conclusion, the Court need not address the other grounds on which Facebook argues that its counterclaims are timely.

**B.     Breach of Contract**

Facebook filed its original Answer and Counterclaims on October 18, 2013, at which time it asserted only two counterclaims: inducement to breach of contract and fraud. (D.I. 31) On December 3, 2013, Facebook amended its Answer and Counterclaims to add breach of contract. (D.I. 47) Kickflip seeks dismissal of the breach of contract counterclaim on the ground that "Facebook has already once failed to cure the deficiencies in its counterclaims, [so] they should be dismissed with prejudice." (D.I. 50 at 2)

A breach of contract claim requires: (1) the existence of a contract, (2) the breach of an obligation imposed by that contract, and (3) resulting damages to the claimant. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Kickflip argues that Facebook has not pled enough facts to show there was a contract, omitting crucial information including how Kickflip agreed to Facebook's policies or why Facebook can impose its policies unilaterally on a third-party like Kickflip, who merely does business with someone who operates on Facebook (e.g., a developer). (*See* D.I. 50 at 13) "Kickflip just ask[s] Facebook to plead an offer and acceptance, but Facebook's complaint doesn't do that." (Tr. at 50)

Facebook has adequately pled its breach of contract counterclaim. Facebook's amended pleading asserts that Kickflip was a user of the Facebook website and Platform and subject to the

10

Facebook Terms, which "Kickflip accepted as a condition of its use of the Facebook website and Platform and which were contractually binding upon Kickflip." (D.I. 47 ¶ 21)

The key dispute between the parties is whether Facebook's Terms qualify as a "contract" for the purposes of Facebook's claim. It is undisputed that the counterclaims plead that Kickflip used the Facebook website, and set forth the Terms which bind Facebook's users. (*See* D.I. 47 ¶¶ 2-6, 8) ("Prior to November 9, 2009, Kickflip used the Facebook website and Platform and was subject to the Facebook Terms.") Kickflip does not point to any pleading deficiency in its motion to dismiss, but merely disagrees with Facebook as to the legal relevance of the Terms. This is not a basis on which the Court may dismiss Facebook's counterclaim.

Facebook has also adequately pled the other elements of breach of contract, namely breach of an obligation imposed by the contract and damages. Facebook identified ads which violated Facebook's Terms, constituting a breach. As for damages, Facebook cites bad press coverage, user complaints, and loss of reputation and goodwill. Although Kickflip argues these alleged "damages are too speculative to quantify" (Tr. at 51), at this stage Facebook's allegations are sufficient to withstand Kickflip's motion to dismiss.

### C. Inducement to Breach of Contract/Tortious Interference with Contract

To state a claim for inducement of breach of contract, a party must allege "[a]n intentional interference inducing or causing a breach or termination of the relationship." *Bowl-Mor Co., Inc. v. Brunswick Corp.*, 297 A.2d 61, 65 (Del. Ch. 1972). Kickflip's opening brief asserts, "A claim for tortious interference with contract requires that the defendant act with specific intent to cause a third party to breach its contract with the plaintiff." (D.I. 50 at 11) (citing Restatement (Second) of Torts § 766 cmt. h (1979)).

11

Kickflip seeks to dismiss Facebook's counterclaim on the ground that Facebook only alleges that Kickflip "encouraged" developers to use its services, which would merely constitute negligence based on "insufficient safeguards." (D.I. 50 at 11) Kickflip further contends that Facebook failed to allege that Kickflip's conduct resulted in any contract being breached, alleging instead just a "substantial certainty" that a developer would breach Facebook's Terms if it used Gambit's non-complying ad service. (*Id.*) Kickflip's contentions are unpersuasive.

Facebook's allegations show that Kickflip knew it was serving non-compliant ads as of April 2009. (D.I. 47 ¶ 19) Facebook has set forth allegations that Kickflip made statements to its developer customers that it was 100% compliant with Facebook's Terms, when in fact non-compliant ads were still being served by Kickflip and the parties were communicating nearly daily about Kickflip's progress. (*Id.* ¶¶ 15-17) The allegations are further that Kickflip was soliciting business as late as the day that Facebook revoked its privileges to use the Platform, after being informed it was serving ads in violation of Facebook's terms. (*Id.* ¶¶ 17-18) Facebook further alleges that Kickflip knew it had insufficient safeguards in place to prevent such offending ads. (*Id.* ¶ 28) Facebook adds that Kickflip's noncompliance continued after the November 5, 2009 cease and desist letter, although Kickflip made contrary representations to developers. (*Id.* ¶ 17)

In short, Facebook has sufficiently pled intent. The Court will not dismiss its inducement to breach of contract claim.

### D.     Fraud

To state a claim for fraud, Facebook must allege specific facts that: (1) Kickflip made a materially false representation of fact to Facebook; (2) with knowledge of its falsity; (3) Kickflip

12

had an intent to induce Facebook to act or to refrain from acting; (4) Facebook acted in justifiable reliance upon the representation; and (5) Facebook was damaged as a result. (D.I. 50 at 13) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)) "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9.

Kickflip contends that Facebook has failed to meet the heightened pleading standard of Rule 9, which

> requires fraud to be pled with particularity. That means Facebook as the putative claimant here has the burden of showing the who, what, when, and where of the claim. They have to cite the fraudulent misrepresentation. They have to say who said it. They have to say that it was reasonable reliance on their part and that they suffered damages and that the speaker knew that . . . statement to be false.

(Tr. at 52) Facebook responds that Kickflip's arguments are nothing more than a premature attempt to contradict Facebook's allegations with counter-allegations of its own. (D.I. 60 at 10)

In attempting to state a claim for fraud, Facebook cites a May 22, 2009 email from Noah Kagan of Kickflip, in which Mr. Kagan represented that none of the ads served by Kickflip contained adult conduct, a contention Facebook alleges was false. (D.I. 47 ¶ 11; D.I. 60 at 16) While the Court must take as true that Mr. Kagan's statement was false, the counterclaim lacks an allegation that Mr. Kagan knew his statement was false. Instead, Facebook cites evidence that Kickflip had insufficient safeguards to prevent non-complying ads from being served, and that later statements by the Kickflip team admit that they had been serving "higher risk ads." (D.I. 47 ¶ 39) Neither of these further allegations, however, are sufficient to plead fraud in connection with Mr. Kagan's May 22, 2009 email, as they allege nothing to the effect that the statements were knowingly false. (*See* Tr. at 61-62 ("We allege repeated statements that were ***misleading***

13

throughout this period.") (emphasis added))  The Court agrees with Kickflip that while its alleged conduct may have risen to the level of negligence, there are not sufficient allegations of willful misrepresentation to support a claim for fraud based on Mr. Kagan's email.

Facebook also cites a November 6, 2009 letter sent by Kickflip's attorneys, which stated that Kickflip hoped to be in compliance with Facebook's terms by November 9, 2009.  (D.I. 47 ¶ 41)  These allegations, too, fail to plead sufficient facts to support a claim for fraud, since they do not allege that the November 6 letter was a misrepresentation.

For these reasons, Facebook's fraud counterclaim will be dismissed.

## IV. CONCLUSION

For the reasons stated above, Kickflip's motion to dismiss will be granted as to Facebook's fraud counterclaim and will be denied as to Facebook's breach of contract and inducement to breach a contract counterclaims.  An appropriate Order follows.