## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KICKFLIP, INC., a Delaware corporation,

    *Plaintiff*,

    v.

FACEBOOK, INC., a Delaware corporation,

    *Defendant*.

**C.A. NO. 12-1369-LPS**

**REDACTED PUBLIC VERSION**

██████████████

## DECLARATION OF ERIC W. BENISEK

Mary B. Matterer (I.D. #2696)
Kenneth L. Dorsney (I.D. #3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com
kdorsney@morrisjames.com

Derek A. Newman (*pro hac vice*)
Derek Linke (*pro hac vice*)
NEWMAN DU WORS LLP
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
(206) 274-2800
dn@newmanlaw.com
linke@newmanlaw.com

Brian R. Strange (*pro hac vice*)
Keith L. Butler (*pro hac vice*)
STRANGE & CARPENTER
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com

**ATTORNEYS FOR PLAINTIFF
KICKFLIP, INC., D/B/A GAMBIT**

Dated: April 17, 2015

**Public version filed: April 24, 2015**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KICKFLIP, INC.

      Plaintiffs,

vs.

FACEBOOK, INC.

      Defendant.

Case No. 12-1369-LPS

## <u>DECLARATION OF ERIC W. BENISEK</u>

I, Eric W. Benisek, declare:

1.     I am a partner at the law firm of Vasquez Benisek & Lindgren, LLP.  I am licensed to practice law in the state of California and admitted to practice in all courts therein, and I have been admitted *pro hac vice* on several occasions to practice in the Federal District Court for the District of Delaware.  I have appeared before this Court in matters such as *ReefEdge Networks LLC v. Enterasys Networks Inc.*, 1:12-cv-01147-LPS.

2.     I make this declaration upon personal knowledge and, if called to testify, I would testify to the statements herein.

3.     My personal practice is in the area of intellectual property litigation and counseling, and the counseling of start-up technology companies regarding general business matters.

4.     I have no stake whatsoever in the outcome of this litigation, and I am not being compensated to provide this testimony.

5.     I make this declaration for purposes of establishing the creation and execution date

of the Contribution of Assets in Exchange for Shares Agreement (which I understand the parties refer to as the "December Agreement") between Kickflip, Inc. and Gambit Labs, Inc., and to respond to certain allegations made by Facebook in its Supplementary Reply Brief in Further Support of Motion for Summary Judgment for Lack of Standing (D.I. 95).

**BACKGROUND**

6.

7.

8.

9.

████████

## KICKFLIP'S DISPUTE WITH FACEBOOK

10.     The dispute started with a cease and desist letter from Facebook to Kickflip instructing Kickflip to stop all activity on Facebook including the Gambit service, and deactivate all accounts.  A copy of the original cease and desist letter is attached hereto as **Exhibit A.**

11.     ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████

## FORMATION OF GAMBIT LABS, INC.

12.     ████████████████████████

████████████████████████████████

██████████████████████████

13.     ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

14.  ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████ The document I created memorializing the transfer between Kickflip and

Gambit Labs was entitled "Asset Assignment Agreement" and is attached hereto as **Exhibit B** (I

understand the parties refer to this agreement as the "November Agreement").

**CREATION OF SUBSEQUENT "EXCHANGE" AGREEMENT**

15.  Since being asked to assist Mr. Smoak in preparation of his Rule 30(b)(6)

depositions, it has always been my recollection that the December Agreement attached hereto as

**Exhibit C** was created within a few months of the original formation of Gambit Labs, Inc.  I

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

16.  ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

17.  ███████████████████████████████████

**DISCUSSIONS WITH CHRIS SMOAK RE THE NOVEMBER AGREEMENT (EX. B) AND DECEMBER AGREEMENT (EX. C)**

18.

19.

**REVIEW OF MY BILLING RECORDS RELATED TO GAMBIT/KICKFLIP**

20.

21.

22.

23. ███████████████████████████████████████

███████████████████████████████████████████

**RESPONSE TO FACEBOOK'S SUPPLEMENTAL MEMORANDUM**

24.     On April 9, 2015, Kickflip's litigation counsel forwarded me a copy of Facebook's Supplementary Reply Brief In Further Support Of Motion For Summary Judgment For Lack Of Standing.  I reviewed the brief and have the following comments:

25.     I can confirm the December Agreement was drafted and signed in March 2012 and backdated effective December 2009. █████████████████████████████

26. ███████████████████████████████████████

27. 

