## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KICKFLIP, INC.,

        Plaintiff,

    v.

FACEBOOK, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 12-1369-LPS

**REDACTED PUBLIC VERSION**

## FACEBOOK'S OPENING BRIEF RE:
## SCOPE OF PLAINTIFF'S WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE
## AND APPLICATION OF THE CRIME-FRAUD EXCEPTION

*Of Counsel*:

Thomas O. Barnett
Jonathan Gimblett
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001-4956
(202) 662-6000
tbarnett@cov.com
jgimblett@cov.com


Dated:  November 3, 2015

ROSS ARONSTAM & MORITZ LLP
David E. Ross (#5228)
Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
dross@ram-llp.com
bschladweiler@ram-llp.com

*Counsel for Defendant Facebook, Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

I.      PRELIMINARY STATEMENT ...................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................... 1

III.    ARGUMENT .................................................................................................................... 5

        A.      The Documents Sought By Facebook Are Within the Scope of Kickflip's
                Waiver of Privilege. ............................................................................................... 5

                1.      Fairness Guides the Interpretation of the Scope of a Selective
                        Waiver. ....................................................................................................... 5

                2.      Fairness Requires that Facebook Be Allowed to See All
                        Documents Relating to the November and December Agreements
                        Created Prior to Kickflip's Submission on October 14, 2013. ................... 6

                3.      Kickflip's Proposed Limitation of Its Waiver Would be Unfair. ............... 8

        B.      Alternatively, the Documents Sought By Facebook Are Not Privileged
                Under the Crime-Fraud Exception. ...................................................................... 10

                1.      The Exception Applies if There Is a Reasonable Basis to Suspect
                        That The Documents at Issue Were Used in Furtherance of a Fraud
                        by Kickflip. ............................................................................................... 10

                2.      There is a Reasonable Basis to Suspect that Kickflip Engaged in
                        Fraud by Knowingly Misrepresenting the True Date of the
                        December Agreement and that Litigation Counsel Was Used in
                        Furtherance of that Fraud. ........................................................................ 13

                3.      There is a Reasonable Basis to Suspect that Kickflip Engaged in
                        Tax Fraud by Backdating the December Agreement and Used its
                        Litigation Counsel to Conceal it ............................................................... 18

IV.     CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1100 West, LLC v. Red Spot Paint & Varnish Co.*,
2009 WL 232060 (S.D. Ind. Jan. 30, 2009)..........................................................................12

*Addie v. Kjaer*,
No. CIV. 2004-135, 2008 WL 5632261 (D.V.I. Jan. 10, 2008) ...............................................10

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
237 F.R.D. 618 (N.D. Cal. 2006) .............................................................................................9

*Cleveland Hair Clinic, Inc. v. Puig*,
968 F.Supp. 1227 (N.D.Ill. 1996) ..........................................................................................12

*In re G-I Holdings Inc.*,
218 F.R.D. 428 (D.N.J. 2003) .................................................................................................10

*Glenmede Trust Co. v. Thompson*,
56 F.3d 476 (3d Cir. 1995).......................................................................................................9

*In re Grand Jury*,
705 F.3d 133 (3d Cir. 2012).............................................................................................. *passim*

*In re Grand Jury Investigation*,
352 F. App'x 805 (4th Cir. 2009) ...........................................................................................18

*In re Grand Jury Investigation*,
445 F.3d 266 (3d Cir. 2006)...........................................................................................13, 18

*In re Grand Jury Proceedings*,
417 F.3d 18 (1st Cir. 2005).....................................................................................................12

*In re Intel Corp. Microprocessor Antitrust Litig.*,
258 F.R.D. 280 (D. Del. 2008) ................................................................................................6

*Micron Tech., Inc. v. Rambus Inc.*,
645 F.3d 1311 (Fed. Cir. 2011)..............................................................................................13

*In re Motion to Quash Bar Counsel Subpoena*,
982 A.2d 330 (Me. 2009).........................................................................................................20

*Murray v. Gemplus Intern., S.A.*,
217 F.R.D. 362 (E.D. Pa. 2003) ............................................................................................10

*In re Neurontin Antitrust Litig.*,
  801 F. Supp. 2d 304 (D.N.J. 2011) ...........................................................................12, 14, 20

*Rambus, Inc. v. Infineon Techs. AG*,
  222 F.R.D. 280 (E.D.Va. 2004) ...........................................................................................11

*In re Sealed Case*,
  162 F.3d 670 (D.C. Cir. 1998) ..............................................................................................12

*In re Sealed Case*,
  754 F.2d 395 (D.C. Cir. 1985) ...................................................................................... *passim*

*In re Teleglobe Commc'ns Corp.*,
  493 F.3d 345 (3d Cir. 2007) ....................................................................................................6

*United States v. Chen*,
  99 F.3d 1495 (9th Cir. 1996) .................................................................................................11

*United States v. Doe*,
  429 F.3d 450 (3d Cir. 2005)...................................................................................................11

