```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -
     KICKFLIP, INC.,
4                                    :    CIVIL ACTION
            Plaintiff,               :
5                                    :
            v.                       :
6                                    :
     FACEBOOK, INC.,                 :
7                                    :    NO. 12-1369 (LPS)
            Defendant.               :
8                          - - -

9                    Wilmington, Delaware
                  Wednesday, October 7, 2015
10                  Telephone Conference

11                         - - -

12   BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

13   APPEARANCES:            - - -

14
             MORRIS JAMES, LLP
15           BY:  KENNETH L. DORSNEY, ESQ.

16                and

17           NEWMAN DuWORS, LLP
             BY:  DEREK LINKE, ESQ., and
18                DEREK A. NEWMAN, ESQ.
                  (Seattle, Washington)
19
                     Counsel for Kickflip, Inc., d/b/a
20                   Gambit

21
             ROSS ARONSTAM & MORITZ, LLP
22           BY:  DAVID EVAN ROSS, ESQ., and
                  BENJAMIN J. SCHLADWEILER, ESQ.
23
                  and
24

25                   Brian P. Gaffigan
                     Registered Merit Reporter
```

```
 1   APPEARANCES:  (Continued)

 2
                      COVINGTON & BURLING, LLP
 3                    BY:  THOMAS O. BARNETT, ESQ.,
                           JONATHAN GIMBLETT, ESQ., and
 4                         LAUREN S. WILLARD, ESQ.
                           (Washington, District of Columbia)
 5
                           Counsel for Facebook, Inc.
 6

 7

 8

 9                            - oOo -

10                   P R O C E E D I N G S

11              (REPORTER'S NOTE:  The following telephone

12   conference was held in chambers, beginning at 10:33 a.m.)

13              THE COURT:  Good morning, everybody.  This is

14   Judge Stark.  Who is there, please?

15              MR. DORSNEY:  Good morning, Your Honor.  For our

16   plaintiff Kickflip, it's Ken Dorsney from Morris James; and

17   my co-counsel, Derek Newman and Derek Linke from Newman DuWors.

18              THE COURT:  Okay.

19              MR. SCHLADWEILER:  Good morning, Your Honor.

20   This is Ben Schladweiler and David Ross from Ross Aronstam

21   & Moritz on behalf of Facebook.  We're joined today by

22   Jonathan Gimblett, Tom Barnett, Lauren Willard, and Sonya

23   Laura Pasteur from Covington.

24              THE COURT:  Okay.  Thank you very much.  For the

25   record, and I do have my court reporter here, of course, it
```

1    is our case of Kickflip Inc. versus Facebook Inc., Civil

2    Action No. 12-1369-LPS.  And this discovery dispute today

3    relates to a Facebook request for production of documents

4    and possibly logging of documents that are being withheld

5    on the basis of privilege.

6              So let me start with Facebook.  Please go ahead.

7              MR. GIMBLETT:  Good morning, Your Honor.  This

8    is Jonathan Gimblett for Facebook.

9              Just to give a little bit of context for today's

10   call, the starting point for the teleconference is the

11   declarations that Kickflip filed on April the 17th on behalf

12   of Eric Benisek, an outside counsel, and Christopher Smoak,

13   their Chief Technology Officer admitting that the asset

14   transfer agreement that Kickflip had previously represented

15   was completed on December the 15th of 2009 was actually

16   created in March of 2012 in the midst of an IRS tax audit

17   and backdated in order to secure tax benefits.

18             So we had a telephone conference on June 12th

19   in which Kickflip highlighted two issues related to these

20   disclosures which we contended required further investigation:

21             One was whether the December agreement was created

22   for a fraudulent purpose and as such was null and void ab

23   initio and cannot be relied upon by the Court to establish

24   Kickflip's standing to go pursue this suit.

25             And the second issue is whether, given the

1    seriousness of Kickflip's repeated misrepresentations both to

2    Facebook and the Court, whether there had been a lack of due

3    diligence in discovery that might wind to sanctions.

4            At the end of that conference, you indicated

5    that was not reasonable and for us or indeed for the Court

6    to want to better understand what had happened, how it had

7    happened, and what, if any, of the implications were for the

8    litigation, and you ordered discovery as the way to get at

9    those facts.

10           So during the course of discovery since then,

11   Facebook has raised a number of concerns with Kickflip

12   concerning the scope of its production.  After trying to

13   narrow those differences as much as possible, we've asked

14   you today to address just a few remaining issues which we

15   believe go to the heart of the inquiry that you ordered in

16   June.  And this might be a good moment to pause and ask

17   whether you would like us to take all three issues at the

18   same time or whether you would like to go one by one.

19           THE COURT:  I would like you to take all three

20   at once, but let me preface it by asking you, it's not

21   entirely clear to me how the three issues relate to each

22   other, so to be concrete, if I required them to do the

23   privilege log you are asking for and then allowed them to

24   also submit the documents for in camera review that they're

25   proposing, would that potentially take care of today's

1    issues or is there a third something else that you are

2    asking for today?

3              MR. GIMBLETT:  No.  Well, I summarize it by

4    saying there are two principal things that we're asking for

5    today:

6              The first, we're asking that you order

7    production of documents related to November and December

8    agreements, just documents created prior to October

9    the 14th, 2013.

10             And the second thing we're asking is that you

11   order that they search for and log documents related to two

12   of our document requests that go directly to the question

13   of their due diligence.

14             The third issue is this:  The parties have

15   already agreed to that Kickflip will submit certain

16   documents for in camera review.  We put that in the letter

17   so that it would be plain on the face of the letter that

18   that issue would be before the Court.  I don't think there

19   is much disagreement except that we will probably ask you to

20   order or permit us to submit a short brief if it's submitted

21   to the Magistrate Judge.

22             THE COURT:  Well, with that, go ahead and

23   address the two or three issues as you see them.

24             MR. GIMBLETT:  Right.  So let me start with the

25   question of the documents related to November and December

1    agreements.

2           We were deliberately narrow in our document

3    requests concerning these agreements asking only that Kickflip

4    and its litigation counsel produce documents created on or

5    before October the 14th, 2013.  The significance of that date

6    is that that was when Kickflip introduced the December

7    agreement into the litigation, submitting it to the Court in

8    support of its contention that there is no need for discovery

9    on standing, and discovery on standing that the Court has in

10   fact already ordered.

11          Now, we now know, what we didn't know at the

12   time, that the December agreement was created not on

13   December the 15th, 2009 but only seven months before the

14   initiation of this litigation.  And we also know, as a

15   result of the most recent phase of document production, that

16   the specific reasons why it was created and then backdated

17   to December 2009 was to serve personal financial needs and

18   in view of anticipated Facebook lawsuit.

19          So with the benefit of that knowledge, it seems

20   quite likely to us that litigation counsel's documents

21   referring to agreements in the period before they introduced

22   the December agreements will disclose important facts.

