# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KICKFLIP, INC., | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 12-1369-LPS |
| FACEBOOK, INC., | : | |
| Defendant. | : | |

Mary B. Matterer, Kenneth L. Dorsney, MORRIS JAMES LLP, Wilmington, DE.

Derek A. Newman, Derek Linke, NEWMAN DU WORS LLP, Seattle, WA.

Brian R. Strange, Keith L. Butler, STRANGE & BUTLER, Los Angeles, CA.

    Attorneys for Plaintiff.


David E. Ross, Benjamin J. Schladweiler, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE.

Thomas O. Barnett, Jonathan Gimblett, COVINGTON & BURLING LLP, Washington, DC.

    Attorneys for Defendant.


## MEMORANDUM OPINION

**UNSEALED ON
OCTOBER 11, 2016**

September 14, 2016
Wilmington, Delaware

STARK, U.S. District Judge:

The parties in this antitrust action selected documents for the Court to review *in camera*. The Court accepted the submission of such documents as a step in resolving the parties' disputes as to the scope of an attorney-client privilege waiver found by the Court on January 21, 2015. The submission was also intended to aid the Court in determining whether the crime-fraud exception to the privilege has been triggered.

## I.    BACKGROUND

The presently pending disputes arise out of Facebook, Inc.'s ("Facebook" or "Defendant") challenge of Kickflip, Inc.'s ("Kickflip" or "Plaintiff") standing to sue and Facebook's request for early discovery on standing. Facebook argues that on November 9, 2009, Kickflip divested itself of all properties and assets, including its interests in this litigation, by execution of an agreement ("November Agreement") that same date with Gambit Labs, Inc. ("Gambit"). (*See* D.I. 52 at 1) As part of an effort to avoid early discovery related to standing, Kickflip produced to Facebook an agreement dated December 15, 2009 ("December Agreement") between Kickflip and Gambit. (*See* D.I. 26 at 1) ("There is no longer a need for limited, early discovery. Kickflip produced the December 15, 2009 agreement between Kickflip and Gambit Labs, Inc., which resolves the standing issue . . . .")

When Kickflip's Rule 30(b)(6) representative, Chris Smoak, was questioned during deposition about the December Agreement, he asserted attorney-client privilege. (*See, e.g.*, D.I. 62 at 24) Subsequently, in connection with briefing on Facebook's summary judgment motion regarding standing, Kickflip submitted a declaration by Mr. Smoak which provided certain details about the December Agreement which Mr. Smoak had previously withheld on account of

1

attorney-client privilege. (D.I. 58) Consequently, after further motions practice, on January 21, 2015, the Court issued a Memorandum Opinion and Order finding that Kickflip had waived its attorney-client privilege with respect to "the November and December Agreements, including the motives for and effects of entering into them, as well as the negotiation, performance, and implementation of these Agreements," and ordered that Kickflip produce previously withheld documents related to the November and December Agreements. (D.I. 81 at 7; *see also* D.I. 82 at 1)

The additional discovery into the circumstances surrounding the November and December Agreements led to the production of documents calling into question the December Agreement's true creation date. (*See* D.I. 90 Exs. 8, 9) When Facebook asked Kickflip for any documents corroborating the purported December 15, 2009 creation date of the December Agreement, Kickflip represented to the Court that there was "no support for Facebook's last-ditch effort to cast doubt on the date the December Agreement was created." (D.I. 93 at 1) On April 3, 2015, Facebook once again requested that Kickflip "produce any document that would establish when [the December Agreement] was created and executed, such as, for example, any relevant attorney billing records." (D.I. 96 Ex. 1) Facebook requested production of any such documents by April 7, 2015, the day before Facebook's reply brief on its summary judgment motion was due. (*See id.*) Kickflip did not respond by April 7, 2015.

Instead, on April 17, 2015, Kickflip wrote to the Court to state: "Counsel learned last week of a factual inaccuracy that requires correction concerning the creation and execution date of the December Agreement that impacts several representations our client, Kickflip, Inc., has made to this Court and arguments that counsel has made based on those representations." (D.I.