28.     I hope my declaration has clarified the circumstances surrounding the creation and timing of the December Agreement.  If a deposition is necessary, I am willing to be deposed without the need for a subpoena.  I have no stake in this litigation and have a patent infringement trial set for May 11, 2015 that is rapidly approaching.  Therefore, I would ask that the deposition take place in my office and be limited to a few hours, and count against the seven hour cap if I am deposed again.  Also, I would ask that the deposition take place next week (April 20 to April 24), or after completion of my May 11, 2015 trial which would likely be sometime in the second half of May, or first half of June 2015.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge.  Executed on this 17th day of April 2015, in Lafayette, California.

Eric W. Benisek

**Public version filed: April 24, 2015**

EXHIBIT A



1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

Joseph P. Cutler
PHONE: (206) 359-6104
FAX:   (206) 359-7104
EMAIL: Jcutler@perkinscoie.com

November 5, 2009

**SENT VIA EMAIL AND UPS OVERNIGHT**

Kickflip, Inc. d/b/a www.getgambit.com
Attn: Noah Kagan
6990 Chiala Lane
San Jose, CA 95129
kickflipinc@gmail.com
noahkagan@gmail.com

Re:   **Cease and Desist Accessing, Developing Applications for, or Advertising on Facebook.com**

Mr. Kagan:

We represent Facebook, Inc., based in Palo Alto, California.  It has come to our attention that your company, Kickflap, Inc. d/b/a www.getgambit.com, continues to violate Facebook's Statement of Rights and Responsibilities, Advertising Guidelines, and Platform Policies (collectively, "Terms") despite repeated warnings by Facebook staff to bring your advertising practices into conformance with Facebook's Guidelines.  Specifically, you continue to run advertisements with deceptive offers within applications running on Facebook's Platform.  Your advertisements violate Facebook's policies, including those against pop-ups, fake application closing behavior, and acquiring information from Facebook user profiles without authorization.  Moreover, some of your advertisements promote gambling and alcohol.

Facebook takes the protection of the user experience very seriously, and is committed to keeping Facebook a safe place for users to interact and share information.  Facebook has developed its Terms in order to protect its users and facilitate these goals.

Specifically, Facebook's Terms prohibit:

- Advertisements that contain a URL or domain in the body that links to a different URL or domain;

60406-0005/LEGAL16328799.1

Kickflap, Inc./getgambit.com
November 5, 2009
Page 2

- Developing advertisements or using the Facebook website in ways that violate Facebook's Advertising Guidelines;

- Misleading Facebook users;

- Sending users to different landing pages than the advertised page when they click on the advertisement;

- Using landing pages that generate pop-ups, pop-overs, pop-unders, or "fake" application close behavior;

- Promoting gambling without authorization from Facebook;

- Promoting alcoholic beverages in violation of Facebook's specific guidelines;

- Giving data you receive from Facebook to third parties, including ad networks, or using user data you receive or collect through running an ad, including information you derive from your targeting criteria, for any purpose off of Facebook, without user consent; and

- Using misleading advertisements to promote Subscription Services.

*See* http://www.facebook.com/ad_guidelines.php.

Your continued refusal to conform your advertising practices to Facebook's Terms constitutes blatant violations of these Terms, and *will not be tolerated*.

Pursuant to Section 14 of Facebook's Statement of Rights and Responsibilities, you are hereby notified that, effective immediately, you, your agents, your employees and/or anyone acting on your behalf (collectively, "You" or "Your"), are no longer authorized to access the Facebook website, use the Facebook development platform, advertise on Facebook, or use any of the services offered by Facebook, Inc. whatsoever for any reason. Facebook will treat further activity by You on the Facebook websites or platform as unauthorized access to its protected computer network.

Please respond to me in writing no later than close of business, Monday November 9, 2009, confirming that You have:

(1) Ceased and desisted in and will refrain from any use of the Facebook website, Facebook Platform, and/or any other service offered by Facebook, Inc.; and

(2) Removed all advertisements and applications run by You and have deactivated all of Your personal profiles or Fan Pages.

60406-0005/LEGAL16328799.1

Kickflap, Inc./getgambit.com
November 5, 2009
Page 3

Should you choose to ignore this letter and continue your current improper conduct, Facebook is continuing to evaluate its options and reserves the right to take whatever measures it believes are necessary to enforce its rights, maintain the quality of its site and protect its users.