*United States v. Edwards*,
  303 F.3d 606 (5th Cir. 2002) .................................................................................................20

*United States v. Estate of Stonehill*,
  660 F.3d 415 (9th Cir. 2011) .........................................................................................13, 14

*United States v. Schussel*,
  291 F. App'x 336 (1st Cir. 2008).......................................................................................13, 18

*V. Mane Fils S.A. v. Int'l Flavors & Fragrances, Inc.*,
  249 F.R.D. 152 (D.N.J. 2008)..................................................................................................6

*Wachtel v. Guardian Life Ins. Co.*,
  239 F.R.D. 376 (D.N.J. 2006)................................................................................................12

*Westinghouse Elec. Corp. v. Republic of Philippines*,
  951 F.2d 1414 (3d Cir. 1991 )..................................................................................................6

**Other Authorities**

Fed. R. Evid. 502, comments ....................................................................................................5, 6

## I.      PRELIMINARY STATEMENT

Facebook submits this brief pursuant to the Court's direction at the conclusion of the telephonic status conference on October 7, 2015, and the parties' Joint Status Report.  D.I. 129. Facebook respectfully requests that the Court rule that Kickflip may not withhold as privileged any document concerning the November or December Agreements created on or prior to October 14, 2013, the date on which Kickflip first submitted the December Agreement to the Court in an attempt to forestall discovery on standing.  There are two independent reasons for this result.

First, the requested documents fall within the scope of the waiver of attorney-client privilege found by the Court in its order of January 21, 2015.  The evidence now indicates that the October 14, 2013 submission fulfilled one of the purposes for which the December Agreement was created in March 2012, which was to deflect the Court's attention from Kickflip having transferred ownership of "all assets" related to the Gambit business in the November Agreement.  The fairness principle underpinning the selective waiver doctrine demands that Facebook be allowed to see all documents prior to the submission, so that it can present the Court with the complete story around the November and December Agreements.

Second, these documents fall within the crime-fraud exception to the attorney-client privilege.  There is ample basis to suspect that Kickflip created the December Agreement in March 2012 and backdated it to 2009 as part of a tax fraud scheme and to attempt to establish its standing in this litigation and that Kickflip used its litigation counsel to submit the December Agreement while concealing its true date of creation from this Court.

## II.     STATEMENT OF FACTS

On October 26, 2012, Kickflip initiated this litigation with a Complaint in which it describes itself as "a Delaware corporation, d/b/a Gambit" seeking damages for injuries allegedly inflicted by Facebook on its Gambit business between November 2009 and the date of filing.

D.I. 1 at 1, 28.  Facebook subsequently challenged Kickflip's standing to bring this action because Kickflip had sold the Gambit business to another entity in 2009.  D.I. 12 at 19–20.  Indeed, subsequent discovery has revealed that Kickflip sold "all assets" of the Gambit business to another entity on November 9, 2009.  D.I. 53, Ex. 9 (the "November Agreement").

In October 2013, in an effort to avoid discovery, Kickflip pre-emptively produced the December Agreement and represented to the Court that it had been entered into on December 15, 2009.  It claimed that this agreement "resolv[ed] the standing issue" because of language in a whereas clause purporting to transfer all of the assets of the Gambit business to the other entity, except for any legal claims against Facebook.  See D.I. 26 at 1 ("There is no longer a need for limited, early discovery. Kickflip produced the December 15, 2009 agreement between Kickflip and Gambit Labs, Inc., which resolves the standing issue….").

Notwithstanding Kickflip's representations, the Court ordered further discovery on the standing issue.  On November 25, 2013, Facebook deposed Christopher Smoak, the Rule 30(b)(6) representative for both Kickflip, Inc. and Volume 11 Media, Inc. (the successor of the 2009 purchaser of the Gambit business).  Mr. Smoak declined on grounds of attorney-client privilege to answer questions concerning the parties' reasons for entering into the November and December Agreements or the effects of those Agreements.  See, e.g., D.I. 62, Ex. 1 (Kickflip Dep. Transcript) at 32:18 - 33:11; 36:3 - 36:22 and D.I. 62, Ex. 2 (Vol. 11 Dep. Transcript) at 20:18 - 21:4; 22:16 - 24:22; 69:14 - 70:13.

On January 7, 2014, Facebook moved for summary judgment on the grounds that Kickflip lacked standing because it had divested itself of all assets relating to the Gambit business in late 2009, notwithstanding the language in the December Agreement.  D.I. 52 at 8–14.  In its opposition, Kickflip submitted a declaration by Mr. Smoak that addressed in detail

topics he had refused to address at his deposition on the grounds of attorney-client privilege.  *See* D.I. 58.  For example, Mr. Smoak explained specific details about the motivations for and effect of the November and December Agreements.  *Id.*  Among other things, Mr. Smoak declared that, "[i]f the November Agreement were not superseded, Gambit Labs would have been required to pay substantial taxes," *id*. ¶ 34, and that the December Agreement "accurately reflected our intention that 'Kickflip remain as a viable entity to … maintain any legal claims against Facebook arising out of the Facebook ban,'" *id.* ¶ 40.