23   Those facts might include whether there was fraudulent

24   intent on Kickflip's part in representing this is an

25   agreement to December the 15th, 2009; what Kickflip's

1    understanding was of the effect of the November agreement on

2    its standing; and what litigation counsel knew at the time

3    they submitted this agreement about the true circumstances

4    of its creation.

5             As we have set out in our letter brief, we

6    believe that there are two bases on which the Court should

7    order production of these documents:  First, they fall

8    squarely within the claim language of the waiver found by

9    the Court in its order of January 21, this year.  And that

10   order, actually the memorandum opinion accompanying the

11   order, you stated the way that extended two, but only two,

12   the November and December agreements, including the notice

13   for and the effects of entering into them as well as the

14   negotiation, performance, and implementation of these

15   agreements.

16            Now, Kickflip has argued that that formulation

17   should be read to mimic the way the specific examples of

18   license that you stated were within the scope.  Namely, the

19   motives for and entering into the agreement, negotiation,

20   performance, et cetera; but if you look at the January 21

21   memorandum, in context, it is quite clear that is not, that

22   wasn't the basis for the reasoning.

23            In fact, the memorandum cites two things that

24   Facebook has requested be included within the scope of the

25   waiver:  The first point was any documents previously

1    withheld as privileged relating to November and December

2    agreements.  And the second was any documents reviewed or

3    relied upon by Mr. Smoak in drafting his earlier declaration.

4         And the decision you reached basically granted

5    the first of those requests and denied the second request

6    which you thought would unduly risk requiring Kickflip to

7    disclose communications outside the subject matter.

8         So we believe that the wording of the waiver

9    as expressed in the January 21 order is clear, and that

10   documents related to the November/December agreement, which

11   is precisely what we are asking for are covered by it.

12        There is a second basis, however, if you

13   conclude differently on the scope of the waiver, and that

14   is the exception to the attorney-client privilege.  Here,

15   the case law of the Third Circuit is clear.  We cited a

16   case in our letter brief which makes clear that the

17   attorney-client privilege is broken where there is a

18   reasonable basis to suspect that the privilege holder was

19   committing or intending to commit a crime of fraud and that

20   the attorney-client communications or attorney work product

21   were used in the furtherance of the alleged crime of fraud.

22        Now, in their responsive letter brief, Kickflip

23   has suggested that that doesn't apply because there is no

24   suggestion that litigation counsel participated in the fraud.

25        If we look, though, at the case we cited, that

1   is very clear that the knowledge of litigation counsel is

2   neither here nor there.  This is the case *In Re:  Grand*

3   *Jury Investigation*, 445 F.3d 266.  And the specific language

4   I'm citing can be found at 279, note 4, where it states,

5   "Of course, the crime fraud exception applies even when an

6   attorney is unaware that the client is engaged in or planning

7   a crime."

8              Again, from the circumstances here, the disclosure

9   that the December agreement was actually created seven months

10  before the beginning of this litigation, that it was created

11  specifically with a view to establishing a record on ownership

12  for this litigation, we believe that that constitutes ample

13  grounds to suspect that the documents that we're after may

14  well establish fraudulent intent on Kickflip's part.

15             If there are no questions on that part, on that

16  item, I can move on to the second issue.

17             THE COURT:  Go on to the second issue, and then

18  we'll come back and I'll ask my questions.  Go ahead.

19             MR. GIMBLETT:  So the second issue relates to

20  the logging of documents relating to Kickflip's discovery

21  efforts.  And the two issues addressed in the relevant

22  documents requests covered by this issue goes to the heart

23  of the concerns discussed on the June 12th teleconference.

24             Firstly, what, if any, action Kickflip and its

25  counsel took to establish the true dates of the December

1    agreements creation after Facebook began to raise questions

2    about it in February of this year.

3              And, second, what, if any, evidence there is

4    to support Mr. Benisek's contention in his April 17th

5    declaration that he suffered a hard drive failure in 2012

6    in which he lost many otherwise responsive documents.  And

7    that was a hard drive failure for which there had been no

8    disclosure prior to April the 17th, 2015.

9              Now, we've tread carefully around these issues

10   in view of Kickflip's assertion that any such documents

11   are privileged.  We're not asking today that you order

12   production of responsive documents, only that you order that

13   they be searched for, and that they be listed on a privilege

14   log.

15             That treatment is consistent with Kickflip's

16   assertion the documents are privileged.  It does represent

17   a limited modification of the Court's default standard on

18   discovery which provides that normally there is no

19   requirement for counsel to load documents created after the

20   beginning of litigation, but that is a default standard and

21   by definition default standards can be departed from when

22   the circumstances require.

23             In our view, the circumstances here are utterly

24   extraordinary, and particularly in view of the concerns

25   aired by the Court in June, it's amply warranted we believe

1    that that departure from the default standard be required.

2              We believe that locating these documents will be

3    a useful next step.  Firstly, if Kickflip can find no such

4    documents, that will establish important facts relevant to

5    their diligence and potentially relevant to your discretion

6    on the discovery sanctions.  But if it does find documents,

7    the log may well disclose or potentially in camera review

8    may disclose whether an exceptions privilege such as the

9    crime fraud exception applies to those documents.

10             And then very quickly on the third issue, the

11   question of in camera review.  Kickflip has already agreed

12   to submit certain specified documents for in camera review.

13   They have done so on the condition that they could be

14   reviewed by the Magistrate Judge.

15             We don't oppose that request.  We think it is

16   to your discretion.  We do see some potential inefficiency

17   in asking the Magistrate Judge who is not aware or educated

18   with the facts of this case to do this from scratch and

19   therefore if that is the way that you order in camera review

20   to be conducted, we would ask that you allow us to submit a

21   short brief memo of five pages so that we can provide the

22   context necessary to help the Magistrate Judge support any

23   information of relevance here.

24             So we let me pause there, and if you have any

25   questions I'll be happy to answer them.

1            THE COURT:  I do.

2            In terms of the logging request, one of the

3       criticisms from Kickflip is that you are essentially in

4       their view requiring them potentially to log sort of daily

5       activities over the course of this litigation, potentially

6       every communication they've had, that is, litigation counsel

7       has had with their client, and that that would therefore be

8       unduly burdensome even under the circumstances here.

9            Respond to that.

10           MR. GIMBLETT:  Well, the context of the request we

11      explained in the June 12th teleconference was that beginning

12      in February, 2015, we flagged on numerous occasions to

13      Kickflip and to its counsel that there are serious questions

14      about whether the December agreement was actually created in

15      December of 2009.  We did so at the deposition of Mr. Smoak on

16      February the 25th, I think it was.  We did so fuller in RFPs

17      specifically asking Kickflip to produce any document that

18      referenced the December agreements with its creation date.  We

19      did so in our supplementary brief on summary judgment.

20           What necessitated it at the time was a statement

21      in Kickflip's reply brief, supplementary reply brief that

22      there was no basis for our contention that the question mark

23      as to when the December agreement was created.