99) Accompanying the letter were two declarations: one from Mr. Smoak ("Smoak Declaration") and the other from Eric Benisek, Kickflip's corporate counsel ("Benisek Declaration"). (D.I. 100, 101)  The Smoak and Benisek Declarations state that Mr. Benisek's newly-found billing records – requested and received by Mr. Smoak on April 7, 2015 – revealed that the December Agreement had actually been created in March 2012 and backdated to December 2009 for tax purposes. (D.I. 100, 101)  Mr. Benisek explained that he had not previously recalled the March 2012 creation date, in part due to the failure of his hard drive in 2012, which caused him to lose a number of documents. (D.I. 100)  Mr. Smoak explained that he had relied on Mr. Benisek for his previous statements about the December Agreement. (D.I. 101)

In light of what Facebook accurately described as Kickflip's "startling admission," on June 12, 2015 the Court granted Facebook's request for additional discovery extending to any of the facts or issues addressed in the Smoak and Benisek Declarations. (D.I. 118 at 20-21)  Facebook thereafter served requests for documents "related to Kickflip's or its agents' efforts to ascertain when the December Agreement was created" and "relating or referring to the failure of Eric Benisek's hard drive in 2012." (D.I. 150 Ex. D at 6-7)  That discovery revealed that the December Agreement was created not only for tax purposes, but also to address a "need for documenting ownership between Kickflip and Gambit in light of . . . [the] Facebook lawsuit." (D.I. 136 Ex. A)

Kickflip refused to search for, log, or produce responsive documents created after the Complaint was filed on October 26, 2012.  The resulting impasse led to a discovery teleconference on October 7, 2015, during which Facebook requested that the Court order: (1) the

3

scope of the attorney-client privilege waiver extends to litigation counsel's documents between

October 26, 2012 and October 14, 2013, when the December Agreement was first produced;

(2) Kickflip must search for and log litigation counsel's documents related to Kickflip's

discovery efforts surrounding the true creation date of the December Agreement; and (3) *in*

*camera* review of an email chain among litigation counsel related to the Benisek Declaration and

six of Mr. Benisek's billing records. (D.I. 126, 127, 142) After hearing from the parties, the

Court ordered Kickflip to: (1) search and log litigation counsels' responsive documents subject to

reasonable date and search term limitations; (2) submit additional briefing on the scope of the

attorney-client privilege waiver; and (3) submit for *in camera* review by Magistrate Judge Burke

the billing records and email chain. (D.I. 142 at 41-45)

       In the parties' Joint Status Report filed on October 13, 2015, Kickflip agreed that its

litigation counsel would, with respect to "documents related to Kickflip's efforts to ascertain the

true date of the December Agreement, . . . search for documents in their possession created

between January 21, 2015 and April 17, 2015," and with respect to "the alleged failure of Eric

Benisek's hard drive, . . . search for documents in their possession created between January 1,

2012 and April 17, 2015." (D.I. 129 at 2)

       The parties' efforts to comply with the Court's October 7, 2015 order have led to the

disputes now pending before the Court. On November 3 and 4, 2015, Kickflip's litigation

counsel, Newman Du Wors LLP and Strange & Butler, each produced privilege logs withholding

246 and 121 documents, respectively, on the basis of three different formulations of privilege.