Sincerely,

Joseph P. Cutler

EXHIBIT B

## ASSET ASSIGNMENT AGREEMENT

This ASSET ASSIGNMENT AGREEMENT (the "Agreement") dated as of November 9 2009, is among Kickflip, Inc., a Delaware corporation (the "Brother"), and Gambit Labs, Inc., a Delaware corporation (the "Sister").

### WITNESSETH

WHEREAS, the Brother corporation wishes to transfer certain assets of the Brother corporation to the Sister corporation, and the Sister corporation wishes to receive such asset contribution from the Brother upon the terms and conditions of this Agreement;

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants set forth below, the parties hereby agree as follows:

## SECTION 1 - ASSIGNMENT OF ASSETS

**1.1    Assignment of Assets.** Subject to the provisions of this Agreement, the Brother agrees to transfer and the Sister agrees to receive, all of the properties and assets of the Brother related to the Brother's "Getgambit" Internet payments business, whether tangible and intangible, real, personal or mixed, and wherever located, including without limitation all cash, accounts receivable, inventory, equipment, intellectual property rights, copyrights, computer programs, and Brother's good will related to the Internet server hosting business; provided, however, that there shall be excluded from such contribution and assignment, Brother's properties and assets related to its software publisher business of creating games and other applications, and the Brother's stock record books, corporate record books containing minutes of meetings of directors and stockholders and such other records as have to do exclusively with Brother's organization or stock capitalization.  The assets, property and business of Brother to be contributed and assigned to the Sister or its designee under this Agreement are hereinafter sometimes referred to as the "Contributed Assets."

**1.2 Assumption of Liabilities.** Sister shall not assume or be liable for (a) any obligation or liability of Brother, of any kind or nature, known, unknown, contingent or otherwise, related or attributable to Brother's business, or (b) any liability or obligation owing to the Brother's stockholders.

**1.3 Consideration.** In exchange for the contribution and of the Contributed Assets to Sister, at the Closing, the Sister shall convey to the Brother $1 USD in consideration for the transfer herein.

**1.4  Transfer of Contributed Assets.** At the Closing, or as soon as practicable thereafter, Brother shall, to the extent necessary to effectuate this transfer, deliver or cause to be delivered to the Sister good and sufficient instruments of transfer transferring to the Sister title to all of the Contributed Assets and shall effectively vest in the Sister good title to all of the Contributed Assets free and clear of all liens, restrictions and encumbrances, except as otherwise disclosed herein.

**1.5  Delivery of Records and Contracts**.  At the Closing, or as soon as practicable thereafter, Brother shall deliver or cause to be delivered to the Sister all written leases, contracts, commitments and rights evidencing Contributed Assets, with such assignments thereof and consents to assignments as are necessary to assure the Sister of the full benefit of the same. Brother shall also deliver to the Sister at the Closing, or as soon as practicable thereafter, all of Brother's business records, tax returns, books and other data relating to its assets, business and operations (except corporate records and other property of Brother excluded under Section 1.1)

Brother shall take all requisite steps to put the Sister (or its designee) in actual possession and operating control of such assets and business of Brother.

## SECTION 2 - MISCELLANEOUS

**2.1  Entire Agreement**.  This Agreement and all other documents executed in connection with the consummation of the transactions contemplated herein contain the entire agreement among the parties, and supersedes all prior agreements, written or oral, with respect thereto.

**2.2  Governing Law**.  This Agreement shall be governed and construed in accordance with the laws of the state of Delaware without regard to its conflict of law principles.

**2.3  Binding Effect; No Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and legal representatives.  This Agreement is not assignable except by operation of law or by the Sister to any of its affiliates.

**2.4  Counterparts**.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.  Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.

Date:  November 9, 2009                         Date:  November 9, 2009

By:                                             By:

Andrew Hunter, CEO                              Andrew Hunter CEO
Kickflip, Inc.                                  Gambit Labs, Inc.

EXHIBIT C

## CONTRIBUTION OF ASSETS IN EXCHANGE FOR SHARES AGREEMENT

THIS CONTRIBUTION OF ASSETS IN EXCHANGE FOR SHARES AGREEMENT (the "Agreement") is made and entered into as of December 15, 2009 (the "Effective Date") by and between Kickflip, Inc., a Delaware corporation (the "Kickflip") and Gambit Labs, Inc., a Delaware corporation ("Gambit").

WHEREAS, in October 2009, Facebook banned its publishers from doing business with Kickflip, Inc., resulting in an immediate and substantial impairment of the Kickflip business.