After briefing and oral argument on a motion from Facebook, the Court issued an opinion holding that "there was an intentional waiver of the attorney-client privilege through the disclosures contained in the [Smoak] Declaration."  D.I. 81 at 7.  The Court held that the scope of the waiver extended to:

> the November and December Agreements, including the motives for and effects of entering into them, as well as the negotiation, performance, and implementation of these Agreements."  *Id.*

The Court ordered Kickflip to "produce any documents previously withheld relating to the November and December Agreements, including the motives for and effects of entering into them, as well as the negotiation, performance, and implementation of these Agreements."  D.I. 82 at 1.  The Court did not order the production of all documents reviewed by Mr. Smoak in connection with his declaration, which could have included documents unrelated to the November and December Agreements.

Pursuant to that order, Kickflip produced new documents indicating that the December Agreement had not been created and executed in December 2009 as previously represented to the Court.  The new documents revealed that Kickflip's counsel drafted an errata document in July 2010 that would have been unnecessary if the December Agreement had been executed in 2009.  D.I. 90, Exs. 8, 9.  Facebook asked Kickflip to explain both this discrepancy and the absence of

any document in Kickflip's productions corroborating the date of creation of the December Agreement.  Kickflip's response was to represent to the Court that there was "no support for Facebook's last-ditch effort to cast doubt on the date the December Agreement was created." D.I. 93 at 1.  Facebook nonetheless pressed the issue on April 3, 2015, with a request that Kickflip "produce any document that would establish when [the December Agreement] was created and executed, such as, for example, any relevant attorney billing records."  D.I. 96, Ex. 1.

Rather than respond to Facebook, Kickflip filed new declarations by Mr. Benisek and Mr. Smoak on April 17, 2015.  D.I. 100, 101.  ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████  Kickflip had not previously disclosed this alleged computer failure to Facebook.

At the conclusion of a discovery teleconference on June 12, 2015, the Court granted Facebook's request for discovery into the circumstances surrounding Kickflip's "startling admission" that the purported December 2009 agreement was actually created in March 2012 and backdated, purportedly to obtain a tax benefit in the 2009 fiscal year.  Transcript, 20:22 - 21:23.  The scope of that additional discovery "extends to any of the facts or issues addressed in the declarations filed by Christopher Smoak and Eric Benisek on April 27, 2015."  D.I. 117 at 2.

That discovery has revealed that Kickflip created the December Agreement with two purposes in mind:  (i) reducing tax liabilities due under the November Agreement that the IRS had raised in October 2011 during an audit ██████████████████████████████████ ████████████████████████████████████████████████████████

4

███████████████████████ Ex. A (Vasquez, Benisek & Lindgren invoice for services rendered in March 2012, KICK 00002044 et seq.).  In other words, one of the purposes of creating and backdating the December Agreement in March 2012—only 7 months before filing the Complaint—was to address ownership problems for Kickflip under the November Agreement for legal claims relating to the Gambit business that it had sold.

Kickflip balked, however, at providing documents related to the November and December Agreement that were created after the filing of the Complaint on October 26, 2012.  Accordingly, Facebook asked this Court to order Kickflip to produce any such documents from its litigation counsel after October 26, 2012 through October 14, 2013.

On October 7, 2015, the Court held a telephonic conference to discuss the dispute.  At the end of the conference, the Court asked the parties to submit additional briefing regarding the scope of the waiver and the application of the crime-fraud exception.

## III.   ARGUMENT

### A.   The Documents Sought By Facebook Are Within the Scope of Kickflip's Waiver of Privilege.

The Court should order Kickflip to produce litigation counsel's documents relating to the November or December Agreements created on or before October 14, 2013, because those documents are within the scope of Kickflip's waiver of attorney-client privilege.

#### 1.   Fairness Guides the Interpretation of the Scope of a Selective Waiver.

Federal Rule of Evidence 502 provides that an intentional disclosure waives the attorney-client privilege for undisclosed communications on the same subject if fairness warrants that all such communications be considered together.  The prime example of when fairness warrants a full subject-matter waiver is when "a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner."  Fed. R. Evid. 502, comments to

5

Subdivision (a); *see also In re Intel Corp. Microprocessor Antitrust Litig.*, 258 F.R.D. 280, 290 (D. Del. 2008) ("The fairness doctrine aims to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege holder's selective disclosure during litigation of otherwise privileged information.") (citation and internal quotation marks omitted).