24           So if there was a concern here about this being

25      an unbounded request, I think that we could specify a time

1    range for the request which would cover those concerns

2    specifically.  I could see this being a request for

3    documents created on or before January the 21st, 2015, for

4    example, which would cover all of those events that I just

5    recounted and demonstrate whether in fact Kickflip or its

6    counsel did anything between our first raising this issue

7    in February and their statements in late April, that those

8    are the basis for our contention to actually investigate the

9    facts.

10              THE COURT:  Would you be agreeable to a back-end

11   cutoff date for the logging of, I don't know, April or

12   thereabouts?

13              MR. GIMBLETT:  Yes, I think the logical back-end

14   date would be April the 17th, which was the date on which

15   the Benisek and Smoak declarations were submitted.  So up

16   to, and including, that date.

17              THE COURT:  And then --

18              MR. GIMBLETT:  The request about --

19              THE COURT:  Go ahead.

20              MR. GIMBLETT:  I'm sorry, Your Honor.  So that

21   relates to our request on the question of the creation date

22   of the agreement.

23              The other part of our request was the documents

24   relating to the alleged failure of Mr. Benisek's hard

25   drive.  That I don't see that being quite so easily limited

1    in time.  Mr. Benisek has represented that the failure

2    happened at some point in 2012.  He can't say exactly when.

3            I think we would be interested in seeing any

4    documents in the beginning in 2012 on which that substantiates

5    that we had this hard drive failure.  I don't believe it's

6    that burdensome a request because Kickflip can use, quite

7    easily use such search terms that would pull up correspondence

8    between themselves and Mr. Benisek or perhaps litigation

9    counsel, documents that reference a hard drive failure or a

10   laptop failure.

11           THE COURT:  Okay.  And in terms of really the

12   first issue about the production of documents, I guess my

13   first question is, do you agree that the documents already

14   produced establish at least that litigation counsel were not

15   involved in the actual backdating of the December agreement?

16           MR. GIMBLETT:  I think we want to see the

17   kinds of the documents before we draw any hard and fast

18   conclusions because the course of this litigation has

19   demonstrated how much misunderstanding can evolve on the

20   basis of new disclosures.

21           I will say that I think there are certain

22   documents that would support that contention and the fact

23   that apparently they were engaged in April 2012 when the

24   agreement was created in March of 2012.  That is not the

25   only issue in play here, though.  Another issue is what

1    their knowledge was at the time the December agreement was

2    introduced into the litigation in October of 2013.  And I

3    think in a general context here, it's reasonable to suspect

4    that there may be information in these documents that go to

5    that issue.

6              I would also flag -- and this is something that

7    we mentioned in our submission before the June hearing --

8    the curious objection as proposed by Kickflip's counsel

9    during a deposition of Mr. Smoak in November of 2013.  When

10   I asked Mr. Smoak, the question was:

11             "Question:  At the time this agreement was

12   concluded, December the 15th, 2009, Gambit Labs was already

13   operating the GetGambit Internet payment business, wasn't

14   it?"

15             And the response or the objection was:

16             "Mr. Newman:  Objection.  Misstates the date of

17   the agreement, vague as to time."

18             And my follow-up question asks Kickflip's

19   counsel to explain the basis of that objection and was

20   followed by a long silence and nervous station.

21             So I think there are facts in the record which

22   gives a basis to suspect that those documents could be

23   educative.

24             THE COURT:  And what was the timing of that

25   deposition?

1          MR. GIMBLETT:  It was November the 25th, 2013.

2     And the document item is 62, Exhibit 2, and the text that I

3     just read out was page 71.

4          THE COURT:  And that was before the time that

5     you put the plaintiff on notice that you had some suspicions

6     about the date of the agreement; correct?

7          MR. GIMBLETT:  Correct.  It was about 15 months

8     before we did so.

9          THE COURT:  In terms of the possible application

10    of the crime fraud exception to the attorney-client privilege,

11    your argument I think is not whether or not there was fraud-

12    ulent intent in connection with the backdating that evidently

13    occurred I think around 2012 but whether or not there was

14    fraudulent intent by litigation counsel introducing that

15    backdated document into the case in this court.  Is that

16    generally your position?

17         MR. GIMBLETT:  I think it is possible we might

18    discover facts going to either of those frauds.  And you are

19    right, there are two different frauds at issue here.  One

20    is a potential tax fraud in the initial backdating and the

21    second is a potential fraud on the Court by representing

22    this is an agreement of December the 15th, 2009 when we

23    have reason to suspect that did certainly and potentially

24    as litigation counsel knew that that was not the case.  I

25    wouldn't exclude that the documents we're asking for would

1  have information relevant to both of those frauds.

2             THE COURT:  All right.  Thank you.  Let me hear

3  from Kickflip, please.

4             MR. NEWMAN:  Thank you.  Good morning, Your

5  Honor.  This is Derek Newman.

6             The first of Facebook's first two issues is

7  whether litigation counsel's documents relating or referring

8  to the November or December agreements that are otherwise

9  privileged and work product are within the scope of the

10  January 21 waiver.

11             They are not.  The January 21 waiver concerned

12  attorney-client communications that occurred before

13  litigation counsel was ever engaged.  And, in fact, when

14  the parties briefed how narrow or broad that waiver should

15  be, Kickflip sought a narrow waiver and Facebook sought an

16  extraordinarily broad waiver.

17             Facebook originally sought, as Mr. Gimblett

18  acknowledged, any documents reviewed or relied upon by Mr.

19  Smoak in drafting his declaration concerning the subject

20  matters as to which Kickflip in Volume 11 had waived

21  privilege.  And presumably Facebook sought that because

22  if there was a waiver, documents that he reviewed when he

23  signed a declaration causing that waiver are relevant.

24             But the Court rejected that and found that the

25  waiver only extends to the November and December agreements,

1    including the motives for and effects of entering them

2    as well as the negotiation, performance, and implementation

3    of those agreements.

4            The Court noted that expanding the waiver beyond

5    that, in other words, allowing the disclosure of documents

6    that Smoak reviewed when he waived the privilege, expanding

7    the waiver beyond that would encompass a lot more than

8    Facebook was entitled to.  And the Court wrote that it would

9    unduly risk requiring Kickflip to disclose communications

10   outside the subject matter of what is disclosed in the

11   declaration.

12           All the documents that Facebook seeks now are

13   outside the subject matter of what was disclosed in the

14   January 2014 declaration.  And if the Court did not extend

15   the waiver to communications that Mr. Smoak reviewed to

16   prepare a declaration actually waiving the privilege, then

17   the Court should not allow communications among counsel that

18   weren't in connection with waiving the privilege and don't

19   relate to the execution of the November/December agreements.

20           We have to keep in mind that the privilege that

21   was waived was about legal advice given before litigation

22   counsel was ever engaged.  And that is the scope of the

23   waiver.  The waiver can't be prospective.  It can't relate to

24   advice that occurs long after the waiver occurred.  It can't

25   relate to advice that is outside the scope of the advice given

1  that was waived which occurred before litigation counsel was

2  ever engaged.

3           The attorney-client privilege is absolute.  It

4  can be waived, and it was here, and the Court found the

5  scope of that waiver, but it is absolute.  And the waiver

6  here is limited to communications before March 2013 about

7  why the parties entered into the November and December

8  agreements.