(D.I. 150 Exs. E & F) Because "[t]he two privilege logs list[ed] no documents relating to any

efforts to ascertain the creation date of the December Agreement prior to April 7, 2015,"

Facebook filed a Motion to Compel Production, arguing that the documents listed in the privilege logs should either be (1) produced because they are "stripped of privilege by operation of the crime-fraud exception" or (2) "submitted for *in camera* review to establish whether the crime-fraud exception applies and/or to assist in the Court's consideration of whether to exercise its discretion to sanction Kickflip for discovery abuses." (D.I. 150 at 6-7)  On March 11, 2016, the Court granted Facebook's Motion to Compel Production "to the extent it seeks *in camera* review of a portion of the documents listed on the privilege logs produced by Newman Du Wors LLP and Strange & Butler." (D.I. 157)  Thereafter, on March 18, 2016, Kickflip submitted 15 documents for *in camera* review, all of which were selected by Facebook from the two privilege logs. (*See* D.I. 158)  The parties each also filed a letter brief summarizing their position on how the *in camera* review should come out. (*See* D.I. 159, 160)  The results of the *in camera* review are the principle subject matter of this Memorandum Opinion.

In the meantime, on December 1, 2015, the parties completed supplemental briefing on the scope of the attorney-client privilege waiver that had been found by the Court on January 21, 2015 and the applicability, if any, of the crime-fraud exception. (D.I. 136, 143, 145)  The issue of whether the attorney-client privilege waiver extends to litigation counsel's documents between October 26, 2012 and October 14, 2013, or, alternatively, whether these documents are subject to production based on the crime-fraud exception to the privilege, is a dispute that is also presently before the Court and addressed in this Memorandum Opinion.

Notably, on January 12, 2016, Judge Burke completed his *in camera review*, finding that certain portions of Mr. Benisek's billing records should be produced to Facebook in unredacted form, but also finding that the email chain among litigation counsel regarding the Benisek

5

Declaration need not be produced subject to the crime-fraud exception, as it did not contain

evidence of tax fraud or fraud on the Court. (*See* D.I. 152; *see also* D.I. 132, 133)

## II.   SCOPE OF ATTORNEY-CLIENT PRIVILEGE WAIVER

With respect to the scope of the attorney-client privilege waiver found on January 21,

2015, the Court, for the reasons explained in the following section, can adequately conclude

based on the documents submitted for *in camera* review that Kickflip's litigation counsel were

***not*** aware of the true creation date of the December Agreement prior to April 7, 2015, when they

were working diligently to correct any misrepresentations made to the Court. To the contrary,

the communications reveal litigation counsel's efforts to discover the true creation date of the

December Agreement and to submit corrections to the Court. Because Kickflip's litigation

counsel did not know "the motives for and effects of entering into [the November and December

Agreements], as well as the negotiation, performance, and implementation of these Agreements,"

i.e. the full extent of the waiver previously found by the Court (D.I. 81 at 7), their documents do

not fall within the scope of the previously-found waiver.

Indeed, Kickflip represents that it has "produced all communications with its corporate

counsel, accountant, and tax counsel relating in any way to the November and December

Agreements," as well as "redacted copies of litigation counsel's pre-Complaint communications

relating to the Agreements." (D.I. 143 at 8) Because Kickflip's agents – not its litigation counsel

– are the only individuals who would have some basis for knowing "the motives for and effects

of entering into [the November and December Agreements], as well as the negotiation,

performance, and implementation of these Agreements" (D.I. 81 at 7), it stands to reason that

litigation counsel's own documents would not shed any further light on these issues. Thus, the

Court concludes that the scope of the attorney-client privilege waiver it found on January 21,

2015 does **not** extend to litigation counsel's documents between October 26, 2012 and October

14, 2013.

## III.   CRIME-FRAUD EXCEPTION

Next, the Court considers whether the crime-fraud exception should apply to litigation

counsel's withheld documents.  Kickflip asserts both attorney client-privilege and attorney work

product doctrine with respect to the documents listed on the privilege logs of its litigation

counsel.  As a general matter, the Court's analysis of the crime-fraud exception below applies

equally to litigation counsel's documents between October 26, 2012 and October 14, 2013,

which were the subject of Facebook's October discovery dispute with Kickflip, and to litigation

counsel's documents from 2015, which were the subject of Facebook's Motion to Compel

Production.  However, in this Memorandum Opinion the Court will only specifically address

whether the documents submitted for *in camera* review must be produced to Facebook.