WHEREAS, in order to carry on the business without the stigma of the Facebook ban, the shareholders of Kickflip agreed to transfer assets from Kickflip to a new entity, Gambit, in exchange for 100% of the shares of Gambit.

WHEREAS, the shareholders agreed that the proportional ownership in Kickflip shall be mirrored in the new entity, Gambit, and the Gambit shares distributed accordingly.

WHEREAS, it is the intention of the Kickflip shareholders that Kickflip remain as a viable entity to service certain ongoing business of those publishers that continue to use Kickflip on the Facebook platform, and maintain any legal claims against Facebook arising out of the Facebook ban.

NOW THEREFORE, in consideration of the mutual promises and the covenants and promises hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## 1.    CONTRIBUTION OF ASSETS.

1.1.1.    <u>Transferred Assets</u>.  Kickflip shall transfer to Gamibt all assets associated with the Gambit offer service including the Gambit offerwall and payments service.  Kickflip shall further transfer existing cash in the existing Kickflip bank account as of December 1, 2009. Kickflip shall further transfer and assign to Gambit the convertible note between Kickflip and The Hit Forge, and all related rights, title, and benefits.  All other assets shall remain with Kickflip.  Note that, to the extent Kickflip requires use of Gambit offerwall and payments service to continue servicing existing publishers that continue to use the Gambit offerwall and payment service on Facebook, Kickflip shall be entitled to lease and/or license access from Gambit to said service.

1.1.2.    <u>Retained Assets</u>.  All assets not transferred under Section 1.1.1 herein shall remain the property of Kickflip.

1.1.3.    <u>Supersede/Replacement of Prior Transfer</u>.  This Agreement restates, replaces and supersedes any and all prior asset transfers between Kickflip and Gambit including a certain asset transfer agreement dated November 9, 2009.

## 2.    EXCHANGE FOR SHARES.

**2.1.1.**    Exchange of Shares. On the terms and subject to the conditions set forth in this Agreement, at the Closing the shareholders of Kickflip will direct Kickflip to convey, transfer and assign to Gambit the assets set forth in Section 1.1.1, and Gambit will accept the assets, and in exchange, the shareholders of Kickflip will receive their pro-rata portion of the shares in Gambit to be allocated among the Kickflip shareholders as set forth in **Schedule A**. In order to receive the Gambit shares contemplated herein, each Kickflip shareholder must enter into a separate stock purchase agreement with Gambit on standard terms and conditions and may be required to provide additional consideration.

## 3.    REPRESENTATIONS AND WARRANTIES.

**3.1.**    Representations and Warranties. Kickflip and Gambit hereby represent and warrant to each other, all of which representations and warranties are true, complete, and correct in all respects as of the date hereof and will be as of the Closing Date, as follows:

(a) Organization and Qualification. Both companies are corporations duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Gambit and Kickflip have all requisite power and authority to own those properties and conduct those businesses presently owned or conducted by it, and are duly qualified to do business now being conducted and are in good standing as foreign corporations in each other jurisdiction where the property owned, leased or used by each or the conduct of the business makes such qualification necessary. The copies of the articles of incorporation and bylaws of each company, which have been (or will be, at least two days before the Closing Date) delivered to the each company, are complete and correct and are in full force and effect at the date hereof.

(b) Authorization; No Restrictions, Consents or Approvals. Kickflip and Gambit have full power and authority to enter into and perform this Agreement. This Agreement has been duly executed by each company and constitutes the legal, valid, binding and enforceable obligation of each company, enforceable against each company and their shareholders in accordance with its terms. The execution and delivery of this Agreement, the exchange of assets for shares, do not and will not on the Closing Date: (i) conflict with or violate any of the terms of the articles of incorporation and bylaws of either company or any applicable law relating to the companies, (ii) conflict with, or result in a breach of any of the terms of, or result in the acceleration of any indebtedness or obligations under, any agreement, obligation or instrument by which the companies are bound or to which any property of the companies is subject, or constitute a default thereunder, (iii) result in the creation or imposition of any lien on any of the assets of the companies, (iv) constitute an event permitting termination of any agreement or instrument to which the companies are a party or by which any property or asset of the companies are bound or affected, pursuant to the terms of such agreement or instrument, or (v) conflict with, or result in or constitute a default under or breach of or violation of or grounds for termination of, any license, permit or other governmental authorization to which the companies are a party or by which the companies may be bound, or result in the violation by the companies of any laws to which the companies may be subject, which would materially adversely affect the

transactions contemplated herein.  No authorization, consent or approval of, notice to, or filing with, any public body or governmental authority or any other person is necessary or required in connection with the execution and delivery by the companies of this Agreement or the performance by the companies of their obligations hereunder.