Where a party presents a one-sided story to the court based on a selective waiver, fairness requires that the opposing party gain access to the full story. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007) ("When one party takes advantage of another by selectively disclosing otherwise privileged communications, courts broaden the waiver as necessary to eliminate the advantage" and "to ensure that all parties are treated fairly"); Fed. R. Evid. 502, comments to Subdivision (a) ("[A] party that makes a selective, misleading presentation that is unfair to the adversary opens itself to a more complete and accurate presentation."). Under this fairness principle, the scope of a selective waiver extends to the entire subject matter. *See Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1426 n. 12 (3d Cir. 1991 ) ("If partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject."); *V. Mane Fils S.A. v. Int'l Flavors & Fragrances, Inc.*, 249 F.R.D. 152, 155 (D.N.J. 2008) ("[W]here a party is attempting to gain an advantage or make offensive use through intentional disclosure, there must be a full subject matter waiver.").

        **2.**      **Fairness Requires that Facebook Be Allowed to See All Documents Relating to the November and December Agreements Created Prior to Kickflip's Submission on October 14, 2013.**

In accordance with the relevant jurisprudence, this Court correctly held that Kickflip waived its attorney-client privilege with respect to the general subject matter of the November and December Agreements given the selective disclosures in Mr. Smoak's January 14, 2014

Declaration.  *See* D.I. 81 at 7 ("[T]he Court finds the scope of the waiver to extend to, but only

to, the November and December Agreements, including the motives for and effects of entering

into them, as well as the negotiation, performance, and implementation of these Agreements.").[1]

The Court now needs to decide whether the waiver extends to litigation counsel's documents

created on or before October 14, 2013, the date on which Kickflip submitted the December

Agreement to the Court in an attempt to avoid discovery on standing.  Facebook submits that,

particularly in light of the revelations since the Court made its finding on waiver, application of

the fairness principle dictates an affirmative answer to this question.

Additional evidence disclosed in the wake of the Court's finding of waiver has

established that Mr. Smoak's January 2014 was far more one-sided and misleading than either

the Court or Facebook could have known at the time.  For example:

- Contrary to Mr. Smoak's testimony that the December Agreement was entered on December
  15, 2009, once "the immediate crisis caused by Facebook's ban calmed down," D.I. 58 ¶ 30-
  31, the evidence establishes that the December Agreement was created 27 months later in
  March 2012.

- Contrary to Mr. Smoak's testimony that the December Agreement restated the November
  Agreement during the same tax year to avoid "Gambit Labs [having] to pay substantial
  taxes," *id.* ¶ 34, the evidence establishes that Kickflip created the agreement long after the
  close of the 2009 tax year and backdated it in order to ███████████████████ for

---

[1] The Court did not extend the waiver to include all documents reviewed by Mr. Smoak in
connection with his declaration, which could have included documents unrelated to the
November and December Agreements.  The Court explained that expanding the waiver to any
documents "reviewed" by Mr. Smoak in drafting his Declaration would  "unduly risk requiring
Kickflip to disclose communications outside of the subject matter of what is disclosed in the
Declaration."  *Id*. at 8.

Kickflip's shareholders than that contemplated by the IRS in October 2011 during its audit of Kickflip's 2009 taxes.  Ex. B.

- Contrary to Mr. Smoak's testimony that the December Agreement was created almost immediately after the November Agreement, *id.* ¶ 31, the evidence establishes that it was created more than two years later to provide a basis for standing in this lawsuit by ██████████████████████████████████████████ that is lacking in the November Agreement.  Ex. A.

Fairness requires that the waiver be interpreted to include all otherwise privileged documents needed to allow Facebook to present the complete story around the November and December Agreements, "including the motives for and effects of entering into them, as well as [their] negotiation, performance and implementation."  We now know that Kickflip's submission of the December Agreement to the Court on October 14, 2013 to avoid discovery on standing fulfilled one of the specific purposes for which the agreement was created.  It is therefore reasonably likely that litigation counsel's documents relating to the November and December Agreements created any time before that date will shed light on why Kickflip believed the December Agreement was needed to establish its standing.  The fairness principle demands an interpretation of the waiver that gives Facebook access to these documents, without which it will not be in a position to tell the full story behind the November and December Agreements.

### 3.    Kickflip's Proposed Limitation of Its Waiver Would be Unfair.

Kickflip seeks to limit its waiver with regard to both its subject matter and its temporal scope.  Neither limitation is justified.

First, Kickflip has argued that its waiver should apply only to documents concerning the "motives for negotiation, implementation and performance" of the November and December Agreements and not to other documents relating to those agreements.  Ex. C (D. Linke email of

September 3, 2015 to J. Gimblett).  Uncovering the truth in these circumstances, however,

requires disclosure of all documents addressing the subject matter.  *See, e.g.*, *Glenmede Trust Co.*

*v. Thompson*, 56 F.3d 476, 486–87 (3d Cir. 1995) (affirming that, where a party discloses advice

of counsel with respect to one aspect of a transaction, the attorney-client privilege is waived "as

to all communications, both written and oral, to or from counsel as to the entire transaction").