9           We were engaged after that.  And for that

10  reason, the waiver cannot extend to communications with

11  litigation counsel that occurred long after that.

12           Now, Facebook argues that these documents are

13  relevant, the documents they seek.  And they might be, but

14  the privilege is absolute.

15           Relevance is not the standard.  And, in fact,

16  generally, the communications between an attorney and a

17  client in connection with litigation is always relevant

18  to that litigation.  It doesn't mean that there is an

19  additional waiver of the privilege.

20           The second issue that Facebook presents is

21  whether litigation counsel should search for and log all

22  work product and privilege communications about three

23  issues:  when the December agreement was created, Mr.

24  Smoak's April 2015 declaration, and Benisek's hard drive

25  failure.

1          Litigation counsel should not have to undertake

2     that burden.  Again, there is no attorney-client privilege

3     waiver for litigation counsel's review and analysis of the

4     December agreement, or Mr. Smoak's declaration, or the hard

5     drive failure.

6          The crime fraud exception doesn't apply because

7     litigation counsel was not engaged until April 2012.  So if

8     there is an exception, and I don't think there is, but if

9     there is, it would apply to Mr. Benisek, his firm, but not

10    to litigation counsel, because we weren't involved at the

11    time, at the time that the alleged fraud occurred.

12          And there is not fraud on the Court as Facebook

13    now argues.  We filed this declaration of Mr. Smoak and Mr.

14    Benisek disclosing it as soon as we learned about it.  It

15    wasn't prompted by anything.  It's not like Facebook asked

16    us to file a declaration or the Court had some suspicions

17    and asked us to look into it.

18          I think the Court and Facebook was as surprised

19    by the declaration as we were to learn that the document

20    was executed after December of 2009.  So there wouldn't be a

21    fraud on the Court and any document relating to a hard drive

22    failure would be available from Eric Benisek.  You don't

23    need to search my files for it.

24          I don't know if I have any documents relating

25    to the hard drive failure, but I do know that it would take

1    hours and hours to search through all the e-mails, even

2    using search terms to uncover that.

3            The burden to search among documents is

4    substantial, and that burden far outweighs any futility.

5    It doesn't bear on the issue of standing or the validity of

6    the agreement that was signed seven months before litigation

7    commenced.  All the documents that are in my files are

8    privileged and work product.  And there is no purpose in

9    logging them because there would be no reason why we would

10   have to disclose them.

11           The third issue that Facebook raises is whether

12   the Court should review seven specific documents that Facebook

13   requested.

14            The background on that is Eric Benisek sent his

15   declaration to my firm attached to an e-mail.  We produced

16   that e-mail because it is not privileged.  We don't enjoy a

17   privilege with Eric Benisek.  He was never our co-counsel.  We

18   never worked together with him, so we produced that.

19           Facebook then wanted litigation counsel's e-mail

20   with internal work product and privilege communications about

21   our communications with Eric Benisek.

22           We provided that, although we redacted the

23   internal work product and privileged communications.  And now

24   Facebook would like the Court to review seven e-mails that are

25   between my firm and my co-counsel's firms about Eric Benisek

1    signing that declaration.  And to avoid any doubt about

2    propriety, we would agree to provide those seven e-mails to

3    the Court for an in camera review, although we think it is

4    unnecessary.  We don't like the idea about privileged and

5    internal work product going to the Court, but if the Court has

6    a concern about propriety, we would do that.

7                    THE COURT:  All right.

8                    MR. NEWMAN:  What questions does the Court have?

9                    THE COURT:  Yes.  So I guess going roughly in

10   the order that you raised the issues.

11                   First, on the scope of the waiver, you do agree,

12   of course, that I have already found there to be waiver of

13   privilege in this case.  Correct?

14                   MR. NEWMAN:  Of course, Your Honor.

15                   THE COURT:  And when I look at the January

16   21st, 2015 opinion, we were not satisfied with either

17   party's proposal as to what the scope of the waiver should

18   be, but can you make any arguments that what we ultimately

19   decided was not pretty close to what Facebook asked us to

20   find was the scope of the waiver?

21                   MR. NEWMAN:  Your Honor, I agree that the Court

22   found a broad waiver.  It is provided in that memorandum and

23   opinion.  But the Court does limit it and gives an example

24   of limiting it.  Namely, when Mr. Smoak reviewed documents

25   in connection with the waiver itself, the Court declined to

1    allow Facebook to see those documents and that is a lot more

2    narrow than what Facebook desires here.

3              Communications with litigation counsel are not

4    within the scope of the waiver in that memorandum order.

5    To the extent that they are, then there is a new body of

6    law being developed.  Namely, that once there is a waiver,

7    a client is never allowed to seek advice about the subject

8    matter of that waiver because anything, past looking or

9    future looking, is within the scope of the waiver, and I

10   don't think the Court intended a waiver that broad.

11             The waiver was about the reasons for entering

12   into the December and November agreements and the execution

13   and implementation of them.  All of that occurred before

14   litigation counsel was engaged.  Since it all occurred

15   before litigation counsel was engaged, my communications

16   with my client and my internal work product are not within

17   the scope of that waiver.

18             THE COURT:  Put aside whatever we intended by the

19   breadth of that waiver in January of this year.  If there were

20   documents showing that you or other litigation counsel knew at

21   the time that you presented the December agreement into this

22   litigation that it was actually backdated, why is that it a

23   document or a communication that I should not want to see as

24   part of ultimately resolving whether this case should be in

25   this court?

1          MR. NEWMAN:  Before I answer that question, I

2    feel compelled to state that we have always exercised candor

3    to the Court, my law firm, my co-counsel.  That is the

4    reason why we filed this declaration that everyone was so

5    surprised by.

6          Again, nothing prompted it, no one requested it.

7    We learned about when the December agreement was executed.

8    We conducted an internal investigation.  In fact, I can

9    disclose that my firm conducted one, and Strange & Butler

10   conducted a separate investigation, and we did that

11   intentionally because we wanted to make sure that we were

12   clear on the facts.

13          THE COURT:  Now, is that before --

14          MR. NEWMAN:  We then contacted Eric Benisek --

15          THE COURT:  Let me stop you there.  Is that

16   before or after Facebook started raising questions about the

17   timing of the execution of the agreement?

18          MR. NEWMAN:  After the time that Facebook raised

19   questions.  When Facebook raised questions, we consulted

20   with our client.  We didn't have a relationship with Eric

21   Benisek.  So we spoke with our client, and our client

22   assured us of when the agreement was executed, and then

23   later we learned otherwise.  So we filed the declaration,

24   and we asked Eric Benisek to file a declaration.

25          THE COURT:  Right.  But --

1          MR. NEWMAN:  He drafted it, he drafted it

2     entirely.

3          THE COURT:  Let me stop you there.  You at least

4     initially on the call today I think were characterizing your

5     disclosure and the declaration as entirely unprompted by any

6     concern of the Court or any concern of Facebook.  But I

7     don't think that is quite right, and I think you have just

8     acknowledged you undertook the investigation and the efforts

9     in response to questions that Facebook was raising.  Is that

10    correct?