### A.     Legal Standards

The attorney-client privilege "is designed to encourage clients to make full disclosure of

facts to counsel so that he may properly, competently, and ethically carry out his representation."

*In re Impounded*, 241 F.3d 308, 316 (3d Cir. 2001) (internal quotation marks omitted).  "[T]he

privilege belongs to the client, and only the client may waive it."  *Haines v. Liggett Group Inc.*,

975 F.2d 81, 90 (3d Cir. 1992), as amended (Sept. 17, 1992).  However, "when the  lawyer is

consulted, not with respect to past wrongdoing but to future illegal activities, the privilege is no

longer defensible and the crime-fraud exception comes into play."  *In re Impounded*, 241 F.3d at

316-17 (internal quotation marks omitted); *see also Haines*, 975 F.2d at 90 ("The seal is broken

when the lawyer's communication is meant to facilitate future wrongdoing by the client."). In applying the crime-fraud exception, "the client's intention controls and the privilege may be denied even if the lawyer is altogether innocent." *United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005) (internal citation and quotation marks omitted).

On the other hand, "the protection stemming from the work product doctrine belongs to the professional, rather than the client, and . . . efforts to obtain disclosure of opinion work product should be evaluated with particular care." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 866 (3d Cir. 1994) (citing *Haines*, 975 F.2d at 94 ("This court has accorded an attorney's work product almost absolute protection from discovery.")). This is because "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). Accordingly, the Third Circuit has

> left open the possibility that there may be circumstances in which
> [an] attorney, without knowledge of his client's illegal activity,
> might . . . properly claim and prevail in asserting a work product
> privilege even when his client cannot. Because the work product
> doctrine protects the interests of attorneys separately from the
> interests of clients, there is at least some basis for the proposition
> that an innocent attorney should be able to prevent disclosure of
> work product that his client used to further a crime or fraud.
> Accordingly, other courts of appeals have afforded attorneys this
> protection in appropriate circumstances.

*In re Grand Jury*, 705 F.3d at 158 (internal citation and quotation marks omitted).[1]

---

[1]*See also Rhone Poulenc Rorer Inc.*, 32 F.3d at 866 ("[I]t appears the magistrate judge and the district court had concluded that a finding that the insureds had waived the attorney client privilege necessarily meant they had also waived the protection from disclosure for the work product of the firms that had represented and advised them. For a number of reasons, one does not lead to the other. As a factual matter, if the state of mind of the insureds is in issue, papers reflecting the work product of counsel that were not shared with or communicated to the clients

8

Courts which have afforded attorney work product this protection have generally "distinguish[ed] between two kinds of work product: ordinary work product, which includes raw factual information, and opinion work product, which encompasses counsel's mental impressions, conclusions, opinions or legal theories," finding that the former "is generally discoverable upon a showing of substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship," and that the latter "enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances," such as when it appears "that the attorney in question was aware of or a knowing participant in the criminal conduct." *In re Green Grand Jury Proceedings*, 492 F.3d 976, 980-81 (8th Cir. 2007) (internal citation and quotation marks omitted); *see also In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 252 (4th Cir. 2005); *In re Grand Jury Proceedings*, 867 F.2d 539, 541 (9th Cir. 1989). The Court will follow this approach, which it views as prudent in light of the Third Circuit's statements in *In re Grand Jury*.

The crime-fraud exception, an "extreme remedy," *see Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1359 (Fed. Cir. 2011), applies only where there is "a reasonable basis to suspect that ***the privilege holder*** was committing or intending to commit a crime or fraud ***and*** that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud." *In re Grand Jury*, 705 F.3d at 153 (emphasis added). "The reasonable basis standard is intended to be reasonably demanding; neither speculation nor evidence that shows only a distant likelihood of corruption is enough." *Id.* (internal quotation marks omitted). But

---

are not relevant. Work product that was not communicated to the client cannot affect the client's state of mind.").