(c) <u>Subsidiaries</u>.  Neither company owns a subsidiary and does not own any interest in any corporation, partnership, joint venture, limited liability company, association, trust or entity.

(d) <u>Brokers' Fees</u>.  Neither company has an obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

(e) <u>No Operations</u>.  Gambit was organized on November 9, 2009, and has not incurred any known liabilities.

(f) <u>Assets</u>.  Kickflip has good and marketable title to the assets identified in Section 1.1.1, free and clear of any liens or encumbrances.

(g) <u>Intellectual Property and Tangible and Intangible Assets</u>.  Kickflip owns or possesses all right, title and interest (or holds valid licenses) to use, whether or not registered, all intellectual property and tangible and intangible assets that make-up and are included in the transferred assets identified in Section 1.1.1 herein.  All actions reasonably necessary to maintain the registered intellectual property and tangible and intangible assets have been taken by Kickflip.  The use by Kickflip of any of the intellectual property or tangible and intangible assets does not violate the proprietary rights of any other person and no claims have been asserted by any person with respect to the use of the assets being transferred by Kickflip.  No person is infringing upon the assets being transferred by Kickflip.  Kickflip has taken reasonable security measures to protect the secrecy, confidentiality and value of the intellectual property.  Kickflip is not a party to any confidentiality, secrecy or similar agreements with third parties related to the assets being transferred under Section 1.1.1 herein.

(h) <u>Disclosure</u>.  No statement, representation or warranty by the companies in this Agreement, including the Schedule hereto, contains any untrue statement of material fact, or omits to state a material fact, necessary to make such statements, representations and warranties not misleading.

(i) <u>Legends</u>.  Kickflip acknowledges and agrees on behalf of its shareholders that the certificates representing the Gambit shares shall bear the following legends: (as well as any legends required by applicable state and federal corporate and securities laws):

(i)     THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR

DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

(ii)     THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

(iii)    Any legend required to be placed thereon by the California Commissioner of Corporations.

## 4. CLOSING.

**4.1.**    <u>Conditions to Kickflip's Obligations</u>.  The obligations of the Kickflip under this Agreement, (including, without limitation, the obligation to transfer assets), shall be subject to satisfaction of the following conditions, unless waived:

(a) The Kickflip shall have performed in all material respects all agreements, and satisfied in all material respects all conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date.

(b) All representations and warranties of Kickflip herein shall have been true and correct in all material respects when made (or will have been made true and correct by the Closing Date), shall have continued to have been true and correct in all material respects at all times subsequent thereto, and shall be true and correct in all material respects on and as of the Closing Date as though made on, as of and with reference to such Closing Date.

(c) There shall not have occurred any material adverse change with respect to the transferred assets identified in Section 1.1.1 herein.

(d) Kickflip shall have executed and delivered to the Gambit all documents necessary to transfer the assets identified in Section 1.1.1 herein, as contemplated by this Agreement.

**4.2.**    <u>Conditions to the Gambit's Obligations</u>.  The obligations of Gambit under this Agreement, (including, without limitation, the obligation to issue shares to the Kickflip shareholders in exchange for the transferred assets) shall be subject to satisfaction of the following conditions, unless waived:

(a) Gambit shall have performed in all material respects all agreements, and satisfied in all material respects all conditions on its part to be performed or satisfied hereunder, at or prior to the Closing Date.

(b) All of the representations and warranties of Gambit herein shall have been true and correct in all material respects when made, shall have continued to have been true and correct in all material respects at all times subsequent thereto, and shall be true and correct in all material respects on and as of the Closing Date as though made on, as of, and with reference to such Closing Date.

**4.3.**   Gambit Closing Documents.   At the Closing, Gambit shall deliver to the Kickflip and Kickflip's shareholders, in form and substance reasonably satisfactory to the Kickflip and the Kickflip shareholders, all appropriate documents to effect the issuance of the shares, including the following:

(a) A certificate evidencing the issued Gambit outstanding shares of common stock of Gambit, registered in the name of the Company.