 The developments so far underscore the importance of this broader approach.  For

example, the truth about the creation date of the December Agreement was uncovered in part due

to a July 2010 email chain that was only tangentially related to the November Agreement.  *See*

D.I. 87, at 4–6.  The new production also revealed that one of the motivations for the December

Agreement was the current litigation against Facebook. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Ex. A (Benisek March 2012 bill summary) (emphasis added).  The Court's

January 21, 2015 order finds that Kickflip waived privilege for documents related to the

"motives for and effects of entering into them."  As such, all documents related to the role of the

December Agreement in the Facebook litigation are directly within the scope of that waiver.

 Second, Kickflip has argued that any document created after the creation of the

December Agreement in March 2012 is outside the scope of the waiver.  Transcript of October 7,

2015 Discovery Conference, at 23:11-17.  There is no basis for limiting the temporal scope of the

waiver.  In its order of January 21, 2015, the Court placed no temporal restriction on its finding

of waiver.  D.I. 81.  Nor would a temporal restriction be supported by the case law.  Subject

matter waivers are limited by subject, not by time.  "Once a waiver has occurred, it is

inappropriate to limit waiver on a temporal basis."  *Bd. of Trustees of Leland Stanford Junior*

*Univ. v. Roche Molecular Sys., Inc*., 237 F.R.D. 618, 627 (N.D. Cal. 2006) (compelling Stanford

to produce "any subsequent documents and communications that relate to the correctness of the declarations as used in pursuing subsequent patents and applications claiming priority from the '327 Application, from May 10, 1994 until the present") (citations and internal quotation marks omitted).  In *Murray v. Gemplus Intern., S.A.*, the defendant argued that the waiver should only cover a certain portion of the negotiating period, but the district court was "unconvinced by this argument, as the existence of a temporal break in communications has no bearing on the subject-matter of those communications."  217 F.R.D. 362, 367 (E.D. Pa. 2003).  "The voluntary disclosure by a client of a privileged communication waives the privilege as to other such communications relating to the same subject matter made both prior to and after the occurrence of the waiver."  *Addie v. Kjaer,* No. CIV. 2004-135, 2008 WL 5632261, at *3 (D.V.I. Jan. 10, 2008).  "Once a party waives the attorney-client privilege, it relinquishes the privilege for all purposes and circumstances thereafter."  *In re G-I Holdings Inc.*, 218 F.R.D. 428, 432 (D.N.J. 2003) (debtors permanently waived right to assert the attorney-client privilege on the subject matter to which they responded, namely the tax treatment of a particular transaction).  Finally, Facebook is not even seeking current litigation documents at this time but has limited its request to documents created prior to October 14, 2013, the date that Kickflip produced the December Agreement.

> **B.     Alternatively, the Documents Sought By Facebook Are Not Privileged Under the Crime-Fraud Exception.**

The Court could also order production of the requested documents on the ground that they fall within the crime-fraud exception to the attorney-client privilege.

> **1.     The Exception Applies if There Is a Reasonable Basis to Suspect That The Documents at Issue Were Used in Furtherance of a Fraud by Kickflip.**

The crime-fraud exception breaks the attorney-client privilege where there is "a

reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud." *In re Grand Jury*, 705 F.3d 133, 153 (3d Cir. 2012); *see also In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985) ("Communications otherwise protected by the attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud, or other misconduct.").

In determining the applicability of the crime-fraud exception, "the client's intention controls and the privilege may be denied even if the lawyer is altogether innocent." *United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005) (citation and internal quotation marks omitted). "The privilege is the client's, so it is the client's knowledge and intentions that are of paramount concern to the application of the crime-fraud exception; the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply." *United States v. Chen*, 99 F.3d 1495, 1503–04 (9th Cir. 1996) (citation and internal quotation marks omitted); *see also In re Grand Jury*, 705 F.3d at 157 ("For the crime-fraud exception to apply, the attorney does not have to be implicated in the crime or fraud or even have knowledge of the alleged criminal or fraudulent scheme.").

Courts interpret the type of conduct that triggers the crime-fraud exception broadly to include wrongful conduct beyond conventional crimes and frauds. *See, e.g.*, *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 288–89 (E.D.Va. 2004) ("other courts, when confronted with a variety of untoward conduct, have concluded that the exception is not confined to circumstances of crime or fraud."). "The crime-fraud exception is not limited to evidence that supports a finding of common-law fraud," but  also "encompass[es] communications and attorney work product in furtherance of an intentional tort that undermines the adversary system

itself."  *Wachtel v. Guardian Life Ins. Co*., 239 F.R.D. 376, 380 (D.N.J. 2006) (internal quotation

marks and citation omitted).  The exception applies, for example, to obstruction of justice,

discovery abuses, fraudulent representations to the court, and other litigation misconduct.  *See,*

*e.g.*, *In re Sealed Case*, 162 F.3d 670 (D.C. Cir. 1998) (obstruction of justice—offering a false

declaration—can be used to establish crime-fraud exception); *Cleveland Hair Clinic, Inc. v.*