11         MR. NEWMAN:  Yes, that is correct.  But we had

12    discovered nothing, and then when we did, we promptly filed

13    the declaration.  It wasn't in response to a request to file

14    a declaration or a request to conduct that investigation.

15    We did that on our own, and we did it to exercise candor to

16    the Court.  We weren't involved in the earlier decision

17    making.

18         I don't see a problem with the fact that the

19    document was postdated.  Others on this call and the Court

20    perhaps may disagree.  If I knew about this back in time,

21    I would have said that it was signed in March of 2013,

22    effective in December of 2009.  It is proper under the law,

23    and that is the position I would have taken.

24         I have no interest in convincing the Court that

25    it was actually signed in December of 2009.  It doesn't help

1    or hurt my case.  I think the facts are relevant.  I would

2    never have hid that from the Court.  I don't believe that

3    anyone intentionally hid that from the Court.

4                  I believe my client, because I interrogated my

5    client.  I believe that my client understood the agreement

6    was signed in December of 2009, not in 2013.

7                  THE COURT:  Okay.  But coming back to I guess

8    the other --

9                  MR. NEWMAN:  To the waiver --

10                 THE COURT:  Hold on.  The question then remains

11   why isn't this an area in which under the arguably unique

12   circumstances here where there has already been a finding

13   of a waiver of privilege, and then, thereafter, in response

14   to questions about the timing of a document that your client

15   interjected into the case in an effort to show that it has

16   standing to bring this case, it later turned out that

17   representations that were made, maybe they didn't have to be

18   made but were made, as to the timing of that document turned

19   out to be false?  Why isn't this an area that the Court

20   should continue to be particularly concerned with and

21   arguably even err on the side of finding a waiver and

22   allowing discovery so we can ultimately know what happened

23   here.  And perhaps it will all reflect what you have said,

24   but if it doesn't, that would raise serious questions about

25   whether this case should be here.

1          MR. NEWMAN:  Your Honor, the Court should always

2    be concerned about candor and propriety, compliance with the

3    rules of ethics.  So when Your Honor asks why shouldn't the

4    Court be concerned, I think the Court should always be

5    concerned.

6          But that doesn't mean there was a waiver.  The

7    privilege is absolute.  And even if the Court has suspicions,

8    and I hope the Court does not, that doesn't mean that there

9    is an additional waiver.  A waiver has to be intentional.  The

10   waiver is provided by case law.  The exception, the crime

11   fraud exception is the only one, and there has to be a basis

12   for it.  There is no basis here that suggests that our client

13   used litigation counsel to perpetuate misstatement to Facebook

14   or to the Court.

15         So my answer is the Court should absolutely be

16   concerned, but that doesn't mean the privilege is waived.  And

17   when the Court says why shouldn't I order more discovery, I'm

18   not saying that the Court shouldn't.  Let's take discovery to

19   its natural end.  And I think that we have been very compliant

20   in discovery.  We have delivered documents.  Discovery has

21   been broad.  There has been some third-party discovery.  We

22   have complied with it, produced everything.

23              There are going to be depositions.  And

24   Facebook should ask my client, and Facebook should ask Eric

25   Benisek, and Facebook should ask any other witness about the

1    impropriety that it suspects and the Court should continue to

2    have its concerns and let's follow it to the natural end, but

3    that did not mean that there was an attorney-client waiver or

4    a work product waiver.

5          THE COURT:  In terms of the searching and the

6    logging, how could it take hours and hours to search for

7    whether or not you have any e-mails or other documents that

8    reference a potential hard drive crash?

9          MR. NEWMAN:  Your Honor, of the three subject

10   matters that Facebook requests, the hard drive is probably

11   the easiest one to search for.  And my suspicion is that

12   there is nothing.  But we have thousands of e-mails between

13   our firms and with our client, and I don't know if the

14   search queries will result in, but words like "hard" and

15   "drive" and "failure" would probably lead to thousands of

16   documents that require substantial review to find documents

17   that wouldn't assist here.  They wouldn't assist here

18   because any documents relating to Eric Benisek's hard drive

19   failure would be in the custody and control of Eric Benisek,

20   not within my custody or control.

21          And I will represent to the Court, I didn't

22   know anything about a hard drive failure until I saw Eric

23   Benisek's declaration.  I doubt there are any e-mails on it.

24          THE COURT:  The defendant is seeking documents

25   that are potentially relevant to the diligence of the

1    efforts in discovering the timing of the December agreement

2    and issues related to being forthright with the Court about

3    the timing of that agreement and the interjection of that

4    document with the agreement, the interjection of that

5    document into the case and potential sanctions depending on

6    what the results of all that are.

7              In that context, isn't it relevant what you all

8    did in that January to April time frame?  And I understand

9    your argument I shouldn't just find a waiver based on

10   relevance, but shouldn't I understand the circumstances here

11   at least make you search for and log those documents?

12             MR. NEWMAN:  No, Your Honor.  The Court should

13   not make us search for and log those documents because it

14   wouldn't help in connection with resolving the issue, even

15   the accusations, which I don't think there is a basis for

16   that my firm did anything improper.  We would spend hours

17   and hours and hours.  We'd have to hire an outside discovery

18   vendor.  This wouldn't assist in the resolution of the case.

19   We would produce a privilege log that lists subject matters,

20   wouldn't disclose the communication itself because of course

21   that is privileged and it is work product.  So we would have

22   this substantial log that takes hours and hours and hours

23   and hours to create but it wouldn't aid in the resolution of

24   the matter.

25             The way that the resolution of the allegations

1    should occur is that discovery should continue against my

2    client, discovery can continue against third-party witness

3    Eric Benisek and his law firm and anyone else involved, but

4    simply because it is relevant or there is a suspicion does

5    not mean that there is a waiver or that the Court or parties

6    are entitled to litigation counsel's privileged and work

7    product communications.

8            To the extent that that were the policy, then

9    any time a criminal defendant were on trial, his counsel's

10   communications would be disclosed for the jury to see.  And

11   I'm not necessarily speaking of defense counsel at a criminal

12   trial but any lawyers who advised him, and that's not the

13   case.  It is only the case if the lawyer's advice led to the

14   perpetration of the crime, and here there is nothing here

15   that suggests that.

16           The discovery is appropriate.  The Court's

17   concerns are appropriate.  I agree that it is relevant,

18   everything in my file is relevant to this case, but that

19   does not mean there is a waiver or that we should have to

20   undertake that substantial burden that is not going to

21   result in the resolution of these issues.

22           THE COURT:  And on the in camera review, you

23   have a preference that if I go forward with that I should

24   let the Magistrate Judge do it first.  Can you help me

25   understand why that would be?

1          MR. NEWMAN:  Your Honor, I work with a team, and

2     there is some on my team that believe since it is for the

3     Court's consideration that this Court probably shouldn't

4     review our internal files.