"the party opposing the privilege is not required to introduce evidence sufficient to support a

verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud

occurred." *Id.* at 153-54 (internal citation and quotation marks omitted). "[U]nder federal law,

the [crime-fraud] exception can encompass communications and attorney work product in

furtherance of an intentional tort that undermines the adversary system itself," including

misrepresentations by omission. *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 380 (D.N.J.

2006) (internal citation and quotation marks omitted); *see also In re Sealed Case*, 162 F.3d 670

(D.C. Cir. 1998) (finding that obstruction of justice through false declaration can serve to

establish crime-fraud exception).

**B.     Discussion**

With regard to the first requirement for application of the crime-fraud exception,

Facebook argues that there are two reasonable bases upon which to suspect crime or fraud on

behalf of Kickflip. First, Facebook argues that Kickflip committed fraud on the Court by

repeatedly and intentionally misrepresenting the true creation date of the December Agreement.

Despite the insistence of the Smoak Declaration and the Benisek Declaration that any

misrepresentations were unintentional (D.I. 100; D.I. 101), the Court finds that there is a

reasonable basis to suspect that either Kickflip and/or its corporate counsel, Mr. Benisek, were

intentionally misleading the Court. The Court agrees with Facebook that because "the December

Agreement was created [in March 2012] specifically with a view to the litigation filed seven

months later against Facebook," and was signed at that time by both Kickflip principals including

Mr. Smoak, there is "a reasonable basis to suspect that Kickflip's principals would have recalled

the timing and true purposes of the December Agreement when they caused their counsel to

10

submit it to the Court on October 14, 2013, with the representation that it resolved any dispute over standing." (D.I. 136 at 14) (citing D.I. 28)

Because the Court finds a reasonable basis to suspect that Kickflip and/or its corporate counsel intentionally misrepresented the December Agreement's true creation date, it need not consider whether Facebook's allegation of tax fraud provides an additional basis for satisfying the first requirement of the crime-fraud exception. In any case, a finding that there is a reasonable basis also to suspect tax fraud would not change the scope of any applicable privilege waiver as the Court has discerned nothing in the *in camera* documents to show that Kickflip used its counsel in furtherance of any alleged tax fraud.

Having found a reasonable basis to suspect fraud on the Court by Kickflip, the Court must determine whether and to what extent litigation counsel's attorney-client communications or attorney work product were used by Kickflip (either on its own or through its corporate counsel, Mr. Benisek) in furtherance of the suspected misrepresentations (to Facebook and to the Court) about the December Agreement. The Court also considers the extent to which litigation counsel had any knowledge about Kickflip's misrepresentations regarding the December Agreement.

To address these issues, the Court has reviewed the 15 Kickflip documents submitted for *in camera* review. The parties discuss these issues in three categories, and the Court will do so as well. As explained below, the Court will order Kickflip to produce the Category 1 documents but will permit Kickflip to withhold the Category 2 and 3 documents, given that the second requirement for application of the crime-fraud exception is not satisfied.

11

1.      **Category 1 Documents**

The first category of documents submitted for *in camera* review consists of documents

for which Kickflip claims attorney-client privilege and work product protection because they

reflect communications with or among counsel regarding legal strategies for prosecuting

Kickflip's case against Facebook, including a summary of Kickflip's document collection efforts.

Two of the 15 documents submitted for review (CTRL00182063, CTRL00182179) fall into

Category 1.  Both of these documents are email chains containing litigation counsel's notes of

conversations with Mr. Smoak about Kickflip's document collection and preservation efforts.

(*Id.*)  As they are factual summaries, the Court views these documents as ordinary work product.

The two documents were primarily selected by Facebook for review because they are the

only documents identified in the privilege logs as "relating to or referring to the failure of Eric

Benisek's hard drive in 2012."  (*See* D.I. 160 at 3; D.I. 150, Ex. F)

Having reviewed the documents *in camera*, the Court finds that they reveal that litigation

counsel were aware of Eric Benisek's computer failure more than two months before disclosing

that fact to Facebook or the Court.[2]  This fact may be relevant to future consideration of the

propriety of sanctions against Kickflip.