(b) Copies of Gambit's bylaws and resolutions adopted by the board of directors of Gambit authorizing the execution and delivery of, and performance of Gambit's obligations under this Agreement, certified by the Secretary or an Assistant Secretary of Gambit.

(c) A certified copy of Gambit's articles of incorporation, including amendments, if any, together with a certificate of good standing for Gambit issued by the Secretary of State of the jurisdiction of its incorporation and dated not more than 20 business days prior to the Closing Date.

## 5.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION.

**5.1.**   Survival of Representations and Warranties and Covenants.   The representations, warranties, covenants, and obligations of Kickflip and Gambit set forth in this Agreement and in any certificate, agreement, or instrument delivered in connection with the transactions contemplated hereby, shall survive the Closing for a period of three years.

**5.2.**   Successors.   The merger, consolidation, liquidation, dissolution or winding up of, or any similar transaction with respect to the parties hereto, shall not affect in any manner the obligations of the parties pursuant to Section 6 or any other term or provision of this Agreement, and the parties covenant and agree to make adequate provision for their liabilities and obligations hereunder in the event of any such transaction.

## 6.   GENERAL PROVISIONS.

**6.1.**   Documentary Taxes.   Each party shall pay any documentary or other taxes, arising from the issuance of any capital stock by such party.

     6.2.   <u>No Third Party Beneficiaries</u>.  Nothing in this Agreement shall be construed to confer any rights or benefits upon any person (including, but not limited to, any employee or former employee of the Shareholders) other than the parties hereto and the Kickflip shareholders, and no other person, shall have any rights or remedies hereunder.

     6.3.   <u>Specific Performance</u>.  Each of the parties acknowledges and agrees that the other parties would be damaged irreparably if any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, each party agrees that the other party shall be entitled, without the necessity of pleading or proving irreparable harm or lack of an adequate remedy at law or posting any bond or other security, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.  Any such claim for specific performance shall be brought and determined in the appropriate federal or state court, in the State of California and in no other forum.  The parties hereby irrevocably submit to the jurisdiction of any such California state court or federal court in California, in connection with such claim for a specific performance.

     6.4.   <u>Severability</u>.  If any parts of this Agreement are found to be void, the remaining provisions of this Agreement shall nevertheless be binding with the same effect as though the void parts were deleted.

     6.5.   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The execution of this Agreement may be by actual or facsimile signature.

     6.6.   <u>Benefit</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, successors, heirs and permitted assigns.

     6.7.   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties and supersedes all prior oral and written agreements between the parties hereto with respect to the subject matter hereof.

     6.8.   <u>Governing Law</u>.  This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, the obligations provided herein or performance shall be governed or interpreted according to the internal laws of the State of California without regard to choice of law considerations.

     6.9.   <u>Arbitration</u>.  Any controversy, dispute or claim arising out of or relating to this Agreement, or its interpretation, application, implementation, breach or enforcement which the parties are unable to resolve by mutual agreement, shall be settled by submission by either party of the controversy, claim or dispute to binding arbitration in California (unless the parties agree in writing to a different location), before a single arbitrator in accordance with the rules of the American Arbitration Association then in effect.  In any such arbitration proceeding the parties agree to provide all discovery deemed necessary by the arbitrator.  The decision and award made

by the arbitrator shall be final, binding and conclusive on all parties hereto for all purposes, and judgment may be entered thereon in any court having jurisdiction thereof.

      6.10.   <u>Amendment and Waiver of Rights</u>.  Any provision of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the consent of both parties; provided, however, that any amendment to Sections 1 and 2 shall be in writing signed by both parties.

      6.11.   <u>Captions</u>. The captions or headings in this Agreement are made for convenience and general reference only and shall not be construed to describe, define or limit the scope or intent of the provisions of this Agreement.

*[Signature page follows.]*

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed under seal as of the date first above written.

**GAMBIT LABS, INC.**

By:_____

Name/Title:  Chris Smoak, CTO

**KICKFLIP, INC.:**

By:_____

Name/Title: Andrew Hunter, CEO

- 8 -

<u>SCHEDULE A</u>

SHARES ISSUED IN EXCHANGE FOR ASSETS

| <u>Name</u> | <u>Kickflip Ownership %</u> | <u>Gambit Shares of Common Stock to be Issued</u> |
|---|---|---|
| Chris Smoak | 33% | 3,000,000 |
| Noah Kagan | 33% | 3,000,000 |
| Andrew Hunter | 33% | 3,000,000 |
| Total: | 100% | 9,000,000 |