*Puig*, 968 F.Supp. 1227, 1241 (N.D.Ill. 1996) (extending crime-fraud exception to bad faith

litigation misconduct); *1100 West, LLC v. Red Spot Paint & Varnish Co.*, 2009 WL 232060, at

\*7 (S.D. Ind. Jan. 30, 2009) (crime-fraud exception waived attorney-client and work product

privileges where plaintiff "has committed discovery fraud and has made misrepresentations to

the Court in pleadings");  *In re Sealed Case*, 754 F.2d at 400–401 (discovery misconduct—

including perjured testimony, document destruction, and other misconduct—is serious

misconduct that warrants application of the crime-fraud exception).  Further, the crime or fraud

need not be alleged in the Complaint or at issue in the underlying litigation.  *See*, *e.g.*, *In re*

*Neurontin Antitrust Litig.*, 801 F. Supp. 2d 304, 311 (D.N.J. 2011) (conflicting testimony in

patent infringement case supported application of crime-fraud exception in separate antitrust

case); *In re Sealed Case*, 754 F.2d at 400–401 (perjury and obstruction of justice warranted

application of crime-fraud exception in case related to tax investigation).

     The Third Circuit has adopted the "reasonable basis standard," where a party seeking to

invoke the crime-fraud exception need only provide facts supporting "a reasonable basis to

suspect that the privilege holder was committing or intending to commit a crime or fraud and that

the attorney-client communications or attorney work product were used in furtherance of the

alleged crime or fraud." *In re Grand Jury*, 705 F.3d at 153; *see also In re Grand Jury*

*Proceedings*, 417 F.3d 18, 23 (1st Cir. 2005) ("As we read the consensus of precedent in the

circuits, it is enough to overcome the privilege that there is a reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud.").

The burden for establishing the applicability of the crime-fraud exception "is not a particularly heavy one."  *In re Grand Jury*, 705 F.3d at 153 (internal quotation marks omitted); *see also Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1329–31 (Fed. Cir. 2011) (Making a "*prima facie* showing" for the application of the crime-fraud exception is "'not a particularly heavy' burden") (quoting *In re Grand Jury Investigation*, 445 F.3d 266, 274–75 (3d Cir. 2006)). "[T]he party opposing the privilege is not required to introduce evidence sufficient to support a verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud occurred.  *In re Grand Jury*, 705 F.3d at 153–54.  The crime-fraud exception applies "even if the client is ultimately found not to be guilty . . . of any wrongdoing."  *United States v. Schussel*, 291 F. App'x 336, 346 (1st Cir. 2008).

> **2.    There is a Reasonable Basis to Suspect that Kickflip Engaged in Fraud by Knowingly Misrepresenting the True Date of the December Agreement and that Litigation Counsel Was Used in Furtherance of that Fraud.**

Kickflip repeatedly misrepresented the true creation date of the December Agreement to both Facebook and the Court.  *See, e.g.*, D.I. 101 (Smoak Declaration of April 17, 2015, admitting that representations made in deposition testimony and declaration of January 14, 2014 were incorrect.  If those misrepresentations were knowingly made, that would constitute fraudulent conduct.  *See, e.g.*, *In re Sealed Case*, 754 F.2d at 400–401 (discovery misconduct— including the submission of false testimony—warranted application of the crime-fraud exception); *1100 West, LLC v. Red Spot Paint & Varnish Co.*, 2009 WL 232060, at *7 (discovery fraud and misrepresentations to the Court in pleadings triggered crime-fraud exception).  As indicated above, a reasonable suspicion that this is the case strips any

communications in furtherance of the suspected fraud of attorney-client privilege and work product protection, regardless of whether Kickflip's counsel were aware of any fraud.

The facts that have already emerged are more than sufficient to create a reasonable basis to suspect that Kickflip engaged in fraudulent conduct in its dealings before this Court.  First,

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

The temporal proximity between the December Agreement's creation date in March 2012 and the beginning of the litigation in October 2012, together with the causal connection between the two events, provides a reasonable basis to suspect that Kickflip's principals would have recalled the timing and true purposes of the December Agreement when they caused their counsel to submit it to the Court on October 14, 2013, with the representation that it resolved any dispute over standing.  D.I. 28.  *See, e.g.*, *In re Sealed Case*, 754 F.2d at 398–402 (crime-fraud exception applied where "false declarations, altered documents, and perjured testimony were presented" to the court and attorneys "were used to file and verify the authenticity of false documents"); *In re Neurontin Antitrust Litig.*, 801 F. Supp. 2d at 311 (discrepancies between party's testimony in a prior case provided basis to suspect that false testimony was submitted to the court that would justify probing into privileged documents under the crime-fraud exception).