5          My personal belief is I'm not opposed to Your

6     Honor reviewing them, but they requested, some of my team

7     the Magistrate review them because it seems inappropriate

8     for this Court to review our internal communications unless

9     the Court actually finds that they're relevant to resolving

10    the issue.

11         THE COURT:  Well, let me ask you this, Mr.

12    Newman.  Then we'll turn back to Mr. Gimblett.

13         This case, it is hard to exaggerate how hard

14    it has been for it to get moving.  We're still trying to

15    resolve whether there is standing here.  So I am concerned

16    about whether or not I can help the case actually move

17    forward.  Do you have any thoughts on that generally but

18    specifically with respect to whether I should bring another

19    judicial officer into the case and, secondarily, whether

20    I might regret taking it slowly as I hear you suggesting,

21    which is let the discovery essentially that has already been

22    noticed play out and then perhaps revisit the issues in

23    front of me today.

24         So if you would speak to all of that and the

25    progress of the case, I'd appreciate it.

1          MR. NEWMAN:  Your Honor, I believe that the

2     case should move forward on the merits.  I believe the Court

3     should rule on the pending summary judgment motion, but if

4     I'm being accused of impropriety, and it sounds like perhaps

5     I am, I don't know that it has been expressed but it is at

6     least implied, I want to be as direct and forthcoming as I

7     possibly can.

8          I don't want to disclose confidential

9     attorney-client communications or work product.  I don't

10    want to spend and have my staff spend and have an electronic

11    evidence vendor who I pay spend hours and hours and hours of

12    time.  But to the extent there is an alleged impropriety and

13    the Court would like discovery to continue we're not going

14    to oppose that effort, but really I think the case should

15    proceed on the merits.  I think the Court should decide the

16    summary judgment motion based on standing.  I think that

17    Facebook has substantial discovery related to these

18    ancillary issues.

19         I think Facebook has done a fantastic job at

20    causing distraction, and I think that we have contributed

21    to that distraction by filing a declaration that says

22    statements made at deposition weren't true.  And I take some

23    responsibility for that because I represent a client that I

24    didn't know the statements weren't true until we learned

25    about it a few days before we filed the declaration.

1          I think the Court should allow the case to move

2     forward on the merits and perhaps discovery that Facebook

3     wants to undertake now could occur on a parallel track so

4     that we could move forward and Facebook can continue its

5     discovery on the impropriety, but the case won't be stalled

6     anymore.  I think the Court should move the case forward.

7          THE COURT:  All right.  Thank you.

8          Mr. Gimblett, back to you.  Respond as you wish.

9          MR. GIMBLETT:  Thank you, Your Honor.

10          Well, firstly, on that last point, Facebook is

11     thinking to get through the discovery on standing hopefully

12     itself and regrets that we have had to come back to you

13     several times because of facts that were represented to us

14     proving to be false.

15          We do not believe that it makes any sense for

16     the Court to move to the merits before it is established

17     whether Kickflip has standing or not, and so it would be

18     proper to conclude the current phase of discovery and then

19     have supplementary briefing on the summary judgment motion

20     and decide that motion before moving the case forward.

21          We believe that can be done pretty promptly,

22     and that is why we come to the Court with these three very

23     specific requests today.

24          I think if the Court orders the disclosures

25     we've requested, we can finish off document production and

1    get through depositions and be before you on summary

2    judgment pretty promptly.

3            On the question of privilege.  Mr. Newman keeps

4    saying that the privilege is absolute, which isn't really

5    true because privilege can be subject to waivers.  It can

6    be subject to exceptions.  And our contention today is that

7    both the waiver and an exception, the crime fraud exception

8    applies with regard to our request for documents related to

9    the November and December agreements.

10           He also treats the privilege as if it belongs

11   to him, but as we all know, attorney-client privilege

12   belongs to the client, Kickflip.  And Kickflip waived

13   this privilege in January 2015 -- January of 2014 when it

14   submitted the first Smoak declaration.  That declaration

15   treats this privilege as both a sword and a shield.  Mr.

16   Smoak had refused to answer questions relating to the

17   reasons for the December agreement in his November 25th

18   deposition.  And in his declaration in January 2014, he set

19   forth a very learned and erudite counter to the reasons,

20   the legal reasons for that agreement.  There are documents

21   that we have requested from Kickflip that all predate that

22   January 2015 waiver.

23           Now, as Mr. Newman pointed out, the starting

24   point for that waiver were questions relating to the reasons

25   for the December agreement.

1          We now know, and what we didn't know in January

2     of 2014, that the reasons for the agreement specifically

3     include creating a record of ownership to establish standing

4     in this litigation.  And, therefore, the documents that we

5     are seeking up to October 2013 relate essentially to that

6     core issue of the opinion waiver.

7          Finally, I would note that Mr. Newman has made

8     much of the April 2012 engagement of his firm.

9          As I said earlier, in response to your question,

10    I'm not going to draw any conclusions about what happened

11    until I have seen the entire documentary record.  One thing

12    I do know from my own experiences, and it is not unheard of,

13    for law firms to be talking to prospective clients before

14    they get engaged.  And so I certainly don't regard the date

15    of the engagement letter in April 2012 as dispositive of

16    the fact whether there was any discussion before that date,

17    perhaps including March of 2012 between litigation counsel

18    and Kickflip.

19         Moving on to the second issue.  Mr. Newman

20    mentioned that if there were any documents relating to the

21    failure of Mr. Benisek's hard drive, those would be in the

22    possession of Mr. Benisek.

23         While separately having a discussion with Mr.

24    Benisek about his production in this litigation, which

25    consisted of five documents, when we asked him why it was so

1    slim, one of the reasons that he put forward was that he had

2    given huge amounts of information previously to Kickflip's

3    litigation counsel, and he is refusing to produce anything

4    that he has already given to counsel.

5           So knowing both that litigation counsel has

6    those documents in his possession, knowing also that Mr.

7    Benisek is declining to produce materials from that document

8    set, that I think it would be, I think it is entirely

9    appropriate to ask Kickflip's litigation counsel to do that

10   search and to log what they find.

11          Third, the concern that Mr. Newman have stated I

12   think is significantly overstated.  As many lawyers do, I am

13   confident, having searched through my files to find eventful

14   documents that clients are asking me for, and usually I

15   don't have to engage outside vendors to undertake that.

16          So I think what we have asked for is manageable,

17   it's reasonable, and it certainly goes to the heart of the

18   issues that concerned the Court back in June of this year.

19          THE COURT:  All right.  A couple more questions

20   for you.

21          With respect to the scope of the waiver of the

22   privilege as we found it in January, in our memorandum, it

23   sounds like what you are saying is that the waiver should

24   now be found to be a little broader than we found it there

25   because of what we've learned about the dating of the

1    December agreement.  Is that what you're saying?  And, if

2    so, do I really have a basis to do that?