Because these emails reflect representations by Kickflip to litigation counsel about

---

[2]*E.g.*, CTRL00182063 at 1 ("Eric told Chris that he has to basically take a backup out and
reformat it.  Chris has spoken with him and will speak with him again.  All that he would have
on that backup that are not otherwise available are drafts.  Eric had a laptop that died, but that
only had drafts and chat logs, so most of it should be available to clients."); CTRL00182063 at 3
("Eric's computer . . . - final documents and email would not have been lost when this machine
failed"); CTRL00182063 at 2 ("Chris is concerned because at the previous deposition he may
have testified that he thought he had everything, but now he realizes some materials have
possible [sic] been lost.").

Kickflip's inability to remember the purpose and motivation for the creation of the December

Agreement in March 2012[3] – which, as explained above, can be reasonably suspected to be false

– the Court finds that these communications were used in furtherance of the suspected fraud on

the Court.  Additionally, the Court finds that: (1) Facebook has a substantial need for these

documents, given that it may need to evaluate whether to pursue sanctions for opposing counsel's

lack of diligence and candor to the Court in representing that there was no basis to doubt the

December Agreement's creation date (*see* D.I. 93 at 1), and (2) Facebook would not be able to

obtain these documents by any other means.

Accordingly, the crime-fraud exception applies to these Category 1 documents, and

Kickflip will be ordered to produce them to Facebook.

## 2.    Category 2 Documents

The second category of documents submitted for *in camera* review consists of documents

for which Kickflip claims attorney-client privilege and work-product protection because they

reflect communications with or among counsel regarding legal strategies for prosecuting its case

against Facebook, including responding to Facebook's request for attorney billing records.  Four

of the documents submitted for review (CTRL00182071, CTRL00182414, CTRL00182056,

CTRL00182057) fall within Category 2.  All four are email chains exchanged among litigation

counsel immediately before and at the time they learned that the December Agreement was

---

[3]*E.g.*, CTRL00182063 at 1 ("Chris has not found, is not aware of, and does not recall any emails with Eric about the purpose/motivation/consideration for the December agreement.  He recently discussed the rational for both agreements with Eric: 1. when we created November agreement, in a hurry – rush; . . .  3. Eric later, through discussions with colleagues, realized that there was a better way to structure the transaction for tax purposes, and at the same time, decided to clarify language about the Facebook claims.").

actually created in March 2012, and they reveal strong reactions and concerns expressed by counsel.[4] (*See* D.I. 159 at 3 ("When counsel discovered the March 2012 creation date, they reacted strongly and voiced speculative concerns – but after thorough investigations, they concluded that the client made a mistake as to the date based on information provided by Mr. Benisek (client's corporate counsel)."))

These emails reflect mental impressions and opinions of the attorneys involved. Thus, the Court views these documents as containing opinion work product, which is subject to greater work product protection than the fact work product that was the subject of the Category 1 documents. Facebook requested these Category 2 documents primarily because of their suspicion of litigation counsel's inadequate candor and diligence regarding their efforts to investigate the true creation date of the December Agreement. (*See* D.I. 160 at 4) As Facebook suspected, review of these documents does reveal a lack of diligence in researching the true creation date of the December Agreement prior to making (false) representations about it.[5]

At the same time, these documents also confirm a lack of awareness among litigation counsel about the December Agreement's true creation date or the reasons why litigation counsel had been led to believe it was created in December 2009.[6] Moreover, only the first set of emails in these chains could be characterized as even arguably being drafted in furtherance of Kickflip's suspected fraud on the Court, and even those were never actually ***used*** in furtherance of that

---

[4]*E.g.*, CTRL00182056 at 1-2. The Court will cite, but not quote from, documents it is not ordering be produced.