14

Second, documents produced by Kickflip in response to Facebook's most recent set of document requests ████████████████████████████████████████████████ ████████████████████████████████████ In so doing, Mr. Hunter pointedly omitted to disclose that the agreement had been created seven months previously and not on December 15, 2009, the date shown on the agreement itself, or that it had been created specifically with the litigation in mind.  Ex. D (email of October 17, 2012 from A. Hunter to litigation counsel, copying C. Smoak, ████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

It is likely that both Mr. Hunter and Mr. Smoak would have recalled the true nature of the December Agreement at the time of these communications—just seven months after its creation—and that, if he failed to inform his counsel of that fact, Mr. Hunter did so knowingly. This evidence of misrepresentation by omission in October 2012 provides a reasonable basis to suspect that Kickflip knowingly misrepresented the creation date of the December Agreement when, on October 14, 2013, it caused its counsel to inform the Court it was an agreement of December 15, 2009.  D.I. 28.  Even if litigation counsel were not aware of Kickflip's misrepresentations, that would not be relevant to the application of the crime-fraud exception. *See In re Grand Jury*, 705 F.3d at 157 ("For the crime-fraud exception to apply, the attorney

does not have to be implicated in the crime or fraud or even have knowledge of the alleged criminal or fraudulent scheme.").

Third, as late as his deposition in February 2015, Mr. Smoak retained a detailed recollection of his communications with Mr. Benisek at the time of the creation of the December Agreement, notwithstanding his subsequent claim to have misremembered the timing of those events. *See* Smoak Dep. Tr. February 25, 2015, at 116–117:



Mr. Smoak's ability to recall these details about the circumstances surrounding the creation of the December Agreement undermine the plausibility of his claim to have misremembered the timing of the agreement by some 27 months.[2]

Fourth, objections interposed by Kickflip's counsel during the course of the same deposition raise further questions.

---

[2] Mr. Smoak testified that he had no recollection regarding the timing of his conversation with Benisek and execution of the December Agreement. *See* Smoak Dep. Tr. February 25, 2015, at 120:2-10 ("Q. Do you have any recollection that this tax question was particularly urgent because you were coming to the end of the calendar year? A. *I do not recall*. Q. Do you have any recollection of whether there was a particular timing issue involved here that the agreement needed to be done in December to meet a deadline for any reason? A. *No, I don't remember*.") (emphases added)

BY MR. GIMBLETT:

Q. At the time this agreement was concluded, ***December the 15th, 2009***, Gambit Labs was already operating the GetGambit Internet payments business, wasn't it?

MR. NEWMAN: Objection; ***misstates the date of the agreement, vague as to time.***

MR. GIMBLETT: You'll have to enlighten me on how that misstates the date of the agreement.

BY MR. GIMBLETT:

Q. I'll ask the question again, and you may answer, Mr. Smoak.

A. Yeah.

Q. At the time this agreement was concluded, December the 15th, 2009, Gambit Labs was already operating the GetGambit Internet payments business, wasn't it?

MR. NEWMAN: Objection; ***vague as to time***.

D.I. 62, Exhibit 2, at 71:1-18 (emphases added).

All of these facts, taken together, provide a reasonable basis for suspicion about the knowledge of both Mr. Smoak and Kickflip's litigation counsel concerning the truth around the creation date of the December Agreement.

If Kickflip has engaged in fraudulent conduct before this Court, it is clear that it has also used its litigation counsel in furtherance of its fraud.  Litigation counsel filed the October 14, 2013 letter attaching the December Agreement as a basis for avoiding discovery on standing. Litigation counsel also submitted additional written submissions and defended depositions in which Kickflip misrepresented the true date of the December Agreement.  Facebook "is not required to make a specific showing of the client's intent in consulting the attorney, especially in a case, like this one, in which the attorneys essentially served as 'front men' in a scheme to subvert the judicial process itself."  *In re Sealed Case*, 754 F.2d at 402.  Here, as in *In re Sealed Case*, litigation counsel were "used to file and verify the authenticity of false documents" and were "instrumentalities in the ongoing cover-up whether they realized it or not."  *Id*.

**3.      There is a Reasonable Basis to Suspect that Kickflip Engaged in Tax Fraud by Backdating the December Agreement and Used its Litigation Counsel to Conceal it**

Finally, although the Court need not reach this issue, there is also ample evidence to suggest that Kickflip engaged in tax fraud when it backdated the December Agreement in the midst of an IRS audit to avoid significant tax penalties for its shareholders.  If Kickflip used litigation counsel to cover up that fraudulent conduct, that provides a separate basis to apply the crime-fraud exception.

Courts have often held that tax fraud can be the basis of the application of the crime-fraud exception to the attorney-client privilege.  *See, e.g.*, *In re Grand Jury Investigation*, 445 F.3d 266, 275 (3d Cir. 2006) (crime-fraud exception applied where evidence provided reasonable basis to suspect that company willfully evaded paying federal income taxes and engaged in conspiracy to defraud federal government of federal income taxes); *In re Grand Jury Investigation*, 352 F. App'x 805 (4th Cir. 2009) (crime-fraud exception applied where there was evidence of a scheme to defraud the United States by concealing funds and circumventing the collection of taxes); *United States v. Schussel*, 291 F. App'x 336 (1st Cir. 2008) (crime-fraud exception applied where party provided false information to attorney to evade taxes and mislead the IRS).