3              MR. GIMBLETT:  No, I think the language of the

4    waiver speaks for itself in the January 22 order.  You were

5    very clear that it extended to the November and December

6    agreements, and what we are asking for is documents relating

7    to the November and December agreements.  Certainly, what

8    we have discovered since you found the waiver increases

9    the relevance and the importance of Facebook being allowed

10   to have discovery within the scope of the waiver, but it

11   doesn't necessarily change what the limits of the waiver are.

12             THE COURT:  In terms of the crime fraud

13   exception, I understand your contention that it may apply

14   even when the attorney is unaware that they're being used by

15   the client to perpetuate a fraud or a crime, but you do need

16   to show a basis to believe that the attorney was being used

17   to perpetuate, say, the fraud.  Do you not have to show that?

18   And do you think you have made that showing at this point?

19             MR. GIMBLETT:  We will have more to say on this

20   when we make our supplementary submission on the summary

21   judgment, but I think even the documents appended to

22   Kickflip's submission for today's telephone conference goes

23   some way towards establishing that.  They include e-mail

24   exchanges between Andrew Hunter or Kickflip and litigation

25   counsel here in which Andrew Hunter forwards the December

1    agreement which he had signed just seven months previously

2    and makes no disclosure whatsoever in the e-mail that this

3    agreement was created in March 2012 and backdated.

4         So, yes, I think that even the limited documents

5    we have seen so far give cause to believe that as of October

6    2012, Kickflip was using counsel to misrepresent this

7    agreement.  And I think it is quite likely that if you

8    ordered the additional discovery as we requested, we will

9    see more of that type.

10        THE COURT:  But the only way that you have

11   articulated I think that I should give you the documents

12   that you are seeking, the first of the issues today, is

13   either to find that it's within the scope of the waiver I

14   have already found or, if not, I understood you to be saying

15   I need to find today that you have made out a case adequate,

16   met your burden to show application of the crime fraud

17   exception.

18        Are you taking that position that you have met

19   your burden there or only that you think you are on your way

20   to making that?

21        MR. GIMBLETT:  No, we believe that the burden

22   is met on the basis of what we already know about the way

23   in which the December agreement was created and how it was

24   presented to the Court.  Obviously, in a three-page letter

25   brief for today's teleconference, we didn't really have the

1   pleasure to lay that out at great length.

2          But we did attach an exhibit which is extremely

3   relevant I think to this issue, which shows that when it was

4   created in March of 2012, it was for the purpose of or it

5   was in light of personal financial needs and the Facebook

6   lawsuit.

7          That I think tells us pretty clearly that an

8   agreement was created, backdated to December of 2009 with

9   the express purpose of establishing standing in this lawsuit

10  which was then served up to Facebook and the Court as having

11  been concluded in December of 2009.

12         Those facts alone goes, I would say get you over

13  the line of a reasonable suspicion that the documents we're

14  asking for contain evidence of fraud.

15         THE COURT:  Okay.  Thank you.  Mr. Newman, is

16  there anything else you want to add?

17         MR. NEWMAN:  Yes, Your Honor.

18         In this profession that I have chosen, my

19  reputation is all I have.  My reputation before the bench,

20  my reputation before opposing counsel, and my reputation

21  before clients.

22         We're not hiding anything, and we don't oppose

23  the investigation Facebook is doing.  Facebook is correct

24  that my client owns the privilege.  To the extent that it

25  has been waived, we've disclosed all documents in that scope

1    of the waiver, but the waiver has not extended beyond what

2    the Court found concerning the January 2015 opinion and

3    order and we have to protect our client's privilege and our

4    work product.  The investigation can continue but we can't

5    disclose privileged communications.  Thank you.

6              THE COURT:  All right.  Thank you.

7              You have given us a very difficult situation,

8    and I'm afraid I don't have an easy answer as to how to go

9    forward.  I'm going to give you a partial answer now but

10   part of that answer is going to require more work from all

11   of you.

12             And I regret that because the case has moved

13   slowly.  It has taken me time to resolve the issues you've

14   put in front of me.  Even when I ordered status reports, it

15   has taken me time to figure out what to do in response to

16   status reports.

17             I'd really like to be in a position where everyone

18   can be fully heard on the standing, and then I can decide if

19   there is standing, and then the case can go forward.  So

20   it's with reluctance that I reach the conclusion today that I

21   unfortunately need to keep proceeding as I have been which is

22   going to be requiring a status report and probably further

23   briefing to help me resolve the discovery dispute which will

24   ultimately help me resolve whether there is standing, whether

25   there is sanctionable conduct, whether this case should

1    proceed or not to the merits.

2              I'm not ready to get to the merits now, and I'm

3    not, under the circumstances, going to start the process of

4    discovery on merits.  We are where we are for reasons that

5    have been described before and which include a finding of

6    a waiver of attorney-client privilege and a finding of a

7    startling admission about a document that was submitted to

8    the Court which was presented to the Court as something it

9    could rely on in determining whether there was standing and

10   therefore subject matter, a document that later turned out

11   to have been backdated in a way that certainly was not known

12   probably to anybody involved in the case on the phone today

13   but certainly at a minimum was not known to Facebook and was

14   not known to the Court.

15             So until we clear that up, under the circumstances

16   here, this case is really not going to move forward towards

17   the merits, which is why I was hoping I could just very simply

18   agree with one side or the other today and at least get you

19   moving a little bit forward, but I find reluctantly that I

20   can't do that.

21             So what are we going to do?

22             First, in terms of the request for logging, for

23   searching for documents and logging, I am granting Facebook's

24   request with the caveat that I do want the parties to meet and

25   confer now knowing that Kickflip is going to be made to search

1    for and log documents in the categories that the defendant has

2    asked for.  But I want you now to put your heads together and

3    see how we can make the burden on Kickflip in doing that as

4    minimal as necessary.

5              So a date range, for instance, seems to be a very

6    obvious way to begin to do that.  It may be that there are

7    other ways that perhaps search terms can be agreed upon.  I'm

8    not quite sure.  But I am going to make Kickflip do the

9    searching and the logging because I am concerned, I share

10   the concerns that Facebook has raised.

11             It may be that ultimately some or all of what

12   ends up on that log may have to be produced, but I'm not in

13   a position to decide that.  But I do understand Kickflip's

14   concern that the burden not be any greater than necessary, and

15   so I do want the parties to meet and confer and see if you can

16   figure out a concrete way to go forward on the searching and

17   the logging consistent with what I have said.

18             Further, I'm going to go ahead and order you to

19   do the in camera review that you have essentially agreed on.

20   I'll refer the in camera review to the Magistrate Judge, and

21   I hereby order that either side can provide their discussion

22   of up to five pages of what they think the Magistrate may

23   need to know for context in order to conduct that in camera

24   review.

25             It should go without saying I don't think that

1    an in camera review always has to be in front of the

2    Magistrate Judge.  Sometimes it's appropriate, sometimes

3    it's not necessary.

4            If I thought the rest of this case was ready

5    to move forward in a very expeditious fashion, I probably

6    would not bring another judge into it at this point, but

7    the case is not going to suddenly take off and move quickly

8    and so I'm not too worried about any extra time that might

9    be involved in getting the Magistrate Judge up to speed and

10   helping us resolve that portion of the dispute.