[5]*E.g.*, CTRL00182056 at 15-17.

[6]*E.g.*, CTRL00182056 at 2.

14

fraud, as litigation counsel changed course upon learning the true creation date of the December

Agreement.[7]

Accordingly, because these documents are entitled to a higher level of protection as

opinion work product and evidence litigation counsel's lack of knowledge of Kickflip's

suspected fraud on the Court, they are not subject to the crime-fraud exception and need not be

produced to Facebook.

### 3.    Category 3 Documents

The third category of documents submitted for *in camera* review consists of documents

for which Kickflip claims attorney-client privilege and work product protection because they

reflect communications with or among counsel regarding legal strategies for prosecuting its case

against Facebook, including strategies for submitting corrected testimony to the Court.  Nine of

the documents submitted for review (CTRL00182199, CTRL00182409, CTRL00182396,

CTRL00182397, CTRL00182333, CTRL00182334, CTRL00182110, CTRL00182065,

CTRL00182096) fall into Category 3.  Facebook requested these documents for multiple reasons,

including its suspicion that Mr. Smoak did not draft the Smoak Declaration.  (*See* D.I. 160 at 4-5)

One of these documents is an email chain among litigation counsel regarding their

professional responsibilities relating to prior representations about the creation date of the

December Agreement.  (CTRL00182199 at 1)  As this email chain consists of legal theories, the

Court views it as opinion work product  This email further evidences that litigation counsel really

did not know the true creation date of the December Agreement or why they were led to believe

---

[7]*E.g.*, CTRL00182056 at 2.

15

it had been created in December 2009.[8]  Because it does not appear to have been used in furtherance of the suspected fraud on the Court, this email chain is not subject to the crime-fraud exception and need not be produced to Facebook.

Five other documents in Category 3 are emails and an attachment distributed among litigation counsel regarding their efforts to correct the prior misrepresentations made to the Court.  (CTRL00182409, CTRL00182396, CTRL00182397, CTRL00182333, CTRL00182334)  As these documents consist of raw factual information, the Court views them as ordinary work product.  These documents were not used in furtherance of the suspected fraud on the Court; to the contrary, they reveal litigation counsel's efforts to correct prior misrepresentations.  None of these documents warrants application of the crime-fraud exception.[9]

The final three documents in this category are email chains among litigation counsel regarding the Smoak Declaration (CTRL00182110, CTRL00182065) or the Benisek Declaration (CTRL00182110, CTRL00182096).  As these email chains consist of mental impressions and opinions, the Court views them as opinion work product.  These email chains reveal that litigation counsel were involved with drafting efforts leading to the Smoak Declaration, but that Mr. Benisek initially drafted the Benisek Declaration subject to revisions by litigation counsel.[10]  As such, the Court finds that these emails were used in furtherance of the suspected fraud on the Court.  However, because these emails consist of opinion work product, and they contain no evidence that litigation counsel were aware of any false statements in the declarations, the Court

---

[8]*E.g.*, CTRL00182199 at 2.

[9]*E.g.*, CTRL00182396 at 1.

[10]*E.g.*, CTRL00182110 at 2; CTRL00182096 at 2; CTRL00182065 at 2, 3.

16

declines to apply the crime-fraud exception to them, finds that work product protection remains, and will not order that they be produced to Facebook.

## IV.   CONCLUSION

For the foregoing reasons, Kickflip's litigation counsel's documents are not subject to the waiver found by the Court on January 21, 2015 for any time period.  However, due to the application of the crime-fraud exception, Kickflip will be ordered to produce to Facebook the two documents submitted for *in camera* review which fall into Category 1.  The Court will give the parties an opportunity to meet and confer and determine if there are any additional documents being withheld that would fall within Category 1 and, if so, if the parties have any dispute as to whether these documents should be produced by Kickflip.

Kickflip will be permitted to withhold the Category 2 and 3 documents.

An appropriate Order follows.