There is sufficient evidence to suggest that Kickflip engaged in tax fraud when it backdated the December Agreement.  █████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████



This sequence of events strongly suggests that the "personal financial needs" of Kickflip's stockholders (two of whom subsequently signed the backdated agreement) were apparently part of the motivation for the creation of the December Agreement.

there is a reasonable basis to suspect that it relied on litigation counsel to conceal this fact before and even after Facebook began questioning the creation of the December Agreement. Kickflip, through its litigation counsel, repeatedly objected to Facebook's inquiries into the creation of the December Agreement. *See, e.g.*, Kickflip's Response to Defendant's Supplementary Memorandum, D.I. 93 at 1 (there is "no support for Facebook's last-ditch effort to cast doubt on the date the December Agreement was created."); Excerpt from Smoak Deposition Transcript, D.I. 90-5 at 175:6-8

; Facebook's Second Set of Requests for Production of Documents, D.I. 90-10 at 7 (Kickflip failed to respond to Facebook's request for "[a]ll native versions of the December Agreement in the possession or under the control of Kickflip or Mr. Eric Benisek, with the

accompanying metadata specified in Item 5(e) of the Court's Default Standard for Discovery");
March 5, 2015 Letter from Brian Strange to Jonathan Gimblett (objecting to Facebook's second
set of RFPs as "improper" and arguing that the Court's January 21, 2015 order "did not reopen
discovery").  Kickflip's failure to ascertain the true creation date of the December Agreement
until months after Facebook raised the issue also suggests that documents between Kickflip and
its litigation counsel leading up to the April 17, 2015 declaration may contain evidence that
Kickflip sought, at first, to cover up the backdating of the December Agreement.

Courts have held that using counsel to conceal fraudulent conduct waives the attorney-
client privilege.  *See, e.g.*, *United States v. Edwards*, 303 F.3d 606 (5th Cir. 2002) (crime-fraud
exception applied where defendant used counsel to cover up past extortion and perpetuate his tax
fraud); *In re Neurontin Antitrust Litig.*, 801 F. Supp. 2d at 311 (crime-fraud exception would
apply if party makes misrepresentations to court as part of scheme to hide prior misconduct); *In
re Motion to Quash Bar Counsel Subpoena*, 982 A.2d 330, 336–37 (Me. 2009) (crime-fraud
exception can apply "if the lawyer's services are used to actively conceal past wrongdoing"); *In
re Sealed Case*, 754 F.2d at 402 (crime-fraud exception extended to "past acts of misconduct
[that] were the *subject* of the cover-up that occurred during the period of representation").

Given the evidence already known to Facebook, there is a reasonable basis to suspect that
Kickflip engaged in tax fraud and sought to conceal that fraud—or at least avoid discovery of the
backdating of the Agreement.  The potential tax fraud also provides further evidence of and
potential motivation for Kickflip's fraudulent misrepresentations to this Court.

## IV.  CONCLUSION

For the foregoing reasons, the Court should hold that the requested documents are not
protected by the attorney-privilege and compel Kickflip to produce them.

20

Respectfully submitted,

ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

Thomas O. Barnett
Jonathan Gimblett
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001-4956
(202) 662-6000
tbarnett@cov.com
jgimblett@cov.com


Dated:  November 3, 2015

*/s/ David E. Ross*
David E. Ross (#5228)
Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
dross@ramllp.com
bschladweiler@ramllp.com

*Counsel for Defendant Facebook, Inc.*

21

## <u>CERTIFICATE OF SERVICE</u>

I, David E. Ross, hereby certify that on November 3, 2015, a true copy of the foregoing

***Facebook's Opening Brief Re: Scope of Plaintiff's Waiver of the Attorney-Client Privilege and***

***Application of the Crime-Fraud Exception*** was served via electronic mail upon the following

counsel of record:

Mary B. Matterer
Kenneth L. Dorsney
MORRIS JAMES LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE  19801
mmatterer@morrisjames.com
kdorsney@morrisjames.com

*Counsel for Plaintiff Kickflip, Inc. d/b/a*
*Gambit Labs, Inc.*

Derek A. Newman
Derek Linke
Newman DuWors LLP
1201 Third Avenue
Suite 1600
Seattle, WA  98101
dn@newmanlaw.com
linke@newmanlaw.com

Brian R. Strange
Keith L. Butler
STRANGE & BUTLER
12100 Wilshire Boulevard
Suite 1900
Los Angeles, CA  90025
bstrange@strangeandbutler.com
kbutler@strangeandbutler.com

*Counsel for Plaintiff Kickflip, Inc. d/b/a*
*Gambit Labs, Inc.*

 */s/ David E. Ross*
 David E. Ross (#5228)