11           In terms of the first request, the bigger

12   question about whether I should order Kickflip to produce

13   these documents of communications with litigation counsel

14   and the plaintiff before October 14th of 2013, the date that

15   the plaintiff introduced the December agreement into this

16   litigation, I wish I could decide which way I am going to

17   go on that today but I just simply can't.

18           There are difficult questions about the scope

19   of the waiver that I have already ordered and how it relates

20   to today's request, particularly in light of what has been

21   learned in discovery to this point about the backdating of

22   the December agreement.  I think it is fair to say that in

23   our January 2015 ruling, we thought we were much closer to

24   Facebook's position and articulation of the scope of the

25   waiver than what Kickflip was arguing, and certainly some of

1   what I have seen I think in the letters leading to today,

2   positions that Kickflip may have taken about how narrow the

3   waiver was that we found don't seem consistent with the full

4   scope of the waiver that I thought I found in January of

5   this year.

6           But privilege is important, and I'm reluctant to

7   take any step on a phone call based on three-page letters

8   that may inadvertently overstate the scope of the waiver and

9   so that is where I am going to need assistance.

10          I'm further going to need assistance on the

11  application, if any, of the crime fraud exception to the

12  attorney-client privilege.  Even after the questioning, I'm

13  a little unclear as to whether the defendant I guess -- I

14  guess I understand they think that they can meet their

15  burden under the case law based on what they have already

16  learned.  I think they recognize they haven't shown me in

17  just a three-page letter where I think only one paragraph is

18  devoted to crime fraud, they haven't shown me yet how they

19  meet that burden, but I think it is appropriate to give them

20  the opportunity to do so because it could well be on that

21  basis that I would grant the discovery sought, the documents

22  in Category 1.

23          Again, I'm uncomfortable making that decision

24  today in the context of something less than full briefing on

25  an issue as important as the crime fraud exception to the

1    attorney-client privilege.  So I believe I'm going to need

2    full briefing on some sort of motion about the application

3    of attorney-client privilege and the potential waiver, the

4    breadth of the waiver that has already been found, how that

5    has been impacted by what has been learned in discovery

6    subsequent to my ruling in January as well as that the

7    application of the crime fraud exception.  I think I am

8    going to need full briefing on all of that.

9              And, again, I regret needing you all to do that.

10   I regret needing to put the further time and effort into

11   it on my part.  I regret that it will keep this case from

12   progressing materially for quite some time, but having

13   considered all of the alternative options, I find, again

14   reluctantly, that I think that is the best one and the

15   appropriate one in the context of this case.

16             So the end result is I am ordering you to meet

17   and confer and provide a joint status report to tell me

18   exactly what you are going to give me and on what basis in

19   terms of the further briefing.

20             I would like to get that joint status report

21   back from you as soon as possible so I can get you on your

22   way towards doing that.  But I'll now turn to you for your

23   thoughts as to how soon you can meet and confer and get back

24   to me on what I have asked you to do.  First, Mr. Gimblett.

25             MR. GIMBLETT:  I think we can meet and confer

1    quite quickly.  I'd like to believe that we can get

2    something to you by the end of the week.  I think in view

3    of the way it worked out last time, it might be prudent to

4    give ourselves until early next week, say Tuesday, close on

5    Tuesday.

6             THE COURT:  Mr. Newman, what do you think of

7    that?

8             MR. GIMBLETT:  Thank you, Your Honor, and

9    Mr. Gimblett.  We would agree to Tuesday of next week.

10            THE COURT:  Okay.  Then I do order the joint

11   status report consistent with what I outlined to be provided

12   to me by next Tuesday, and we will try to turn to it as soon

13   as we can.

14            I should ask now, are there other questions?

15   First, Mr. Gimblett.

16            MR. GIMBLETT:  Just one observation, Your Honor,

17   which is that a scheduling order that governs this phase of

18   discovery in which the deadlines for depositions are keyed

19   off of the close of document production.

20            Our view is that we're not yet to the point

21   where we can say that document production is closed, because

22   we have these outstanding issues.  If we see the clock for

23   those depositions is still ticking, I don't know if it makes

24   any sense for us to try to depose witnesses until we resolve

25   these issues and Kickflip has complied with whatever orders

1   the Court has issued as a result of this dispute.

2              THE COURT:  Well, that is something I think you

3   will want to take up in your meeting and conferring.  And I

4   should add if there are any modifications to the schedule,

5   or any other work that either or ideally both parties think

6   I should enter as a result of what I said today in your

7   further meeting and conferring I would appreciate if you

8   submit proposed forms of those orders with your submission

9   next week.

10             Is there anything else, Mr. Gimblett, from your

11  side?

12             MR. GIMBLETT:  No, that's it.  Thank you, Your

13  Honor.

14             THE COURT:  Okay.  Mr. --

15             MR. DORSNEY:  Your Honor?

16             THE COURT:  Yes.

17             MR. DORSNEY:  Your Honor, if I may.  It's Ken

18  Dorsney.  May I have an opportunity to speak for a moment?

19             THE COURT:  Sure.

20             MR. DORSNEY:  I guess I just want to ask the

21  Court, to the extent that the Court is concerned about the

22  propriety of my co-counsel in submitting the declaration, is

23  that a basis for the relief that the Court is trying to give

24  now?  It is definitely something that -- to me, it sounds

25  like based upon Facebook's representations about something

1    that I am not sure they have identified specifically,

2    there is a question in the Court's view as to whether or

3    not my co-counsel and I guess potentially my firm acted

4    with propriety in submitting the declaration to clarify our

5    understanding of the dating of that document.  But I don't

6    believe that that evidence or that specificity has been put

7    forth to the Court.

8              To the extent the Court is basing its relief today

9    on that assertion, is it possible to have that specified?

10   Because if we go through this process months and months, and,

11   of course, I can only speak for myself.  I'm aware of no

12   impropriety in connection with the filing of that declaration,

13   but to the extent we go through months and months and the

14   Court has shaped its relief on that assertion but we don't

15   have any specificity, then it leaves us with no opportunity to

16   seek some type of recovery for all of that time and burden and

17   expense.  So I guess I would just like to respectfully ask the

18   Court if some allegation from Facebook as to impropriety on my

19   co-counsel is a basis for the relief that the Court is trying

20   to shape.

21             THE COURT:  I appreciate you raising the

22   question.  I don't have anything further to say at this time

23   than what I have just said at more length than I had hoped

24   to articulate it with, and I'm asking for more assistance

25   from the parties.  And you can certainly raise any concerns

1    or issues you wish in the submissions on Tuesday.

2              Are there any other questions from the plaintiff?

3    No?

4              (Pause.)

5              THE COURT:  I'll take that as a "no."  Thank you

6    all very much.  We'll look for your submissions on Tuesday.

7    Good-bye.

8              (Telephone conference ends at 11:47 a.m.)

9

10        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

11

12                        /s/ Brian P. Gaffigan
                        Official Court Reporter
13                       U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25